

**F I L E D**

DEC 12 2024

Heidi D. Campbell, Clerk
U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

RONALD EDWARD DURBIN, II )
)
    Plaintiff, )
)
    v. )
)
OKLAHOMA BAR ASSOCIATION, )
OKLAHOMA SUPREME COURT, )
OKLAHOMA BOARD OF BAR )
EXAMINERS, OKLAHOMA )
PROFESSIONAL RESPONSIBILITY )
COMMISSION, OKLAHOMA )
PROFESSIONAL RESPONSIBILITY )
TRIBUNAL, LANE NEAL, )
BRYAN DIXON, STAN MCCABE, )
GREG MASHBURN, GINA HENDRYX, )
LORAINE FARABOW, SHEILA NAIFEH, )
SHEILA J. NAIFEH, ATTORNEY )
AT LAW, PLLC, 14th JUDICIAL )
DISTRICT OF THE STATE OF )
OKLAHOMA, STATE OF OKLAHOMA, )
SHARON HOLMES, individually and as )
a Judge of the 14th Judicial District, )
MORGAN WILLIAMS, individually and )
as an employee of the 14th Judicial District )
of Oklahoma, LORETTA RADFORD, )
individually and as a Judge of the 14th )
Judicial District of Oklahoma, )
MARIA TERESSA )
TERAN-GROSSNICKLAS, individually, )
CITY OF TULSA, G.T. BYNUM, )
individually and as Mayor of the )
City of Tulsa, BLAKE EWING, )
individually and as Chief of Staff of the )
City of Tulsa, MARK HOGAN, )
individually and as an employee of the )
City of Tulsa, UNIVERSAL PROTECTION )
SERVICE, LP, an Oklahoma Limited )
Partnership, RICHARD LEE )
TESTERMAN, IV, individually and as an )
agent and/or employee of Universal )
Protection, LP and City of Tulsa, )
NATHANIEL MARTINEZ, )

CIVIL RIGHTS COMPLAINT
INJUNCTIVE AND
DECLARATORY RELIEF
42 U.S.C. § 1983 (Freedom of
Speech)
42 U.S.C. § 1983 (Freedom of
Association)
42 U.S.C. § 1983 (Freedom of
Press)
MONETARY DAMAGES

JURY TRIAL DEMANDED

24 CV - 6 0 3 JFH - MTS



individually and as an agent and/or )
employee of Universal Protection, LP and )
City of Tulsa, JOSHUA GRANGER )
individually and as an agent and/or )
employee of Universal Protection, LP )
and City of Tulsa, VANESSA HALL )
HARPER, individually and City Councilor )
for the City of Tulsa, LAURIE DECTER )
WRIGHT, individually and as City )
Councilor for the City of Tulsa, )
LAURA BELLIS, individually and City )
Councilor for the City of Tulsa, )
DANNA MALONE, individually and as an )
employee of Brydie & Associates, PLLC, )
ISAIAH BRYDIE, individually and as an )
Employee of Brydie & Associates, PLLC, )
BRYDIE & ASSOCIATES, PLLC, )
TULSA COUNTY SHERIFF'S )
DEPARTMENT, JOHN CARR, individually )
and as an employee of TCSO, JASON )
TEETER, individually and as an employee )
of TCSO, JOHN BOATMAN, individually )
and as an employee of TCSO, JAMES )
COLLINS, individually and as an employee )
of TCSO, TULSA COUNTY DISTRICT )
ATTORNEY'S OFFICE, DISTRICT )
ATTORNEY STEVE KUNZWEILER, )
TULSA COUNTY COURT CLERK, )
DON NEWBERRY, individually, )
MICHAEL JELSING, individually, )
CHRISTINE JELSING DURBIN, )
Individually, LEANN CRAIN, individually, )
RICHARD CRAIN, individually, )
JUDGE TRACY PRIDDY, )
ANTHONY BRIXEY, individually, )
JOSEPH LANTZ, individually, )
TJB RESTRICTED HOLDINGS, LLC, )
OKLAHOMA COUNTY DISTRICT )
ATTORNEY, VICKI BEHENNA, )
individually and as Oklahoma County )
District Attorney, TAYLOR BURKE, )
individually, BARBER & BARTZ, a )
Professional Corporation, )
JACK MATTINGLY, METRC, LLC, )
OKLAHOMA MEDICAL MARIJUANA )
AUTHORITY, EMERALD X, LLC d/b/a )

*Durbin v. Okla. Bar Ass'n, et al.*
Complaint

MJBIZ CON, OKLAHOMA BUREAU OF )
NARCOTICS AND DANGEROUS DRUGS,)
TRACY PRIDDY, individually and as a )
Judge of the 14th Judicial District, )
MICHAEL MITCHELSON, individually )
and as an agent of the Oklahoma Medical )
Marijuana Authority, ADRIA BERRY, )
Individually and as an employee of the )
Oklahoma Medical Marijuana Authority, )
CASSIDY THOMPSON, individually and )
as an employee of the Oklahoma Medical )
Marijuana Authority, DOUG PEWITT, )
Individually and as District Attorney for )
Ottawa and Delaware Counties, SHEILA )
D. STINSON, individually and as a Judge )
of the 7th Judicial District for the State of )
Oklahoma, 7TH JUDICIAL DISTRICT for )
the State of Oklahoma, VOJISLAV )
HRISTOV, individually, FOX 23, )
IMAGICOMM COMMUNICATIONS, )
LLC, and INSP, LLC., COX RADIO, LLC )
d/b/a KRMG, COX MEDIA, LLC, )
OKLAHOMA ATTORNEY MUTUAL )
INSURANCE COMPANY, DANIEL )
HIGGINBOTTOM, OKLAHOMA CITY )
POLICE DEPARTMENT, OKLAHOMA )
CITY, ALAN BEATY, )
OKLAHOMA HIGHWAY PATROL, )
OKLAHOMA FIRE MARSHALL, )
LAS VEGAS CONVENTION CENTER, )
JOHN DOES 1 & 2 SECURITY GUARD )
FOR LAS VEGAS CONVENTION )
CENTER, ANTHONY SMITH, JOHN )
FRASURE, CARRI LAWRENCE, )
WALLACE LAWRENCE, HIVE )
STAFFING, LLC d/b/a CHRONIC DOCS, )
HONEY COMB HOLDING )
INVESTMENTS, LLC, HEATHER )
KIRK COLLINS, CHAD COLLINS, and )
KURT GLASSCO, CHAD BIBLER )
)
Defendants, )
)
and )
)
ADAM GRANT MILLER, and )

92  TULSA COUNTY COMMISSIONERS,    )
                                   )
    Indispensable parties.         )

## COMPLAINT

### I.    INTRODUCTION- Emergency and Temporary Relief Sought

1. Plaintiff Ronald Edward Durbin, II (hereinafter "Plaintiff"), seeks emergency/temporary and permanent declaratory and injunctive relief to remedy the unconstitutionally improper admission standards, improperly coerced and restricted speech, and coerced association by the State of Oklahoma infringing upon Plaintiff's Federal Constitutional rights and the rights afforded pursuant to the Amendments thereto.

2. Plaintiff seeks emergency/temporary and permanent declaratory and injunctive relief to remedy unconstitutionally coerced membership by the State of Oklahoma in the Oklahoma Bar Association (hereinafter "OBA").

3. Plaintiff seeks emergency/temporary and permanent declaratory and injunctive relief to prohibit the Oklahoma Supreme Court and OBA from punishing Plaintiff for protected activity under the Federal Constitution and the Amendments to it.

4. Plaintiff seeks emergency/temporary and permanent declaratory and injunctive relief to remedy unconstitutionally non-germane activities of Defendants Oklahoma Supreme Court, OBA, and Oklahoma Board of Bar Examiners (hereinafter "OBBE"), related to speech, association, and political ideology.

5. Plaintiff seeks emergency/temporary and permanent declaratory and injunctive relief prohibiting Defendants Oklahoma Supreme Court, OBA, and OBBE from punishing Plaintiff for his association with Adam Grant Miller and from punishing Adam Grant Miller for his association with Plaintiff.

6.  Plaintiff seeks emergency/temporary and permanent declaratory and injunctive relief prohibiting Defendants 14th Judicial District from enforcing Rule 11 of the Local Rules of the Tulsa County District Court, as written because it violates Plaintiff and others' rights under the 1st and 14th Amendments.

7.  Plaintiff seeks emergency/temporary injunctive relief prohibiting Defendants Oklahoma Supreme Court, OBA, PRT, and Defendant trial panel members from proceeding with the trial of Plaintiff next set for December 10, 2024 and continuing on December 12, 2024 and 20th.

8.  Plaintiff seeks emergency/temporary injunctive relief finding that, even if Oklahoma may compel membership and mandatory fees generally, per the custom and practice of Defendant OBA Defendants, the compelled membership and fees violate Plaintiff's Federal Constitutional rights.

9.  Plaintiff seeks emergency/temporary injunctive relief finding that, even if Oklahoma may compel membership and coerced fees for limited regulatory purposes related to its germane activities, Defendant OBA's non-germane activities render compelled membership of Plaintiff unconstitutional.

10. Plaintiff seeks emergency/temporary injunctive relief finding that, even if Oklahoma may compel membership and coerced fees for limited regulatory purposes related to its germane activities, Defendant OBA's opt-out procedures for members to disassociate from Defendant OBA's political and ideological activities are woefully inadequate, and therefore unconstitutional.

11. Even if Oklahoma may compel membership and coerced fees for its limited regulatory purposes, it is IMPOSSIBLE to separate Defendant OBA's use of mandatory fees for non-

germane activities because the non-germane activities related to speech and association permeate every aspect of Defendant OBA's operation from Membership (see Miller facts below) to suspension and disbarment as Defendant OBA seeks of the Plaintiff.

12. Throughout the entire process, Defendant OBA inserts evaluation of associations and speech which are NON-GERMANE to Defendant OBA's mission.

## II.    **JURISDICTION AND VENUE**

13. Plaintiff is a member of the Oklahoma Bar Association and is admitted to practice law in the State of Oklahoma.

14. Plaintiff is presently suspended from Defendant OBA without hearing pending the outcome of Defendant OBA's trial of Plaintiff seeking his disbarment.

15. Plaintiff graduated from the University of Tulsa College of Law, an American Bar Association (hereinafter "ABA") accredited law school, in May of 2009; subsequently, Plaintiff took and passed the Oklahoma Bar Examination, which was officially administered by the Oklahoma Board of Bar Examiners (hereinafter "OBBE"), in Fall 2009.

16. The Oklahoma Supreme Court admitted Plaintiff to practice law in the Fall 2009 and he has continuously maintained good standing since that time while actively engaging in the practice of law.

17. Until the filing of the action at issue in this matter by Defendant OBA, Plaintiff was NEVER disciplined, either formally or informally, for any wrongdoing as an attorney.

18. Plaintiff resides in the Northern District of the State of Oklahoma.

19. Defendant Oklahoma Supreme Court is a political subdivision of the State of Oklahoma.

20. Defendant OBA is a political subdivision of the State of Oklahoma created by the Oklahoma Supreme Court.

21. Defendant OBA maintains significant connections throughout the State of Oklahoma, including the Northern District of Oklahoma.

22. Defendant OBBE is a political subdivision of the State of Oklahoma created by the Oklahoma Supreme Court under the Oklahoma Bar Association managing the admission of ALL attorneys throughout the State of Oklahoma, including attorneys located in the Northern District of Oklahoma such as the Plaintiff.

23. Defendant Oklahoma Professional Responsibility Commission (hereinafter "PRC") is a subdivision of the State of Oklahoma created by the Oklahoma Supreme Court under the Oklahoma Bar Association operating and overseeing attorneys across the entire State of Oklahoma including the Northern District of Oklahoma.

24. Defendant Oklahoma Professional Responsibility Tribunal (hereinafter "PRT") is a subdivision of the State of Oklahoma, created by the Oklahoma Supreme Court under the Oklahoma Bar Association, which oversees attorneys throughout the entire State of Oklahoma, including attorneys in the Northern District of Oklahoma.

25. Defendant Lane Neal (hereinafter "Neal") is sued in his individual capacity and in his official capacity as the Chief Master of the PRT.

26. Defendant Neal hand-picked the Members of the three member Trial Panel to ensure Plaintiff's constitutional rights were infringed and disbarment obtained.

27. Defendant Bryan Dixon (hereinafter "Dixon") is sued in his individual capacity and as Presiding Master of the PRT overseeing the proceedings against Plaintiff as assigned by the Oklahoma Supreme Court.

28. Defendant Dixon's actions and/or inactions directly and intentionally interfered with Plaintiff's constitutional rights and Dixon conspired with one or more Co-Defendants to

operate a system which systematically infringes upon the rights of Plaintiff and other applicants to practice law in the State of Oklahoma.

29. Defendant Stan McCabe (hereinafter "McCabe") is sued in his official capacity only as a non-lawyer member of the PRT who conspired with one or more Co-Defendants to operate a system which systematically infringes upon the rights of Plaintiff and other applicants to practice law in the State of Oklahoma.

30. Defendant Greg Mashburn (hereinafter "Mashburn") is sued in his official capacity only as the lawyer member of the PRT who conspired with one or more Co-Defendants to operate a system which systematically infringes upon the rights of Plaintiff and other applicants to practice law in the State of Oklahoma.

31. Defendant Gina Hendryx (hereinafter "Hendryx") is sued in her individual capacity and official capacity as the General Counsel for the Oklahoma Bar Association.

32. Defendant Loraine Farabow (hereinafter "Farabow") is sued in her individual capacity and official capacity as the Assistant General Counsel for the Oklahoma Bar Association.

33. Defendant Les Arnold (hereinafter "Arnold") is sued in his individual capacity and official capacity as an employee and agent of Defendant Oklahoma Bar Association.

34. Defendant Shelia Naifeh (hereinafter "Naifeh") is a Tulsa attorney who had been hired by Plaintiff to represent him and then conspired with one or more Defendants to obtain Plaintiff's suspension from the practice of law in Oklahoma, which constitutes one issue in this matter. Specifically, she colluded with Defendants Hendryx and Farabow against Plaintiff.

35. Defendant Naifeh resides in the Northern District of Oklahoma.

36. Defendant Sheila J. Naifeh, Attorney at Law, PLLC (hereinafter "Naifeh PLLC") is an Oklahoma Professional Limited Liability Company.

37. Defendant 14th Judicial District is a political subdivision of the State of Oklahoma located in the Northern District of Oklahoma.

38. Defendant State of Oklahoma is a political subdivision of the United States of America.

39. Defendant Sharon Holmes (hereinafter "Holmes"), as an individual, resides in the Northern District of Oklahoma.

40. Defendant Holmes, in her official capacity as a Judge of the 14th Judicial District, operates in the Northern District of Oklahoma.

41. Defendant Morgan Williams (hereinafter "Williams"), as an individual, resides in the Northern District of Oklahoma.

42. Defendant Williams, in her official capacity as an employee of the 14th Judicial District, operates in the Northern District of Oklahoma.

43. Defendant Loretta Radford (hereinafter "Radford"), as an individual, resides in the Northern District of Oklahoma.

44. Defendant Radford, in her official capacity as an employee of the 14th Judicial District, operates in the Northern District of Oklahoma.

45. Defendant Maria Teressa Teran-Grossnicklas (hereinafter "Teran") is a resident of the State of Oklahoma.

46. Defendant City of Tulsa (hereinafter "Tulsa") is a political subdivision of the State of Oklahoma located in the Northern District of Oklahoma.

47. Defendant G.T. Bynum (hereinafter "Bynum") is sued herein individually and in his official capacity as Mayor of the City of Tulsa.

48. Defendant Bynum resides in the Northern District of Oklahoma.

49. Defendant Blake Ewing (hereinafter "Ewing") is sued herein individually and in his official capacity as Chief of Staff of the City of Tulsa.

50. Defendant Ewing resides in the Northern District of Oklahoma.

51. Defendant Mark Hogan (hereinafter "Hogan") is sued herein individually and in his official capacity as Facility Manager for the City of Tulsa.

52. Defendant Hogan resides in the Northern District of Oklahoma.

53. Defendant Universal Protection Service, LP (hereinafter "Universal") is an Oklahoma Limited Partnership operating in Tulsa, Oklahoma located in the Northern District.

54. Defendant Richard Lee Testerman IV (hereinafter "Testerman") is sued herein individually and in his official capacity as an employee of Universal Protection Service, LP and an agent of the City of Tulsa.

55. Upon information and belief, Defendant Testerman resides in the Northern District of Oklahoma.

56. Defendant Nathaniel Martinez (hereinafter "Martinez") is sued herein individually and in his official capacity as an employee of Universal Protection Service, LP and an agent of the City of Tulsa.

57. Upon information and belief, Martinez resides in the Northern District of Oklahoma.

58. Defendant Joshua Granger (hereinafter "Granger") is sued herein individually and in his official capacity as an employee of Universal Protection Service, LP and an agent of the City of Tulsa.

59. Upon information and belief, Granger resides in the Northern District of Oklahoma.

60. Defendant Vanessa Hall Harper (hereinafter "Harper") is sued individually and in her official capacity as a City Councilor for the City of Tulsa.

61. Upon information and belief, Harper resides in the City of Tulsa, Oklahoma located in the Northern District of Oklahoma.

62. Defendant Lori Decter Wright (hereinafter "Wright") is sued in her official capacity as a City Councilor for the City of Tulsa.

63. Upon information and belief, Wright resides in the City of Tulsa, Oklahoma located in the Northern District of Oklahoma.

64. Defendant Laura Bellis (hereinafter "Bellis") is sued in her official capacity as a City Councilor for the City of Tulsa.

65. Upon information and belief, Bellis resides in the City of Tulsa, Oklahoma located in the Northern District of Oklahoma.

66. Defendant Danna Malone (hereinafter "Malone") is an individual residing in Tulsa County, State of Oklahoma, located in the Northern District.

67. Defendant Isaiah Brydie (hereinafter "Brydie") is an individual residing in Tulsa County, State of Oklahoma, located in the Northern District.

68. Defendant Brydie & Associates, PLLC (hereinafter "Brydie & Assocs.") is an Oklahoma professional limited liability company located in Tulsa County, State of Oklahoma, located in the Northern District.

69. Defendant Tulsa County Sheriff's Department (hereinafter "TCSO") is a law enforcement agency of the State of Oklahoma located in the Northern District.

70. Defendant John Carr (hereinafter "Carr") is sued in his individual capacity and as a law enforcement officer employed by TCSO.

71. Carr resides in the Northern District of Oklahoma.

72. Defendant Jason Teeter (hereinafter "Teeter") is sued in his individual capacity and official capacity as a law enforcement officer employed by TCSO.

73. Teeter resides in the Northern District of Oklahoma.

74. Defendant John Boatman (hereinafter "Boatman") is sued in his individual capacity and official capacity as a law enforcement officer employed by TCSO.

75. Boatman resides in the Northern District of Oklahoma.

76. Defendant James Collins (hereinafter "Collins") is sued in his individual capacity and official capacity as a law enforcement officer employed by TCSO.

77. Collins resides in the Northern District of Oklahoma.

78. Defendant Tulsa County District Attorney's Office (hereinafter "Tulsa DA") is a political subdivision of the State of Oklahoma operating in Tulsa County, State of Oklahoma, located in the Northern District of Oklahoma.

79. Defendant District Attorney Steve Kunzweiler (hereinafter "Kunzweiler") is sued individually and in his official capacity as a District Attorney for the Tulsa DA.

80. Kunzweiler is located in Tulsa County, State of Oklahoma, located in the Northern District of Oklahoma.

81. Defendant Tulsa County Court Clerk (hereinafter "Tulsa Clerk") is a political subdivision of the State of Oklahoma located in the Northern District of Oklahoma.

82. Defendant Don Newberry (hereinafter "Newberry") is sued in his individual capacity and official capacity as the duly elected Court Clerk for Tulsa County.

83. Upon information and belief, Newberry is a resident of Tulsa County, State of Oklahoma, located in the Northern District of Oklahoma.

84. Defendant Michael Jelsing (hereinafter "Jelsing") is a resident of Tulsa, Oklahoma, located in the Northern District of Oklahoma.

85. Defendant Christine Jelsing Durbin (hereinafter "C Durbin") is a resident of Tulsa, Oklahoma, located in the Northern District of Oklahoma.

86. Defendant Leann Crain (hereinafter "Mrs. Crain") is a resident of Tulsa, Oklahoma, located in the Northern District of Oklahoma.

87. Defendant Richard Crain (hereinafter "Mr. Crain") is a resident of Tulsa, Oklahoma, located in the Northern District of Oklahoma.

88. Tracy Priddy (hereinafter "Priddy") is sued in her individual capacity and official capacity as a Judge of the 14th Judicial District.

89. Defendant Anthony Brixey (hereinafter "Brixey") is a resident of Delaware County, State of Oklahoma, located in the Northern District of Oklahoma.

90. Defendant Joseph Lantz (hereinafter "Lantz") is a resident of Delaware County, State of Oklahoma, located in the Northern District of Oklahoma.

91. TJB Restricted Holdings, LLC (hereinafter "TJB") is an Oklahoma limited liability Company with its offices located in Delaware County, State of Oklahoma.

92. Defendant Oklahoma County District Attorney (hereinafter "Oklahoma DA") is a political subdivision of the State of Oklahoma.

93. Defendant Vicki Behennan (hereinafter "Behannan") is a resident of Oklahoma County, State of Oklahoma.

94. Defendant Taylor Burke (hereinafter "Burke") is a resident of Tulsa County, State of Oklahoma.

95. Defendant Barber & Bartz, a professional corporation (hereinafter "Barber Bartz") is an Oklahoma professional corporation operating in Tulsa County, State of Oklahoma, located in the Northern District of Oklahoma.

96. Defendant Jack Mattingly (hereinafter "Mattingly") resides in the State of Oklahoma.

97. Defendant Metrc, LLC (hereinafter "Metrc") is a Florida limited liability company operating in the State of Oklahoma.

98. Defendant Emerald X, LLC (hereinafter "Emerald") is a Delaware limited liability company with offices in California, Colorado, and New York.

99. Defendant Emerald does business as MJBIZ CON operating in Las Vegas, Nevada.

100.    Defendant Oklahoma Medical Marijuana Authority (hereinafter "OMMA") is a political subdivision of the State of Oklahoma.

101.    Defendant Michael Mitchelson (hereinafter "Mitchelson") is sued in his individual capacity and official capacity as an Administrative Law Judge for Defendant OMMA.

102.    Defendant Adria Berry (hereinafter "Berry") is sued in her individual capacity and official capacity as Director of Defendant OMMA.

103.    Berry resides in the State of Oklahoma.

104.    Defendant Cassidy Thompson (hereinafter "Thompson") is sued in her individual capacity and official capacity as an employee of Defendant OMMA.

105.    Thompson resides in the State of Oklahoma.

106.    Defendant Doug Pewitt (hereinafter "Pewitt") is sued in his individual capacity and official capacity as District Attorney for Ottawa and Delaware Counties, State of Oklahoma, located in the Northern District of Oklahoma.

107.    Defendant Pewitt resides in the Northern District of Oklahoma.

108.    Defendant Sheila D. Stinson (hereinafter "Stinson") is sued in her individual capacity and official capacity as a Judge of the 7th Judicial District for the State of Oklahoma.

109.    Defendant 7th Judicial District is a political subdivision of the State of Oklahoma.

110.    Defendant Vojislav Hristov (hereinafter "Hristov") is an individual residing in the United States of America.

111.    Defendant FOX 23 (hereinafter "Fox") is a news station located in Tulsa County, State of Oklahoma, located in the Northern District of Oklahoma.

112.    Defendant IMAGICOMM Communications, LLC d/b/a Fox 23 (hereinafter "I Comms.") is a limited liability company registered in the State of Delaware and doing business in the Northern District of the State of Oklahoma.

113.    Defendant INSP, LLC (hereinafter "INSP") is a limited liability company registered in the State of Delaware doing business in the State of Oklahoma.

114.    Cox Radio, LLC (hereinafter "Cox Radio") is an Oklahoma limited liability company.

115.    Cox Media, LLC (hereinafter "Cox Media") is a Delaware limited liability company doing business in the State of Oklahoma.

116.    Defendant Oklahoma Attorney Mutual Insurance Company (hereinafter "OAMIC") is an Oklahoma registered insurance company operating in the Northern District of Oklahoma.

117.    Defendant Daniel Higginbottom (hereinafter "Higginbottom") is sued individually and in his official capacity as a police officer for the Oklahoma City Police Department, a political subdivision of Oklahoma City.

118.    Defendant Oklahoma City Police Department (hereinafter "Oklahoma City PD") is a law enforcement agency falling under the control of Oklahoma City, State of Oklahoma.

119.    Defendant Oklahoma City is a political subdivision of the State of Oklahoma.

120.   Oklahoma Highway Patrol is a law enforcement agency of the State of Oklahoma.

121.   The Las Vegas Convention Center is a public interest corporation owned by the government of the State of Nevada and the City of Las Vegas, Nevada via the Las Vegas Convention and Visitors Authority.

122.   Security Guards John Does 1 & 2 are sued individually and in their official capacities as agents and/or employees of Defendant Law Vegas Convention Center.

123.   Anthony Smith is an individual residing in the State of Oklahoma.

124.   Defendant John Frasure (hereinafter "Frasure") is an individual residing in the State of Oklahoma.

125.   Defendant Carri Lawrence (hereinafter "Mrs. Lawrence") is an individual residing in the State of Oklahoma.

126.   Defendant Wally Lawrence (hereinafter "Mr. Lawrence") is an individual residing in the State of Oklahoma.

127.   Defendant Hive Staffing, LLC d/b/a Chronic Docs is an Oklahoma limited liability company.

128.   Defendant Honey Comb Holding Investments, LLC (hereinafter "HCHI") is an Oklahoma limited liability company.

129.   Defendant Heather Kirk Collins (hereinafter "Mrs. Collins") is an individual residing in the State of Oklahoma.

130.   Defendant Chad Collins (hereinafter "Mr. Collins") is an individual residing in the State of Oklahoma.

131.   Defendant Kurt Glassco (hereinafter "Glassco") is sued in his individual capacity and official capacity as a judge of the 14th Judicial District.

132.   Indispensable Party Adam Grant Miller (hereinafter "Miller"), as detailed below, was denied entry in the Oklahoma Bar Association based on political speech and association with Plaintiff.

133.   Plaintiff challenges the ability of the State of Oklahoma to deny and/or punish bar members for political speech or punish those who associate with them, even when such conduct and/or association occurs prior to the application for admission to the OBA.

134.   Additionally, Defendant OBBE denied Miller's admission to Defendant OBA in part due to his association with Plaintiff, and as such, Miller's constitutionally protected rights could be impacted by this matter.

135.   Therefore, Plaintiff lists Miller out of an abundance of caution as a potentially indispensable party.

136.   Defendant Tulsa County Commissioners control the buildings occupied by the 14th Judicial District, and as such, they have an interest in the matters herein.

137.   Plaintiff's claims arise out of the Constitution of the United States and laws of the United States of America and is brought pursuant to 42 U.S.C. § 1983.

138.   This Court has jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343.

139.   This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to hear all nonfederal question claims contained herein as said claims are inextricably linked to the acts and/or omissions giving rise to the federal question claims.

140.   This case is properly filed in the United States District Court for the Northern District of Oklahoma pursuant to 28 U.S.C. §1391 as the judicial district wherein numerous Defendants reside and operate and where most of the relevant events occurred.

141.   At all times relevant hereto, Plaintiff was a citizen of the United States and a resident of

Tulsa County, State of Oklahoma.

142.    Defendants employed and/or acting as agents for the State of Oklahoma and/or any political subdivision thereto are properly sued directly under 42 U.S.C. § 1983 for their deliberately indifferent unconstitutional decisions, practices, policies, habits, customs, usages, training and derelict supervision, ratification, acquiescence and intentional failures which directly contributed to and/or caused the complained of constitutional and statutory violations and injuries of Plaintiff Ronald E. Plaintiff, II (hereinafter "Plaintiff and/or "Plaintiff").

143.    Plaintiff acknowledges this Court's likely need to bifurcate matters contained herein.

144.    Plaintiff does not object to this Court's division of the matter for adjudication in the manner it deems appropriate, provided that he be provided notice and an opportunity to respond beforehand.

## III.    GENERAL FACTS

145.    On June 26, 2018, the State of Oklahoma passed State Question 788 dealing with medical marijuana use in the State of Oklahoma.

146.    Plaintiff became an outspoken advocate for the protection of business and patient rights established under State Question 788.

147.    Plaintiff's advocacy consisted, in part, of him informing the public, via his Facebook Page, as to the current events in Oklahoma cannabis legislatively, legally, administratively, and otherwise.

148.    Plaintiff broadcast live videos on a Facebook Page he set up to share information with the public.

149.   Unknowingly and unintentionally, Plaintiff became a well-respected source of information regarding medical marijuana in Oklahoma on top of already being an active practicing attorney; for all intents and purposes, this newfound role was effectively that of a journalist.

150.   Over the years, the name of the Facebook Page changed depending on how Plaintiff decided to brand his content at the time.

151.   Plaintiff, individually, controlled his Facebook Page and never granted another entity and/or individual control over the message or posts thereon.

152.   Facebook restricted Plaintiff from changing the name as often as he would like due to policies on the platform limiting the manner and timing of allowed name changes.

153.   Beginning in 2018 and working through today, Plaintiff amassed a Facebook page with over 20,000 followers.

154.   As of October 25, 2024, Plaintiff's Facebook page has 20,197 followers consisting of 48.5% men and 51.5% women. *See* Audience from Plaintiff Facebook Page attached hereto as **Exhibit** "**A**."

155.   On Plaintiff's Facebook Page, Plaintiff alerted other concerned citizens to events in the cannabis space related to regulation, and using the Facebook platform, he called numerous rallies against the OMMA, the OBNDD, the Oklahoma State Fire Marshall, Defendant OBA, and other agencies of the State of Oklahoma.

156.   Plaintiff regularly uses his Facebook page to engage in political speech regarding numerous issues of state and national concern.

157.   In addition to the Facebook Page, Plaintiff's adult son created a company named Guerrilla Publishing, LLC and a YouTube Channel named "Guerrilla Publishing."

158.    Plaintiff works with his son on the Guerrilla Publishing YouTube Channel, and in doing so, they produce regular news content.

159.    Plaintiff owns no portion of Guerrilla Publishing, LLC and does not control any decisions of the company, despite effectively being the "spokesperson" for the brand.

160.    As of October 25, 2024, the Guerrilla Punishing YouTube Channel boasts 62,803 subscribers with more than 5,000 subscribers added in the last 28 days alone. *See* Guerrilla Publishing Subscribers attached hereto as **Exhibit "B."**

161.    The abuses outlined by Plaintiff included, among many things, revelations of corruption in the Administrative Judge used by the OMMA and in the legal offices of the OMMA.

162.    Plaintiff regularly uses his Facebook page to post about the conduct of judges (district court judges are elected in Oklahoma) and other political officials in the State of Oklahoma and nationally.

163.    Plaintiff revealed on video Defendant Holmes engaging in felonious drinking and driving with a minor child. *See* Judge Holmes Video attached hereto as **Exhibit "C."**

164.    Aside from the Judge Holmes Video, Plaintiff released at least two (2) other videos regarding Defendant Holmes and he was vocal in his strong criticism of the Oklahoma Supreme Court, Defendant OBA, and others, in personal and official capacities, for their failures to take expeditious action against her. *See* Judge Holmes Video 2 and Video 3 attached hereto as **Exhibits "D" and "E"** respectively.

165.    Plaintiff qualifies as press for purposes of protections afforded pursuant to the 1st Amendment to the Federal Constitution.

166.    Using his Facebook page and the Guerrilla Publishing YouTube Channel, Plaintiff regularly engages in newsgathering and news sharing activities protected by the First Amendment of the United States Constitution.

167.    To date, videos published by Plaintiff and Guerrilla Publishing have generated more than ten million (10,000,000) combined views, not including views from those sharing the videos on other social media platforms (for example, despite not posting on TikTok, videos posted by others taken from the Guerrilla Publishing's YouTube have independently generated millions of views on that platform).

168.    Clearly, the content produced by Plaintiff and Guerrilla Publishing constitute matters of public concern and importance as evidenced by the sheer volume of direct and intentional engagement by the public at large.

169.    Content published by Plaintiff is not always flattering to government, and specifically, Plaintiff regularly criticizes the Oklahoma Judiciary, the Oklahoma Supreme Court, Oklahoma Supreme Court Justices, Oklahoma judges, and Oklahoma attorneys.

170.    Without a doubt, Plaintiff has used almost every curse word and other derogatory phrase which came to his mind to describe the conduct of the Oklahoma Judiciary and, if he did not say it, he certainly thought it.

171.    Plaintiff DOES NOT expect this Court, nor any court for that matter, to like his behavior outside of Court, respect it, condone it, or find it in any way tasteful but, as this Court well knows, civil appropriateness and constitutional protection are not intrinsically linked to each other.

172.    Frankly, if this Court found the messaging of Plaintiff any of those things, it would not resonate as well with the public at which it is targeted.

173.    Plaintiff begs this Court, unlike the Defendants, not to judge and punish Plaintiff because it does not like the words used by Plaintiff.

174.    As the saying goes, one man's curse word is another man's lyric.

175.    Although it is socially acceptable, and arguably the norm of many, to dislike the communicative delivery methods employed by Plaintiff outside of Court, those methods are still constitutionally protected activities. Similarly, the Court held in *Supreme Court of N. H. v. Piper* (470 U.S. 274) that the right to practice law, like the right to pursue other occupations, is protected under the Privileges and Immunities Clause of Art. IV, §2 of the U.S. Constitution. It is manifestly unconstitutional to require Plaintiff sacrifice or otherwise restrict one constitutionally protected right in order to benefit from another constitutionally protected right- this is a lesson the Court must teach the OBA Defendants.

176.    As the Court reads through the myriad of allegations against Plaintiff, there becomes no doubt he, in an individual, unofficial capacity, referred to an administrative hearing officer, OUTSIDE OF COURT, as Captain Kangaroo after witnessing firsthand the sham proceedings conducted by Mitchelson.

177.    Plaintiff no doubt referred to a District Attorney as a Scumbag in a Facebook post after Pewitt referred to Plaintiff's client as a "scum" in court that morning.

178.    The State of Oklahoma's judicial system consists of twenty-six (26) different judicial districts encompassing Oklahoma's seventy-seven (77) counties.

179.    The 14th Judicial District consists of Tulsa and Pawnee Counties.

180.    The Tulsa County District Court operates in multiple buildings including the Tulsa County Building located at 500 S. Denver, Tulsa, OK 74103 (hereinafter the "County Building").

181.    The County Building, besides providing space to Defendant 14th Judicial District, also
houses government offices for at least the following: i) Passport Office, ii) Tulsa County
Court Clerk, iii) Marriage Licenses, iv) Tulsa County Clerk (Land Records), v) Tulsa County
Tax Assessor, vi) Tulsa County District Attorney, and vii) Tulsa County Sheriff's
Department.

182.    Operational control of the Tulsa County Building at issue herein is vested with the Tulsa
County Commissioners, pursuant to Title 19, Section 863.1 et seq. of the Oklahoma Statutes,
and such power is to be exercised by duly elected officials of Tulsa County.

183.    Only the Tulsa County Commissioners, and not Defendant 14th Judicial District, may
adopt rules and regulations for portions of the building under its dominion and control.

184.    Aside from the individual courtrooms, the Tulsa County Commissioners control every
aspect of the County Building.

185.    While the Judges of the 14th Judicial District may cancel court, they have ZERO
AUTHORITY to close or otherwise restrict public access to the County Building.

186.    The 14th Judicial District possesses such little power over the County Building that it
cannot keep the building open and operating on its own accord. The 14th Judicial District
previously acknowledged this lack of authority when it comes to operation of the County
Building, affirmatively assenting their subservience to the County Commissioners. *See* Rule
12 of the Local Rules providing for procedures if the County Commissioners close the
building attached hereto as **Exhibit** ____.

187.    Plaintiff concedes Defendant 14th Judicial District possesses inherent power to control
its operations over the courtrooms themselves and ensure the smooth operation of the courts.

188.    In doing so, Plaintiff further concedes the 14th Judicial District may properly restrict certain otherwise constitutionally protected activities within its limited dominion and control provided such limitations imposed are narrowly tailored to achieve a compelling government purpose.

189.    On July 13, 2011, the Tulsa County Judges adopted the Local Rules of the Tulsa County District Court (hereinafter "Local Rules"). *See* Local Rules attached hereto as **Exhibit** "**F**."

190.    Rule 11 of the Local Rules is titled: "Photographing, Recording, Broadcasting and Televising Judicial Proceedings[.]"

191.    Rule 11 provides:

1.  Except as expressly permitted by the individual Judge, the use of cameras, television and other recording and broadcasting equipment is prohibited:

    a.  Inside a courtroom

    b.  In the immediate vicinity of a courtroom, including the hallways, with the exception of that hallway between the public elevators.

192.    Rule 11 is not narrowly tailored to achieve a compelling government interest, and as such, it is per-se unconstitutional.

193.    Additionally, Rule 11 is overly vague and unduly burdensome, and as such, it is unconstitutional on its face.

194.    Rule 11's use of a phrase like "immediate vicinity," without creating a bright line to properly define the phrase, creates nothing more than a ripe opportunity for debate among people about what constitutes "immediate vicinity" and a chance for the government to unlawfully overreach, suppressing constitutionally protected activities in the process. Is someone in the "immediate vicinity" if they are approximately five (5) feet away? What about six (6) feet

away?    The inherent vagueness of the phrase is readily apparent and does not pass constitutional muster in its current form.

195.    The County Building lays out differently on each floor, and the areas between the elevator differ depending on which floor one is located.  On some floors, despite being located between the elevators, one would find themselves within five feet of a courtroom.  Would they then be in the "immediate vicinity" of the courtroom?  Reasonable minds would disagree resulting in disparate enforcement.

196.    Rule 11 restricts activity in the Tulsa County building outside of the areas controlled by the 14th Judicial District and, as such, any rule by the 14th Judicial District restricting the public's access to portions of the County Building outside its purview, if constitutional at all, must be adopted by the Tulsa County Commissioners since they hold operational control of the Tulsa County building.

197.    Rule 11 language need not be overly vague.  Use of feet in the rule and/or physical signs of demarcation inside the County Building would reasonably serve to notify the public of the behavior allowed and disallowed and where such behavior is allowed and disallowed inside the County Building.

198.    As it stands now, the public is left to guess, where they may engage in constitutionally protected 1st Amendment activity, and where such activity is restricted in the County Building.

199.    Rule 11 by its express language and by its enforcement unfairly and unconstitutionally targets freedom of the press guaranteed by the United States Constitution and the equal protection afforded therein.

200. Rule 11, as enforced and detailed below, targets media as those utilizing cell phones to record are not subject to the same recording restrictions.

201. As it relates specifically to the press, Rule 11 expressly provides:

> It should be emphasized that the representatives of the news media are expected to conduct themselves at all times in a professional manner consistent with the spirit and intent of this directive. In order to insure (sic) such conduct, if conduct of the news media which is violative of the foregoing rules is brought to the attention of any Judge, the offending person shall be notified immediately to cease and desist such activity. If the offending party refuses to comply with the order, then the Judge may immediately command his or her personnel to take affirmative action to end such activity, including the seizure of the equipment of such person. Any offender may be dealt with for contempt of Court.

202. Rule 11 does not even pretend to be facially neutral towards everyone. It per se discriminates against members of the press and subjects them to a warrantless search of their persons, warrantless seizure of their equipment, and potential jail via contempt, all for engaging in behavior which all other members of the public may freely engage without the fear of retribution and incarceration.

203. Worry not, while Defendant 14th Judicial District had no issue restricting the press' rights in whatever way they deemed appropriate, the judges gave themselves an out to do as they please should it suit them by allowing any judge to grant permission for recording in any situation the judge sees fit including their own "broadcasting interviews with any television station . . . " *See Id.*

I.   **FACTS AND CLAIMS AGAINST DEFENDANTS OKLAHOMA BAR ASSOCIATION, OKLAHOMA SUPREME COURT, OKLAHOMA BOARD OF BAR EXAMINERS, OKLAHOMA PROFESSIONAL RESPONSIBILITY COMMISSION, OKLAHOMA PROFESSIONAL RESPONSIBILITY TRIBUNAL, LANE NEAL, BRYAN DIXON, STAN MCCABE, GREG MASHBURN, GINA HENDRYX, LORAINE FARABOW, and LES ARNOLD (collectively the "OBA DEFENDANTS).**

   A.   **FACTS RELATED TO CLAIMS AGAINST DEFENDANT OBA DEFENDANTS**

### A.1 Facts Related to OBA's First Amended Complaint Resulting in Plaintiff's Interim Suspension WITHOUT HEARING:

#### (i)   The Malone Grievance

204.   Count 1 of Defendant OBA's Complaint against Plaintiff, titled "The Malone Grievance", notes the Complainant, Dana Malone, "began working on state questions related to the medical marijuana industry." *OBA First Amended Complaint* at ¶ 6. See First Amended Complaint attached hereto as Exhibit "G."

205.   Defendant OBA notes Plaintiff's opposition to Malone's work related to the state question, and referenced posts made to Plaintiff's Facebook page regarding the same. *Id*. at ¶ 7.

206.   Defendant OBA further noted that Malone alleged Plaintiff "has become a bully w/in the Cannabis industry & he expects people w/in the industry to do what he says, when he says & do it how he says." *Id*. at ¶ 9.

207.   Malone also complained Plaintiff "has an over inflated ego that makes him think that everyone should or does worship him." *Id*.

208.   Defendant OBA alleges, after Plaintiff received the Malone Grievance, he then, despite the grievance, "engaged in a Facebook live session . . . wherein he made profanity laced comments and disparaged Malone by calling her and others within her group '… the idiots that are behind 811, 812, and 813.'" *Id*. at ¶ 12.

209.   Malone, being advised of Plaintiff's public comments on his Facebook live, Defendant OBA alleges Plaintiff went to his Facebook page and posted a comment to which Plaintiff, after reading Malone's comment aloud, "threatened he was 'coming for [her] and [her] business." *Id*. at ¶ 13.

210. Defendant OBA noted further alleged Plaintiff "'strongly discourage[ed]' people from doing business with her' and that Plaintiff referred to Malone as "a piece of shit" and stated that the people behind 812 and 813 'are some of the biggest morons we have in the state."

211. On May 27, 2020, Malone filed another grievance against Plaintiff alleging similar things regarding statements made about Malone by Plaintiff on his Facebook page. *Id*. at ¶ 19.

212. Defendant OBA, by its own admission, after receiving the Malone Grievance, threatened Plaintiff with discipline if he spoke publicly about the Malone Grievance. *Id.* at ¶ 26.

213. Any restriction on an attorney to discuss a complaint against them violates their constitutional rights and no restriction survives constitutional scrutiny.

214. Defendant OBA also "discussed with Respondent that his public comments . . . may be in violation of his professional duties." *Id*.

215. Defendant OBA also noted that it threatened Plaintiff of action against him for using "abusive, threatening, and foul language" because it "reflected on him as a member of Defendant OBA and the legal profession as a whole[.]" *Id.*

216. Defendant OBA notes further that, at that meeting, Defendant OBA compelled Respondent to remove the Facebook Live about Dana Malone, although Defendant OBA says that such removal was "of his own volition . . . ." *Id*. at ¶ 27.

217. Plaintiff DID NOT remove the post by his own volition but due to the threats of Defendant OBA.

218. Defendant OBA alleges that Plaintiff's behavior, as it relates to the Malone Grievance, violates Rules 4.4(a), 8.4(a) of the Oklahoma Rules of Professional Conduct and RGDP 1.3 and 5.4. *Id*. at ¶ 29.

     (ii)    **The Holmes and Williams Grievances:**

219. The Holmes and Williams Grievances (hereinafter "Holmes Grievance") specifically relates to the First Amendment of the United States Constitution.

220. Defendant OBA, quoting Rule 11, notes, "Tulsa County District Court Local Rules . . . prohibit the use of cameras, television and other recording or broadcasting equipment '[i]n the immediate vicinity of a courtroom, including the hallways . . .' to ensure courtroom proceedings are conducted at all times with the dignity and in a manner calculated to avoid the disruption of order and decorum which the judicial process demands." First Amended Complaint at ¶102.

221. Defendant OBA fails to note in its First Amended Complaint, that, in Oklahoma, the Courts, including the 14th Judicial District at issue here, are TENANTS of the County Building in which they reside.

222. Defendant 14th Judicial District, as TENANTS, do not possess the authority to even close the building, as that power is reserved to County Supervisors. *See* Facts Related to Rule 11 discussed below.

223. Defendant OBA further states Defendant Williams, "advised the reporters that there is a specifically designated area of the courthouse where media are permitted to conduct interviews . . . ." *Id*. at ¶ 103.

224. Defendant OBA then states Plaintiff, "began yelling at Williams demanding to know where this policy was and what the policy was." *Id*. at ¶ 104.

225. That is not what transpired as Plaintiff, upon leaving another courtroom, observed Williams yelling at reporters about conducting interviews in the County Building hallway.

226. Plaintiff, being a strong advocate of the 1st Amendment, despite not being the one Defendant Williams was yelling at, came to the defense of the reporters and asked what rule Defendant William's referred to when it came to recording.

227. Defendant Williams became further irrationally agitated, and she threatened to "get her judge," to which Plaintiff replied Defendant Williams was free to do as she pleased.

228. Plaintiff, Plaintiff's client Indispensable Party Grant Miller, Defendant Burke, and the gaggle of reporters, then walked to the elevators and began waiting for them to arrive to depart to the bottom floor of the County Building.

229. While waiting, Plaintiff decided to begin recording, and that recording, titled "Press Recording" is attached hereto as Exhibit "H."

230. Plaintiff began recording before Defendant Holmes appeared because Plaintiff knew of Defendant Holmes volatile nature and temperament, and Plaintiff believed that if she appeared, recording Defendant Holmes would prevent any disputes as to what transpired.

231. Plaintiff recorded not knowing if Defendant Holmes would appear, but rather Plaintiff did so out of an abundance of caution due to prior dealings of Plaintiff with Defendant Holmes when Defendant Holmes was drunk.

232. Plaintiff adopts and incorporates the sights and sounds depicted in the Press Recording as if they were fully laid out herein.

233. Defendant OBA states that, "Williams went to the courtroom and advised Judge Holmes of the situation. When Judge Holmes came out to the hallway where Respondent and the media were congregated, Respondent pulled out his cellphone and told her she was being recorded." *Id*. at ¶ 108.

234. Prior to Defendant Holmes appearing in the hallway of the Tulsa County Building, Plaintiff, while standing "between the elevators" inquired of the reporters present as to the "invisible line" that Defendant Williams referred as it related to recording in the County Building.

235. As the reporters and Plaintiff discussed the absurdity of any rule involving an "invisible line," Defendant Holmes appeared.

236. Defendant Holmes wore regular attire, and SHE DID NOT HAVE ON A ROBE.

237. Defendant OBA states, "Judge Holmes attempted to advise Respondent about the media rule, but he interrupted and yelled, 'I wasn't talking to you' and called her 'Sharon.' *Id*. at 108.

238. In fact, Sharon Holmes, a citizen, came into the hallway of a public building, the Tulsa County Courthouse, and interrupted the conversation of Plaintiff and a reporter discussing the finer points of the First Amendment. *See* Holmes Video 1 attached Hereto as Exhibit "C."

239. Plaintiff knew Sharon Holmes, who also sometimes plays the role of Judge Sharon Holmes, from prior encounters with her at the Hunt Club, a bar in Tulsa Oklahoma.

240. The Hunt Club, known for its live music, featured Sharon Holmes as a regular drunk guest, and each of the ten (10) or so times that Plaintiff ever went to the Hunt Club, he encountered a drunk Sharon Holmes.

241. At the Hunt Club, Sharon Holmes did not shy away from telling everyone who would listen that she was a powerful Tulsa Judge, which Plaintiff found particularly strange given his knowledge of Oklahoma's constitutional prohibition of drunken judges.

242. In fact, Oklahoma Constitution Article 7A Section 1 states, "Cause for removal from office shall be: . . . habitual drunkenness . . . ."

243.   On numerous occasions, Plaintiff witnessed Holmes in a drunken stupor at the Hunt Club, and on one occasion, Plaintiff witnessed Holmes get heavily intoxicated at the Hunt Club, depart from the Hunt Club to attend a show at the Tulsa Performing Arts Center, and then she returned to the Hunt Club after in a drunken condition that made Plaintiff wonder how her white male companion got her back to the bar.

244.   Plaintiff remembers this encounter vividly because Plaintiff made the mistake of saying something to Holmes during her drunkenness that night, and Holmes spent the next twenty (20) minutes explaining to Plaintiff how powerful she was as a judge.

245.   Plaintiff, having met Holmes on numerous prior occasions at that bar was most shocked because Holmes did not seem to recognize Plaintiff, whom she met previously numerous times.

246.   Particularly, Defendant OBA appears upset that, "in front of media, [Plaintiff] continued to engage Judge Holmes and threatened to file a judicial complaint." *Id.* at ¶ 111.

247.   Defendant Holmes elected to engage Plaintiff in a public hallway of the Public Building in front of reporters, and Plaintiff told Defendant Holmes, repeatedly, that he did not wish to engage with her.

248.   Defendant OBA appears to believe that Holmes could not retreat to the office from whence she came and get away from Plaintiff, who had no choice but to wait for the elevators.

249.   Defendant OBA complains Plaintiff said to Holmes, "'Say hello' to al the media' and commented, 'Why don't you go drink some more at the bar, judge? You do that a lot. Go be a drunk judge." Respondent then stated, 'She is a drunk.'" *See* Holmes Video 1 Press Video attached hereto as Exhibit "C."

250. First, Plaintiff absolutely believes Defendant Holmes to constitute a drunk, even by its most constrained definition, so such a statement, when made by Respondent, was TRUE.

251. Defendant Sharon Holmes, as evidenced in the Press Video, demanded her title of "Judge," to which Plaintiff complied, and Plaintiff, given the public hallway informal setting of the conversation, engaged in additional First Amendment protected activity by telling the drunk to go back to the bar. *See Id.*

252. Defendant OBA also complains that "Plaintiff used profanity and threatened to sue the deputies." *First Amended Complaint* at ¶ 113.

253. Defendant OBA particularly complained Plaintiff's actions **were witnessed by a news reporter** who "tweeted from her Twitter account on November 22, 2022, the following: . . . Plaintiff, told officers in the courthouse to 'f\*ck off' & that they were 'too fat' to chase him after an employee said I could not interview Miller's team in front of the courtroom." *Id*. at ¶ 114.

254. In other words, Plaintiff stood up for his First Amendment rights, and the rights of the press, and in doing so, Plaintiff embarrassed Defendants OBA, Holmes, and 14th Judicial District by expressing his firmly held belief that Defendant Holmes is a drunk, and that the recording policy violates First Amendment rights of Plaintiff and others.

255. Plaintiff, because of this encounter, wrote a letter to Judge Douglas Drummond, as Presiding Judge of the 14th Judicial District, in which he laid out his objection to the recording policy. *See* Letter to Drummond attached hereto as Exhibit "I."

256. Plaintiff also notified Drummond of his intention to record in all publicly accessible areas of the County Building. *See Id.*

257.    Plaintiff went to the Tulsa County Courthouse and recorded in all publicly accessible areas as indicated in his letter, without issue.

258.    This demonstration clearly established that Rule 11, outlined in detail below, is selectively enforced and is broader than necessary to maintain order inside the areas of the 14th Judicial District.

259.    Defendant OBA then states, "Respondent's public statements about Judge Holmes were known to be false or were made with reckless disregard as to their truth or falsity concerning the qualifications or integrity of a judge." *Id*. at ¶ 117.

260.    Defendant OBA further stated that, Plaintiff's "false and/or reckless comments about Judge Holmes serve to undermine public confidence in the administration of justice." *Id*. at ¶ 118.

261.    In response to the grievances filed by Defendants Williams and Holmes, Plaintiff stood on "the doctrine of truth and my rights protected by the 1[st] and 14th Amendments . . . and those . . . granted pursuant to 42 U.S.C. § 1983." *See* Respondent's Answer to Complaint attached hereto as Exhibit "J"

262.    Plaintiff stands on that position and further notes that, since that time, Plaintiff proved the validity of his statements publicly, live and in living color. *See* Holmes Videos attached hereto as Exhibits D & E.

263.    Defendant OBA makes this assertion, and the Oklahoma Supreme Court relied upon it when suspending Plaintiff, despite the fact they know Plaintiff CAPTURED DEFENDANT HOLMES ON CAMERA GETTING DRUNK AND DRIVING A MINOR CHILD on numerous occasions. *See* Holmes Videos attached hereto as Exhibits D & E.

264.    Plaintiff, and hundreds of others after watching Holmes Video No. 2 and 3 attached hereto as Exhibits D & E, filed Judicial Complaints against Defendant Holmes with the Oklahoma

Council on Judicial Complaints for Holmes and Williams conduct in this matter, Defendant Holmes conduct related to drinking and driving with a minor child present on numerous occasions, and Holmes attempted coverup of a drunken altercation with her daughter whereby Defendant Holmes daughter stabbed her and Defendant Holmes called a police officer friend, Tulsa Police Officer Marcus Harper, to try and keep matters quiet.

265. The Council on Judicial Complaints found substantial evidence of Holmes improper behavior based on Plaintiff's complaints, and referred the matter to the Chief Justice of the Oklahoma Supreme Court.

266. The Oklahoma Supreme Court despite suspending Plaintiff for mere words, DID NOT PUNISH DEFENDANT HOLMES. See Letter from Chief Justice attached hereto as Exhibit "K."

267. As a result of the conduct Defendant OBA alleges Plaintiff committed, it argues Plaintiff violated Rules 3.5(d), 8.2(a), 8.4(a), 8.4(c), and 8.4(d) of the Oklahoma Rules of Professional Conduct and RGDP 1.3 and 5.2. *Id*. at ¶ 122.

    **ii.**    **The Burke Grievance.**

268. On November 11, 2022, Attorney Taylor Burke and his client, Mykey Arthrell, held a press conference at the Tulsa County Election Board on behalf of Mykey Arthrell, a City of Tulsa candidate for District 5 Council seat. *See Id.* at ¶ 123.

269. Plaintiff and his client, Miller, did not attend the Burke/Arthrell Press Conference.

270. During the afternoon of November 11, 2022, Plaintiff and his client, Miller, filed at the Tulsa County Election Board for a recount in the election, that Miller won, to address a potential voting abnormality.

271.    After filing, Plaintiff and Miller conducted a press conference to rebut the statements made during the morning Burke/Arthrell Press Conference.

272.    Burke attended Plaintiff and Miller's press conference in person.

273.    Plaintiff, after seeing Burke, "made an 'off-color' comment' about grammatical issues he believed were in Burke's petition." *Amended Complaint* at 124.

274.    In fact, Plaintiff publicly insulted Burke, to Burke directly, for the numerous and egregious grammatical mistakes in his TWO SENTENCE pleading filed earlier that day in the matter.

275.    Defendant OBA also notes that Plaintiff informed Buke via email that, "several times it's been mentioned that other attorneys could fill in for me. I wanted to make clear that the female attorneys in my office will have nothing to do with you Mr. Burke. They find you as detestable as I do.'" *Id*. at 129.

276.    Plaintiff meant the words he wrote to Mr. Burke, and the feelings of the female attorneys regarding Burke were true, as Plaintiff had to ask Defendant Glassco to recuse from a case for those attorneys in a case involving Burke due to Glassco and Burke's behavior in the matter.

277.    Judge Glassco did recuse in the matter at Plaintiff's adamant request. *See Id*. at ¶ 143.

278.    Judge Kurt Glassco was investigated by the Oklahoma Council on Judicial Complaints regarding corruption allegations leveled by Plaintiff and others related to his role over the probate courts for the 14th Judicial District and specifically related to his improper financial and other relationships with attorney like Burke.

279.    The Oklahoma Council on Judicial Complaints found sufficient evidence to forward the matter to the Chief Justice of Defendant Oklahoma Supreme Court, WHICH FAILED TO PUNISH GLASSCO and instead suspended Plaintiff.

280.    Plaintiff's complaint specifically related to Burke and Glassco's improper relationship and the solicitation and receipt of bribes by Glassco.

281.    Defendant OBA then notes that, "an attorney for Burke sent Respondent a letter demanding that he cease and desist from making false and defamatory public statements about Burke and his ability to practice law." *Id*. at ¶ 134.

282.    Plaintiff received such a letter and filed it in the trash can it belonged as Plaintiff's comments regarding Burke's incompetence are believed by Plaintiff and were made in response to allegations made publicly by Burke and his client, Arthrell in the media.

283.    In essence, the Burke Grievance is an attorney whining that Plaintiff's press conference was mean and it seeks retribution for his friend, Glassco.

284.    Plaintiff reminded Defendant OBA, Burke and Arthrell conducted the first press conference regarding the matter, not Plaintiff or his client.

285.    Plaintiff does not object to Burke and his client conducting a press conference as the matter was of substantial public importance (a contested election for Tulsa City Councilor) and the First Amendment guarantees such conduct.

286.    Instead, it is Burke who complains because, despite going to the press himself, he cannot handle the public fight resulting which called into question his ethics and abilities.

287.    The Burke Grievance also notes a tweet allegedly sent by Plaintiff which states in response to a tweet by Holmes Bailiff Morgan Williams, "'Wow. If you are the Bailiff, you are an absolute moron for being on here posting this stuff.  Get your judge out of the bars!!!

And I mean the ones she drinks at too much!' He then tweeted, 'If you think I'm worried about Judge Drummond, or any judge in that courthouse, you clearly do not know me.' He also tweeted '. . . your behavior here doesn't shock me considering she acted like a drunk in the hall today. Was that alcohol on her breath?' and 'I only called your judge a drunk based on passed [sic] behavior I've witnessed personally, so . . . Perhaps we should see how often she gets plastered at the Hunt Club?" *Id.*

288.    Defendant OBA then proceeds to use Burke to imply that Plaintiff has "greater health challenges or issues about how he handles his emotions." *Id.* at ¶ 151.

289.    Such statement was made without evidence of any such infirmity and to cause Plaintiff great emotional abuse.

290.    Not a SINGLE ALLEGATION in the Burke Grievance involves alleged conduct by Plaintiff INSIDE A COURTROOM or in PLEADINGS filed by Plaintiff, but instead relates solely to Plaintiff's statements outside of court while exercising his rights protected by the First Amendment to the United States Constitution.

291.    Defendant OBA alleges Plaintiff's conduct outlined in the Burke Grievance violate Rules 3.1, 3.5(d), 3.6(a), 4.1, 4.4(a), 8.2(a), 8.4(c) and 8.4(d) of the Oklahoma Rules of Professional Conduct and Rules 1.3 and 5.2 of the RGDP.

    **iii.**    **The Mattingly Grievance (Count VI):**

292. On September 18, 2020, the State of Oklahoma entered a marijuana seed-to-sale contract with Metrc, LLC (hereinafter "Metrc"). *Id.* at 157.

293. Plaintiff, believing the contract to violate Oklahoma law and resulted in Metrc making tens of millions of dollars per year improperly, "began engaging in regular, wide-ranging editorial streams on his law firm's Facebook page where he . . . discussed his

displeasure with OMMA and Metrc and his intentions to file suit against OMMA." *Id* at 158.

294. Additionally, Plaintiff "created an internet website called 'Screw Metrc,' wherein he posted profanity laced 'infomercials' of himself attacking Metrc." *Id*. at ¶ 159.

295. Plaintiff admits he created such a website, and he finds the content created hilarious to this day, despite the suspension.

296. Plaintiff also, "sold merchandise disparaging Metrc on this website." *Id*.

297. Defendant Mattingly, as Defendant Metrc's attorney, did not like the fact that Plaintiff disparaged his clients and obtained an injunction on behalf of Oklahomans delaying the Metrc implementation for a year costing them millions in tag fees.

298. In the Mattingly Grievance, Defendant OBA notes that, on a Facebook Live, Plaintiff that, "I mean and certainly no guarantees with that black robe sitting there, because I'm sorry, but the person that graduated last in their law class can still become a judge. And there's an old saying that, 'Those who can, do, and those that can't, run for office.' And the truth of the matter is a lot of lawyers who can't hack it, run to be a damn judge; and so they're dumber than most lawyers, honestly." *Id*. at 160.

299. While not recalling the exact statement, the allegations by Defendant OBA match one-hundred percent Plaintiff's feelings on the matter, and Plaintiff does not deny making such truthful statements to his Facebook Live audience.

300. Defendant OBA and Mattingly also complains Plaintiff posted "a photograph of Mattingly . . . taken at night and depicted Mattingly wearing a bathrobe while standing outside his home." *Id*.

301. The picture in question was taken by Plaintiff's process server in public after serving Mattingly with a lawsuit against his client, Metrc, after he refused to accept service at his law office.

302. As Defendant OBA noted, Plaintiff posted on his Facebook Page, "Jack Mattingly, attorney for Metrc, tried to evade service. He fled from his office despite knowing the process server was there to serve him. Process Server tracks him down at home! He then emails today asking to not be required to attend. Yeah, I think not, Jack, you got to show up. Can you please bring that beautiful red house robe! It's fantastic! I will buy if from you! I've got $5.00 ready to go!" *Id* at ¶. 163.

303. Defendant OBA then complains Plaintiff made statements about Judge Ramirez, assigned to the Metrc case, regarding her being in "over her head" after she transferred the case and that Plaintiff "suggested there was judicial impropriety involved in the transfer . . ." *Id*.

304. Plaintiff and his client believed Judge Ramirez was over her head in the matter and that the transfer was improperly placating to a state agency and a rich company like Metrc.

305. For some reason, and frankly in a first that I can find in the history of Oklahoma, Defendant OBA in the matters against Plaintiff appear to be taking sides in litigation disputes, despite having no germane reason for doing so.

306. It is as if Defendant OBA's is fighting for parties to litigation that lost or did not get the results they wanted as some sort of do-over to punish Plaintiff.

307. Defendant OBA then alleges additional out of court statements and conduct by Plaintiff against Metrc and concerning Plaintiff's opinions regarding Metrc. *See Id*. at 163-184.

308. Defendant **OBA** alleges that the Mattingly Grievance establishes that Plaintiff violated Rules 1.3, **3.1,** 3.2, 3.3, 3.4, 3.5, 3.6, 4.4(a), 8.2(a), 8.4(a), 8.4(c), 8.4(d) of the Oklahoma Rules of Professional Conduct and RGDP 1.3 and 5.2. *Id.* at ¶ 185.

   **iv.    The General Counsel's Grievance.**

309. No longer waiting for others to file complaints, the General Counsel Hendryx took it upon herself to monitor Plaintiff to find any conduct she could use to try and silence Plaintiff's criticism of Defendant OBA and corrupt members of the Oklahoma judiciary.

310. Plaintiff does not believe that all Judges are bad, just most of them, and in Oklahoma, more bad ones appear to exist than good ones based on Plaintiff's experience dealing with the corrupt systems in place.

311. In its grievance, the General Counsel alleges Plaintiff "advised his viewers that if a state employee refuses to allow him access to inspect OBNDD records upon his demand or fails to provide him with copies of the requested records, then that employee is guilty of a misdemeanor and that he was going to call the police and try to have that person arrested for violation of the Open Records Act ("ORA")." *Id.* at ¶ 187.

312. Defendant **OBA** noted that, "Respondent's group did not have an appointment with anyone at the Agency . . . ." *Id.* at ¶ 188.

313. The Oklahoma Open Records Act provides that public record SHALL be available during REGULAR BUSINESS HOURS, and as such, NO APPOINTMENT IS NECESSARY.

314. Defendant **OBA** then detailed Plaintiff demanded the records and the OBNDD failed to provide them. *See Id.* at ¶ 189.

315. Defendant OBNDD failed to provide all records requested by Plaintiff, and Plaitniff seeks those records herein.

316. Defendant OMMA failed to provide almost all of the records requested by Plaintiff, and Plaintiff seeks those records herein.

317. Defendant OBA takes issue with, after the OBNDD representative insulted the odor of someone with Plaintiff, Plaintiff "asked Woodward if he was smirking and stated that it made Woodward 'look like a f*cking schmuck." *Id.* at 193.

318. The look on Woodward's face, to Plaintiff, made Woodward look like a "fucking schmuck" and given the insult by Woodward to another person about their body odor, Plaintiff felt that Woodward deserved to hear his opinions.

319. Defendant OBA then notes Plaintiff called Woodward other names like a "piece of shit", "a motherfucking piece of shit", a "scumbag", and mocked Woodward's massive nose and appearance. *Id.* at ¶ 194.

320. Defendant OBA notes that, "Respondent and his group, along with law enforcement, moved outside of the OBNDD . . . ." *Id.*

321. Defendant OBA fails to mention that one of the law enforcement officers on scene was Defendant Beaty, the Same Deputy Beaty which Defendant OBA used to provide security for the hearing before the PRT in this very matter.

322. The use of a witness as security for a hearing in the matter is HIGHLY SUSPECT if not outright improper on its face, and yet, that is exactly what Defendant OBA did.

323. Defendant OBA alleges Plaintiff gave the OHP Supervisor, DEPUTY BEATY, (1) a five-page letter for Open Records Act Request dated March 9, 2023, (2) a three-page letter for Open Records Act Request dated March 16, 2023, (3) a six-page printed copy

of the Open Records Act, Section 24A.5, and (4) a two-page printed copy of the Open Records Act, Section 24A.17. *Id.* at ¶ 199.

324. In other words, Defendant OBA laid out that Plaintiff appeared at the OBNDD prepared with his prior written Open Record Act Requests, which the OBNDD ignored, and he additionally brought copies of the Open Record Act for the police which he intended to call to file a criminal complaint if the OBNDD failed to comply with the Open Records Act.

325. Defendant OBA then complains that the Tulsa World, a Tulsa Newspaper, ran a story about Plaintiff's activities at the OBNDD. *See Id.* at 200-213.

326. Defendant OBA General Counsel in its OBNDD grievance alleges that Plaintiff's conduct violates Rules 4.4(a), 8.4(a) and 8.4(d) of the Oklahoma Rules of Professional Conduct and RGDP 1.3 and 5.2. *Id.* at ¶ 218.

**v.The General Counsel's Grievance- Plaintiff's Conduct at Tulsa City Hall**

327. Defendant OBA next moves to March 31, 2023 when Plaintiff "livestreamed his visit to Tulsa City Hall . . . ." *Id*. at ¶ 219.

328. Defendant OBA then outlines Plaintiff's objection to Defendant City of Tulsa's demand for identification from Plaintiff to conduct Open Record Act request from a division of the City of Tulsa. *See Id.*

329. Defendant OBA then alleges that, Plaintiff was "advised . . . [it is] City policy for security to request visitors to sign in and present identification, [to which] [Plaintiff] stated on video that he equates having to identify himself to Nazi Germany making lists of people that attend meetings." *Id.* at 220.

330. Defendant OBA then outlines that Plaintiff generally treated the security guards for the
City of Tulsa in, in Defendant OBA's opinion, an unkind manner by insulting them.

331. Plaintiff meant every word he said, and he believed any statements made at the time
they were made.

332. Defendant OBA then alleges that, "Security told Respondent he could not access
certain floors without an appointment. Respondent again attempted to get on the
elevator, but Officer Testerman held out his arm to block Respondent's progress and
told him to 'Stop.' Respondent pushed Testerman's arm away and tried to push past
him." Respondent punched Testerman in the chest and yelled, 'Do not f*ucking touch
me . . . You put your f*cking hands on me, you mother*cking prick! You idiot!'" *Id*
at ¶ 224.

333. The use of the * is by Defendant OBA, which appears to have serious objection to the
use of curse words in public, far away from a courtroom.

334. Defendant OBA's account is factually inaccurate, and the City of Tulsa Video clearly
establishes that Plaintiff received clearance to go on the 1st and 4th floors of the Tulsa
City Hall without presenting identification. See City of Tulsa Video attached hereto
as Exhibit "L."

335. Additionally, Defendant OBA's account fails to state that, after being told that he could
proceed to the 1st or 4th floors, Plaintiff made a positive statement that he would go to
the 4th floor, and it was upon such assertion, and a single step, that SECURITY
GUARD Testerman, battered Plaintiff by placing his arm on Plaintiff's shoulder to
physically impede his permissible movement. *See Id.*

336.  Defendant OBA recounts that, after being assaulted and battered, Plaintiff then stated

that, "he was going to call the police and that security 'just bought yourselves a

lawsuit.'  Respondent stated that he would deal with the situation with a 1983 action

and that it is illegal not to allow him to access public records during regular business

hours.  *Id*. at ¶ 225.

337.  Defendant OBA then alleges Plaintiff posted a picture of Defendant Testerman on his

Facebook Page with a statement which read,

TYRANT!!!! This Paul Blart University Rent a Cop went hands on today and
made the mistake of grabbing me aggressively.  Video is posted.  Also got met
by a city councilor.  People wanted men added to the accountability mission,
and today these people made it necessary for me to sue them to [sic].  Will be
suing on the [Open Record Act] on Monday.  Would anyone like [sic] join me
Monday requesting documents at the City of Tulsa? Let me Know!

As for the mall cops, since they work for the City of Tulsa, as is clear on the
video, I will be filing suit against them for violation of my civil rights. 42 USC
1983. I've brought a bunch in my day fighting for other peoples [sic] rights, and
now I'm going to fight for my own. I hate being touched aggressively. It's a
trigger. I did really well not cussing until then. Forgive me. Lol

*Id*. at ¶ 227.

338.  Defendant OBA then goes on to lay out an April 9, 2023 Tulsa World Article regarding

the incident, and spends three (3) paragraphs detailing its contents.  *See Id*. at ¶ 228-

230.

339.  Defendant OBA alleges Plaintiff's conduct and speech related to the General Counsel's

grievance regarding the City of Tulsa violates Oklahoma Rules of Professional

Conduct Rules 4.4(a), 8.4(a) and 8.4(d) and RGDP 1.3 and 5.2.  Id. at ¶ 234.

    **vi.**    **The General Counsel's Grievance Regarding Plaintiff's Comments
about the Tulsa County Judiciary.**

340. In Count IX of the Amended Complaint, Defendant OBA brings up *Culver v. City of Tulsa*, a case filed by Plaintiff in which Tulsa Judge Tracy Priddy was assigned to the case.

341. After reading an incorrect minute order online entered by Defendant Priddy, Plaintiff returned to the Courthouse and "advised Judge Priddy's clerk he was there because the minute order he read was not a correct depiction of what happened." *Id*. at ¶ 243.

342. Defendant Priddy "came out of her chambers and Respondent advised her that he was recording her." He stated he was there because her minute was not a correct reflection of what happened, and that he came to correct it, because he had withdrawn [the motion set earlier] [at] his request. *Id*. at ¶ 244.

343. Defendant OBA recounts how members of Defendant TCSO showed up, and that Plaintiff made rude comments to them. *See Id*. at ¶ 249-250.

344. Fortunately, Plaintiff recorded the interaction, and such interaction is depicted in the Priddy Video attached hereto as Exhibit "M."

345. After walking away, Defendant OBA complains Plaintiff continued to talk to the camera and stated that what "he just addressed with the Judge was 'a sham.' *Id.* at ¶ 251.

346. Defendant OBA complains that, outside of the presence of Judge Priddy, Plaintiff comments on a Facebook Live that Judge Priddy was a "crooked Judge" and an "absolute criminal judge." *Id*.

347. Plaintiff believes all statements made by him regarding Defendant Priddy.

348. Defendant OBA then complains Plaintiff, "posted the video of his visit to Judge Priddy's chambers . . . with the comment 'People lie far too much. Corruption is rampant!! If this isn't corruption, I don't know what is!" *Id.* at ¶ 254.

349. Defendant OBA then goes into further discussion of Plaintiff making comments regarding the continued corruption of Defendant Priddy and opposing counsel, with whom Defendant Priddy is close friends, and the improperly altered court Minute Order. *See Id*. at ¶ 256-259."

350. Defendant OBA alleges Plaintiff's comments about Defendant Priddy are false, but despite that position by Defendant OBA, Plaintiff clearly and firmly believes in each of his statements regarding what he calls outside of court, "Judge Priddy Corrupt." *See Id*. at ¶ 260.

351. Plaintiff, as outlined below, caught Defendant Priddy red handed destroying court orders, and such conduct constitutes a felony in Oklahoma.

352. Defendant OBA alleges Plaintiff's conduct related to Defendant Priddy Corrupt constitutes violations of Oklahoma Rules of Professional Conduct Rules 3.3(a)(1) and (d), 4.4(a), 8.2(a), 8.4 (a)(c) and (d) and RGDP 1.3 and 5.2. *Id* at ¶ 272.

**vii.    The Hogan Grievance (Count X).**

353. Mark Hogan, an employee of the City of Tulsa, relates to Plaintiff's continued effort to obtain Open Records from the City of Tulsa, which clearly does not like to share its records. *See Id*. at ¶ 274-280.

354. Defendant OBA and Hogan's Grievance centers on Plaintiff's "conduct at City Hall . . . and advised that [Plaintiff] posted a video of the incident on . . . Facebook . . . ." *Id.* at ¶284.

355. The grievance filed by Defendant Hogan, acting in his capacity as an employee of the City of Tulsa, contained false and defamatory statements made either negligently or with conscious disregard for the truth.

356. Defendant OBA alleges Plaintiff's conduct violates Oklahoma Rules of Professional Conduct Rules 4.4(a), 8.4(a) and 8.4(d) and GRDP 1.3 and 5.2. *Id*. at ¶ 289.

### viii.    The Teran-Grossnicklas Grievance

357.  Defendant Teran-Grossnicklas filed a grievance against Plaintiff, and Defendant OBA seeks Plaintiff's disbarment because, according to Defendant OBA, Plaintiff "publicly harassed Teran-Grossnicklas while she was at the Capitol speaking with two representatives about a pending bill. *Id.* at ¶ 292.

358. Defendant OBA expressly acknowledges the political nature of the communication by expressly referencing pending legislation. *See Id.*

359. Defendant OBA complains Plaintiff "blatantly recorded her and improperly narrated the content of her conversation while he streamed video on his firm's Facebook page." *Id*. at ¶ 292.

360. Defendant OBA, while pointing out that the conversation and recording occurred at the Oklahoma State Capitol, fails to point out that the video and conversation occurred in the PUBLIC ROTUNDA of the Capitol building, a public forum if there ever was one given its regular use in Oklahoma for legislative protests. *See Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37 (1983) (explaining the legal nuances

regarding various public forums, of which the Capitol Rotunda would constitute a public forum.).

361. As a public forum, Plaintiff possessed every legal right necessary to engage in any of the conduct alleged by Defendant OBA, and such conduct by Plaintiff CANNOT BE THE BASIS OF DISCIPLINE when such conduct constitutes protected First Amendment activity.

362. Defendant OBA complains Plaintiff accused Oklahoma State Senator Jessica Garvin of having an improper sexual affair with the late Travis Kirkpatrick, former Director of the Oklahoma Medical Marijuana Authority and an Oklahoma Department of Health official." *Id*. at ¶ 295.

363. Kirkpatrick told Plaintiff of the relationship directly before his untimely passing, and Plaintiff believed it to be true at the time it was said. That relationship, as well as others of Garvin's during her brief tenure, resulted in Garvin LOSING in her re-election campaign. Plaintiff campaigned strongly against Garvin for re-election.

364. Defendant OBA complains Plaintiff left a note for Governor Kevin Stitt and made other negative comments about the Governor. *See Id*. at ¶302.

365. Plaintiff admits he engaged in political speech that day and left a note for Governor Kevin Stitt stating, "Fuck You" and signed it.

366. That is how Plaintiff feels about Gov. Kevin Stitt, then and now, and Plaintiff traveled to the Oklahoma Capitol to the public offices of the Governor to pass along that message.

367. Defendant OBA alleges Plaintiff's conduct, as it relates to the Teran grievance, violates the Oklahoma Rules of Professional Conduct Rules 4.1, 4.4(a), 8.1(b), 8.4(a) and (c) and RGDP 1.3 and 5.2.

### ix.    The Thompson Grievance (Count XII):

368.  Next Defendant OBA moves to another livestream of Plaintiff's, this time on his "Facebook account under the title, 'MAY THE 4TH BE WITH YOU!! OCCUPPY OMMA!!!!!' as he was enroute to a hearing at the OMMA in Oklahoma City."

369. Plaintiff does not dispute he told the world about the abuses by the OMMA of the rights of medical marijuana businesses through sham legal processes it concocted.

370. Plaintiff does not dispute he invited the PUBLIC to attend PUBLIC hearings at the OMMA to witness first-hand the abuse and corruption of the administrative circus being run by the OMMA.

371. Defendant OBA complains, prior to attending a hearing, Plaintiff made comments on the steps of the OMMA building regarding the sham legal process. *Id*. at 311.

372. Defendant OBA complains of Plaintiff's attire, which by Defendant OBA's own admission, constituted speech by Plaintiff done with his clients' advice and consent. *Id*. at ¶ 311.

373. At the time, no dress code existed for the administrative hearings before Defendant OMMA.

374. Defendant OBA appears upset Plaintiff educated his audience as to the administrative nature of the proceedings, the public nature of the hearings, and the limitation on power of the person administering the hearing. *Id*. at ¶ 312.

375. Every statement made by Plaintiff was believed by him at the time stated, and Plaintiff does not now believe any of the statements to be incorrect.

376. Defendant OBA fails to note Plaintiff filed a formal complaint against the ALJ, Michael Mitchelson, for corruption, and after much fighting by Plaintiff, he was removed from hearing all matters at Defendant OBA.

377. Defendant OBA failed to respond to Plaintiff's complaint against Defendant Mitchelson.

378. Defendant OBA failed to take any action against Mitchelson. *See* Durbin Grievance against Mitchelson and OBA Response attached hereto as Exhibit "N."

379. As it relates to the hearing and Mitchelson, Defendant OBA complains Plaintiff "challenged him by asking about the number of cases he had tried." *Id*. at 312.

380. Plaintiff does not dispute he asked a multitude of questions about Defendant Mitchelson's experience during the hearing because Defendant Mitchelson did not appear to understand even the most basic rules of evidence, did not know how to admit exhibits, and generally appeared unable to run a hearing. Plaintiff sought to understand if Mitchelson's behavior was due to ignorance or other causes.

381. Defendant OBA alleges that, after Court that day and over the course of several days, Plaintiff made additional comments on his Facebook Page regarding other individuals associated with the OMMA, the government of the State of Oklahoma, and others. *Id*. at ¶315-330.

382. Anything Plaintiff said on his Facebook page, he believed, and frankly, Plaintiff believes them all to this date as they are true.

383. OBA then complains that, at a subsequent hearing, Plaintiff stated on the record, "that Judge Mitchelson's behavior was '. . . utterly and completely unprofessional, despicable, and a violation of pretty much every Rule of Judicial Conduct that exists in the State of Oklahoma.' *Id* at 332.

384. Defendant OBA notes *Plaintiff* "accused Mitchelson of engaging in ex parte communications with the State . . . ." *Id*. at 332.

385. Defendant OBA fails to note that, Defendant Mitchelson, ON THE RECORD, admitted to engaging in ex parte communications with the OMMA via the hearings clerk.

386. Defendant OBA fails to note that, after Plaintiff's complaints to the Attorney General and Oklahoma Bar Association, Mitchelson mysteriously disappeared from ALL HEARINGS AT OMMA and new administrative hearing officers were appointed from the Oklahoma Attorney General's Office.

387. Defendant OBA fails to mention that Plaintiff, on behalf of his client MK Herb, tried the case before a replacement hearing officer, and Plaintiff's CLIENT PREVAILED and the suspension of its license, emergency granted by Defendant Mitchelson without hearing, was LIFTED by the new hearing officer.

388. Defendant OBA then continues ad nauseum with additional comments it alleges Plaintiff made about Mitchelson and others which it finds offensive. Frankly, Plaintiff finds the conduct of the Defendants and many judges he encounters in Oklahoma offensive. *See Id*. 333-337.

389. Defendant OBA then moves on to complain Plaintiff said allegedly mean things to Counsel for the OMMA outside of the hearing. *See Id*. at ¶346-350.

390. Defendant OBA alleges Plaintiff's alleged conduct, lumped together under the Thompson Grievance, violated the Oklahoma Rules of Professional Conduct Rules 3.1, 3.3(a)(1) and (d), 3.5, 4.4(a), 8.2(a), 8.4(a) and (d) and RGDP 1.3. *Id*. at ¶352.

### x. The Pewitt Grievance (Count XIII):

391. Defendant OBA next turns its attention to a complaint filed by Doug Pewitt, the elected District Attorney for Delaware and Ottawa Counties, State of Oklahoma. *See Id*. at ¶ 353.

392. Defendant OBA alleges that Plaintiff and Pewitt engaged in a conversation, and that, according to Pewitt, Plaintiff "went into the hall, and falsely stated that Pewitt had referred to his clients as 'scumbags.'" *Id*. at ¶ 358.

393. In fact, without the provocation that Pewitt alleges, Pewitt did refer to Plaintiff's client as a "scumbag", which was overheard by Plaintiff and at least three (3) other witnesses. *Id*. at ¶ 358.

394. Pewitt is correct that, after hearing the comment, Plaintiff left the courtroom, where no hearing had begun, to discuss the matter with his clients, who also overheard the statement by Pewitt.

395. Defendant OBA complains that, after the hearing, Plaintiff made another Facebook post, this time stating, "NO SIR, YOU ARE SCUM!!!" *See Id*. at ¶ 359-361.

396. Plaintiff admits he made the post and believes everything he wrote.

397. Not that it is particularly relevant, but before Plaintiff was suspended, he succeeded in obtaining a dismissal of the charges against one of the parties in the case at issue and provided excellent care of the other client in the case.

398. On September 13, 2023, Pewitt filed a complaint against Plaintiff for the conduct addressed herein. *See. Id*. at ¶ 361.

399. Plaintiff, while finding Pewitt's insult of his client annoying, did not think to file a complaint against Pewitt calling his clients "Scum" because frankly, Plaintiff, unlike Pewitt and Defendant OBA, enjoys the First Amendment and its protections.

400. After receiving notice Defendant OBA intended to prosecute Plaintiff for comments allegedly made about Pewitt on his public Facebook page and outside court, Plaintiff decided to test Defendant OBA and filed his own complaint against Pewitt.

401. In the Complaint, Plaintiff laid out in detail Pewitt's conduct and identified witnesses of the conduct.

402. Defendant OBA, acknowledging receipt, clearly did not see any irony in the situations, of prosecuting Plaintiff for statements while not doing the same to Pewitt, because Defendant OBA General Counsel responded by letter stating that it would take NO ACTION about Pewitt's comments.  *See* Plaintiff's Complaint against Pewitt and Defendant OBA Response attached hereto as Exhibit "O."

403. Defendant OBA's refusal to apply a similar speech standard on Pewitt that it applied to Plaintiff proves the disparate treatment at play here.

404. Defendant OBA alleges that, because of the alleged conduct at play in the Pewitt allegations, Plaintiff violated the Oklahoma Rules of Professional Conduct Rules 3.6, 4.1, 4.3, 8.2(a), 8.4(a)(c) and (d) and RGDP 1.3.

   xi.    **The Stinson Grievance**

405. Stinson is an Oklahoma County District Court Judge assigned to hear a matter filed by Plaintiff on behalf of client, Flower Tops, LLC. *See Id.* at ¶ 371-372.

406. OBA complains Plaintiff "livestreamed . . . 'August 3rd RALLY AGAINST OMMA at 1:30 PM at the Oklahoma County Courthouse!" *Id.* at ¶ 373.

407. Plaintiff invited people to "[c]ome see Adria Berry and many others TESTIFY UNDER OATH!!!!" *Id.*

408. Defendant OBA then notes Plaintiff, "drank a Dos Equis, solicited money for himself and his recently created nonprofit, discussed various clients' cases and strategies, and pleaded for people to show up and support him at the August 3, 2023, hearing." *Id.*

409. Plaintiff, from the fact that Defendant OBA included them, can only presume that Defendant OBA takes issue with Plaintiff drinking a Dos Equis and with him inviting people to attend and observe court proceedings for themselves. Shame on Plaintiff, Defendant OBA believes! *See Id.*

410. Defendant OBA then describes how the Oklahoma County Sherriff's Department received notice that Plaintiff and others would attend the hearing, and "advised the judge that Respondent and his followers would likely attempt to audio and/or video record the proceedings and/or take photographs despite the local court rule prohibiting recording without the court's approval." *Id.* at ¶ 376.

411. Defendant OBA does not explain the Oklahoma County Sherriff's Departments clairvoyance about Plaintiff and the invitation of people, because it did not want to explain how it acquired that knowledge.

412. The truth is, Defendant, OMMA, having dealt with Plaintiff recording at hearings at the OMMA, contacted the Oklahoma County Sherriff's Department and Judge Stinson regarding untrue allegations that Plaintiff and others would record inside her courtroom.

413. When Plaintiff arrived at Judge Stinson's Courtroom that day, there was a commotion caused entirely by the ill-conceived notions of a party to the case spread to the judge through their law enforcement contacts.

414. In other words, Defendant OMMA and Stinson, through the Sherriff's Department, improperly communicated with one another enough to prejudice the Plaintiff's client and cause the commotion on display that day.

415. None of that was the result of Plaintiff *See* Stinson Video attached hereto as Exhibit "P."

416. Based on the display by Defendant Stinson and the Oklahoma County Sheriff's Department that day, Plaintiff's client, Flower Tops, LLC, decided to seek recusal of Defendant Stinson, and then upon further consideration, decided that no fair trial was likely to result before Stinson, so the best course of action was to adjudicate the case before the OMMA, and then appeal upon losing,

417. Fortunately for Flower Tops, LLC, Plaintiff's work to remove Defendant OMMA's shill, Michael Mitchelson, succeeded, and Plaintiff tried the case to a hearing officer appointed by the Oklahoma Attorney General.

418. At the time of trial, and up to trial, Flower Tops, LLC was inoperable due to an emergency suspension improperly placed by Defendant Mitchelson without hearing or Due Process.

419. The Hearing Officer remedied that when it finally ruled and RESTORED FLOWER TOPS TO OPERATIONAL STATUS as requested.

420. Defendant OBA also seems to complain that Plaintiff's "supporters were very unhappy and vocal about spectators not being allowed to enter the courtroom with smart devices." *Id.* at ¶ 379.

421. By including the statement, Defendant OBA implies Plaintiff should be punished not only for his own speech, but speech of those who purport to support him.

422. Defendant OBA complains that, at the direction of his clients, "accused [Stinson] of violating their constitutional rights, of singling out his followers, and asked her to recuse." *Id.* at ¶ 381.

423. Defendant OBA complains that, upon Defendant Stinson raising her voice and making inappropriate facial gestures, Plaintiff made "untrue statements on the record about Judge Stinson's tone, facial expressions, and gestures." *Id.* at ¶ 384.

424. It appears from that statement that OBA complains that Plaintiff made a record about conditions in the Courtroom which do not otherwise make it into the record but are nonetheless critical to the proceedings, especially given Judge Stinson's behavior and pending recusal request.

425. Defendant OBA complains that, "[a]s [Stinson] left the bench, she could hear chanting and disruption in the hall outside her courtroom." *Id.* at ¶ 385.

426. Again, Defendant OBA implies Plaintiff is responsible for the actions of others expressing their First Amendment rights in a public hallway.

427. Defendant OBA then complains that, after leaving the Courtroom, Plaintiff "stepped into the hallway outside Stinson's courtroom, he made a statement that was livestreamed on Facebook wherein he said, 'The judge does not want to let people in the courtroom even if I take their cell phones. She does not want to allow the public

into her courtroom.  We think that's improper.  It was clear there was a bias already developed here, they've got armed security coming out here.  She's yelling and screaming off the record and trying to do all the things that nefarious judges do in Oklahoma . . . This is why OMMA wanted their cases in Oklahoma County because all the judges are on their payroll, they think . . . and that one certainly acted like she's biased.  You want to talk about corrupt.  Sheila Stinson, corrupt judge in Oklahoma County.  Add her to the Priddy list.'"  *Id.* at 387.

428. Plaintiff does not dispute making such a statement, and to this day, believes EVERY SINGLE WORD to be TRUE.

429. Defendant OBA alleges that, as it relates to the Stinson Grievance, that Plaintiff violated the Oklahoma Rules of Professional Conduct Rules 3.5, 8.2(a), 4.4(a), 8.4(a)(c) and (d), and RGDP 1.3.

   **xii.     The Cole Grievance (Count XV):**

430.  In the Cole Grievance, Defendant OBA alleges Plaintiff "hurled insults and threats at the Clerk's staff using obscene and vulgar language and gestures."  *Id.* at ¶ 208.

431. Cole complained because Plaintiff "was 'screaming f*ck you over and over to them and particularly to the lady in the passport area."  *Id*. at "_."

432. Plaintiff does not dispute telling the Tulsa County Court Clerk's staff all sorts of rude things after being told by one of its employees that the Court Clerk would take no action to STOP releasing his personally identifiable information.

433. Plaintiff does not yell, and he did not yell at the Tulsa County Courthouse that day or any other.

434. Plaintiff speaks in a naturally loud and booming voice, that his family attributes to hearing loss, but he refuses to get checked.

435. If Plaintiff did in fact decide to yell, no possible mistake between the two could be made by anyone.

436. Plaintiff complained, no doubt firmly and in a stern voice, because all of the information provided in the document could allow any individual to steal Plaintiff's identify, and more importantly, find and come to his home.

437. The information on the document, publicly available at the Defendant Tulsa County Court Clerk was improperly filed by Defendant Kunzweiler and the Tulsa County DA, without redacting Plaintiff's personally identifiable information.

438. Defendant Tulsa DA for the 14th Judicial District failed to redact purposefully.

439. The personal identifying information released by Defendant Tulsa DA included but is not limited to Plaintiff's Social Security Number, date of birth, home address, height, weight, and eye color.

440. Cole also complains Plaintiff "parade[d] through the 1st floor followed by two young men w/ what appeared to be expensive cameras." *Id.* at ¶ 412.

441. To sum it up, Cole complains because Plaintiff said the word "fuck" multiple times while PETITIONING the government employees releasing his personally identifying information to STOP DOING SO, and she complains because Plaintiff did such with expensive cameras recording. *See Id.*

442. Defendant OBA then further complains that Plaintiff told someone to "go fuck herself" and "held up his middle finger . . . ." *Id.*

443. Plaintiff meant what he said, and the middle finger constituted communication by Plaintiff to the government employees of his dissatisfaction with their performance and failure to assist the public in need.

444. Defendant OBA alleges Plaintiff's conduct related to the Cole Grievance violates the Oklahoma Rules of Professional Conduct Rules 8.2(a), 8.4(a)(b)(c) and (d) and RGDP 1.3. Id. at ¶ 417.

### xiii.    The Jelsing (Ex-Wife's Brother's) Grievance.

255. Defendant Michael Jelsing is Plaintiff's ex-wife's brother. He is Plaintiff's ex-brother-in-law.

256. Defendant Michael Jelsing filed the complaint in retaliation for Plaintiff prevailing in the custody case against Michael Jelsing's sister, Defendant Christine Jelsing, and for suing him for the behaviors outlined below. *See First Amended Complaint* at ¶ 53-100.

257. The Michael Jelsing Grievance complains of litigation filed by Plaintiff against Jelsing. *Id*.

258. The Jelsing Grievance, and Defendant OBA both fail to address that, in the Jelsing litigation, Plaintiff is a PARTY, and is NOT ENTERED AS AN ATTORNEY.

259. Plaintiff's attorney, Oklahoma attorney Jacob Aycock, signed and filed the Petition on behalf of Plaintiff.

260. Even though Plaintiff was represented by Counsel upon the filing of the Petition, and the Petition is signed by said counsel, Defendant OBA seeks somehow to punish Plaintiff, a party represented by legal counsel, for reasons which are utterly nonsensical and insane, even applying the most liberal sanity schedule to the review.

### xiv.    The Rules OBA Alleges Plaintiff Violated and the Respective Grievances: A Guide.

445. OBA alleges Plaintiff's alleged activities above, warrants his DISBARMENT for violating the following rules:

| Rule | Exact Verbiage of the Rule | Parenthetical Content |
|---|---|---|
| Rule 1.3 | Diligence: A lawyer shall act with reasonable diligence and promptness in representing a client. | Mattingly |
| Rule 3.1 | Meritorious Claims and Contentions: A lawyer shall not bring or defend a proceeding unless there is a basis in law and fact for doing so that is not frivolous. | Mattingly, Thompson |
| Rule 3.2 | Expediting Litigation: A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client. | Mattingly |
| Rule 3.3 | Candor Toward the Tribunal: A lawyer shall not knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement. | Mattingly |
| Rule 3.3(a)(1) | A lawyer shall not knowingly make a false statement of fact or law to a tribunal. | Priddy, Thompson |
| Rule 3.3(d) | In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer. | Priddy |
| Rule 3.4 | Fairness to Opposing Party and Counsel: A lawyer shall not unlawfully obstruct another party's access to evidence or alter, destroy, or conceal evidence. | Mattingly |
| Rule 3.5 | Impartiality and Decorum of the Tribunal: A lawyer | Mattingly, Stinson |

| | | |
|---|---|---|
| | shall not seek to influence a judge, juror, or other official improperly. | |
| Rule 3.5(d) | A lawyer shall not engage in conduct intended to disrupt a tribunal. | Holmes, Burke, Pewitt |
| Rule 3.6 | Trial Publicity: A lawyer who is participating in a case shall not make an extrajudicial statement that may prejudice the case. | Mattingly |
| Rule 3.6(a) | A lawyer shall not make an extrajudicial statement that the lawyer knows will have a substantial likelihood of materially prejudicing an adjudicative proceeding. | Mattingly, Burke |
| Rule 4.1 | Truthfulness in Statements to Others: A lawyer shall not make a false statement of material fact or law to a third person. | Burke, Pewitt |
| Rule 4.3 | Dealing with Unrepresented Person: In dealing with an unrepresented person, a lawyer shall not state or imply that the lawyer is disinterested. | Pewitt |
| Rule 4.4(a) | A lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person. | Malone, Holmes, Burke, Mattingly, City of Tulsa, Priddy, Hogan, Thompson, Pewitt, Stinson |
| Rule 8.2(a) | A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard concerning the qualifications or integrity of a judge or public official. | Holmes, Burke, Mattingly, Priddy, Thompson, Pewitt, Stinson |
| Rule 8.4(a) | It is professional misconduct for a lawyer to violate or attempt to violate | Malone, Holmes, Burke, Mattingly, City of Tulsa, Priddy, Hogan, Thompson, Pewitt, Stinson |

| | the Rules of Professional Conduct. | |
|---|---|---|
| Rule 8.4(c) | A lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. | Holmes, Burke, Mattingly, Priddy, Pewitt, Stinson |
| Rule 8.4(d) | A lawyer shall not engage in conduct that is prejudicial to the administration of justice. | Holmes, Burke, Mattingly, City of Tulsa, Priddy, Hogan, Pewitt, Stinson |

IV. **FACTS AND CLAIMS AGAINST DEFENDANTS STATE OF OKLAHOMA EX REL OKLAHOMA SUPREME COURT, OKLAHOMA BAR ASSOCIATION, BOARD OF BAR EXAMINERS, PROFESSIONAL RESPONSIBILITY COMMISSION, PROFESSIONAL RESPONSIBILITY TRIBUNAL, JANET JOHNSON, LANE NEAL, BRYAN DIXON, STAN MCCABE, GREG MASHBURN, GINA HENDRYX, LORAINE FARABOW, and LES ARNOLD (hereinafter "Supreme Court Defendants")**

**A. Facts Related to the Claims FACTS RELATED TO AND CLAIMS AGAINST THE SUPREME COURT DEFENDANTS.**

**A.1 FACTUAL BACKGROUND- Plaintiff's Answer and Affirmative Defenses to OBA's Complaint**

446.    Plaintiff, appearing Pro Se, filed his Answer to Defendant OBA's Complaint on August 11, 2023.  *See Answer* attached hereto as Exhibit "Q."

447.    In his Answer, Plaintiff "denies the allegations contained in Paragraphs Nos. 2-302 of the Complaint and demands strict proof thereof."  *See Answer* at p. 1.

448.    Plaintiff asserted further that the actions by Defendant OBA constituted an "abuse of process by Defendant OBA as this is in retaliation for Respondent advising the General Counsel of Defendant OBA of his intention to file suit against her (Gina Hendrix) and Loraine Farabow for their negligence related to their failure to investigate and prosecute Logan Jones, Matt Stacy, and other attorneys involved in complex criminal conspiracy."

449.    Plaintiff asserted further the doctrine of "Truth" as "Defendant OBA does not allege that Respondent did not believe a single ting which he stated . . . ."  *Id.* at p. 2.

450.  Plaintiff further asserted the "United States Constitution including all amendments thereto; . . . [t]he Oklahoma Citizens Participation Act, 12 Okla. Stat. § 1430. *Id.*

451.  In the Rules Governing Disciplinary Proceedings (RGDP), the Oklahoma Supreme Court "declares that it possesses original and exclusive jurisdiction in all matters involving the admission of persons to practice law in this State, and to discipline for cause, any and all persons licensed to practice law in Oklahoma . . . ." RGDP § 1.1

452.  In exercising its declared powers, Defendant Oklahoma Supreme Court promulgated rules "which shall govern disciplinary and unauthorized practice of law proceedings." *Id*.

453.  In affixing discipline, Defendant Oklahoma Supreme Court appears to acknowledge and frankly expressly adopts a due process requirement before the imposition of discipline by stating in RGDP § 1.7 that, "[i]n fashioning the degree of discipline to be imposed for misconduct, the Professional Responsibility Tribunal and the Court shall consider prior misconduct where the facts are charged in the complaint and proved and the accused has been afforded an opportunity to rebut such charges."

454.  RGDP § 5.2 lays out the complaint process for lawyers.

455.  RGDP § 5.2 provides,

> [a]fter making such preliminary investigation as the General Counsel may deem appropriate, the General Counsel shall either (1) notify the person filing the grievance . . . that the allegations of the grievance are inadequate . . . or (2) file and serve a copy of the grievance . . . upon the lawyer, who shall thereafter make a written response . . . within twenty (20) days after service of the grievance . . . ."

> RGDP § 5.2

456.  Failure to answer within twenty (20) days is additional grounds for discipline. See Id.

457.  Formal proceedings against an attorney are governed by RGDP § 6.1 which provides that, "[t]he proceeding shall be initiated by a formal complaint prepared by the General Counsel,

approved by the Commission, signed by the chairman or vice-chairman of the Commission, and filed with the Chief Justice of the Supreme Court.

458.    Upon that filing, the matter is finally "a matter of public record." *Id.*

459.    Defendant Professional Responsibility Commission (hereinafter "PRC") consists of seven (7) members.  RGDP § 2.1

460.    Five (5) are lawyers "appointed by the President of the Association . . . ." *Id.*

461.    In other words, five (5) of the seven (7) members of the PRC, or seventy-one-point four three percent (71.43%), are appointed as the judge, jury and executioner of Plaintiff by the same OBA President, Defendant Janet Johnson, seeking to punish Plaintiff in this matter.

462.    Plaintiff specifically interrupted a rally held by Defendant Oklahoma Bar Association and its host, OBA President Janet Johnson, at the Oklahoma State Capitol, and after doing so, OBA President Janet Johnson, who appointed the members now judging Plaintiff, fled the scene in anger.

463.    Defendant OBA'S lobbyists threatened to fight Plaintiff because of him interrupting their lobbying efforts.

464.    The other two lay member of the PRC are appointed by the Speaker of the Oklahoma House and the President Pro Tempore of the Senate. *Id.*

465.    Plaintiff regularly engages in negative political discourse about both the Oklahoma Speaker of the House and the President Pro Tempore of the Senate, and those appointees are now tasked with passing judgment on Plaintiff for negative comments he made about the persons appointing them and their colleagues.

466.    While RGDP provides that the PRC shall meet regularly "at such places and times as it may

elect[,]" the PRC meets specifically and **exclusively** at the offices of Defendant OBA.  *See*

*RGDP* § 2.4

467.    Defendant OBA provides staff to assist and coddle the PRC in its duties endearing the PRC

to Defendant OBA and Defendant OBA General Counsel. Defendant OBA further takes care

of the needs of the members of the PRC in other ways thereby endearing the members of the

PRC to Defendant OBA when presented with requests by Defendant OBA.

468.    The PRC is NOT SUPPORTED BY ANY LEGISLATION, but rather is common law

created by the Oklahoma Supreme Court to fulfill its desires to control every aspect of the

lives of its members.

469.    In RGDP § 2.8, the Oklahoma Supreme Court enshrines in the PRC the following powers:

   (a)    To consider and investigate any alleged ground for discipline . . . of any lawyer . .
          . called to its attention, or upon its own motion, and to take such action with respect
          thereto as shall be appropriate to effectuate the purposes of these Rules.

   (b)    In its investigations, to hold hearings, and to administer oaths or affirmations,
          receive testimony and other evidence, and issue and serve or cause to be served
          subpoenas requiring testimony . . . [and]

   (c)    [t]o require lawyers and other persons to respond or give testimony in connection
          with Commission investigations."

470.    Since one ethics focused commission was not enough, the Oklahoma Supreme Court then

created the Professional Responsibility Tribunal.  *See RGDP* § 4.1 et seq.

471.    RGDP § 6.2A(4) related to interim suspensions provides that, "Disposition. In addition to

the above, the respondent shall file an answer to the complaint with the Chief Justice pursuant

to Rule 6.4, and, except as provided above, all proceedings thereafter shall be conducted in

accordance with the Rules Governing Disciplinary Proceedings where no interim suspension

is sought; provided that, the respondent may include in his/her answer a request for

accelerated disposition, and, thereafter, the entire proceedings shall be concluded by the Professional Responsibility Tribunal and the Court without appreciable delay."

472.  RGDP § 6.7 requires a hearing "which shall not be less than thirty (30) nor more than sixty (60) days from the date of appointment of the Trial Panel."

473.  However, RGDP § 6.7 also allows the Trial Panel to grant extensions of that time, "for good cause shown." *Id.*

474.  In this matter, the Trial Panel and Oklahoma Supreme Court granted Defendant OBA three (3) leaves to Amend its complaint, thereby each time slowing down the process.

475.  Defendant Trial Panel refused to grant Plaintiff his request for additional time to conduct discovery.

476.  In addition to the PRC, the Oklahoma Supreme Court created "a panel of Masters" known as the Professional Responsibility Tribunal (hereinafter "PRT") "which shall consist of twenty-one members . . . ." RGDP § 4.1

477.  The Oklahoma Supreme Court declares that the "function of the Tribunal shall be to conduct hearings on formal complaints filed against lawyers, and on applications for reinstatement to the practice of law." RGDP § 4.5 (a).

478.  The Oklahoma Supreme Court further allows the PRT it created from thin air to then "adopt appropriate procedural rules governing the conduct of proceedings before it, which shall include provisions for requests for disqualification of members of the Tribunal assigned to hear proceedings." *Id*. at § 4.5(b).

479.  The Rules of the PRT are not readily available on the State's court network found at OSCN.net.

480.   Upon the inhiation of formal action before the Oklahoma Supreme Court, the PRT is directed

by RGDP § 6.6 to "select three members thereof to serve as a trial panel of Masters . . . to

hear the complaint which it calls the "Trial Panel."

481.   Two of the Trial Panel must be lawyers, and one a non-lawyer. *Id.*

482.   According to RGDP § 6.6, two of the three constitutes a quorum for conducting hearings,

ruling on and receiving evidence, and rendering Findings of Fact and Conclusions of Law."

483.   Defendant Bryan Dixon heads the Trial Panel related to this matter.

484.   RGDP § 6.7 requires a hearing "which shall not be less than thirty (30) nor more than sixty

(60) days from the date of appointment of the Trial Panel."

485.   However, RGDP § 6.7 also allows the Trial Panel to grant extensions of that time, "for good

cause shown." *Id.*

486.   In this matter, the Trial Panel and Oklahoma Supreme Court granted Defendant OBA three

(3) leaves to Amend its complaint, thereby each time slowing down the process.

487.   Defendant Trial Panel refused to grant Plaintiff his request for additional time to conduct

discovery.

488.   Defendant Oklahoma Supreme Court created an "Emergency Interim Suspension" process

which violates attorney's rights to Due Process, and in this matter, clearly violated the

Constitutional rights of Plaintiff causing him damages resulting from his interim suspension.

489.   RGDP § 6.2A deals with emergency interim suspensions, and it provides that, "[t]he General

Counsel, with the concurrence of the chairperson or vice-chairperson of the Professional

Responsibility Commission, upon receipt of sufficient evidence demonstrating that a lawyer

subject to these Rules has committed conduct in violation of the Oklahoma Rules of

Professional Conduct, and where such conduct poses an immediate threat of substantial and

irreparable public harm, may file a verified complaint in accordance with Rule 6 hereof requesting interim suspension and other appropriate relief."

490.    RGDP § 6.2A(2)(a) provides that, "[u]pon the filing of the verified complaint, the Court . . . may issue an order directing the respondent to object and show cause within ten (10) days why such order of interim suspension should not be entered."

491.    In the event an objection is timely filed, RGDP. §6.2A(2)(b) provides "the Court, or any Justice thereof, may rule on the matter or the Court may refer the matter to the Professional Responsibility Tribunal for hearing and recommendations."

492.    In RGDP § 6.12(c), the Oklahoma Supreme Court established that, "[t]o warrant a finding against respondent in a contested case, the charge or charges must be established by **clear and convincing evidence** . . . ."  (bold emphasis added).

493.    Defendant RGDP's overbroad grant of authority to the General Counsel allows for abuse and disparate treatment of lawyers.

494.    Defendant OBA General Counsel works for Defendant OBA, utilizes its resources, occupies its offices, and relies upon it for all functions.

495.    RGDP § 5.1(b) provides that the General Counsel, solely at their discretion, "may refer the respondent to the diversionary program."

496.    However, before doing so, the General Counsel shall consider lesser misconduct which "is misconduct that does not warrant a sanction restricting the respondent's license to practice law." *Id.*

497.    According to RGDP § 5.1, conduct shall not be considered lesser misconduct if any of the following applied:

    a.    The misconduct involved the misappropriation of funds;

b.    The misconduct resulted or is likely to result in substantial prejudice to a client or other person;

c.    The misconduct is of the same nature as the misconduct for which the respondent has been disciplined in the last five years;

d.    The misconduct involved dishonesty, deceit, fraud or misrepresentation by the respondent; or

e.    The misconduct constitutes a serious crime (any felony or lesser crime that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects).

*Id.*

498.    Defendants PRT and Oklahoma Supreme Court refused Plaintiff any modicum of due process to defend the salacious claims laid out against him by Defendant OBA. *See* OSCN Docket attached hereto as Exhibit "R."

499.    RGDP states, "All proceedings brought under the provisions of Rules 6, 7, 8 and 11 of [the RGDP] shall be filed with the Clerk of the Supreme Court and be a matter of public record at all times except as limited by Rule 5.7." RGDP §5.9 attached hereto as Exhibit "_."

500.    Rule 5.7 of the RGDP is inapplicable here as a formal complaint was filed by Defendant OBA.

501.    Defendant OBA filed the original complaint with the Oklahoma Supreme Court on July 21, 2023, which the Oklahoma Supreme Court subsequently filed of record on August 2, 2023.

502.    Filing of the Original Complaint finally made the matter PUBLIC which Plaintiff sought for years.

503.    Rule 6.8 of the RGDP provides in "Formal Proceedings Before Supreme Court and Professional Responsibility Tribunal" that, "[d]epositions may be taken and read . . ." *Id.* § 6.8(a).

504. Rule § 6.8 of the RGDP additionally provides that, "documents and things may be required to be produced for inspection and/or copying[] . . . ." *Id.*

505. Pursuant to Rule §6.8 of the RGDP, depositions and discovery via written requests shall be "in the same manner as in civil cases[.]" *Id.*

506. 12 Okla. Stat. §3233 governs interrogatories in civil discovery in Oklahoma, it and provides a responding party shall provide responses "within thirty (30) days after the service of the interrogatories." *Id.* at § 3233(A).

507. 12 Okla. Stat. §3234 governs the production of documents and things in civil discovery in Oklahoma, and it provides "[t]he party to who the request is directed shall respond in writing within thirty (30) days after being served. *Id.* at § 3234(B)(2)

508. 12 Okla. Stat. § 3236 governs requests for admissions in civil discovery in Oklahoma, and it provides, "[t]he matter is admitted unless, within thirty (30) days after service of the request, . . . a written answer or objection [is sent by the responding party]. *Id.* at § 3236(A).

509. 12 Okla. Stat. § 3230 governs depositions upon oral examination in civil discovery in Oklahoma, and while it's possible to undertake a deposition in a period possibly shorter timespan than thirty days, the deposition is not final until "[t]he deponent shall have . . . (30) days in which to review [the transcript] and, if there are changes to form or substance, to sign a statement reciting such changes . . . ."

510. 12 Okla. § 2004.1 governs subpoenas in civil matters, and it does allow someone to command the production of documents via subpoena from a non-party "at least seven (7) days after the date that the subpoena [is] served . . ." *Id.* at § 2004(B)(1).

511. However, that seven (7) day turn around becomes infinite because § 2004(C)(1) allows the party upon which a subpoena is served to "serve written objection to inspection . . . ." *Id.* at § 2004.1(C)(2)(b).

512. Production pursuant to § 2004.1(C)(2)(b) then depends on the court's timeline to rule on the relevant objections. *See Id.*

513. Defendant OBA's Original Complaint consisted of eleven (11) counts over a total of sixty-nine (69) pages.

514. Plaintiff filed his Entry of Appearance and Answer on August 11, 2023.

515. On August 29, 2023, Defendant Bryan Dixon entered an Order Setting Scheduling Conference setting a Scheduling Conference on September 6, 2023 at 10:00 A.M.. *See* Order Setting Scheduling Conference attached hereto as Exhibit "S."

516. On September 6, 2023, Plaintiff attended the PUBLIC Scheduling Conference.

517. Defendant Bryan Dixon became very upset at Plaintiff and the others present for recording the PUBLIC proceedings. Defendant Dixon began shouting at Plaintiff, and Defendant Dixon abruptly ended the hearing refusing Plaintiff's request for necessary time to conduct discovery in the matter.

518. Defendant Dixon, without consultation with Plaintiff, then entered and filed a Scheduling Order on September 6, 2023 (hereinafter 'September 2023 Scheduling Order". *See* September 2023 Scheduling Order attached hereto as Exhibit "T."

519. In the September 2023 Scheduling Order, Defendant Presiding Master Defendant Bryan Dixon set the trial to begin on November 27, 2023. *See Id.* at ¶ 6.

520. From the date of the entry of the September 2023 Scheduling Order to the trial date ordered by the Trial Master, Plaintiff was given less than three (3) months to conduct discovery, take

depositions, and prepare for a trial of the matter related to the defense of an eleven (11) count sixty-nine (69) page complaint.

521.   The time granted Plaintiff from the entry of the Scheduling Order to the start date of the trial of the matter amounted a mere eighty-two (82) days for Plaintiff to undertake discovery necessary to rebut Defendant OBA's case.

522.   The first claim addressed in Original Complaint, the Malone Grievance, was received by Defendant OBA on April 20, 2020. *See* Original Complaint at ¶ 8.

523.   Since receiving that first complaint against Plaintiff, Defendant OBA took one thousand one hundred and eighty-seven (1,187) days to conduct its investigation, interview witnesses, and prepare its filed case against Plaintiff. (April 20, 2020-July 21,2023).

524.   The delay of Defendant OBA to prosecute these matters constitutes, in and of itself, a violation of Plaintiff's right to a speedy trial and due process.

525.   Federal criminal trials, which move at lightning speed, do not hold a candle to the timeline Defendant OBA Defendants allowed Plaintiff.

526.   The due date for the Preliminary Witness List was September 13, 2023.

527.   Defendant Trial Panel ordered Plaintiff to produce his Final Exhibit Log and Trial Exhibits fourteen (14) days before hearing, meaning that in fact, Plaintiff had, at absolute best, sixty-eight (68) days to conduct discovery and prepare for trial under the Original Scheduling Order.

528.   During this stage of the proceedings, Plaintiff issued written discovery to Defendant OBA. Defendant OBA failed to properly respond, and Defendant OBA failed to supplement its responses despite the multiple amendment of its Complaints.

529.   On October 24, 2023, approximately thirty (30) days before trial, Defendant OBA requested
       a continuance.  *See* OBA's First Motion for Continuance attached hereto as Exhibit "U."

530.   In its First Motion for Continuance, Defendant OBA alleges it "has received, and is currently
       investigating, additional allegations of professional misconduct against the Respondent." *Id.*
       at ¶ 3.

531.   Defendant OBA noted that, after the continuance, it would, "move this Tribunal for leave to
       file an Amended Complaint . . . ." *Id.*

532.   In support of its First Motion for Continuance, Defendant OBA further notes that, "[j]ustice
       so requires . . . that in attorney disciplinary proceedings, the interests of justice are best served
       when all relevant matters are presented and heard in one hearing in order to avoid piecemeal
       analysis and provide a complete record to the Court.  Id. at ¶ *6 citing Ass'n v. Wolfe*, 1997,
       OK 47, ¶¶23-24, 937 P.2d 988.

533.   In addition to its request for continuance, Defendant OBA requested, "the current discovery
       deadlines shall be **stayed** pending the issuance of an Amended Scheduling Order following
       the setting of a new hearing date." *Id.* at p. 2 (emphasis added).

534.   The VERY NEXT DAY, and without allowing Plaintiff to respond OBJECTING to said
       request for a continuance, Defendant Bryon Dixon GRANTED DEFENDANT OBA's
       CONTINUANCE.   *See* First Order Continuing Hearing attached hereto as Exhibit "V."

535.   Defendants OBA and Gina Hendryx improperly communicated with and colluded with
       Defendant Dixon to deny Plaintiff his civil rights in this matter.

536.   In addition to continuing the hearing, the Defendant Dixon also, as requested by Defendant
       OBA, "**stayed** [deadlines] pending resetting of the hearing and issuance of an Amended
       Scheduling Order. *Id.* (bold emphasis added).

537. Plaintiff, as directed by Defendants Trial Panel and Dixon, awaited an Amended Complaint from Defendant OBA in order to commence and undertake complete discovery in the matter.

538. Plaintiff agrees with Defendant OBA's affirmative position that things are best done when not done in a piecemeal fashion as Defendant OBA argued when it sought a continuance.

539. Additionally, Plaintiff frankly cannot afford to conduct discovery multiple times or take multiple depositions. With limited financial resources come hard choices in litigation, and making those choices before fulling understanding the charges against him makes the decision utterly guesswork.

540. As the proceedings are quasi criminal in nature, Plaintiff held a right to Brady level production of documents, along with an opportunity to conduct his own discovery after production by Defendant State of Oklahoma.

541. On February 13, 2024, Defendant OBA filed its Motion for Leave to Amend Complaint. *See* Motion for Leave to Amend No. 1 attached hereto as Exhibit "W."

542. On February 15, 2024, despite the fact Defendant OBA only sought leave to file an Amended Complaint and sought leave to seek Plaintiff's immediate suspension, the Oklahoma Supreme Court, instead of allowing Plaintiff the statutory time to respond to Defendant OBA's Application, ordered Plaintiff to respond and show cause why he should not be suspended by March 1, 2024. *See* Order to Show Cause attached hereto as Exhibit "X."

543. The First Amended Complaint consisted of Seventeen (17) Complaints and totaled one hundred and nine (109) pages, 40 more pages than the Original Complaint. *See Id*.

544. The six (6) additional complaints in the Amended Complaint equates to an addition of Fifty-five percent more claims faced by Plaintiff tin the Amended Complaint than in the Original Complaint.

545.   By granting Defendant OBA's Motion to Continue, Defendant OBA received from the PRT an additional one hundred and twelve (112) days to conduct additional investigations and work while discovery and scheduling orders were stayed for Plaintiff.

546.   On March 4, 2024, Defendant Bryon Dixon set the Hearing (trial) for the First Amended Complaint to begin on April 8, 2024. *See* March 4, 2024 Order Setting Hearing attached hereto as Exhibit "Y."

547.   The following day, March 5, 2024, the Oklahoma Supreme Court granted Plaintiff ten (10) days to file an Answer to the Amended Complaint and Application for Interim Suspension after Plaintiff pointed out correctly that the Supreme Court deprived him of due process by treating an application to amend as an amendment.

548.   On March 29, 2024, Plaintiff filed his Answer to Amended Complaint and asserted the following affirmative defenses: 1. Abuse of process, Truth, Fraud, Laches, the Oklahoma Constitution, the United States Constitution including all amendments thereto, 42 U.S.C. § 1983 et seq., and 7. The Oklahoma Citizens Participation Act, 12 Okla. Stat. § 1430. *See* Respondent's Answer to Amended Complaint and Verified Application for an Order of Emergency Interim Suspension Pursuant to Rules 6 and 6.2A RGDP (hereinafter "First Amended Answer" attached hereto as Exhibit "Z."

549.   On April 12, 2024, Defendant Dixon set the matter for conference on April 17, 2024. *See* the Second Scheduling Conference Order attached hereto as Exhibit "AA."

550.   Unlike the original Scheduling Order, Defendant Dixon added an additional Order directly targeting Plaintiff and his public supporters' constitutional rights. *See Id*.

551.   Defendant Dixon ordered that, "there will be no audio or video recordings permitted except for the court reporter." *See Id*.

552.    This Second Scheduling Order provision prohibiting Plaintiff or other members of the public and press from recording the PUBLIC hearing directly conflicts with the rights of Plaintiff to a Public hearing, just as every other profession in the State of Oklahoma enjoys when accused by the state of things which could warrant the taking of a license. Additionally, Defendant OBA's denial of Plaintiff and others right to record a public hearing violates their First and Fourteenth Amendment rights.

553.    Plaintiff demanded a public hearing to recount the public allegations against him, and Defendant OBA Defendants and Defendant Dyxon specifically punished Plaintiff for recording in the initial hearing to his displeasure.

554.    The actions of Defendant OBA Defendants violate the Oklahoma Open Meetings Act.

555.    Despite "staying" proceedings including discovery, Defendant Dyxon did not afford Plaintiff any realistic opportunity to conduct discovery after the filing of the First Amended Complaint.

556.    Plaintiff and members of the public attended the April 17, 2024 Conference set by Defendant Bryan Dixon.

557.    As Plaintiff and members of the public attempted to enter the public hearing room, they were confronted by members of the Oklahoma Highway Patrol which attempted to search Plaintiff and others present.

558.    Defendant Oklahoma Highway Patrol (hereinafter "OKP) acted as security for Defendant OBA hearing on April 17, 2024.

559.    Defendant Beaty worked as security for Defendant OBA hearing on April 17, 2024.

560.    Plaintiff and those attending with him were told by Defendant OKP they were being subjected to enhanced security screenings other participants in the trial were not required to undergo.

561.    In the process, the Defendant, Oklahoma Highway Patrol Officer Beaty improperly assaulted and battered Plaintiff and other members of the public by improperly touching them in a harmful and offensive manner without his consent.

562.    Plaintiff and the public entered the hearing room before the scheduled hearing time in order to situate themselves for the hearing before it commenced.

563.    At the time of entering the hearing room, the PRT panel members were already seated at the front of the room, and Defendants Hendryx and Farabow were already seated at council table.

564.    From all appearances and the behavior of Defendant Dyxon at the time, it appears from all available evidence that Defendant OBA Defendants went on the record and started the proceedings early, BEFORE PLAINTIFF ARRIVED.

565.    In fact, it appears OBA Defendants conspired to go on the record and start the proceedings before Plaintiff entered in an attempt to cause harm to Plaintiff by prohibiting him from recording the public hearing room.

566.    Plaintiff, holding his cell phone after being battered but cleared to enter the room by Defendant Beaty, entered the hearing room.  At that time, Defendant Dyxon ordered Plaintiff not to record.  Plaintiff WAS NOT recording at the time.

567.    To make it clear to Defendant Dyxon that he was not recording, Plaintiff sat his phone flat on the table.

568.    Defendant Dyxon then ordered Defendants Beaty and Oklahoma Highway Patrol to unlawfully seize Defendant's personal cellular device, to which Plaintiff refused.

569. Defendant Dyxon ordered Plaintiff and other's electronic devices confiscated without a warrant, and Defendant Beaty attempted by physical means to grab the phone of Plaintiff and others in the public gallery.

570. When Defendant Dyxon was unsuccessful in illegally obtaining Plaintiff's cellular phone, he then proceeded to take direction from Defendant Gina Hendryx and illegally demanded the search and seizure of other persons electronic devices in the room. *See* Hearing Videos attached hereto as Exhibits "BB."

571. The events at issue on April 17, 2024 were captured by witnesses in attendance and published on the Guerrilla Publishing page. The video of the hearing captured by Guerrilla Publishing is attached hereto as Exhibit BB.

572. Defendant Dyxon, being unable to illegally seize Plaintiff that day instead filed a Certification of Contempt Citation to instead prosecute Plaintiff for allegedly filming in the April 17, 2024 hearing.

573. Again, Plaintiff DID NOT record at that hearing, and even if he had, he had a constitutional right to do so which Defendant OBA and Defendant Beaty violated by ordering him not to and by attempting to illegally seize his property without Due Process.

574. Plaintiff is set for trial on the allegations of contempt by allegedly filming a public hearing in early 2025.

575. As noted in Hearing Videos of the April 17, 2024 hearing, PRT Presiding Master Dyxon acted in an impartial and improper manner reflecting a temperance not appropriate for any jurist. His conduct, tone, and actions reflected a clear bias against Plaintiff. *See Id.*

576. Defendant Dyxon again abruptly ended the scheduling hearing over Plaintiff's objection, and instead entered another scheduling order without input from the Respondent.

577.   On April 19, 2024, Defendant Dyxon entered Defendant Trial Panel's Amended Scheduling Order.  *See* the Amended Scheduling Order attached hereto as Exhibit "CC."

578.   The Amended Scheduling Order, filed April 19, 2024, provided Plaintiff must produce his "final list of witnesses in chief, together with addresses and a brief summary of expected testimony . . . by May 13, 2024."

579.   The Amended Scheduling Order, like the First Scheduling Order, did not allow Plaintiff sufficient time to conduct discovery.

580.   In fact, after originally granting Plaintiff only sixty-eight (68) days of discovery in the Scheduling Order, as addressed above, and then "staying" all deadlines at the request of Defendant OBA, Defendant Trial Panel on the Second Scheduling Order granted Plaintiff a measly **twenty-four (24) days** from entry of a Scheduling Order to the date which Plaintiff must produce his final witness list and summary of testimony to Defendant OBA.

581.   As a further exhibit that Defendant Trial Panel, and specifically Defendant Dyxon, are taking punitive action against Plaintiff for asserting his constitutional rights, Defendant Dyxon in the Amended Scheduling Order writes,

> [t]he hearing shall be recorded by certified shorthand court reporter appointed by the Professional Responsibility Tribunal.  No other recording device shall be permitted or used in the hearing room.  This includes cameras, cell phones and any other device used for video or audio recordings.  Any person attempting to use a recording device prohibited by this Order shall have the recording device removed from the person and shall be held until the end of the hearing, or if contempt proceedings are sought, the recording device will be held as evidence until such contempt proceedings are finally concluded, pursuant to the Rules Governing Disciplinary Proceedings, Rule 6.11(c)

> *Id*. at ¶5.

582.   Defendant Dyxon's Order directs itself at Plaintiff and those attending with him, and it prohibits Plaintiff from recording his own record.  In fact, Plaintiff is prohibited from

employing his own court reporter by Defendant Dyxon's Order, and instead must rely on the court reporter cherry-picked by the PRT. *See Id.*

583. As laid out above, the Oklahoma Discovery Code, which applies to this matter, provides that when it comes to discovery like interrogatories, requests for admissions, and requests for production, the responding party receives thirty (30) days to provide responses. In other words, if Plaintiff sent discovery on the date the Discovery Order was entered, Defendant OBA would be obligated to respond six (6) days **AFTER** Plaintiff's final witness list is due together with a summary of the expected testimony.

584. OBA Defendants created a discovery impossibility as Plaintiff does not have legitimate means to conduct discovery in this matter.

585. Twelve (12) days after entry of the Amended Scheduling Order, Defendant OBA on May 1, 2024, again filed a Motion to Continue (hereinafter "Third Motion to Continue"). *See* Third Motion to Continue attached hereto as Exhibit "DD."

586. In its Motion, Defendant OBA complained, the "server that houses the disciplinary database is currently not operational and documents cannot be retrieved from same." *Id* at ¶ 3.

587. Additionally, Defendant OBA noted, "[a]fter considering additional grievances filed against Respondent. . . [OBA needs] to amend the formal charges currently pending against Respondent to include these new grievances." *Id*. at ¶ 5.

588. On April 7, 2024, AGAIN WITHOUT GIVING PLAINTIFF TIME TO RESPOND OBJECTING, the PRT via Defendant Bryan Dixon, entered an order GRANTING Defendant OBA's request in its Order Continuing Hearing (hereinafter "Third Order Continuing Hearing") attached hereto as Exhibit "EE."

589.    On September 3, 2024, OBA filed its Second Amended Complaint, attached hereto as
        Exhibit "FF."

590.    The Second Amended Complaint consisted of nineteen (19) grievances, although totaling
        many more encompassed in the broad claims, and consisted of thirty additional pages of
        alleged facts by Defendant OBA against Plaintiff. *See Id.*

591.    On September 5, 2024, two dates later and before Plaintiff's Answer date, Defendant OBA
        filed a Motion for Issuance of Second Amended Scheduling Order attached hereto as Exhibit
        "GG."

592.    In their Motion for Scheduling Order, Defendant OBA attached a proposed scheduling order
        inviting Defendants Trial Panel and Dyxon to require Plaintiff submit his final list of
        witnesses in chief on October 11, 2024, just thirty-six (36) days from the date of the Motion
        for Scheduling Order by FILED by Defendant OBA. *See Id.*

593.    In its Motion for Scheduling Order, Defendant OBA first reveals to Plaintiff that Defendant
        PRT adopted a new rule, Rule 4.5(b), amending the Rules Governing Disciplinary
        Proceedings applicable to Plaintiff's hearing, designed specifically to prohibit Plaintiff from
        recording a PUBLIC HEARING. *See Id.* at P. 5.

594.    Defendant PRT, by adopting the rule at issue, establishes definitively it knew that no such
        prohibition previously existed, and as such, Defendant OBA's public hearings constituted,
        at a minimum, a limited public forum. One in which previously, the public and press were
        not prohibited from recording.

595.    Adoption of any rule to prohibit recording of a public hearing by media and a party, after
        previously allowing the public's free admission and ability to record its hearings constitutes

an unlawful and unconstitutional constraint on Plaintiff's First Amendment rights and rights pursuant to the Open Meetings Act by Defendant OBA Defendants.

596.    Clearly, OBA Defendants realized recording in its hearing was a matter of public concern and right previously, which is why, only after Plaintiff asserted his legal right to record, Defendant OBA Defendants sought to limit it by adopting a rule prohibiting previously permissible conduct.

597.    Rule 5.4(b) is also insufficiently tailored to survive constitutional scrutiny, and as such, it should be struck down.

598.    On September 23, 2024, Defendant Trial Panel, again without consulting Plaintiff, entered what it titled its Second Amended Scheduling Order, and four (4) days later, entered its Third Amended Scheduling Order. *See* Second Amended Scheduling Order attached hereto as Exhibit "GG" and Third Amended Scheduling Order attached hereto as Exhibit "HH."

599.    Defendants Trial Panel and Dyxon again granted Defendant OBA, their master, exactly what it requested in its Motion for Scheduling Order.

600.    By the PRT's Second and Third Scheduling Orders, Plaintiff received from September 23, 2024, the date of the Second Amended Scheduling Order was filed until October 11, 2024 in which to provide his "final list of witnesses in chief, together with their addresses and brief summary of expected testimony where witnesses has not already been deposed." *Id*. at ¶ 2.

601.    Even the form scheduling order anticipates that, prior to a trial, discovery, including depositions, would occur, and it includes that language because of the procedural necessity for ample discovery to ensure due process in the matters. *See Id*. at ¶ 2.

602.    With its September 23, 2024 Order, Defendants Trial Panel and Dyxon in effect allowed Plaintiff just eighteen (18) days (September 23, 2024-October 11, 2024) to conduct discovery on Defendant OBA's nineteen (19) broad claims and over 139 pages of allegations (Amended Complaint plus Second Amended Complaint). As noted above, the timeline for Plaintiff to conduct discovery is IMPOSSIBLE under the Oklahoma Rules of Civil Procedure. *See* 12 O.S. 2002 et seq.

603.    On October 4, 2024, Defendant OBA filed another "Motion for Extension of Time" this time for additional time to submit its finalized trial exhibits. *See* Complainant's Motion for an Extension of Time in Which to Submit its Finalized Trial Exhibits attached hereto as Exhibit "II."

604.    On October 8, 2024, again WITHOUT AFFORDING RESPONSE FROM PLAINTIFF, Defendants Trial Panel and Dyxon again GRANTED Defendant OBA's Motion for additional time without considering objections by Plaintiff. *See* OBA Case Docket attached hereto as Exhibit "R."

605.    On October 18, 2023, Plaintiff filed Respondent's Motion to Amend Scheduling Order attached hereto as Exhibit "JJ."

606.    In Respondent's Motion to Amend Scheduling Order, Respondent laid out to Defendant Trial Panel that it, on three (3) previous occasions, granted Defendant OBA a continuance without allowing Plaintiff to respond. *Id*. at ¶ 2, 3 and 5. (hereinafter "Respondent's Motion to Amend").

607.    Plaintiff's Motion to Amend also noted that Defendant OBA did not consult with Plaintiff when proposing any scheduling orders and "failed to consider Respondent's need to conduct discovery." *Id*. at ¶ 3.

608.    Plaintiff also pointed out that, pursuant to Title 12 of the Oklahoma statutes, which govern discovery in the proceeding, "this Tribunal failed to allow Respondent sufficient time to conduct discovery in this matter." *Id.* at ¶ 4.

609.    In his Motion to Amend, Plaintiff reminded the PRT that he is "SUSPENDED" and as such, "NO HARM" could come to Defendant OBA by allowing Plaintiff sufficient time to prepare for trial. *See Id*. at ¶ 6.

610.    Plaintiff requested a reasonable one hundred and twenty (120) days to conduct discovery on Defendant OBA's nineteen complaints and over one hundred and thirty (30) pages of allegations. *See Id*. at ¶ 7.

611.    Plaintiff additionally requested that "all other deadlines be extended to allow for discovery in this matter." *Id*. at ¶ 8.

612.    On October 24, 2024, Defendant OBA filed its Objection to Respondent's Motion to Amend Scheduling Order attached hereto as Exhibit "KK."

613.    In its Response, despite its earlier statement, Defendant OBA absurdly argues, "Respondent has been afforded the opportunity to conduct discovery the entirety of the investigatory and/or disciplinary stages of these proceedings." *Id*. at ¶ 2.

614.    Defendant OBA's statement fails to acknowledge its own prior Motion to Amend in which it noted, in support of its First Motion for Continuance, that "[j]ustice so requires . . . that in attorney disciplinary proceedings, the interests of justice are best served when all relevant matters are presented and heard in one hearing in order to avoid piecemeal analysis and provide a complete record to the Court. *Id*. at ¶ *6 citing Ass'n v. Wolfe*, 1997, OK 47, ¶¶23-24, 937 P.2d 988.

615.   Defendant OBA also fails to acknowledge that, by its own request, Defendant Trial Panel "stayed" deadlines to allow Defendant OBA time to amend its complaint.

616.   Defendant OBA's position seems to argue that, despite absolute knowledge by Plaintiff that Defendant OBA intended to amend its pleadings to add additional claims, Plaintiff should still have undertaken potentially unnecessary and duplicative discovery.

617.   Defendant OBA argues Plaintiff deserves punishment and was properly denied a scheduling conference in which to work out the necessary time to conduct discovery because, in Defendant OBA's own words, "Respondent willfully and deliberately disobeyed the orders of the PRT's Presiding Master by refusing to stop recording the proceedings with his mobile telephone and/or other recording devices and acting in a contemptuous manner." *Id*. at ¶ 4.

618.   As noted above, when Defendant Trial Panel, at Defendant OBA's request, destroyed Plaintiff's rights to a timely trial, Defendant Trial Panel, by its own words, "stayed" the discovery deadline to be reset by the PRT.

619.   There is no way Plaintiff could reasonably anticipate he needed to conduct discovery on some matters when Defendant OBA intended to submit additional claims. Doing so would result in duplicative and costly discovery potentially unnecessary upon amendment by Defendant OBA. Plaintiff could not and should not be forced to make impossible assumptions.

620.   OBA Defendants could have and absolutely should have entered a proper scheduling order to begin with in which it set out all deadlines, including deadlines for Defendant OBA to amend its pleadings.

621. Nothing prohibited Defendant Trial Panel from doing so, and nothing in Oklahoma law prohibited Defendant OBA from instituting a secondary disciplinary proceeding encompassing additional charges for which it seeks discipline.

622. On October 29, 2024, Defendant Trial Panel via Defendant Bryan Dixon, DENIED Plaintiff's request for extension of time to conduct discovery, despite granting EVERY REQUEST OF DEFENDANT OBA.

623. Plaintiff issued dozens of subpoenas in this matter to non-party witnesses.

624. Every single subpoena issued by Plaintiff was challenged via motions to quash filed by the receiving party in Defendant OBA case, and yet Plaintiff is expected by OBA Defendants to try a matter set for trial before Defendant Trial Panel resolves discovery issues.

625. Defendant Bryan Dyxon, without allowing Plaintiff time to respond, entered an order, three (3) days before trial, QUASING EVERY SINGLE SUBPOENA OF PLAINTIFF. *See* Order Quashing Subpoenas attached hereto as Exhibit "LL."

626. Plaintiff is unsure how to defend himself under these circumstances.

627. As noted in the Order Setting Hearing, Defendant Trial Panel uses and relies upon Defendant OBA and its facilities for its location and needs in preparing all filings and for all other needs before, during and after its hearings.  This relationship gives Defendant OBA an unfair relationship with Defendant Trial Panel.

628. Defendant Oklahoma Supreme Court improperly restricts the First Amendment rights of lawyers by restricting their free speech regarding complaints.

629. RGDP § 5.4 provides that, "[m]atters contained in grievances submitted to the Association, the Commission or the General Counsel, and statements, oral or written, with respect thereto,

shall be privileged. Litigation or the threat of litigation by a respondent lawyer against a person filing a grievance by reason of such filing may be ground in itself for discipline.

630.   RGDP § 5.4 unlawfully restricts Plaintiff's 1st and 14th Amendment rights.

631.   RGDP § 5.4 is not just there for show as Defendant OBA, beyond all doubt, uses it to silence Plaintiff and all Oklahoma attorneys.

632.   Plaintiff, being aware of the Rule, notified Defendant General Counsel that complainant Dana Murphy appeared on his Facebook Live in which she began posting comments about the complaint she filed against Plaintiff.

633.   Defendant OBA advised Plaintiff that, since Dana Malone was not an attorney, there was nothing they could or would do regarding her decision to communicate about the contents of the Malone grievance.

634.   Defendant OBA threatened Plaintiff that, pursuant to RGDP § 5.4, if he should talk about the matter publicly, regardless of complainant's instigation, Plaintiff would be subjected to discipline by Defendant OBA.

635.   Defendant OBA's General Counsel also, in a promise that it would resolve the complaint filed by Dana Malone against Plaintiff if he did so, demanded Plaintiff remove the post about Dana Malone.

636.   Plaintiff, despite believing the content protected by the First Amendment, caved to the pressure by Defendant OBA and removed the post. Despite Plaintiff complying Defendant OBA's demand, Defendant OBA did not resolve the matter as promised and breached its contract with Plaintiff by continuing to pursue these absurd matters.

637. In 2023, Adam Grant Miller applied for admission to the Oklahoma Bar Association and passed the Oklahoma Bar Examination. See Findings of Fact and Conclusions of Law attached hereto as Exhibit "MM."

638. On March 31, 2023, the Oklahoma Board of Bar Examiners, a part of Defendant OBA, "sent Applicant Miller by certified mail a pre-denial notice of concerns pursuant to Section 2 of Rule 11." Id. at p. 1.

639. While finishing law school, Miller decided to run for political office, and was elected as City Councilor of District 5 of the City of Tulsa.

640. Defendant Miller is the same Miller Plaintiff represented when, after completing that hearing, the events alleged in the Holmes/Williams grievance occurred in the Court Building hallway.

641. The Miller referenced here is the same Miller allegedly when Plaintiff insulted OBNDD Agent Mark Woodward at the offices of Defendant OBNDD.

642. Mr. Miller's denial of admission relates to his choice to associate with Plaintiff, and if further violates his rights to political speech.

643. During its case against Miller to prohibit his admission, Defendant OBBE called witnesses against Miller including 1) Defendant G.T. Bynum, Mayor of the City of Tulsa, 2) Defendant Tulsa City Council Member Lori Decter Wright, 3) Defendant Tulsa City Council Member Vanessa Hall-Harper, 4) Defendant Tulsa City Council Member Laura Bellis, 5) the personal attorney for 3 City Councilors, Laurie Phillips, 6) City of Tulsa Attorney Patrick Boulden, 6) Defendant City of Tulsa employee Mark Hogan and others. *Id.* at p. 2.

644. Defendant OBBE DENIED MILLER'S APPLICATION to associate with the Oklahoma Bar Association, a condition precedent to Miller practicing law in the State of Oklahoma.

645.  Without Miller's admission, Plaintiff, as a member, was unable to associate with Miller as an attorney, infringing on Plaintiff's freedom of association.

646.  Without Miller's admission, Miller was and is unable to associate with others as a practicing attorney in the State of Oklahoma.

647.  Defendant OBBE punished Miller and denied him admission to Defendant OBA, not for his own speech, but for the speech and conduct of Plaintiff.

648.  In outlining its Findings, Defendant OBBE noted, "City of Tulsa Mayor G.T. Bynum testified that he had concerns about whether Applicant Miller has good moral character and due respect for the law." *Id*. at p. 4, ¶ 3.

649.  The basis for the concerns, according to Defendant Bynum were, among other things, "Applicant Miller's repeated allegations in public forums that the City of Tulsa staff was guilty of either malfeasance or misfeasance in connection with cost increases on the Gilcrease Museum Project without providing evidence . . . ." *Id*.

650.  By including this statement, from the totality of the testimony, Defendant OBEE established its denial of admission directly related to the political speech of Miller.  Defendant Bynum's own statement establishes Millers comments were made "in public forums" and were about City of Tulsa projects and staff.  Miller's conduct could not be clearer political speech. *See Id*.

651.  Defendant OBBE also included Defendant Bynum's testimony that Miller allegedly "spread misinformation about the Improve Our Tulsa initiative that was voted on by the citizens of Tulsa in August 2023, publicly accusing City staff of destroying relevant documents . . . ." *Id*.

652.    Again, by its of Findings, Defendant OBBE established that its denial of Miller's admission related in large part on political speech by Miller in his role as City Councilor for the City of Tulsa.

653.    Defendant OBBE accused Miller of "using his position as a City Council Member to bully and intimidate civil servants who work for the City on social media . . . ." *Id.*

654.    Again, Defendant OBBE references political speech made on a public website on a page where Miller posts his political thoughts and associates with his supporters. *See Id.*

655.    Getting to the real issue, Defendant OBBE then alleges what it is truly upset with Miller about, and that is his association with Plaintiff.

656.    Defendant OBBE finds that that Miller, by being present with Plaintiff as an employee of Plaintiff's law firm, is unfit because during those times, he is somehow, by proximity alone, "complicit in demeaning and harassing civil servants with Ronald Plaintiff, using the law for revenge and publicity, Applicant Miller's refusal to compromise litigation over text messages of City Council Members in a committee meeting, and creating a climate of fear among City of Tulsa staff[.]" *Id.*

657.    The OBBE finds that the above warrants Miller's denial of admission to Defendant OBA. *Id.*

658.    Defendant OBBE then, after recounting other Tulsa City Councilors do not like Miller, lays out that they find Miller lacks moral character, and then, as if to tell everyone it knows it should not be considering their testimony, Defendant OBBE states, "[n]one of the reasons relied upon by these witnesses were based on political positions of Applicant Miller." *Id.*

659.    Any person reading the Findings of Fact that believes that should see a medical professional immediately, as they are likely suffering from severe brain ischemia. *Id.* at P. 5, ¶4.

660. Tulsa City Attorney Patrick Boulden's relevant testimony, according to the OBBE, was his belief Miller engaged in "an abusive 'fishing expedition' over alleged violations of the Open Records Act by Miller and his boss and mentor, Ronald Plaintiff, motivated by Applicant Miller." *Id.*

661. Defendant OBBE made these finding even though Miller was NOT a party to the litigation.

662. Further, Defendant OBBE's Findings make clear that it punishes Miller for his associations with "boss and mentor" Plaintiff.

663. Such punishment violates the 1st and 14th Amendments to the Federal Constitution by infringing on speech and association of both Miller and Plaintiff. *Id.* at p. 5, ¶ 5.

664. Specifically, Defendant OBA Defendants, specifically including Hendryx, the OBBE and Naifeh, instructed Miller NOT to associate with Plaintiff in order to gain admission to Defendant OBA.

665. At the time, Plaintiff and Miller owned a business together, and Miller began not coming around.

666. Plaintiff did not know the cause of Miller's avoidance, as he did not tell Plaintiff.

667. Instead, Plaintiff learned after Defendant OBA Defendants destroyed the business relationship of Durbin and Miller after Miller's denial of admission, costing Plaintiff millions in economic damages.

668. Defendant OBBE, in case it was not already clear, evaluated and judged Miller on both his, and Plaintiff's speech and association, when it stated that, "Applicant Miller actively planned and facilitated and participated in multiple public confrontations with elected officials, administrative personnel, police officers, and agency employees along with his boss and mentor, Ronald Durbin." *Id.* at p. 6, ¶7.

669. To remove any doubt Defendant OBBE judged Miller based on the content of his and Plaintiff's speech, they stated without hesitation, "OBBE finds those interactions with Oklahoma governmental personnel offensive and unacceptable." *Id.*

670. Defendant OBBE noted that it reviewed "OBBE Ex 39 videos [as] examples of those confrontations." *Id.* at p. 6, ¶7.

671. After relaying all of the facts about regarding Miller's associations and political speech, Defendant OBBE found that Miller, "failed to meet his burden to establish his good moral character . . ." *Id.* at p. 6

672. According to Defendant OBBE's Findings, Miller must wait twenty-four (24) months before he can reapply. *Id.* at 7.

673. Defendant OBBE's decision to deny Miller admission infringes on not only Miller's rights, but the rights of all members of Defendant OBA who wish to freely associate with Miller as an attorney.

674. Defendants OBBE and OBA destroyed Plaintiff and Miller's relationship, and by its own findings, tortiously interfered with Plaintiff's contractual business relationship with Miller. The OBBE and OBA destroyed that relationship, and as a result caused Plaintiff substantial economic damages.

675. On August 25, 2023, Plaintiff, on behalf of numerous clients, filed suit in Tulsa County, State of Oklahoma, against Defendant OBA, General Counsel Gina Hendryx, and others. *See* Blueviewtam Farm, LLC v. Jones Brown, PLLC et al. attached hereto as Exhibit "NN."

676.    The facts and allegations contained in the Blueview Petition, as well as the exhibits thereto, are adopted and incorporated herein as if fully laid out herein. *See* Blueview Petition attached hereto as Exhibit "NN."

677.    Plaintiff advised OBA Defendants of his intention to file the litigation BEFORE Defendant OBA filed its formal complaint against Plaintiff on August 11, 2023.

678.    Defendant OBA rushed out its formal complaint against Durbin in response to his litigation against Defendant OBA and other Defendants.

679.    The failure of Defendant OBA Defendants to take action against attorneys Logan Jones and Eric Brown exhibit the disparate treatment of the current structure of Defendant OBA and the Rules of the Oklahoma Supreme Court.

680.    The Court should pay particular attention to the Exhibits of the Blueview Petition which reflect Plaintiff and his client's frustration with Defendant OBA for doing nothing regarding attorneys Logan Jones, Matt Stacy, and Eric Brown. *See Id*. at Exhibit "A."

681.    Plaintiff, in the Blueview Petition, also provided Defendant OBA with a copy of the fraudulent agreements prepared by Logan Jones and Eric Brown on behalf of hundreds of marijuana businesses in Oklahoma. *See Id*. at Exhibit "B."

682.    Like before, Defendant OBA continues to take ZERO ACTION against Logan Jones, Eric Brown, and/or Matt Stacy and instead plows forward with a vengeance against Plaintiff for suing them for their failures.

683.    Plaintiff believed informing Defendant OBA of his intention to file would cause Defendant OBA to proceed with filing a Complaint against Plaintiff.

684.    Defendant OBA proved Plaintiff correct by rushing out and filing with the Oklahoma Supreme Court the Complaint against Plaintiff.

685.  On April 8, 2024, the Oklahoma Supreme Court issued its Order of Emergency Interim Suspension (hereby "ESO") whereby, WITHOUT HEARING, Defendant Oklahoma Supreme Court SUSPENDED PLAINTIFF'S LICENSE TO PRACTICE LAW despite NO PRIOR PUNISHMENT since his career began in 2009.

686.  In entering the ESO, Defendant Supreme Court noted Defendant OBA complied with the paltry and constitutionally insufficient requirements of Rule 6 of the RGDP which deal with interim suspension. *See* ESO at ¶ 1 attached hereto as Exhibit "OO."

687.  Defendant Oklahoma Supreme Court noted "the concurrence of the Professional Responsibility Commission . . . ." *See Id.*

688.  However, the Order fails to make clear that the concurrence by the Professional Responsibility Commission is limited to the signature of just **one (1) person**, Defendant Karen Henson, Chair of the Professional Responsibility Commission. *See* First Amended Complaint P. 108 attached hereto as Exhibit "G."

689.  The Amended Complaint and Verified Application for an Order of Emergency Interim Suspension Pursuant to Rules 6 and 6.2A, RGDP (hereinafter "First Amended Complaint"), makes NO MENTION OF ANY HEARING by the Professional Responsibility Commission at all, let alone one in which Plaintiff could defend himself and present evidence to rebut the allegations made by the General Counsel. *See Id.*

690.  Plaintiff received NO PRE-REVOCATION HEARING before entry of the ESO.

691.  Defendant OBA's First Amended Complaint is signed by the Defendant General Counsel, Gina Hendryx. *See Id.* at 111.

692.  Defendant Loraine Farabow, First Assistant General Counsel, executed a verification stating:

I, Loraine Dillinder Farabow, have read the herein above-alleged facts, as well as have conducted an investigation into these alleged facts, and hereby assert that they are true and correct to the best of my knowledge and belief.

*Id. at 111.*

693. In issuing its ruling, Defendant Supreme Court alleged, "Defendant OBA **reports** that it has received sufficient evidence demonstrating Respondent has committed conduct in violations of Rules 1.1, 1.3, 1.4, 1.5, 1.6, 1.7, 1.8, 1.9, 1.15, 1.16(d), 3.1, 3.2, 3.3, 3.4, 3.5, 3.6, 4.1, 4.3, 4.4(a, 8.1(b), 8.2(a), and 8.4(a)(b)(c) and (d) of the Oklahoma Rules of Professional Conduct (hereinafter "ORPC"), and Rules 1.3, 5.2, and 5.4 of the RGDP.  ESO at ¶2 (bold emphasis added).

694. Defendant Supreme Court then notes Defendant OBA "**alleges** it has conducted an extensive review of Respondent's court filings, pleadings, and statements made in open Court.  These include matters wherein the Respondent is representing himself and wherein he is acting as an attorney for third parties."  *Id*. at ¶ 3 (bold emphasis added).

695. Defendant Supreme Court specifically notes they are allegations, and it DOES NOT refer to a single solitary specific act alleged committed by Plaintiff which presented a clear and present danger to the courts and practice of law in the State of Oklahoma.

696. Defendant Supreme Court then noted the "Complainant **submits** Respondent continues to assert reckless, malicious and dishonest statements in his 'Facebook Live' broadcast sessions that are posted online and publicly accessible." *Id*. at ¶4 (bold emphasis added).

697. Defendant Supreme Court notes that, "**according to** Defendant OBA grievances, during these broadcasts the Respondent disparages judges, the judiciary, opposing counsel, Defendant OBA, and anyone with opposing views."  *Id*. at ¶4 (bold emphasis added).

698.    Moving along, Defendant Supreme Court then states that, "Complainant further **submits** that Respondent made disparaging remarks and was disrespectful to police officers, state and county officials, and city employees." *Id*. at ¶5 (bold emphasis added).

699.    According to Defendant Supreme Court's recitation of Complainants allegations, Respondent "regularly disrupts the peace when he attempts to retrieve public records pursuant to the Open Records Act." *Id*. at ¶5.

700.    According to Defendant OBA, Plaintiff also, "threatens state employees that they will be arrested if they do not immediately comply with his open records requests and has even caused an office because he caused such a scene that the police had to be called." *Id*.

701.    In the entirety of the ESO, Defendant Supreme Court's own language destroys any semblance Plaintiff received any due process or that the Oklahoma Supreme Court applied its own "clear and convincing evidence" standard in interim suspending Plaintiff.

702.    By interim suspending Plaintiff, WITHOUT HEARING, Defendants OBA and Oklahoma Supreme Court destroyed Plaintiff's ability to defend himself when they choked off the life blood of his survival, his fifteen (15) year career, over **"reports"**, because Defendant OBA **"alleges"**, and **"according to"** Defendant OBA it **"submits"** Plaintiff committed some alleged acts which presents an illusionary danger to society. *See* above and ESO.

703.    Not a single finding in the ESO finds Plaintiff, by clear and convincing evidence, committed any act violating the Rules of Professional Conduct. Additionally, the Oklahoma Supreme Court denied Plaintiff opportunity to defend himself from the allegations, and instead treated all allegations against Plaintiff as TRUE.

704.    Defendant Oklahoma Supreme Court openly acknowledges, "Respondent's conduct has been repeatedly reported on by the media, including his profanity-laced disparaging remarks about judges, the judiciary, and opposing counsel. *Id*.

705.    Defendant Oklahoma Supreme Court noted, PLAINTIFF FILED AN OBJECTION arguing, "among other things, that Defendant OBA General Counsel's Office is corrupt or inept, and/or that Defendant OBA cannot support the allegations against him." *Id*. at ¶ 7.

706.    On March 4, 2024, Plaintiff filed "Respondent's Objection Response to Order to Show Cause why he should not be Interim Suspended or Punished." *See* Plaintiff's Objection attached hereto as Exhibit "PP."

707.    Plaintiff adopts and incorporates by reference the allegations and facts laid out in Plaintiff's Objection attached hereto as Exhibit PP as if each and every allegation were laid out fully herein.

708.    In Plaintiff's Objection, Plaintiff pointed out that the Oklahoma Supreme Court failed to follow its own procedures regarding amendment of a Pleading, a fact Defendant Supreme Court had to note in its March 5, 2024 Order attached hereto as Exhibit "QQ."

709.    Despite Plaintiff's denial of the allegations, Defendant Oklahoma Supreme Court, relying upon the "verified complaint, verified amended complaint, and application for emergency interim suspension, the Court finds that Respondent has committed conduct in violation of the Oklahoma Rules of Professional Conduct that poses an immediate threat of substantial and irreparable public harm." *Id*. at ¶8.

710.    Upon making such finding, Defendant Oklahoma Supreme Court "immediately suspended [Plaintiff] from the practice of law, pursuant to Rule 6.2A of the RGDP. *Id.* at ¶ 9.

711. Defendant Oklahoma Supreme Court also required Respondent, "give written notices . . . within twenty (20) days . . . to all of his clients having legal business pending of his inability to represent them . . . ." *Id* at ¶ 10.

712. With the signature of just three (3) people, Defendant General Counsel, Defendant Assistant General Counsel, and Defendant Chair of the Professional Responsibility, Defendant Oklahoma Supreme Court destroyed entirely Plaintiff's fifteen (15) year legal career performed without a SINGLE violation prior to the allegations at issue herein. *See First Amended Complaint* and *ESO*.

713. Instead of Defendant Oklahoma Supreme Court viewing the evidence in the light most favorable to the non-moving party, as in Motions for Summary Judgment in Oklahoma, the Oklahoma Supreme Court took EVRYTHING in the First Amended Complaint as true, and found that the dangers alleged by Defendant OBA, without evidence, were likely to cause great harm to society. See (holding that in Motions for Summary Judgment, "all inference and conclusions to be drawn from the evidentiary materials must be viewed in the light most favorable to the non-moving party." *Carmichael v. Beller*, 1996 OK 48, ¶2, 914 P.2nd 1051, 1053.

714. On September 6, 2023, Plaintiff filed a Motion to Dismiss Pursuant to 12 Okla. Stat. § 1432 (hereinafter "Motion to Dismiss") attached hereto as Exhibit "RR."

715. Plaintiff adopts and incorporates the entirety of the Motion to Dismiss into this Complaint as if fully and completely laid out herein.

716. In Plaintiff's Motion to Dismiss, he, among other things, requested a stay, limited discovery, a hearing, and dismissal of Defendant OBA's Complaint pursuant to 12 Okla. Stat. § 1430 et. seq. *Id*. at p. 1-2.

717. 12 Okla. § 1430 et seq., more commonly referred to as the "Oklahoma Citizen Participation Act," allows a party to challenge a legal proceeding if the action is based on, relates to, or is in response to a party's exercise of the right of free speech, right to petition or right of association. *See specifically* 12 Okla. Stat. § 1432(A).

718. Further, 12 Okla. Stat. § 1433(A) provides that Plaintiff, pursuant to the Oklahoma Citizen Participation Act was entitled to a hearing within sixty (60) days after service of the Motion.

719. As laid out in Plaintiff's Motion to Dismiss, he specifically challenged Counts 1 and 3-11 of the Original Complaint.

720. Based on the Oklahoma Citizen Participation Act, the burden should then shift to Defendant OBA to establish, "by clear and specific evidence[,]" a prima facie case for each and every essential element of the claim in question. 12 Okla. Stat. § 1434.

721. Despite that, and the entirety of the arguments in Plaintiff's Motion to Dismiss, the Oklahoma Supreme Court REFUSED TO CONSIDER THE MOTION, and on October 2, 2023 ruled that, "[t]he motions of Respondent are hereby denied in full." *See* Order Denying Motion to Dismiss executed on October 3, 2023 but somehow filed on October 2, 2023.

722. In denying Respondent's Motion to Dismiss, the Oklahoma Supreme Court cited only one reason for the denial, RGDP 6.4.

723. RGDP 6.4 provides that, "[t]he respondent may not challenge the complaint by demurrer or motion."

724. In other words, despite the Oklahoma Legislature laying out clearly the right of citizens in Oklahoma to engage in protected First Amendment activity without fear of reprisal in a legal proceeding, the Oklahoma Supreme Court found that its own MADE-UP RULE, trumps the rights granted Plaintiff by the Oklahoma Constitution and Oklahoma Statutes.

725. In denying Plaintiff's right to bring forth a motion which EVERY OTHER OKLAHOMA CITIZEN could bring for making the same statements, Defendant Oklahoma Supreme Court denied Plaintiff Due Process.

726. Additionally, as noted herein, Defendant Oklahoma Supreme Court treated all the suggestions, allegations, and propositions of Defendant OBA as TRUE, and it utterly FAILED to grant Plaintiff even a modicum of opportunity to challenge the validity of the allegations.

727. Further, Defendant Oklahoma Supreme Court failed to allow Plaintiff to defend his conduct and statements based on protected First Amendment Activity, and such denial is violative of the 14th Amendment, the Oklahoma Constitution, and the Oklahoma Citizen Participation Act.

728. Further, in Plaintiff's Motion to Dismiss, he lays out the disparate treatment and ambiguity in both the rule and the application of rules by Defendant OBA when he addressed the Jones Brown and Matt Stacy Files. *See* Plaintiff's Motion to Dismiss at p. 15. attached hereto as Exhibit "SS."

729. Despite the seriousness of the allegations in those matters, those attorneys continue to practice, and apparently, at least according to Defendant OBA, do not present a clear and present danger to the public. *See Motion to Dismiss* at P. 24. Perhaps it is because they are quiet, unlike Respondent?

**B.   CLAIMS FOR RELIEF AGAINST THE OBA DEFENDANTS**

**B.1 COUNT 1- Compulsory Membership in the Oklahoma Bar Association Violates Plaintiff's First and Fourteenth Amendment Right**

730. Defendant Oklahoma Supreme Court created Rules requiring that individuals join the Oklahoma Bar Association in order to engage in their chosen profession. *See* Rules

Creating and Controlling the Oklahoma Bar Association, Sec. 7 (hereinafter "Rules Creating Bar").

731. This provision provides that, "[n]o person . . . shall practice law in the State of Oklahoma who is not an active member of the Association, except as herein provided." *Id.* at Sec. 7(a).

732. Defendant Oklahoma Supreme Court, by its own Rules, authorizes Defendant OBA to charge and collect compulsory annual membership fees to its mandatory members. *See* Rules Creating Bar at Article VIII, Sec. 1.

733. The Rules Creating Bar provides that, "the annual dues for each member shall be $275.00 per year . . . ." *See Id.*

734. Additionally, if a member pays late, "there shall be added thereto an expense charge of $100.00." Rules Creating Bar at Article VIII, Sec. 2.

735. Failure to pay dues and expense charges results in MANDATORY SUSPENSION. *See Id.* (providing that, "if payment of dues and expense charge is not received . . . he shall be so suspended . . . .").

736. As a licensed Oklahoma attorney, Plaintiff is required to join Defendant OBA and pay membership fees to Defendant OBA as a condition precedent to engaging in the practice of his profession.

737. Plaintiff paid annual dues to Defendant OBA since 2009, and Plaintiff must pay annual dues in the future if he chooses to continue to practice law in the State of Oklahoma (should the suspension be lifted).

738. Defendant Oklahoma Supreme Court, through the Chief Justice and Associate Justices, acting in their official capacities, enforce the Court created rules and regulations mandating

compulsory membership in Defendant OBA and funding Defendant OBA's endeavors via compulsory membership fees via dues as a prerequisite to practicing law in the State of Oklahoma.

739.    Unlike in a typical attorney matter, in this instance, Plaintiff's fees fund Defendant OBA's efforts to repress Plaintiff's 1st and 14th Amendment rights as applied to the State of Oklahoma by 42 U.S.C. § 1983.

740.    Defendant OBA projects to spend $448,000.00 of those mandatory fees in 2024 on the General Counsel's office alone, while projecting to spend half as much, $239,900, on Continuing Legal Education for members, and a measly $8,750 on "Practice Assistance". *See* 2024 Budget attached hereto as Exhibit "TT."

741.    OBA Defendants act under color of state law when enforcing Defendant OBA compulsory membership requirement and collecting, dispersing, and spending mandatory fees as they deem appropriate.

742.    No clear and meaningful way exists for members to "opt out" of any of the use of funds, and Defendant OBA's budget reflects such by noting that it only projected $100.00 in opt outs in 2024, after only $31.00 actual opt out in 2023. *See Id.*

743.    Interestingly, and particularly relevant here, Defendant OBA budged $46,000 of the mandatory fees in 2024 to go towards "Legislative Monitoring" *See Id.*

744.    Defendant OBA regularly takes positions regarding Oklahoma legislation, and then uses the mandatory fees collected from members to advocate for its positions.

745.    In 2024, the Oklahoma Supreme Court used OBA Mandatory Fees to lobby against legislation which would provide more oversight over the judicial appointment process, which Plaintiff strongly supported.

746.    Defendant OBA used Plaintiff's own money to strongly lobby against that legislation which
        restricted the POWER of Defendant OBA in the judicial nomination process.

747.    Defendant OBA fails to adequately inform members of past expenditures of OBA funds
        related to government relations, lobbying, and advocacy, and instead provides general
        category classification of expenses which make it impossible for a member to reasonably
        track.

748.    The positions, advocacy, and expenditure of mandatory dues constitutes inherently political
        and ideological speech by Defendant OBA.

749.    Defendant, Defendant OBA does not provide a meaningful dues refund process, as reflected
        by the fact that Plaintiff cannot seem to find the provisions to opt out to include in this
        verbose Complaint.

750.    Defendant Oklahoma Supreme Court acts under color of state law when it created the
        compulsory membership requirements from thin air, and then mandated every person
        engaging in the practice of law join and pay compulsory fees.

751.    In addition to its other functions, Defendant OBA also handles disciplinary matters as
        outlined herein.

752.    As such, Defendant OBA uses Plaintiff and other members mandatory fees to engage in
        speech, including non-germane political and ideological speech.  It further uses the money
        to punish political speech which conflicts with their ideological positions.

753.    In fact, Defendant OBA uses funds to hire lobbyists to engage in speech on its behalf
        regarding a myriad of Oklahoma legislation not related to its function as a trade association
        related to the legal profession.

754.    Defendant OBA hired and paid Clayton Taylor, registered lobbying firm in Oklahoma, to promote its speech, and that lobbyist, while Plaintiff advocated against a bill in the Oklahoma Capitol Rotunda, threatened Plaintiff and invited him outside to fight.

755.    In essence, Plaintiff paid Defendant OBA mandatory fees which it then used to hire a political lobbyist to threaten him in the Oklahoma Capitol Rotunda.

756.    Defendant OBA regularly conducts legislative advocacy through a legislative committee, and in the Spring of 2024, Defendant OBA used its funds, and **paid its employees**, to attend a gathering at the Oklahoma Capitol to lobby against Oklahoma legislation.

757.    Defendant OBA paying staff members to attend political rallies its conducting at the Oklahoma Capitol to uses Plaintiff' and other members money to advocate against Plaintiff's beliefs in most regards, and certainly in relation to all issues addressed herein.

758.    Defendant OBA DOES NOT limit its legislative involvement to purely judicial related legislation with may be germane to its functions. Defendant OBA's lobbying far exceeds anything prior courts addressed in other matters involving use of compulsory membership in bar associations to engage in political activity.

759.    Plaintiff, since 2009, contributed on a compulsory basis to Defendant OBA which improperly membership funds on the above outlined pursuits.

760.    Plaintiff openly opposes the laws, rules, and regulations supported by the Oklahoma Supreme Court and Defendant OBA.

761.    Defendant OBA uses the compulsory fees it collects from Plaintiff and others to fight against Plaintiff's political speech.

762. Plaintiff does not particularly like other attorneys, and Plaintiff objects to all the laws, rules, and regulations compelling him to associate with other lawyers in Oklahoma and compelling him to associate with Defendant OBA, an organization he despises.

763. Plaintiff further opposes Defendant OBA's use of any amount of his mandatory dues to fund even a scintilla of political and/or ideological speech, regardless of viewpoint, by Defendant OBA.

764. Particularly, Plaintiff objects to the use by Defendant OBA of his mandatory dues to expressly advocate against positions Plaintiff believes in strongly.

765. Defendant OBA Defendants mandatory membership requirement and compulsory dues injure Plaintiff because he does not wish to contribute to associate with Defendant OBA, its members, or its political and ideological positions to which Plaintiff stands diametrically opposed.

766. But for compulsory membership and dues requirement, Plaintiff WOULD NOT join Defendant OBA, or any other organization associated with the courts of the State of Oklahoma.

767. Oklahoma's requirement that Plaintiff pay dues to OBA injures Plaintiff because he does not wish to fund Defendant OBA, its political and ideological missions, and Plaintiff certainly does not want his money used by Defendant OBA to infringe on Plaintiff's 1st and 14th Amendment rights as it has done so here.

768. Defendant OBA's lack of reasonable safeguards to ensure members like Plaintiff do not pay for political and/or ideological speech and other matters not expressly germane to regulating the legal profession, injures Plaintiff because he does not wish to fund such activities.

769.   No compelling state interest exists justifying forcing attorneys to associate with, and pay
       dues to, Defendant OBA as a condition precedent to practicing laws in the State of
       Oklahoma.  A myriad of other options exist in which the State of Oklahoma can pay for the
       operational oversight of the courts without compelling membership and compelling dues.

770.   As a result of the compelled speech and association, Plaintiff suffers irreparable injury for
       which there is no adequate remedy at law.

771.   Absent this Court's intervention, Plaintiff will continue to suffer irreparable injury.

772.   Plaintiff further is injured because he does not want to pay for Defendant OBA's repression
       of members or potential members constitutional rights, including his own.

773.   Defendants' use color of state law to enforce the unconstitutional laws and policies
       challenged by Plaintiff herein.

774.   Due to Defendants' enforcement of the rules and regulations at issue herein, Plaintiff, and
       others similarly situated, are now and will continue to be denied the right to refrain from
       subsidizing Defendant OBA's speech and/or the right to refrain from being members of
       Defendant OBA as a mandatory condition precedent to their practice of law in the State of
       Oklahoma.

775.   If not permanently enjoined by this Court, Defendant OBA Defendants and their agents,
       employees, and representatives will continue to implement challenged laws and rules and
       other similar policies and practices which will, as a matter of law, deprive Plaintiff of his
       constitutionally protected rights of free speech, the right to petition, and freedom of
       association.

776. The challenged rules and regulations have caused, are now causing, and will continue to cause Plaintiff to suffer irreparable injury, including but not limited to, deprivation of his freedom of speech and freedom of association rights.

777. Plaintiff has no plain, speedy, and adequate remedy at law for such injuries described herein necessitating and authorizing injunctive relief.

778. As a result of Defendant OBA Defendants' violation of Plaintiff's rights under the United States Constitution and 42 U.S.C. § 1983, Plaintiff suffered economic and non-economic damages in an amount more than two million five hundred thousand dollars ($2,500,000.00).

779. Defendant OBA Defendants are jointly and severally liable for the actions and/or inactions of the other OBA Defendants which violated Plaintiff's rights.

780. The actions and inactions of Defendant OBA Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

781. Wherefore, Plaintiff requests that this Court enter judgment against Defendant OBA Defendants in an amount more than two million five hundred thousand dollars ($2,500,000.00).

**B.2 COUNT 2- Injunctive and Declaratory Relief Regarding Membership in OBA**

782. An actual and substantial controversy exists between Plaintiff and Defendant OBA Defendants as to their respective legal rights and duties.

783. Plaintiff contends that, on their face and as applied to Plaintiff, the challenged rules, laws, and conduct violate the 1st and 14th Amendments of the United States Constitution.

784. The 1st Amendment protects, among other things, the fundamental rights to speech, press, and association.

785.   That said, and just as importantly, it also protect one's freedom NOT TO ASSOCIATE.

786.   By their very nature, and certainly by how it's used, Defendant OBA's mandatory membership and fee scheme violates Plaintiff and all members rights.

787.   Mandatory associations, particularly mandatory associations for expressive purposes, are only permissible when they serve a compelling state interest the government cannot achieve through less restrictive means.

788.   The only possible state interests which Defendant OBA may serve are regulating the legal profession and improving the quality of legal services.

789.   Despite that, as outlined herein, Defendant OBA's interest expand far beyond those areas and well outside the constitutional safeguards.

790.   Defendant OBA Defendants can readily use far less restrictive means than destroying 1st and 14th Amendment protections in their quest to regulate the legal profession and improve the quality of legal services in Oklahoma.

791.   For instance, Defendant State of Oklahoma could create a state agency to freely and without prejudice to outside speech, regulate the admission of members to practice law in the State of Oklahoma.

792.   At least eighteen (18) states have voluntary bar associations.

793.   To protect Plaintiff and other members legal rights, Defendants must create an "opt-in" system as opposed to requiring that attorneys opt out. *See Janus v. AFSCME*, 138 S. Ct. at 2486.

794.   To the extent that mandatory fees are constitutional at all, which this Court should declare THEY ARE NOT, the Supreme Court at minimum requires that Defendants ensure fees are

only used for activities germane to improving the quality of legal services and regulating the legal profession. *See Keller*, 496 U.S. at 14.

795.    Here, the Supreme Court not only failed to ensure such, but they in fact affirmed Defendant OBA's use of mandatory fees to investigate and punish Plaintiff for 1st and 14th Amendment protected activity.

796.    Pursuant to *Keller*, Defendant OBA must provide, at a minimum: (a) notice to members, including adequate explanation of the basis for the dues and calculations of all non-chargeable activities, verified by an independent auditor; (b) reasonably prompt decision by an impartial decision maker if a member objects to the manner his or her mandatory dues are spent; and (c) an escrow for amounts reasonably in dispute while such objections are pending. *See Keller* at p. 14.

797.    Unless and until an attorney provides affirmative consent, his or her dues must not be used to subsidize OBA's attack on Plaintiff's protected activity and its engagement in non-germane activities or speech.

798.    As set forth herein, the OBA Defendants fail to provide Plaintiff and other members with adequate information regarding its activities to allow members to determine whether dues are being improperly used to promote non-germane pursuits by Defendant OBA.

799.    Providing information alone about Defendant OBA's adopted positions on legislation does not suffice because Defendant OBA engages in activities, via its lobbyists, which members could reasonably challenge as not germane to improving the quality of legal services and regulating the practice of law.

800.    For instance, the budget does not show that Defendant OBA's lobbyist will threaten physical violence to OBA members for lobbying against an OBA position at the Oklahoma

Capitol. One must go to the capitol and find out that the lobbyist is only Defendant OBA's payroll from his own mouth, as Plaintiff did of Clayton Taylor.

801.    Requiring Plaintiff or any member to monitor OBA publications for possible notices of political and ideological activity, as opposed to notice when engaging in such, imposes an unreasonable burden on members who wish to protect their constitutional rights.

802.    Defendant OBA fails to provide Plaintiff and other members with constitutionally adequate protections to dispute the manner in which mandatory dues are spent.

803.    By failing to utilize means significantly less restrictive of associational freedoms than a mandatory association, the OBA Defendants maintain and actively enforce laws, practices, procedures, and policies depriving Plaintiff of his 1st and 14th Amendment protections.

804.    By failing to provide minimum safeguards required by the Constitution and 1st and 14th Amendments thereto, before collecting and expending mandatory membership dues, the OBA Defendants maintain and enforce a set of laws, practices, procedures, policies and customs, which deprive Plaintiff of his 1st and 14th Amendment rights.

805.    The deprivation of constitutional rights is causing Plaintiff to suffer irreparable injury for which there is no adequate remedy at law.

806.    Under existing law, the OBA Defendants maintain and enforce a set of laws, practices, procedures, and policies inadequate to ensure mandatory dues are not used for impermissible purposes described herein without an attorneys' affirmative consent.

807.    Plaintiff's law career is destroyed.

808.    Plaintiff's practice is destroyed.

809.    Plaintiff's livelihood is destroyed.

810.    Plaintiff's reputation is destroyed.

811.   ALL DONE WITHOUT HEARING and at the will of Defendant OBA to punish Plaintiff's engagement in political speech and other protected activity.

812.   Unless the deprivation of Plaintiff's rights is enjoined by this Court, Plaintiff will continue to suffer irreparable harm.

813.   Plaintiff is entitled to declaratory and injunctive relief against Defendants' continued enforcement and maintenance of the unconstitutional laws, rules, regulations, practices, procedures and policies.  *See* 28 U.S.C. §§ 2201, 2202; 42 U.S.C. §§ 1983, 1988.

814.   Defendant OBA regularly engages in the use of its resources obtained from compelled fees for membership. for non-germane political speech.

815.   On September 24, 2024, Defendant OBA posted on its website, paid for with membership dues, an article titled, "OBA HOSTS ONLINE RESOURCE FOR VOTER INFORMATION."  *See* OBA Voter Article attached hereto as Exhibit "UU."

816.   Plaintiff adopts and incorporates the entirety of Defendant OBA Voter Article as if laid out fully herein.

817.   Specifically, Defendant OBA Voter Article relates to the November 2024 retention ballot in Oklahoma in which voters will decide whether to keep (retain) three (3) members of the Oklahoma Supreme Court.

818.   Defendant OBA Voter Article constitutes political speech by Defendant OBA masked the sheep's clothing of an innocuous informational endeavor. It is nothing more than political speech, regardless of how hidden.

819.   First, Defendant OBA Voter Article refers to those appointed to the Supreme Court as "qualified individuals prepared by the state's Judicial Nominating Commission." *Id*.

820.    By taking a position on the qualifications of the Supreme Court candidates up for retention,

Defendant OBA engages in political speech.

821.    Plaintiff and the citizens of Oklahoma succeeded in removing one (1) Supreme Court Justice

by a vote against retention for the first time in Oklahoma history.

822.    Additionally, Defendant OBA engaged in political speech disguised as education when it

advocated for the retention system (currently a point of contention in Oklahoma) by stating,

"'This system ensures the people have a voice – and further assures that those who enter

Oklahoma's appellate courtrooms can expect fairness and impartiality free from bias,

prejudice or political influence." *Id*.

823.    The statement by Defendant OBA President, Miles Pringle, constitutes political speech in

that it advocates for a political system which it controls, and it does so using mandatory

membership fees. It also uses its voice to make a political statement and imply that the

present system results in a system free from "bias, prejudice or political influence . . . ." *Id.*

824.    OBA President Miles Pringle, who the Tulsa World recognized as OBA President, sent in

an Opinion/Editorial piece related to the Oklahoma retention ballot. *See* Op Ed attached

hereto as Exhibit "VV."

825.    Using the power and prestige of the office he holds, with thousands of compelled OBA

members apparently behind him, Pringle used the pulpit created by his OBA position to

engage in political speech apparently supported by Defendant OBA and its members. *See*

*Id.*

826.    In the Op Ed, Pringle stated, "[a]ll members of our Oklahoma Supreme Court, including

those not on the ballot, make their decisions based on the facts and the law before them."

Plaintiff wholeheartedly disagrees, and the use of his money to fund the efforts to retain these judges constitutes conduct deplorable to the Constitution.

827.  Pringle echoes Defendant OBA Voter Article when he writes in his clearly political speech Op Ed that, "[t]his nonpartisan commission then selects the most qualified and ethical individuals . . . [and] [t]he governor makes the final decision on three **highly qualified candidates**." *Id.* (bold emphasis added).

828.  Pringle in his Op Ed then links courtfacts.org, created by Defendant OBA, which he calls a "nonpartisan online resource for voter information hosted by the Oklahoma Bar Association." *Id.*

829.  Pringle, using his OBA position, then wades into the political debate related to the retention of the specific justices, and unequivocally engages in non-germane speech when he stated, "[t]his year, you may have seen or heard political advertisements claiming Oklahoma Supreme Court justices up for retention are 'liberal activists.' This is misleading and dangerous . . . ." *Id.*

830.  He continued that, "[d]espite what has been said in these recent misleading ads, Oklahoma has achieved [an ideal judicial appointment system]. *Id.*

831.  Plaintiff is entitled to Declaratory and Injunctive relief finding that the activities addressed herein violate the rights of Plaintiff and prohibiting the OBA Defendants from enforcing them.

**B.3 COUNT 3- Violation of Plaintiff's Civil Rights- 42 U.S.C. §§ 1983, 1988**

832.  The 1st Amendment as applicable to the State of Oklahoma by the 14th Amendment, prohibits Defendant OBA and Supreme Court from compelling Plaintiff and others to subsidize its political and ideological activities, outlined herein ad nauseum.

833.   Plaintiff establishes herein that Defendant OBA uses the compelled dues to engage in numerous non-germane activities of a purely political and/or ideological nature prohibited by the Federal Constitution.

834.   No compelling state interest exists in compelling membership in a Bar Association which then takes the funds and the power of the compelled membership to support non-germane positions regarding speech, association, and other matters of a purely political nature.

835.   Plaintiff and all other compelled members, and non-allowed members like Adam Grant Miller, suffer irreparable injury from which there is no adequate remedy at law.

836.   Absent intervention by this Court, Defendant OBA will not change. As Defendant Hendryx, the General Counsel of Defendant OBA told Plaintiff, they are not afraid of any challenge to their authority as they believe that, like they do, this Court will back the black regardless of what is right.

837.   The OBA Defendants enforce the laws, policies, practices and customs under color of state law to the detriment of Plaintiff and those similarly situated.

838.   Plaintiff is entitled to Declaratory and Injunctive relief finding that the activities addressed herein violate the rights of Plaintiff and prohibiting the OBA Defendants from enforcing them.

839.   As a result of Defendant OBA Defendants' violation of Plaintiff's rights under the United States Constitution and 42 U.S.C. § 1983, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

840.   Defendant OBA Defendants are jointly and severally liable for the actions and/or inactions of the other OBA Defendants which violated Plaintiff's rights.

841.    The actions and inactions of Defendant OBA Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

842.    Wherefore, Plaintiff requests that this Court enter judgment against Defendant OBA Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

### B.4 COUNT 4- 42 U.S.C. §§ 1983, 1988; Violation of the First Amendment

843.    To the extent that Defendant OBA engages in any political or ideological activities, it MUST ensure implementation of sufficient procedures to ensure that individual compelled members are not compelled to support and/or associate with activities with which they disagree.

844.    Defendant OBA's current procedures for separating chargeable and non-chargeable expenses are woefully inadequate to ensure protection of members constitutional rights.

845.    This Court should adopt a mandatory Opt-In procedure before Defendant OBA may use mandatory funds to subsidize non-germane political and ideological activities.

846.    Oklahoma, if it allows an opt out process at all, clearly does not adequately advertise it to its members ad Plaintiff, a 15-year member did not realize anyone could opt out until noting on a budget that opt outs cost the bar less than $100 per annum.  Clearly, there is no meaningful opt out procedure in place in Oklahoma.

847.    Defendant OBA's policies, procedures and customs are insufficient to ensure members are not coerced into expressly or accidently, through lack of knowledge, funding Defendant OBA's political and ideological activities.

848.    The unconstitutional policies and practices of Defendant OBA related to opt out were done under color of state law.

849.    Plaintiff is entitled to Declaratory and Injunctive relief finding that the activities addressed herein violate the rights of Plaintiff and prohibiting the OBA Defendants from enforcing them.

850.    As a result of Defendant OBA Defendants' violation Plaintiff's rights under the United States Constitution and 42 U.S.C. § 1983, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

851.    Defendant OBA Defendants are jointly and severally liable for the actions and/or inactions of the other OBA Defendants which violated Plaintiff's rights.

852.    The actions and inactions of Defendant OBA Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

853.    Wherefore, Plaintiff requests that this Court enter judgment against Defendant OBA Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

## B.5 COUNT 5- 28 U.S.C. § 2201; Declaratory Judgment Act

854.    Plaintiff is entitled to declaratory judgement that Oklahoma law and the policies, practices, procedures, and customs of Defendant OBA Defendants force Plaintiff into supporting Defendant OBA Defendants via his compelled association and compelled membership dues in violation of his 1st and 14th Amendment rights.

855.    Plaintiff is entitled to declaratory judgment that Defendant OBA Defendants opt-out procedures violate the 1st and 14th Amendments.

856.    Plaintiff is entitled to declaratory judgment that he need not join Defendant OBA to practice law in the State of Oklahoma.

857.    Plaintiff is entitled to injunctive relief ordering that Defendant OBA Defendants immediately cease all operations as its current structure violates the rights of Plaintiff and similarly situated individuals.

858.    Plaintiff is entitled to injunctive relief order and a declaratory finding that Defendant OBA Defendants current systems violate the rights of Plaintiff and therefore Defendant OBA Defendants must immediately cease any requirement that attorneys must join the Oklahoma Bar Association in order to practice law in the State of Oklahoma.

859.    Plaintiff is entitled to injunctive relief ordering the OBA Defendants to restore Plaintiff's right to practice law.

### B.6. COUNT 6: Negligence, Gross Negligence, and Negligence Per Se

860.    All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

861.    The actions and/or inactions of Defendant OBA Defendants, as fully laid out herein, constitute negligence, gross negligence, and negligence per se.

862.    Defendant OBA Defendants conspired together, as outlined herein, which caused harm to Plaintiff.

863.    The OBA Defendants actions against Plaintiff, including his suspension, were done because of Plaintiff exposing corruption of the judiciary, Defendant OBA and the legal system in Oklahoma and not for the stated reasons.

864.    As a result of the OBA Defendants' negligence, gross negligence, and negligence per se, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

865. The OBA Defendants are jointly and severally liable for the actions and/or inactions of the other OBA Defendants.

866. The actions and inactions of the OBA Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

867. Wherefore, Plaintiff requests that this Court enter judgment against Defendant OBA Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

### B.7. COUNT 7: Violation of Plaintiff's Civil Rights Related to a Public Hearing and Malicious Prosecution

868. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

869. Defendant OBA Defendants refused, despite the fact that its rules required at the time a public hearing, to provide Plaintiff with a public hearing related to the complaints against him.

870. The OBA Defendants, despite the fact that Plaintiff was entitled to a public hearing, to allow Plaintiff to record his hearing.

871. The OBA Defendants additionally restricted Plaintiffs rights to bring a cell phone into the public hearing, even though the OBA Defendants were allowed to bring their cell phones into the hearing room.

872. The OBA Defendants brought contempt charges against Plaintiff for allegedly recording a public hearing, which he and all of the public should have the right to record.

873. The OBA Defendants brought those contempt charges against Plaintiff in an attempt to coerce him to resign from Defendant OBA to avoid criminal prosecution.

874. OBA Defendants offered to withdraw the contempt complaint against Plaintiff if Plaintiff

resigned from Defendant OBA, and **Plaintiff refused.**

875.   OBA Defendants are currently engaging in the malicious prosecution of Plaintiff related to his alleged recording of a public hearing.

876.   OBA Defendants worked in concert with the actions of the others to cause Plaintiff's malicious prosecution and the denial of his right to record his public hearing.

877.   Plaintiff, due to the actions of OBA Defendants, experienced great emotional pain and suffering and continues to suffer from such due to the pending contempt charges against him.

878.   At all times relevant to the facts in this matter, OBA Defendants were acting within the scope and course of their employment and authority with their governmental employer to try and prevent Plaintiff from exposing their wrongdoing.

879.   All OBA Defendants are jointly and severally liable for the actions and/or inactions of the other City of Tulsa Defendants related to their activities at issue in this matter.

880.   All OBA Defendants, jointly and severally, are thereby each liable to Plaintiff for the injuries he suffered.

881.   As a result of Defendant OBA Defendants' violation of his rights and the malicious prosecution arising therefrom, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

882.   The actions and inactions of ]OBA Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

883.   Wherefore, Plaintiff requests this Court enter judgment against ]OBA Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.6:**   **COUNT 6- ASSAULT, BATTERY, FALSE IMPROSONMENT, NEGLIGENCE, NEGLIGENCE PER SE, GROSS NEGLIGENCE, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (Against Defendant OBA Defendants, Oklahoma Highway Patrol, and Defendant Alan Beaty)**

884. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

885. To violate the rights of Plaintiff, OBA Defendants employed Defendant Oklahoma Highway Patrol and Defendant Alan Beaty, an officer of the Oklahoma Highway Patrol, to prohibit Plaintiff and the public from recording Plaintiff's public hearings.

886. Defendant Beaty also provided security for the Oklahoma Medical Marijuana Authority as described below, and in doing so, he became a witness against Plaintiff for Defendant OBA Defendants.

887. Defendant Beaty is identified as a witness in the allegations by the OBA Defendants against Plaintiff, and despite the fact that Defendant Beaty is a witness against Plaintiff, the OBA Defendants employed Defendant Beaty as security for Plaintiff's OBA hearings at Defendant OBA's bar center.

888. During two (2) of those hearings, Defendant Beaty unlawfully and without legal right put his hands on Plaintiff in violation of Plaintiff's right to be free from harmful and offensive contact.

889. The actions of Defendant Beaty constitute assault, battery, and intentional infliction of emotional distress.

890. Plaintiff on both occasions saw Defendant Beaty as his hands came toward Plaintiff, and Plaintiff tried to move away to avoid contact.

891. Plaintiff, despite his efforts, was unable to avoid the harmful and offensive contact of his person by Defendant Beaty.

892. At the time of Defendant Beaty's actions, he was wearing a uniform issued by Defendant Oklahoma Highway Patrol.

893.    During another hearing, Defendant Beaty hit Plaintiff repeatedly with a handheld metal
        detector, despite Plaintiff repeatedly telling him to stop hitting him with the handheld device.

894.    Plaintiff found the contact of his person harmful and offensive, and demanded repeatedly
        Defendant Beaty stop touching him.

895.    Defendant Beaty also assaulted and battered a veteran during the same hearing, and that
        assault and battery was captured on video by Plaintiff and other members of the public
        attending the hearing.

896.    While acting as security, Defendant Beaty improperly subjected Plaintiff and other members
        of the public to unlawful searches and seizures in violation of their constitutional rights, and
        he admitted that he did not do the same to members of the OBA Defendants, specifically but
        not limited to Defendants Hendryx and Farabow.

897.    Defendant Beaty engaged in improper ex-parte communication with OBA Defendants about
        the matters against Plaintiff in violation of Plaintiff's rights under Oklahoma law.

898.    The actions of the OBA Defendants, via Defendant Beaty, exhibit a disparate treatment of
        Plaintiff and the public compared to members of Defendant OBA General Counsel's office.

899.    At the time of his actions, Defendant Beaty acted as an agent and/or employee of Defendant
        Oklahoma Highway Patrol and Defendant OBA Defendants.

900.    The actions of all OBA Defendants, through Defendant Beaty, constitute assault and/or
        battery of Plaintiff.

901.    The actions and/or inactions of Defendant Beaty constitute negligence, negligence per se,
        and gross negligence.

902.    At all times relevant to the facts in this matter, OBA Defendants and Defendant Beaty were
        acting within the scope and course of their employment and authority with their

governmental employer.

903.    Defendants Beaty, Oklahoma Highway Patrol, and the OBA Defendants are each jointly and severally liable for the actions of Defendant Beaty related to the assault, battery, intentional infliction of emotional distress, negligence, negligence per se, and gross negligence which caused harm to Plaintiff.

904.    As a result of the Defendants' intentional infliction of emotional distress, negligence, gross negligence, negligence per se, assault, and battery, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

905.    The actions and inactions of the Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

906.    Wherefore, Plaintiff requests this Court enter judgment against the Defendants in an amount in excess of two-million five hundred thousand dollars ($2,500,000.00).

## B.7 COUNT 7: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (against OBA Defendants)

907.    All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

908.    The actions of OBA Defendants were done intentionally and with the intention of causing Plaintiff to experience emotional distress.

909.    The actions of OBA Defendants constitute intentional infliction of emotional distress on Plaintiff.

910.    All OBA Defendants are therefore liable to Plaintiff for their intentional infliction of emotional distress.

911.    At all times relevant to the facts in this matter, all individual OBA Defendants were acting

within the scope of their employment and authority with their governmental employer.

912.    As a result of the intentional infliction of emotional distress of Plaintiff caused by OBA
Defendants, Plaintiff suffered economic and non-economic damages in an amount in excess
of two million five hundred thousand dollars ($2,500,000.00).

913.    The actions and inactions of OBA Defendants warrant the imposition of punitive damages,
and Plaintiff requests punitive damages.

914.    Wherefore, Plaintiff requests this Court enter judgment against OBA Defendants in an
amount in excess of two million five hundred thousand dollars ($2,500,000.00).

## B.8 COUNT 8: CIVIL RIGHTS VIOLATIONS (42 U.S.C. 1983) (against OBA Defendants, Oklahoma Highway Patrol, and Alan Beaty)

915.    All of the facts and allegations laid out in this Complaint, including the Exhibits attached
hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

916.    Defendants identified above, at all times relevant hereto, were acting under the color of state
law.

917.    At all times relevant hereto, the OBA Defendants, Beaty, and Oklahoma Highway Patrol
were acting pursuant to the custom, policy, decisions, ordinances, regulations, widespread
habit, usage, and/or practice of the other listed Defendants in their actions pertaining to
Plaintiff.

918.    At the time of the events at issue in this matter, Plaintiff had the clearly established
constitutional right to be free from the violation of his constitutional rights including but not
limited to the improper touching of Plaintiff, malicious prosecution, unreasonable search and
seizure, and brutalization.

919.    Any reasonable person in the roles of OBA Defendants, Beaty, and Oklahoma Highway
Patrol knew, or should have known, of Plaintiff's rights at the time of the incident at issue in

this matter as they were clearly established at that time.

920.    OBA Defendants, Beaty, and Oklahoma Highway Patrol violated Plaintiff's 1st, 4th, and 14th Amendment rights.

921.    OBA Defendants, Beaty, and Oklahoma Highway Patrol engaged in the conduct described herein willfully, maliciously, in bad faith, and in reckless disregard of Plaintiff's federally protected constitutional rights.

922.    The actions against Plaintiff were malicious, shocking, and objectively unreasonable considering the circumstances.

923.    The criminal proceedings brought against Plaintiff by OBA Defendants will terminate in his favor.

924.    The acts and/or omissions of the OBA Defendants, Beaty, and Oklahoma Highway Patrol intentionally deprived Plaintiff of his constitutional and statutory rights and caused him to suffer damages.

925.    None of the Defendants are not entitled to qualified immunity for the conduct at issue in this matter.

926.    As a result of the violation of Plaintiff's constitutional rights by the OBA Defendants, Beaty, and Oklahoma Highway Patrol, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

927.    The actions and inactions of OBA Defendants, Beaty, and Oklahoma Highway Patrol, in violation of Plaintiff's rights, warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

928.    Wherefore, Plaintiff requests this Court enter judgment against the OBA Defendants, Beaty, and Oklahoma Highway Patrol, jointly and severally, in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.9 COUNT 9:  Negligent Hiring and Supervision of Individual Defendants (OBA Defendants and Oklahoma Highway Patrol)**

929.    All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

930.    Defendant OBA and Oklahoma Highway Patrol owned, controlled and/or managed the employed individual Defendant Alan Beaty.

931.    Oklahoma recognizes a tort for the negligent hiring and supervision of employees.

932.    At the time Defendant OBA and Oklahoma Highway Patrol hired Defendant Beaty, they knew and/or should have known that he posed a risk to the persons he came in contact within his official capacities.  Despite this knowledge, Defendants nonetheless proceeded to hire and retain Defendant Beaty, acting with conscious indifference to the rights, safety, and welfare of others, including Plaintiff.

933.    The acts and/or omissions, singularly or in any combination thereof, rise to the level of negligent hiring, retention, and/or supervision of Defendant Beaty by OBA Defendants and Defendant Oklahoma Highway Patrol.

934.    Defendant OBA and Oklahoma Highway Patrol's acts and/or omissions, when viewed objectively, involved an extreme and/or unnecessary degree of risk considering the probability and/or magnitude of harm to others.

935.    OBA Defendants and Defendant Oklahoma Highway Patrol had actual and/or subjective

awareness of the risk involved in hiring and retaining Defendant Beaty, but nevertheless proceeded with conscious indifference to the rights, safety and welfare of others when they hired and retained Defendant Beaty.

936. Therefore, OBA Defendants and Defendant Oklahoma Highway Patrol are liable for the negligent hiring, retention, and/or supervision of Defendant Alan Beaty, and Plaintiff is entitled to recover against Defendant OBA Defendants and Defendant Oklahoma Highway Patrol for all damages he sustained as a result of the acts and/or omissions of Defendant Alan Beaty.

937. As a result of the negligent hiring and supervision, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

938. The negligent hiring and supervision practices by the OBA Defendants and Defendant Oklahoma Highway Patrol warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

939. Wherefore, Plaintiff requests this Court enter judgment against all OBA Defendants and Defendant Oklahoma Highway Patrol in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.10 COUNT 10: Defamation, Libel and Slander (against OBA Defendants, Oklahoma Highway Patrol, and Alan Beaty)**

940. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

941. OBA Defendants, Defendant Oklahoma Highway Patrol, and Defendant Alan Beaty made false statements against Plaintiff to others.

942.    They knew and/or should have known that their statements were false at the time they made
them, and that such false statements would harm Plaintiff.

943.    The knowingly false statements directly led to harm of Plaintiff and forever wrongfully
tarnished his reputation in the community.

944.    As a result of the libel/slander, Plaintiff suffered economic and non-economic damages in an
amount in excess of two million five hundred thousand dollars ($2,500,000.00).

945.    The libel/slander by the OBA Defendants and Defendants Beaty and Oklahoma Highway
Patrol warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

946.    Wherefore, Plaintiff requests this Court enter judgment against all OBA Defendants,
Defendant Oklahoma Highway Patrol, and Defendant Alan Beaty in an amount in excess of
two million five hundred thousand dollars ($2,500,000.00).

**B.11 ELEVENTH CLAIM FOR RELIEF- Respondent Superior (Against the Oklahoma
Supreme Court, Oklahoma Bar Association, Oklahoma Professional Responsibility
Commission, Oklahoma Professional Responsibility Tribunal, and Oklahoma Highway
Patrol.**

947.    All of the facts and allegations laid out in this Complaint, including the Exhibits attached
hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

948.    At the time of the incident, all individual OBA Defendants and Defendant Alan Beaty were
employees, agents, and/or servants of the above listed Defendants, and the individual
Defendants were acting within the course and scope of their employment with the non-
individual Defendants at the time of the incidents at issue in this matter.

949.    As such, the non-individual OBA Defendants and Defendant Oklahoma Highway Patrol are
jointly and severally responsible for the conduct of the individual Defendants under the
doctrine of *respondeat superior* due to the master-servant relationship which existed at the

time of the incident at issue in this matter.

950.   The actions all Defendants warrant the imposition of punitive damages in this matter.

951.   Wherefore, Plaintiff requests this Court enter judgment against OBA Defendants and Defendant Oklahoma Highway Patrol in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.12 TWELVETH CLAIM FOR RELIEF- Tortious Interference with Contractual Relations (Against Defendant OBA Defendants and the Naifeh Defendants)**

952.   All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

953.   OBA Defendants working with the Naifeh Defendants intentionally sought to interfere with Plaintiff's contractual relationship with Miller.

954.   At the time, Miller and Plaintiff were engaged in business together co-owing Trichome Consulting, LLC.

955.   Defendant OBA Defendants and Naifeh Defendants compelled Miller to sever his relationship with Plaintiff in order to gain admission to the Oklahoma Bar Association.

956.   Despite severing the relationships because of their threats not to let him become a member if he continued them, OBA Defendants denied Miller's admission partly on the false accusation that he did not terminate his relationship with Plaintiff quickly enough.

957.   As a result of the actions of OBA Defendants and Naifeh Defendants, Plaintiff had to buy Miller out of his ownership interest in the company causing Plaintiff serious financial distress and depriving Plaintiff of a necessary component to the success of the venture.

958.   Plaintiff was damaged as a result because of the OBA Defendants and Naifeh Defendants tortious interference with Plaintiff's contractual agreements with Miller.

959.   OBA Defendants and Naifeh Defendants' improper and unfair conduct warrants the imposition of punitive damages.

960.   Plaintiff hereby seeks economic and non-economic damages from OBA Defendants and Naifeh Defendants, jointly and severally, in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

961.   Plaintiff seeks Punitive Damages against the OBA Defendants and Naifeh Defendants in an amount to be set at trial, but in an amount in excess of two million five hundred thousand dollars ($2,500,000.00)

## II.    FACTS AND CLAIMS AGAINST DEFENDANTS SHEILA NAIFEH and SHEILA NAIFEH, ATTORNEY AT LAW, PLLC

### A.    Facts Related to Claims against Defendants Sheila Naifeh and Sheila Naifeh, Attorney at Law, PLLC.

962.   All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

963.   Sheila Naifeh is an attorney licensed in the State of Oklahoma.

964.   Plaintiff hired Defendants Sheila Naifeh and Sheila Naifeh, Attorney at Law, PLLC (collectively the Naifeh Defendants) to represent him in the complaints against Defendant before the Oklahoma Bar Association.

965.   Plaintiff entered a contract with the Naifeh Defendants regarding said representation, and the contract requires good faith and fair dealing by the Naifeh Defendants of Plaintiff.

966.    The Naifeh Defendants failed to provide Plaintiff representation, and in what little representation they provided, they did so negligently.

967.    The Naifeh Defendants failed to stay in communication with Plaintiff.

968.    The Naifeh Defendants failed to provide billing to Plaintiff.

969.    The Naifeh Defendants took Plaintiff's money knowing that they did not intend to provide competent representation to Plaintiff.

970.    The Naifeh Defendants instead worked with OBA Defendants to torpedo Plaintiff's defense in the matter in exchange for a favorable relationship with Defendant OBA for the Naifeh Defendants.

971.    As a result of the Naifeh Defendants actions and/or inactions, Plaintiff was suspended without hearing by Defendant OBA Defendants causing Plaintiff to lose his business, Viridian Legal Services, PLLC.

972.    As a result of the Naifeh Defendants actions and/or inactions, Plaintiff's reputation was ruined in the legal community, and his suspension was covered by major media outlets in Oklahoma.

973.    The Naifeh Defendants failed to hold Plaintiff's money in trust as required by Oklahoma law and instead spent the money immediately upon receipt.

**B.1 COUNT 1- Negligence, Gross Negligence, and Negligence Per Se**

974.    All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

975.    The actions and/or inactions of the Naifeh Defendants as fully laid out herein, constitute negligence, gross negligence, and negligence per se.

976. As a result of the Naifeh Defendants' negligence, gross negligence, and negligence per se, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

977. The actions and inactions of the Naifeh Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

978. Wherefore, Plaintiff requests that this Court enter judgment against the Naifeh Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

### B.2 COUNT 2- Breach of Contract against Naifeh Defendants

979. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

980. The actions and/or inactions of the Naifeh Defendants as fully laid out herein, constitute a breach of contract with Plaintiff.

981. As a result of the Naifeh Defendants' breach of contract, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

982. The breach of contract by the Naifeh Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

983. Wherefore, Plaintiff requests that this Court enter judgment against the Naifeh Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

### B.3 COUNT 3- Intentional Infliction of Emotional Distress

984. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

985. The actions and/or inactions of the Naifeh Defendants were done intentionally and knowing that they would cause Plaintiff to suffer great emotional distress.

986. The intentional actions and/or inactions of the Naifeh Defendants caused Plaintiff great emotional distress, and that emotional distress continues to this day.

987. As a result of the Naifeh Defendants' intentional infliction of emotional distress, Plaintiff suffered damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

988. The intentional infliction of emotional distress by the Naifeh Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

989. Wherefore, Plaintiff requests that this Court enter judgment against the Naifeh Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

### B.4 COUNT 4- Fraud, Libel and Slander

990. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

991. The actions and/or inactions of the Naifeh Defendants related to providing Defendant OBA with a false affidavit against Plaintiff, despite her representation, constitutes fraud, libel and slander against Plaintiff.

992. The fraud, libel and slander of the Naifeh Defendants caused Plaintiff economic and non-economic damages.

993. As a result of the Naifeh Defendants' fraud, libel and slander, Plaintiff suffered damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

994. The fraud, libel and slander by the Naifeh Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

995.   Wherefore, Plaintiff requests that this Court enter judgment against the Naifeh Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

### III. FACTS AND CLAIMS AGAINST DEFENDANTS 14TH JUDICIAL DISTRICT, SHARON HOLMES, MORGAN WILLIAMS, LORETTA RADFORD, TULSA COUNTY SHERIFF'S DEPARTMENT, FOX 23, IMAGICOMM COMMUNICATIONS, LLC, INSP, LLC, COX RADIO, LLC d/b/a KRMG, and COX MEDIA, LLC.

#### A. Factual Background: Defendants 14th Judicial District, Sharon Holmes, Morgan Williams, Loretta Radford, Tulsa County Sheriff's Department, Tulsa County, Fox 23, Imagicomm Communications, LLC, INSP, LLC, Cox Radio, LLC d/b/a KRMG, and Cox Media, LLC.

996.   All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

997.   The actions and inactions of Defendants 14th Judicial District, Sharon Holmes, Morgan Williams, and Loretta Radford were done on their own individual behalf and in their official capacity as employees of the 14th Judicial District.

998.   Defendant Sharon Holmes, acting on behalf of herself and the 14th Judicial District, interrupted Plaintiff's conversation with a reporter in the public hallway of a public building.

999.   Defendant Sharon Holmes, identifying herself as "Judge Sharon Holmes" threatened Plaintiff and others for engaging in constitutionally protected activity.

1000.   Defendant Sharon Holmes filed the bar complaint addressed above in an attempt to stifle Plaintiff's First Amendment rights guaranteed under the United States Constitution.

1001.   Defendant Sharon Holmes filed the bar complaint as a result of Plaintiff's free exercise of speech and did so in an attempt to cause Plaintiff harm and infringe on his rights.

1002.   As a result of Defendant Sharon Holmes bar complaint against Respondent, the Oklahoma Bar Association initiated action against Plaintiff alleging that his conduct violated the Rules of Professional Conduct as outlined above.

1003.  Defendant Sharon Holmes' primary complaint centered on Plaintiff's public statements.

1004.  On more occasions than he can count, Plaintiff observed Defendant Sharon Holmes falling-down drunk at the Hunt Club, a bar located in Tulsa Oklahoma.

1005.  During more than one occasion, Plaintiff witnessed Defendant Sharon Holmes refer to her position as judge in drunken verbal altercations with other patrons of Hunt Club.

1006.  Plaintiff's prior observations of Defendant Sharon Holmes' public drunkenness prompted him to tell Defendant Sharon Holmes to go back to the bar because her conduct in the hallway reminded Plaintiff of her drunken behavior at the Hunt Club.

1007.  Defendant Sharon Holmes, in Plaintiff's opinion, an alcoholic who abuses alcohol while working.

1008.  Given her habitual drunkenness, it is likely Holmes was drunk during the interaction with Plaintiff in the County Building hallway.

1009.  After Defendant Holmes filed a complaint against him with Defendant OBA, Plaintiff hired a licensed private investigator to investigate Holmes.

1010.  The investigation consisted of the private investigator going to Hunt Club in Tulsa Oklahoma to see if Holmes showed up and became publicly intoxicated.

1011.  Public drunkenness of judicial officials is in violation of the Rules of Judicial Conduct, the Oklahoma Constitution, and constitutes grounds for removal from office.

1012.  On every occasion that the private investigator went to Hunt Club, Holmes arrived and became heavily intoxicated by drinking shot after shot and white claw after White Claw.

1013.    On numerous occasions, and while Hunt Club was not serving food, Holmes brought her approximate eight (8) year old grandson to the bar and proceeded to become intoxicated. The private investigator and others then observed her drive the minor child while intoxicated.

1014.    Such conduct of Defendant Holmes constitutes a FELONY in the State of Oklahoma.

1015.    All of the conduct alleged herein is documented via video captured by the private investigator during the course of his investigation.

1016.    Plaintiff works for Guerrilla Publishing, LLC, an Oklahoma limited liability company engaged in media and news production and broadcasting.

1017.    Guerrilla Publishing, LLC publishes news content online and garners millions of views monthly.

1018.    Plaintiff, in his role as investigative journalist for Guerrilla Publishing, decided to expose the criminal conduct of Holmes, wherein she repeatedly because intoxicated and drove a vehicle with a minor child.

1019.    Holmes has custody of the minor child because, during a drunken altercation with her daughter, Judge Sharon Holmes was stabbed by her daughter. The minor child is Judge Holmes' grandchild.

1020.    Plaintiff informed friends of Holmes, namely Francetta Mayes, that he intended to publish a story on the Guerrilla Publishing YouTube regarding Judge Sharon Holmes' drunken behavior.

1021.    Francetta Mayes told Defendant Sharon Holmes of Plaintiff's plan to run the story as addressed above.

1022. To complete the story, Plaintiff traveled to Hunt Club to film an intro for the video.

1023. Despite knowing that Plaintiff was about to expose her for drinking and driving with her minor grandchild, Holmes was at the Hunt Club, before 5:00 P.M. on a weekday, consuming alcohol with her minor grandchild present.

1024. Holmes drove to the Hunt Club that day, and she intended to drive home intoxicated like all the other days previous wherein she did the same.

1025. Plaintiff informed the Tulsa Police Department of the dangerous situation, and they advised Plaintiff to wait until Defendant Holmes got in the vehicle and then stop the vehicle and call the police.

1026. Instead, Plaintiff decided not to endanger his own life by doing as the Tulsa Police Department moronically advised and proceeded to Hunt Club to record his intro to the video instead.

1027. Someone, not the Plaintiff, went into the Hunt Club and captured Judge Sharon Holmes getting drunk with her grandchild present, and broadcast it on Plaintiff's Facebook page. *See* Facebook Video attached hereto as Exhibit "WW."

1028. Defendant Bailiff, Defendant Williams, saw the live stream on Plaintiff's Facebook Page and came to the Hunt Club.

1029. Plaintiff filmed his intro to the story about Defendant Holmes, and while doing so, Defendant Williams called the police on Plaintiff for filming on a public sidewalk.

1030.   After the encounter, Defendant Williams launched a smear campaign of terror against Plaintiff by posting false and salacious allegations about Plaintiff on her X (formerly Twitter) account and created a website defaming Plaintiff and accusing him of racism.

1031.   Defendant Williams and Defendant Holmes, acting in their individual capacities, made false accusations that Plaintiff is racist and undertook a campaign to harass Plaintiff at his place of business on Black Wall Street in Tulsa Oklahoma.

1032.   Defendant Williams and Holmes' intentional efforts to defame and falsely accuse Plaintiff of being racist for the reasons he exposed Judge Sharon Holmes' drunkenness caused Plaintiff great emotional distress and forced Plaintiff to relocate his businesses.

1033.   Defendant Williams and Holmes conduct caused Plaintiff to suffer economic losses in excess of two million five hundred thousand dollars ($2,500,000.00)

1034.   After the Tulsa Police Department refused to arrest Holmes for her criminal conduct, Plaintiff filed a police report against Judge Sharon Holmes for her felonious conduct.

1035.   In response, Defendant Sharon Holmes filed for a Protective Order and used her friend, Defendant Loretta Radford, to fraudulently obtain the Protective Order.

1036.   As a result of Defendant Sharon Holmes filing for a protective order, Defendant Radford granted the request, and in doing so, prohibited Plaintiff from possessing any firearm.

1037.   Plaintiff was not accused of using a firearm or weapon against Defendant Holmes, and in fact, Plaintiff used a video camera to record her actions from publicly accessible areas.

1038.   The actions of Plaintiff are protected by the 1st Amendment of the United States Constitution.

1039.   Defendant Williams, individually and on behalf of Defendant Holmes and the 14th Judicial
District, conspired with Defendant Radford and her bailiff to obtain the Protective Order
against Plaintiff. They continued to conspire with them to maintain the Protective Order for
as long as they did.

1040.   Defendant Radford, individually and in her official capacity, worked in concert with
Defendants Holmes, Defendant Williams, and her own bailiff, to intentionally deprive
Plaintiff of his Constitutional rights including those afforded him under the 1st, 2nd, 4th, 5th,
and 14th Amendments of the United States Constitution.

1041.   Defendant Radford, individually and in her official capacity as a judge of the 14th Judicial
District, worked in concert with Defendants Holmes, Defendant Williams, and her own
bailiff, to defame Plaintiff by having the Protective Order issued.

1042.   The issuance of the Protective Order against Plaintiff was used by numerous media outlets
to defame Plaintiff.

1043.   Defendant Judge Radford, after being asked to recuse, improperly continued to exercise
jurisdiction on behalf of the 14th Judicial District to continue the Emergency Protective Order
granted Defendant Holmes further depriving Plaintiff of his Constitutional rights for almost
a year.

1044.   Plaintiff after finally securing the removal of Defendant Judge Radford from the matter, filed
a Motion to Dismiss, and Defendant Holmes, knowing that the game was over, voluntarily
dismissed her Petition and the Protective Order was Dismissed by the Court. *See* Protective
Order Docket attached hereto as Exhibit "XX."

1045.  After obtaining the dismissal of the Protective Order, Plaintiff entered Defendant Judge Sharon Holmes' Courtroom. *See* Video of Contempt Arrest attached hereto as Exhibit "YY."

1046.  Upon entering the courtroom, Defendants Holmes and Williams began staring hatefully at Plaintiff.

1047.  Plaintiff, noticing the looks from Defendants Holmes and Williams, and seeing the full room, decided that, instead of exercising his legal right to attend the hearing, briefly gestured in a short waiving motion at Defendants Holmes and Williams staring at him, turned, and left the room.

1048.  After Plaintiff left the room, a TCSO Deputy, at the direction of Defendant Holmes, unlawfully ordered Plaintiff not to enter the room.

1049.  Defendant Holmes and Williams then, conspiring with the Tulsa County Sheriff's Department, physically forced Plaintiff into Defendant Holmes chamber area.

1050.  Plaintiff, quoting Rule 11 of the Rules of the District Courts, immediately requested Defendant Sharon Holmes recuse.

1051.  According to Oklahoma law, Plaintiff's request for Holmes recusal strips her of all jurisdiction, a fact which she knows and/or should know.

1052.  Despite Plaintiff's request that she recuse, and knowing that she cannot possibly act in an impartial manner or with any appearance of impartiality, Defendant Holmes ordered Plaintiff taken into custody and illegally held by TCSO at the Tulsa County Jail.

1053.  Defendant Holmes held Plaintiff held WITHOUT BOND despite bond being appropriate, and in doing so, deprived Plaintiff of his Constitutional rights.

1054.   Defendant Holmes actions of holding Plaintiff without bail constitutes excessive bail.

1055.   Incarceration of Plaintiff by Defendant Holmes was in retaliation for Defendant's reporting on Defendant Holmes' drunkenness.

1056.   Defendant TCSO unlawfully held Plaintiff in the Tulsa County Jail owned and controlled by Tulsa County, State of Oklahoma.

1057.   Defendant TCSO failed to provide Plaintiff with necessary and critical medical care while Plaintiff was unlawfully held by TCSO.

1058.   Defendant TSCO failed to provide Plaintiff prescription medication nitro while in its custody, and its failure resulted in severe chest pain and other discomfort for Plaintiff.

1059.   Defendant TCSO, as its custom and pattern, holds inmates, including Plaintiff, longer than required and longer than legally authorized.

1060.   Despite being ordered released, Defendant TCSO held Plaintiff unlawfully in solitary confinement against his will for hours depriving him of liberty.

1061.   The actions of Defendants 14th Judicial District, Holmes, Williams, Radford, and TCSO were all for improper purposes, and each Defendant caused Plaintiff great emotional distress, anguish, and harm.

1062.    Fox 23 reporters learned of Plaintiff's arrest by Defendant Holmes for contempt and decided to run a salacious, libelous, and utterly false story about Plaintiff on at least three (3) its news broadcasts that evening.

1063.   During its broadcast, Defendant Fox 23 made false statements regarding Plaintiff.

1064. Defendant Fox 23 wrongfully stated with malicious and reckless disregard for the truth that Plaintiff had been convicted of misdemeanor crimes in the State of Oklahoma.

1065. Defendant Fox 23 shared a written story on its website and on its social media accounts, which included the false statements against Durbin. *See* Fox 23 Article attached hereto as Exhibit "ZZ."

1066. KRMG duplicated and ran the FOX 23 article without verifying its accuracy.

1067. The Associated Press received the Fox 23 article, and it was shared nationally with the false information about Plaintiff.

1068. Plaintiff has NEVER BEEN CONVICTED of a SINGLE misdemeanor or anything other than minor traffic infractions.

1069. Defendants Fox 23 and KRMG knew and/or should have known the information regarding Plaintiff's alleged convictions was incorrect, and by failing to verify the information, Defendants Fox 23 and KRMG slandered and libeled Plaintiff.

1070. Defendants Fox 23 and KRMG acted with intentional indifference to the ramifications of its false public statements about Plaintiff, and by doing so, inflicted great emotional distress upon Plaintiff.

1071. All of the Defendants, 14th Judicial District, Holmes, Williams, Radford, Tulsa County Sheriff's Department, and Tulsa County, knew and/or should have known that their collective actions could result in incorrect reporting about Plaintiff.

1072. But for the wrongful actions of Defendants 14th Judicial District, Sharon Holmes, Morgan Williams, Loretta Radford, Tulsa County Sheriff's Department, and Tulsa County, Fox 23, KRMG and others would have no cause to run the story at issue containing false statements about Plaintiff.

1073.  Defendants 14th Judicial District, Holmes, Williams, Radford, TCSO, Tulsa County, FOX 23, and KRMG are all jointly and severally liable for the damages caused Plaintiff.

**B.  CLAIMS FOR RELIEF AGAINST DEFENDANTS SHARON HOLMES, MORGAN WILLIAMS, LORETTA RADFORD, TULSA COUNTY SHERIFF'S DEPARTMENT**

**B.1 COUNT 1- Declaratory and Injunctive Relief Finding that Oklahoma's Protection of Domestic Abuse Act, 22 O.S. § 60 et seq., as written and as applied against Plaintiff, Violate the United States Constitution.**

1074.  Defendant State of Oklahoma created laws which subject individuals to deprivation of their 2nd Amendment Rights to possess firearms granted by the United States Constitution without due process and without any finding that such deprivation is necessary under the facts and circumstances.

1075.  The State of Oklahoma authorizes judges in the State of Oklahoma to deprive citizens of their 2nd amendment rights without hearing.

1076.  The State of Oklahoma does not require judges to make any specific findings before summarily prohibiting a Protective Order defendant from possessing firearms.

1077.  As identified above, because of Defendant Holmes, Williams and Radford's actions against Plaintiff, including the issuance of a protective order against him, Plaintiff was deprived of his right to possess firearms granted him by the 2nd Amendment.

1078.  For more months, Defendants prevented Plaintiff from possessing firearms because of the protective order which should have never been entered.

1079.  Defendants acted under color of state law when they entered the protective order and denied Plaintiff his right to possess firearms.

1080. Oklahoma's protective order laws lack reasonable safeguards to ensure Defendants are not improperly denied their right to bear arms, and lack of such safeguards caused injury to Plaintiff.

1081. No compelling state interest exists in denying every Defendant of a protective order from possessing firearms, especially which such restrictions are imposed on Defendants without hearing.

1082. Further, the 14th Judicial District's failure to timely hear protective order matters also violated the rights of Plaintiff and similarly situated individuals.

1083. Plaintiff demanded a hearing at the first presentment ten (10) days after the issuance of the protective order, but Defendant Radford and the 14th Judicial District denied Plaintiff's demand for a show cause hearing.

1084. Oklahoma law required Plaintiff receive a timely hearing, and Defendants Radford, Holmes, Williams, and the 14th Judicial District worked in concert to deny Plaintiff a hearing for more than seven (7) months.

1085. The harm caused Plaintiff is capable of repetition yet evades review.

1086. As a result of the improper deprivation of Plaintiff's right to bear arms, Plaintiff suffered irreparable injury for which there is no adequate remedy at law.   Absent this Court's intervention, Plaintiff and similarly situated individuals will continue to suffer irreparable injury.

1087. Defendants' use color of state law to enforce the unconstitutional laws and policies challenged by Plaintiff herein.

1088. Due to Defendants' enforcement of the rules and regulations at issue herein, Plaintiff, and others similarly situated, are now and will continue to be denied their right to bear arms without due process.

1089. If not permanently enjoined by this Court, Defendants State of Oklahoma, 14th Judicial District, Radford, Holmes, and Williams, and their agents, employees, and representatives, will continue to implement the challenged laws and rules and other similar policies and practices which will, as a matter of law, deprive Plaintiff and others of their constitutionally protected right to bear arms.

1090. The challenged rules and regulations have caused, are now causing, and will continue to cause Plaintiff to suffer irreparable injury, including but not limited to, deprivation of his constitutional rights.

1091. Plaintiff has no plain, speedy, and adequate remedy at law for such injuries described herein necessitating and authorizing injunctive relief.

1092. As a result of Defendant's violation of Plaintiff's right to bear arms under the United States Constitution and 42 U.S.C. § 1983, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1093. Defendants are each jointly and severally liable for the actions and/or inactions of the other Defendants which violated Plaintiff's rights.

1094. The actions and inactions of Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1095. Wherefore, Plaintiff requests that this Court enter judgment against Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.2 COUNT 2- Injunctive and Declaratory Relief Regarding Membership in OBA**

1096. An actual and substantial controversy exists between Plaintiff and the Defendants State of Oklahoma, 14th Judicial District, Radford, Holmes, and Williams as to their respective legal rights and duties.

1097. Plaintiff contends that, on their face and as applied to Plaintiff, the challenged rules, laws, and conduct violate the 1st, 2nd, and 14th Amendments of the United States Constitution.

1098. The 2nd Amendment protects, among other things, the fundamental right to bear arms.

1099. By their very nature, and certainly by how they were applied against Plaintiff in this matter, Oklahoma's protective order statutes violate Plaintiff's constitutional rights.

1100. Defendants can readily use far less restrictive means than destroying Plaintiff and others of their 1st, 2nd and 14th Amendment protections in their quest to protective victims of domestic abuse.

1101. For instance, the State of Oklahoma could create a requirement that a judge make certain findings before issuance of an order restricting said rights.

1102. By failing to utilize means significantly less restrictive than those outlined herein, Defendants maintain and actively enforce laws, practices, procedures, and policies depriving Plaintiff and others of their constitutional rights.

1103. By failing to provide minimum safeguards required by the Constitution, Defendants maintain and enforce a set of laws, practices, procedures, policies and customs, which deprive Plaintiff of his 1st, 2nd and 14th Amendment rights.

1104. The deprivation of constitutional rights caused Plaintiff to suffer irreparable injury for which there is no adequate remedy at law.

1105. Under existing law, Defendants maintain and enforce a set of laws, practices, procedures, and policies inadequate to ensure Oklahoma's protective order statutes are not used for impermissible purposes described herein.

1106. Unless the deprivation of Plaintiff and other's rights is enjoined by this Court, Plaintiff and other U.S. citizens residing in the State of Oklahoma will continue to suffer irreparable harm.

1107. Plaintiff is entitled to declaratory and injunctive relief against Defendants' continued enforcement and maintenance of the unconstitutional laws, rules, regulations, practices, procedures and policies related to protective orders. *See* 28 U.S.C. §§ 2201, 2202; 42 U.S.C. §§ 1983, 1988.

**B.3 COUNT 3- Violation of Plaintiff's Civil Rights pursuant to the 1st and 14th Amendments and 42 U.S.C. §§ 1983, 1988.**

1108. Defendants enforce the laws, policies, practices and customs related to protective orders, and the deprivation of citizens 2nd Amendment rights, under color of state law to the detriment of Plaintiff and those similarly situated.

1109. As a result of Defendants' violation of Plaintiff's rights under the United States Constitution and 42 U.S.C. § 1983, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1110. Defendants are jointly and severally liable for the actions and/or inactions of the other Defendants which violated Plaintiff's rights.

1111. The actions and inactions of the Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1112. Wherefore, Plaintiff requests that this Court enter judgment against the Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

### B.4 COUNT 4- Violation of the 2nd Amendment

1113.  Defendants' current laws and procedures related to protective orders are woefully inadequate to ensure protection of individuals constitutional right to bear arms.

1114.  Defendant State of Oklahoma and 14th Judicial District's laws, policies, procedures and customs are insufficient to ensure individuals are not improperly deprived of their right to bear arms.

1115.  The unconstitutional policies and practices of the Defendants related to the deprivation of Plaintiff's rights were done under color of state law.

1116.  Defendants' violation Plaintiff's rights under the 2nd Amendment of the United States Constitution and 42 U.S.C. § 1983, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1117.  Defendants are jointly and severally liable for the actions and/or inactions of the other Defendants which violated Plaintiff's right to bear arms.

1118.  The actions and inactions of the Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1119.  Wherefore, Plaintiff requests that this Court enter judgment against Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

### B.5. COUNT 5- Negligence, Gross Negligence, and Negligence Per Se

1120.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1121.  The actions and/or inactions of the Defendants as fully laid out herein, constitute negligence, gross negligence, and negligence per se.

1122. Defendants conspired together, as outlined herein, to deprive Plaintiff of his right to bear arms, and such actions caused harm to Plaintiff.

1123. Defendants' actions against Plaintiff were done because of Plaintiff exposing Defendant Sharon Holmes, a judge of the 14th Judicial District, of being a drunk.

1124. As a result of Defendants' negligence, gross negligence, and negligence per se, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1125. Defendants are jointly and severally liable for the actions and/or inactions of the other Defendants.

1126. The actions and inactions of the Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1127. Wherefore, Plaintiff requests that this Court enter judgment against the Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

### B.6.    COUNT 6- Abuse of Process

1128. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1129. Defendants refused Plaintiff a show cause hearing despite the fact that Oklahoma law requires the same.

1130. Defendants Holmes, Radford, and Williams used the laws of the State of Oklahoma and the processes of the courts of the state of Oklahoma for an improper purpose and in abuse of the Court's processes.

1131. Defendants Holmes, Radford, and Williams knew that a protective order against Plaintiff was not warranted or allowed under Oklahoma law, and yet they sought and granted one to

prevent Plaintiff from exercising his 1st Amendment rights of speech and freedom of press.

1132. Defendants engaged in improper process in the malicious prosecution of Plaintiff in the protective order matter.

1133. Defendants worked in concert with the actions of the others to cause Plaintiff's denial of his rights.

1134. Plaintiff, due to the actions of the Defendants, experienced great emotional pain and suffering and continues to suffer from such due to the pending contempt charges against him.

1135. At all times relevant to the facts in this matter, Defendants were acting within the scope and course of their employment with the 14th judicial district and authority with their governmental employer to try and prevent Plaintiff from exposing their wrongdoing.

1136. Defendants are jointly and severally liable for the actions and/or inactions of the other Defendants related to their activities at issue in this matter.

1137. Defendants, jointly and severally, are thereby each liable to Plaintiff for the injuries he suffered.

1138. As a result of Defendants' abuse of process, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1139. The actions and inactions of Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1140. Wherefore, Plaintiff requests this Court enter judgment against the Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.7 COUNT 7- Negligent Hiring and Supervision of Individual Defendants (14th Judicial District)**

1141.   All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1142.   The 14th Judicial District owned, controlled and/or managed the employed individual Defendants Williams.

1143.   Defendant Williams conspired with Defendants Radford and Holmes to improperly obtain a protective order against Plaintiff, despite the fact that Plaintiff requested Defendant Radford's recusal, BEFORE she heard and granted the protective order.

1144.   Oklahoma recognizes a tort for the negligent hiring and supervision of employees.

1145.   At the time the hired Defendant Williams and decided to retain her despite knowing of prior improper action by her, they knew and/or should have known that she posed a risk to the persons she came in contact with in her official capacities.   Despite this knowledge, Defendants nonetheless proceeded to hire and retain Defendant Williams, acting with conscious indifference to the rights, safety, and welfare of others, including Plaintiff.

1146.   The aforementioned acts and/or omissions, singularly or in any combination thereof, rise to the level of negligent hiring, retention, and/or supervision of Defendant Williams by the Defendant 14th Judicial District.

1147.   Defendant 14th Judicial Districts acts and/or omissions, when viewed objectively, involved an extreme and/or unnecessary degree of risk considering the probability and/or magnitude of harm to others.

1148.   Defendant 14th Judicial District had actual and/or subjective awareness of the risk involved

in hiring and retaining Defendant Williams, but nevertheless proceeded with conscious indifference to the rights, safety and welfare of others when they hired and retained Defendant Williams.

1149.  Therefore, Defendant 14th Judicial District is liable for the negligent hiring, retention, and/or supervision of Defendant Williams, and Plaintiff is entitled to recover against the Defendant 14th Judicial District for all damages he sustained as a result of the acts and/or omissions of Defendant Williams.

1150.  As a result of the negligent hiring and supervision, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1151.  The negligent hiring and supervision practices by Defendant 14th Judicial District warrants the imposition of punitive damages, and Plaintiff requests punitive damages.

1152.  Wherefore, Plaintiff requests this Court enter judgment against all OBA Defendants and Defendant Oklahoma Highway Patrol in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

### B.8 COUNT 8- DEFAMATION, LIBEL/SLANDER (against Defendant Williams, Holmes, Radford, and 14th Judicial District).

1153.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1154.  Defendants Williams, Holmes, Radford and 14th Judicial District made false statements against Plaintiff to others including stating publicly that Plaintiff is racist towards blacks because he exposed Defendant Holmes drunk driving.

1155.  Plaintiff studied civil rights at the University of Southern Mississippi, and allegations against

him regarding racism are PATETENLY FALSE.

1156.  Defendants knew and/or should have known that their statements were false at the time they made them, and that such false statements would harm Plaintiff.

1157.  The knowingly false statements directly led to harm of Plaintiff and forever wrongfully tarnished his reputation in the community.

1158.  As a result of Defendant Williams and Holmes false statements, Plaintiff received backlash at his offices on Black Wall Street, which forced him to relocate to get away from the abuse caused by the false allegations.

1159.  As a result of the defamation, libel and slander, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1160.  The defamation, libel and slander by Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1161.  Wherefore, Plaintiff requests this Court enter judgment against Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.9 NINTH CLAIM FOR RELIEF- Respondent Superior (Against the 14th Judicial District)**

1162.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1163.  At the time of the incident, Defendant Williams was an employee, agent, and/or servant of Defendant 14th Judicial District, and Defendant Williams was acting within the course and scope of her employment with the 14th Judicial District at the time of the incidents at issue

in this matter. As such, Defendant 14th Judicial District is jointly and severally responsible for the conduct of Defendant Williams under the doctrine of *respondeat superior* due to the master-servant relationship which existed at the time of the incident at issue in this matter.

1164. The actions Defendant Williams and 14th Judicial District warrant the imposition of punitive damages in this matter.

1165. Wherefore, Plaintiff requests this Court enter judgment against Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

## IV. FACTS AND CLAIMS AGAINST DEFENSANT MARIA TERESSA TERAN-GROSSNICKLAS

### A. Facts Against Defendant Maria Teressa Teran-Grossnicklas (hereinafter "Teran")

1166. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1167. Defendant Teran filed for a protective order against Plaintiff, and in doing so, she made false statements regarding Plaintiff.

1168. Plaintiff was served with the Protective Order restricting his liberties afforded him under the United States Constitution.

1169. The false statements of Defendant Teran resulted in a protective order being granted against Plaintiff.

1170. As a result of Defendant Teran's false statements and improper actions, Plaintiff was forced to defend himself in a county more than 2 hours from Plaintiff's residence.

1171. Defendant Teran became upset with Plaintiff when he repeatedly denied her sexual advances.

1172. Defendant Teran lied in her application for protective order in order to defame Plaintiff, and her actions defamed Plaintiff.

1173. Plaintiff defended the protective order, and the Court DENIED and terminated Defendant Teran's protective order against Plaintiff at the show cause hearing.

1174. At said hearing, Defendant Teran failed to make a prima facia showing of a right to a protective order under Oklahoma law, which clearly established that the Emergency Protective Order was obtained without legal cause.

## B. Claims Against Defendant Maria Teressa Teran-Grossnicklas

### B.1 Count 1: Defamation, Libel and Slander

1175. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1176. Defendant Teran made false statements in her complaint against Plaintiff to Defendant OBA Defendants.

1177. Defendant Teran made false statements in her Petition for Protective Order against Plaintiff.

1178. Defendant Teran knew and/or should have known that her statements were false at the time she made them.

1179. Defendant Teran made said false and defamatory statements in an attempt to defame Plaintiff, and her false statements did defame Plaintiff.

1180. Plaintiff incurred significant expenses in defending against Defendant's slanderous actions and fraudulent protective order.

1181. The false statements made by Defendant Teran constitute defamation, libel and slander.

1182. The actions and inactions of Defendant Teran warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1183.  Wherefore, Plaintiff requests that this Court enter judgment against Defendant Teran in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.2 Violation of Plaintiff's Civil Rights- 42 U.S.C. §§ 1983, 1988**

1184.  Defendant Teran's actions deprived Plaintiff of his 1st Amendment rights during the pendency of the emergency protective order.

1185.  Defendant Teran's actions resulted in a deprivation of Plaintiff's rights under the United States Constitution and 42 U.S.C. § 1983.   Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00) as a result of Defendant Teran's violation of his civil rights.

1186.  Defendants are jointly and severally liable for the actions and/or inactions of the other Defendants which violated Plaintiff's rights.

1187.  The actions and inactions of the Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1188.  Wherefore, Plaintiff requests that this Court enter judgment against the Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.3. COUNT 3: Negligence, Gross Negligence, and Negligence Per Se**

1189.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1190.  The actions and/or inactions of Defendant Teran as fully laid out herein, constitute negligence, gross negligence, and negligence per se.

1191.  As a result of Defendant Teran's negligence, gross negligence, and negligence per se, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1192.  The actions of Defendant Teran warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1193.  Wherefore, Plaintiff requests that this Court enter judgment against the Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.4.     COUNT 4: Abuse of Process**

1194.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1195.  Defendant Teran engaged in improper use of the court's process in the malicious prosecution of Plaintiff in the protective order matter.

1196.  Defendant Teran used the Court's process improperly to cause denial of Plaintiff's rights.

1197.  Plaintiff, due to the actions of Defendant Holmes, experienced great emotional pain and suffering and continues to suffer from such due to the pending claims against him levied by Defendant Teran with Defendant OBA Defendants.

1198.  As a result of Defendant Teran's abuse of process, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1199.  The actions and inactions of Defendant Teran warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1200.  Wherefore, Plaintiff requests this Court enter judgment against Defendant Teran in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

V.     **FACTS AND CLAIMS AGAINST DEFENDANTS:  CITY OF TULSA, G.T. BYNUM, BLAKE EWING, MARK HOGAN, RICHARD LEE TESTERMAN, IV, SECURITY GUARD MARTINEZ, SECURITY GUARD GRANGER, VANESSA HALL HARPER, LAURIE DECTER WRIGHT, and LAURA BELLIS (Collectively the "City of Tulsa Defendants").**

### A.    FACTS AGAINST CITY OF TULSA DEFENDANTS.

1201.  Defendant Tulsa City Council constitutes a public body under Oklahoma law. *See* 25 O.S. § 304(1) (defining Public Body to include, "all boards, bureaus, commissions, agencies, trusteeships, authorities, **councils,** committees, public trusts or any entity created by a public trust"). (emphasis added).

1202.  As a "Public Body," Defendant Tulsa City Council and its members must comply with the Oklahoma Open Meeting Act. *See* 25 Okla. Stat. §§ 304 *et seq.*

1203.  The actions giving rise to this suit occurred in Tulsa County, State of Oklahoma.

### A.1 THE OKLAHOMA OPEN MEETING ACT

1204.  Oklahoma codified the Open Meetings Act, as 25 O.S. §§ 301 *et seq.*

1205.  The stated purpose of the Open Meeting Act is to facilitate and encourage an informed citizenry's understanding of government. *25 OS. § 302.*

1206.  Under the statutory provisions contained in 25 O.S. §§ 301 *et seq.,* any public body, as defined in § 304(A) as "all boards, bureaus, commissions, agencies, trusteeships, authorities, councils, committees, public trusts or any entity created by a public trust . . . ", is required to provide to the public specific times and places, which are convenient to the public, such that citizens may attend said meetings and be informed of the activities of their government.

1207.  To be "informed" under Section 301, the Act requires that citizens be aware of matters discussed during public meetings. By communicating about matters of public concern secretively, Defendants violated the Open Meeting Act.

1208.  By its language, the Open Meeting Act requires public bodies, like the Tulsa City Council, to conduct meetings in the fresh air that only the sunshine of transparency brings to the process of governance.

1209.  The language in 25 O.S. § 303 requires that meetings of public bodies be both convenient to
the public and **open** to the public. (emphasis added).

1210.  To be "open" to the public, the public must be able to see and hear all the discourse of all
members of the public body. *See* 25 O.S. §301 et seq.

1211.  Pursuant to the Act, a meeting is not open if the public cannot see the members of the public
body during the public meeting. *See Id.*

1212.  Pursuant to the Act, a meeting is not open if the public cannot hear the members of the public
body while they discuss agenda items during the public meeting. *See Id*

1213.  The Oklahoma Open Meetings Act, 25 O.S. § 303 specifically requires: All meetings of such
public bodies ... shall be preceded by advance public notice specifying the time and place of
each such meeting to be convened as well as the subject matter or matters to be considered
at such meeting, as hereinafter provided.

1214.  Under the Open Meeting Act, "Meeting" means "[t]he conduct of business of a public body
. . . ." 25 O.S. § 304(2).

1215.  Defendant Tulsa City Council is a public body under the Open Meetings Act.

1216.  Defendant City of Tulsa attempted to conduct a meeting under the Act for purposes of
conducting business of the public body.

1217.  A violation of the Open Meetings Act, "does not require a showing of bad faith, malice, or
wantonness, but, rather, encompasses conscious, purposeful violations of law or blatant or
deliberate disregard of law by those who know, or should know requirements of the Act...."
*Wilson* v. *City of Tecumseh,* 2008 OK CIV APP 84, ¶13.

1218.  The Open Meeting Act provides criminal sanctions for violation of its provisions by stating
as follows:

A.  Any person or persons willfully violating any of the provisions of this Act shall be guilty of a misdemeanor and upon conviction shall be punished by a fine not exceeding Five Hundred Dollars ($500.00) or by imprisonment in the county jail for a period not exceeding one (1) year or by both such fine and imprisonment.

25 O.S. § 314(A).

1219.    Aside from the criminal sanctions addressed above, the Open Meeting Act also authorizes any person to bring a civil suit seeking declaratory or injunctive relief, or both. *See* 25 Okla. Stat.§ 314 (B)(l).

### A.2 THE MARCH 22, 2023 TULSA CITY COUNCIL MEETING

1220.    On March 22, 2023, Councilor Grant Miller ("Miller") of the Tulsa City Council called to order the 10:30 A.M. Urban and Economic Development Committee meeting, a regularly scheduled and posted public meetings of the Tulsa City Council. *See* Public Meeting Notice and Agenda attached hereto as Exhibit "AAA."

1221.    The meeting constituted a quorum of the Tulsa City Council.

1222.    The following Councilors were in attendance at the March 22, 2023 meeting: Defendant Vanessa Hall- Harper, Defendant Lori Deeter Wright, Defendant Laura Bellis, Jayme Fowler, Phil Lakin, Jeannie Cue, Christa Patrick, Grant Miller, and Christian Bengel.

1223.    Agenda item number four (4) of the meeting was a presentation and discussion on the Citywide Housing Assessment Report which included a representative from Housing Solutions, Becky Gligo ("Gligo"). *See Id.*

1224.    Gligo spoke to the issue of homelessness within the report during the public meeting.

1225.    During open meetings of Defendant Tulsa City Council, councilors ask questions in tum by raising their hand to be placed on the list to speak on the agenda item and a list is kept by the chairperson of the meeting.

1226.  Councilor Miller asked a question of Gligo related to the above-mentioned report when the report mentioned homelessness.

1227.  As Councilor Miller asked his question, he observed Defendant Wright roll her eyes, smirk, and pick up her phone.

1228.  Councilor Miller observed Defendant Wright typing on her phone keyboard during the public meeting.

1229.  Councilor Miller observed Defendant Bellis, during the public meeting, pick up her phone, read something on the phone, look toward Defendant Wright, and smirk.

1230.  Councilor Miller then observed Defendant Bellis type something on her device's keyboard during the public meeting.

1231.  Councilor Miller then observed Defendant Harper pick up her phone, during the public meeting, look at Defendant Wright and smirk.

1232.  Defendant Harper then looked at Defendant Bellis and smirked.

1233.  Upon information and belief, Councilor Miller suspected the Councilor Defendants were communicating about his question about allocating ten (10) million dollars to homelessness during the public meeting which was related to the topic being discussed as agenda item four (4). *See Id.*

1234.  Immediately after the meeting, Councilor Miller submitted an Open Record Request pursuant to the Oklahoma Open Records Act. 51 O.S. § 24A.l *et seq.*

1235.  Councilor Miller submitted the request to Council Administrator Patrick Boulden ("Boulden").

1236.    Boulden is an employee of the City of Tulsa and more specifically is an attorney employed by the City of Tulsa and/or the Tulsa City Council to provide legal advice to the Tulsa City Council and members of the Tulsa City Council in their official capacity.

1237.    Boulden is available to any councilor for advice regarding compliance with Oklahoma law including, but not limited to, the Oklahoma Open Meeting Act.

1238.    The Councilor Defendants possessed access to Boulden for legal advice, and as such, knew and or should have known that the actions identified herein constitute a violation of the Oklahoma Open Meeting Act.

1239.    Defendant City of Tulsa fulfilled Councilor Miller's Open Record Request and provided Councilor Miller a series of text messages between the Councilor Defendants. *See* Text Messages of Councilor Defendants attached hereto as Exhibit "BBB."

1240.    The Open Record production contained at least two text messages sent from Defendant Wright in a group to Defendants Hall-Harper and Bellis (hereinafter collectively "Defendant Councilors"). *See Id.*

1241.    The Open Record production contained one text message sent from Defendant Bellis to the group containing Defendant Councilors. *See Id.*

1242.    The Open Record production contained text messages received by Defendant Hall-Harper from the other Defendant Councilors. *See Id.*

1243.    Defendant Councilors' messages were all contained within a group message between all three (3) Defendant Councilors.

1244.    The time date stamps of the Defendant Councilors' text messages reflect that they were sent and reviewed during the public meeting identified above and in Exhibit "A."

1245.    The first message from Defendant Wright stated "$10M Gilcrease$ for housing". *See Id.*

1246.   The second message from Defendant Wright stated, "Miller is ridiculous". *See Id.*

1247.   The text message from Defendant Bellis stated "RIDICULOUS". *See Id.*

1248.   All messages were either sent, observed, or both by all three Defendant Councilors.

1249.   Plaintiff attempted to resolve these violations of the Oklahoma Open Meeting Act with the City of Tulsa, but they failed to respond as promised leaving Plaintiff no choice but to initiate this litigation.

1250.   Councilor Defendants, instead of admitting fault and working towards a resolution, sent a threat letter to Councilor Miller. *See* Letter from Laurie Phillips, Counsel for Defendants Hall-Harper, Wright, and Bellis to Councilor Miller attached hereto as Exhibit "CCC."

1251.   Councilor Defendants, instead of admitting fault and working towards a resolution, sent a threat letter to the undersigned after their threat letter to Councilor Miller failed to have the chilling effect they hoped on the inquiry into their wrongdoing.

1252.   Councilor Defendants retained legal counsel for actions taken in the course of their individual capacity indicating that their improper and illegal actions extend into their personal lives as well as their role as members of the Tulsa City Council.

1253.   In her letter, Phillips falsely claimed Councilor Miller accused Defendant Councilors of violations of the Open Meeting Act and Phillips threatened frivolous litigation if Councilor Miller continued to engage in public discourse about the subject.

1254.   Councilor Miller published the threat letter to his public Facebook page.

1255.   Critically, in addition to the violations already known about, Phillips admitted in her letter that Defendant Councilors regularly text during open meetings in violation of the Oklahoma Open Meeting Act stating, "[t]he practice of text message use has been in effect, even during regular City Council meetings."

1256.   Thus, Phillips freely admitted her clients regularly and frequently violate the Act.

1257.   The Councilor Defendants and Phillips made comments to media that their actions are no big deal and not a violation of the Open Meeting Act.

### A.3 FACTUAL BACKGROUND OKLAHOMA OPEN RECORDS ACT AND PLAINTIFF'S OPEN RECORD REQUESTS

1258.   All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1259.   The Open Records Act, codified as 51 O.S. § 24A.l *et seq.* in the State of Oklahoma, makes clear that, "it is the public policy of the State of Oklahoma that the people are vested with the inherent right to know and be fully informed about their government." *Id.* at§ 24A.2.

1260.   The Oklahoma Legislature further provided that, "[t]he purpose of this act is to ensure and facilitate the public's right of access to and review of government records so they may efficiently and intelligently exercise their inherent political power." *Id.*

1261.   Under the statutory provisions contained in 51 O.S. § 24A.3 *et seq.,* a "'Public body' shall include, but not be limited to, any office, department, board, bureau, commission, agency, trusteeship, ... supported in whole or in part by public funds or entrusted with the expenditure of public funds or administering or operating public property ...." 51 O.S. § 24A.3(2).

1262.   Under the Act, "Public office" means the physical location where public bodies conduct business or keep records. *Id.*

1263.  Defendant City of Tulsa maintains its central offices at 175 E. 2nd St., Tulsa, OK 74103, and such location constitutes a Public Office under the Act.

1264.  Defendants City of Tulsa and Tulsa City Council conduct business and keeps records at the Public Office identified above.

1265.  Defendants City of Tulsa and City Council constitute a Public Body under the Act.

1266.  On March 30, 2023, Plaintiff appeared at the City of Tulsa to request public records from the office which processes public grants for the City of Tulsa.

1267.  Plaintiff arrived at approximately 3:50 P.M., while the offices of Defendant City of Tulsa were open.

1268.  Plaintiff inquired with security stationed at the front entrance of the building about speaking with the record custodian who handles public grants.

1269.  Security advised Plaintiff that the office that handled grants closed at 4:00 P.M., and therefore, the City of Tulsa would not process any Open Records Request.

1270.  Security did not offer any alternative to submitting a request despite being open to the public and it being regular business hours for the City of Tulsa.

1271.  Plaintiff advised security that he would return the following day, March 31, 2023 at 2:00 P.M. to make an in-person request to publicly inspect Open Records.

1272.  Plaintiff arrived as promised at 2:00 P.M. on March 31, 2023 to inspect and copy Open Records on behalf of the Plaintiff.

1273.  Plaintiff, upon arriving at the City of Tulsa, advised the front desk security guard that he was there to do a public Open Records Act request with the department which handles public grants and grant funding.

1274.    Plaintiff, as outlined herein, refused to provide identification to submit an Open Record Request, as no such requirement for identification is contained in the Act.

1275.    Defendant City of Tulsa security refused to allow Counsel to enter the building to go to the records custodian over grant funding to make an Open Records Act request.

1276.    Plaintiff requested that security request that the record custodian come to the public lobby so that an open record request might be made.

1277.    Defendant City of Tulsa security, after speaking with several employees of the City of Tulsa, refused to provide anyone to fulfill an open record act request to inspect records.

1278.    Defendant City of Tulsa security, after telling Plaintiff he could go to the fourth floor, then physically battered Plaintiff while taking a step towards going to the 4th floor to make an Open Record Act request.

1279.    The 4th floor is the location for the City Council Administrator, and after being told that he could proceed to the 4th floor, Plaintiff decided not to waste the trip and to request other records desired by Plaintiff related to grant funding in the possession of members of the Tulsa City Council and Council Administrator Pat Boulden.

1280.    Upon information and belief, the office was not closed at the time the initial request was made, and Security lied to try and prevent access to public records.

1281.    According to Defendant City of Tulsa's website, City Hall is open from 8:00 A.M. to 5:00 P.M., Monday through Friday.

1282.    Defendant City of Tulsa adopted a City of Tulsa Open Records Policy (hereinafter "OR Policy") via Executive Order 95-04. Attached hereto as Exhibit "A."

1283.  Defendant City of Tulsa OR Policy states that, "[t]he City of Tulsa shall fully comply with the Oklahoma Open Records Act ... as said Act presently exists or may hereafter be amended by the Oklahoma Legislature." *Id.* at §2.

1284.  The OR Policy further provides that, "[a]s defined by and subject to the requirements and limitations expressed in the State Act, all records of the City of Tulsa, its departments, boards, authorities and commissions shall be open for inspection, copying and/or mechanical reproduction during regular business hours." *Id.*

1285.  The OR Policy clearly anticipates that a citizen may appear during regular business hours to inspect an Open Record, and the OR Policy further makes clear that such request should be honored absent some express statutory limitation.

1286.  None of the items requested are exempt from public inspection under the Oklahoma Open Records Act.

1287.  Section 4 of the OR Policy requires that all OR requests be done in writing. There is no requirement in the Open Records Act which imposes an obligation to write out the documents to be inspected as such would unnecessarily forewarn the government what the citizen may be looking into.

1288.  The OR Policy further requires that, "Open Records Act request forms shall be available for public use at the main administrative office of every City department and City public body.

1289.  Defendant City of Tulsa failed to provide Open Records Act request forms at the front lobby of the main entrance of the City of Tulsa prior to April 3, 2023.

1290.  After not having them at any of the prior meetings, the City of Tulsa did have a form waiting for Plaintiffs counsel, but those forms were not previously available on days prior to April 3, 2023.

1291.  The failure to provide the form constitutes a violation of the City of Tulsa OR policy and constitutes a violation of the Open Records Act because the City of Tulsa provided no means for the public to make an in-person request to inspect records.

1292.  The OR Policy further requires that, "[t]he production of records responsive to a presented request shall be handled promptly by record custodians. *See Id.* at §5.

1293.  Defendant City of Tulsa failed to follow its own OR Policy because it does not provide any records promptly.

1294.  Defendant City of Tulsa refuses to provide documents for inspection same day as required by the Open Records Act

1295.  Defendant City of Tulsa refuses to provide access to inspect computer records as required by the Open Records Act and Section 8 of the OR Policy. *See Id.* at §8.

1296.  In addition to the OR Policy language, the OR Policy also contains a frequently asked questions section.

1297.  Defendant City of Tulsa in the Q&A Section ponders, "Is there a presumption of Confidentiality regarding City Records." The City of Tulsa answers its own proposed question by stating, "No, just the opposite, there is a presumption, with certain listed exceptions, that all City records are open to inspection. *See Id.* at p. 12 (underlined language in document).

1298.  Defendant City of Tulsa by its own answer makes abundantly clear that the public has a right to inspect, and that the records must be open to that inspection.

1299.  Defendant City of Tulsa records are closed to the public in violation of the Open Records Act and City of Tulsa OR Policy.

1300. Defendant City of Tulsa records are closed for inspection by the public in violation of the Open Records Act and City of Tulsa OR Policy.

1301. All employees and public officials of Defendant City of Tulsa are required to comply with the OR Policy and the Open Records Act, and the City of Tulsa makes clear that, in the event an employee "willfully fails to produce the requested records that are available for production, the employee may be fined and/or jailed." *Id* at p. 13.

1302. The answer goes further and notifies employees of Defendant City of Tulsa that, "an employee will not be entitled to representation by the City Attorney's Office during any criminal proceeding." *Id.*

1303. Defendant City of Tulsa clearly recognizes that the Open Record Act requires the Public Body to have someone available during regular business hours to both accept and process Open Records Act request. In fact, the City of Tulsa in its OR Policy provides each City department must, "[d]esignate one or more employees as record custodians ... [and] [t]his designation must result in at least one employee being available at all times when the department' offices are open to the public. In support of this position, the City of Tulsa cites the Open Records Act at 51 O.S.§24A.5(6).

1304. On April 3, 2023, Plaintiff returned to the City of Tulsa with its own Policy and Procedural Manual in hand relating to Open Record Act Requests.

1305. Plaintiff relayed all of the information above to the City of Tulsa Defendants and/or Defendants agents and/or employees, and despite advising them as to the City of Tulsa OR Policy, and the requirements of the Open Records Act, the City of Tulsa Defendants and their agents and/or employees refused to comply with Oklahoma law and City of Tulsa policy.

1306.   Defendant Bynum, as Mayor for the City of Tulsa directed his agents and/or employees to violate the Oklahoma Open Meeting Act and Oklahoma Open Record Act.

1307.   Defendant Bynum, as Mayor for the City of Tulsa, has reason to hide his involvement and participation in the improper funding scheme employed by the City of Tulsa related to destruction and construction of the Gilcrease Museum.

1308.   Defendant Bynum, in an effort to hide his criminal actions, directed his agents and/or Employees, including but not limited to those identified below as Record Custodian Defendants, to take all actions necessary to block the public's access to records which will reveal his complicity in the sham and criminal funding of the Gilcrease Museum.

1309.   Defendant Bynum specifically, and in violation of the Oklahoma Open Records Act, directed his employees to prohibit Plaintiffs access to public records.

1310.   Defendant Bynum, in an effort to protect and burry the illegal allocation of ARPA funding to organizations in which members of the Tulsa City Council hold a pecuniary or other interest, instructed his agents and/or employees to destroy and/or block access to records which may show the improper allocation of ARPA funding.

1311.   Defendant Bynum worked in concert with Defendant Councilor Vanessa Hall Harper on ARPA allocations to direct money to an organization in which she holds a pecuniary interest.

1312.   Defendant Harper failed to publicly disclose her interest in organizations which received ARPA funding, and in doing so, she violated Oklahoma law and the Ethics Code for the City of Tulsa.

1313.    Defendant Bynum, Jack Blair and Patrick Boulden knew of Defendant Hall Harper's conflicts, and despite such knowledge, allowed her to take advantage of her role as a participant in the ARPA funding decisions.

1314.    City of Tulsa Defendants knew of the continual and systemic violations of the Oklahoma Open Meeting Act by the City Council for the City of Tulsa, and in fact, they each engaged in the same violation of the Oklahoma Open Meeting Act, both directly and via staff, to gain improper consensus and conduct improper discussions about City of Tulsa business outside of a public meeting.

1315.    Defendant Harper, contrary to the best interests of City Council District 1, worked to direct ARPA funding away from worthwhile applicants with causes directly impacting District 1 to causes in which she held a financial interest for the purposes of syphoning that money off to her and her associates.

1316.    The records sought by Plaintiff will expose improper conflicts of interest of members of the City Council for the City of Tulsa when they approved ARPA funding.

1317.    The records sought by Plaintiff will expose improper communications of City of Tulsa Defendants in violation of the Oklahoma Open Meetings Act.

1318.    Defendant Bynum instructed his agents and/or employees to try and cover up the violation of Oklahoma law by his agents and/or employees by improperly trying to influence members of the Tulsa City Council in violation of Oklahoma law.

### A.3 FACTUAL BACKGROUND- IMPROVE OUR TULSA

1319.    Defendant Bynum holds an interest in passage of the $772,000,000.00 Improve Our Tulsa 3 Package, and Defendant G.T. Bynum used his role as Mayor of the City of Tulsa to coerce

others to take whatever steps are necessary, criminal or otherwise, to get the funding done by August 2023.

1320.   Defendant Bynum additionally holds an interest in the passage of additional Gilcrease Museum funding.

1321.   Bynum, like the City Councilor Defendants, would prefer to keep their dirty deeds buried deep, and he appears willing to violate any Oklahoma law necessary to facilitate his endeavors.

1322.   Defendant Bynum committed a misdemeanor by violating the Oklahoma Open Records Act.

1323.   Upon information and belief, Defendant Bynum committed a misdemeanor violation of the Oklahoma Open Meeting Act by acting on his own behalf, and/or using his agents and/or employees, wherein he improperly discussed matters of public concern related to Improve Our Tulsa with the Defendant City Council for the City of Tulsa outside public open meetings as required by the Open Meeting Act.

1324.   On March 27, 2023, Plaintiff hand delivered an Oklahoma Open Record Act request to Defendants Harper, Wright, and Bellis, with copies to Patrick Boulden and Jack Blair, at the City of Tulsa.

1325.   Defendants Harper, Wright, and Bellis, along with Patrick Boulden and Jack Blair, violated the Oklahoma Open Records Act by failing to provide the requested documents as required by the Act.

1326.   To date, the City of Tulsa provided no records to Plaintiff.

### A.4 FACTUAL BACKGROUND: THE APRIL 4th OPEN RECORDS ACT REQUESTS

1327. Prior to arriving to conduct an Open Records Act Request, Plaintiff's Counsel notified City Attorney Defendant Jack Blair of his intention to arrive at 2:00 P.M.

1328. Despite being on notice, and in what can only be described as an act of cowardice, Defendant Jack Blair failed to meet with Plaintiff's counsel to resolve the pending Open Records Act issues, and instead, he directed the Defendant security officials and other Defendants to block Plaintiff's lawful Open Records Act requests.

1329. During the April 3, 2023 visit to the City of Tulsa, Counsel for Plaintiff either requested records and/or were denied those records by the following Record Custodians:

    a.    John Reel- Equipment Management Records

    b.    Patrick Boulden- City Council Administrator

    c.    Christy Basgall- Accounting: Financial Statements and Accounting Records

    d.    Jarrod Moore, Carol Jones, and Jake Epp- Budget: Operating, Grants, System Reports, Capitol Planning and Sales Tax Overview Committee Records.

    e.    Angela Bradley- Human Resources

    f.    Michelle Brooks- Mayor's Office covering Mayor emails and text messages along with information regarding board appointments.

    g.    Jack Blair and Tammy Miller- Legal Department

1330. From John Reel, employee of the City of Tulsa, Plaintiff intended to inspect video footage from the lobby of the City of Tulsa from March 31, 2023.

1331. Security specifically denied Plaintiff access to inspect the video.

1332. The requested video constitutes an open record.

1333.   City of Tulsa Employees Jarrod Moore, Carol Jones, and Jake Epp were notified on April 3, 2023 of Plaintiffs presence at the City of Tulsa to conduct an Open Records Act inspection.

1334.   Defendants Jarrod Moore, Carol Jones, and Jake Epp instructed security to block Plaintiff's access to them for purposes of preventing Plaintiff from making an Open Record Act request.

1335.   Security for Defendant City of Tulsa advised Plaintiff that City of Tulsa employees Jarrod Moore, Carol Jones, and Jake Epp were aware of Plaintiff's presence to conduct an Open Records Act request, and Defendant advised security that they were all in a meeting and therefore unavailable.

1336.   Defendant City of Tulsa employees Jarrod Moore, Carol Jones, and Jake Epp, as Record Custodians appointed by Defendant City of Tulsa to handle Open Records Requests for their department, failed to fulfill their obligations in direct violation of Tulsa OR Policy and the Open Records Act.

1337.   The Defendant City of Tulsa Records Custodians each knew and/or should have known that their direction to security to deny Plaintiff access to public records constituted a crime in the State of Oklahoma.

1338.   Despite knowing of their obligations, being duly appointed to fulfill the Open Record Act requests on behalf of their Department and Defendant City of Tulsa, the Record Custodians failed to perform their duties.

1339.   Defendant City of Tulsa employee Christy Basgall is responsible for processing all requests related to Accounting: Financial Statements and Accounting Records.

1340.   Christy Basgall met with Plaintiff in the lobby of the City of Tulsa.

1341.   During that meeting, Plaintiff requested access to inspect the financial payment documents related to ARPA funding.

1342.   Christy Basgall admitted that the City of Tulsa stored those financial records electronically and that such records were available at the City of Tulsa.

1343.   Christy Basgall, as a Custodian of Record for Defendant City of Tulsa, refused to allow Plaintiff to inspect publicly available financial records related to payments on grant allocations related to ARPA.

1344.   Christy Basgall, as Custodian of Record for Defendant City of Tulsa, directed other employees of the City of Tulsa, namely the Security Defendants identified below, to block Plaintiffs counsel's access to the desired open records. In fact, she used Defendant Mark Hogan below to block Plaintiff from accessing the records.

1345.   Defendant City of Tulsa employee Angela Bradley is responsible for processing all requests related to human resources.

1346.   Angela Bradley, as a Custodian of Record for Defendant City of Tulsa, refused to allow Plaintiff to make an Open Records Request to inspect publicly available portions of employment files for some employees of Defendant City of Tulsa.

1347.   Angela Bradley, as Custodian of Record for Defendant City of Tulsa, directed other employees of Defendant City of Tulsa, namely the Security Defendants identified herein, to block Plaintiff access to the desired open records.

1348.   Defendant City of Tulsa employee Michelle Brooks is responsible for processing all requests related to the Mayor's Office for the City of Tulsa.

1349.  Michelle Brooks, as a Custodian of Record for Defendant City of Tulsa, refused to allow Plaintiff to make an Open Records Request to inspect publicly available portions of employment files for some employees of the City of Tulsa.

1350.  Security contacted Michelle Brooks and advised that Plaintiff was present in the lobby to conduct an Open Records Act request to inspect public records.

1351.  Michelle Brooks, as Custodian of Record for Defendant City of Tulsa, directed other employees of Defendant City of Tulsa, namely the Security Defendants identified herein, to block Plaintiff's access to the desired open records.

1352.  While Plaintiff was speaking with someone else, a person Plaintiff was able to later identify as Defendant Mark Hogan, rapidly approached Plaintiff and invaded the personal space of Plaintiff.

1353.  Defendant Hogan is an employee of the City of Tulsa.

1354.  Defendant Hogan's actions on April 3, 2023 were done at the direction and control of Defendants City of Tulsa, G.T. Bynum, and Blake Ewing.

1355.  Defendant G.T. Bynum and/or his agents instructed Defendant Mark Hogan to illegally block Plaintiffs ability to request public records.

1356.  Defendant Hogan is the Director of Asset Management for Defendant City of Tulsa, and as a director, either knew and/or should have known that his actions violated City of Tulsa Ethics guidelines, ordinances of the City of Tulsa, and laws of the State of Oklahoma.

1357.  Defendant Hogan used his proximity to Plaintiff to try and scare and intimidate Plaintiff.

1358.  Plaintiff requested Defendant Hogan take 5 steps back from him in order to allow for personal space.

1359.  Defendant Mark Hogan stated, "I can stand where I want, it's my building."

1360. A search of County Clerk records for Tulsa County for the property on which the City of Tulsa locates its main offices does not reflect that Defendant Hogan owns the building.

1361. A search of County Clerk records for Tulsa County for the City of Tulsa property does not reveal any lease or other interest in the property held by Defendant Hogan.

1362. Upon information and belief, Defendant Hogan lied when he said it was his building as he does not own it or hold any other interest in the property.

1363. Counsel for Plaintiff advised Defendant Hogan that his security agents assaulted him on the preceding Friday, and as such, he was again requesting that Defendant Hogan step back out of the personal space of counsel.

1364. Defendant Hogan then stated that he would take" one (1) step back."

1365. Defendant Hogan only took one (1) step back because he intended to use his physical proximity to Plaintiff to intimidate Plaintiff into not making public record requests.

1366. Defendant Hogan knew Plaintiff has heart conditions as his officers were told that information the preceding Friday, and Defendant Hogan used Plaintiffs heart conditions to try and get Plaintiff to stop investigating.

1367. All City of Tulsa and City Council Defendants, working in concert with one another, want nothing more than to scare off, using whatever means necessary, Plaintiff.

1368. Defendant Hogan, by stating it's his building, implied that he had full dominion and control over the offices of the City of Tulsa and the employees therein.

1369. Defendant Hogan, being in charge of the City of Tulsa building, and being tasked with speaking on behalf of all people in it, is jointly and severally liable for all of the actions of all Defendants.

1370.    Defendant Hogan spoke on behalf of all City of Tulsa Defendants when he denied all Open Record Act requests of Plaintiff.

1371.    Upon information and belief, Defendant City of Tulsa granted Defendant Hogan permission to act on their behalf and bind them as it relates to their obligations as Record Custodians for the City of Tulsa.

### A.4 FACTUAL BACKGROUND- Operating Procedures of the City of Tulsa

1372. On March 31, 2023, Plaintiff entered the public entrance of the City of Tulsa to engage in an Open Records Request and conduct other business within the publicly accessible areas of the City of Tulsa. The events were captured on video. *See* City of Tulsa Video attached hereto as Exhibit "DDD" and Exhibit "EEE."

1373. Upon arriving at the entrance to the City of Tulsa, Plaintiff underwent a security screening whereby his personal belongings were checked by security to ensure nothing dangerous made its way into the city building.

1374. Plaintiff also underwent personal screening for weapons by undergoing an individual security screening involving use of a metal detector by security for the City of Tulsa.

1375. Plaintiff did not and does not object to undergoing security protocols to enter a governmental building.

1376. After fully completing the security screening process, Plaintiff proceeded to engage in his lawful business.

1377. Additional security staff after the security screening area then demanded that Plaintiff produce his government-issued driver's license or other government identification to enter the building.

1378. The security guards at issue involved herein were Defendants Testerman, Martinez, and Granger.

1379. Plaintiff does not know, nor can he readily obtain the first names of Security Guard Martinez and/or Granger and are named in the manner herein due to that.

1380. Plaintiff explained his position that demanding his identification to access publicly accessible areas of the building to engage in activities including, among other things, public open record act requests, violated his rights under the United States Constitution and Oklahoma law.

1381. Plaintiff, having been to the city building many times before, knows that the first floor and the 4th floor of the City of Tulsa Building are open to the public as public meetings occur on both floors. Additionally, Tulsa City Council offices, which are open to the public, are located on the 4th floor.

1382. Plaintiff attempted to enter the public areas of the city building to conduct his business.

1383. During the process, Defendant Martinez assaulted and battered Plaintiff when he physically pushed Plaintiff after Plaintiff tried to gain access to the publicly accessible 4th floor.

1384. Security Martinez acted in a negligent manner when he made physical contact with Plaintiff, and that physical contact caused Plaintiff damages.

1385. After the physical interaction caused by Martinez, Plaintiff had a conversation with Defendant Martinez, who appeared to be a supervisor, about where Plaintiff could access in the building without presenting identification.

1386. Defendant Martinez told Plaintiff HE COULD GO TO THE 1st or 4th FLOORS.

1387. Defendant Martinez told Plaintiff this directly conflicting with his early actions to block Plaintiff's access to the publicly accessible 4th floor. *See Id.*

1388. Upon being told by Defendant Martinez that Plaintiff could travel to either the 1st or 4th floors, Plaintiff stated to the effect, "ok, let's go to the 4th floor." *See Id.*

1389. Plaintiff made this statement out loud to expressly inform those around him of his intentions, and that his intentions matched the verbal permission granted by Defendant Martinez.

1390. During the entire interaction described herein, Defendant Testerman, acted as a security guard for Defendant Universal Protection, LP and an agent of the City of Tulsa.

1391. During Plaintiff's presence at the City of Tulsa that day, Defendant Testerman kept looking at Plaintiff in a manner which made Plaintiff extremely uncomfortable.

1392. Plaintiff told Defendant Testerman about his strange looks and the fact that they were making Plaintiff uncomfortable, as it appeared Defendant Testerman wanted to cause physical harm to Plaintiff based on his looks and demeanor.

1393. Defendant Testerman did not like that Plaintiff insulted him and became further visibly angry.

1394. After being told that he could proceed to the 1st or 4th floor, and stating his intention to travel to the 4th floor, Plaintiff took one step to his right to proceed toward the 4th floor.

1395. As previously established, to access the 4th floor, security would need to badge Plaintiff into the elevator to access the floor.

1396. All City of Tulsa Defendants knew and/or should have known that Plaintiff could not access the 4th floor without Defendants swiping a badge to unlock the elevators.

1397. Despite that knowledge, and because Defendant Testerman was looking for a reason to physically interact with Plaintiff, Defendant Testerman grabbed Plaintiffs shoulder.

1398. Defendant Testerman did not have Plaintiff's permission to touch him, and doing so was negligent and/or assault/battery.

1399. Defendant Testerman is NOT LAW ENFORCEMENT.

1400. Upon information and belief, Defendant Testerman NEVER SERVED AS LAW ENFORCEMENT.

1401. After improperly physically accosting Plaintiff by grabbing Plaintiff's shoulder, Plaintiff used a sweeping motion with his arm to clear Defendant Testerman's hand from his shoulder.

1402. After successfully brushing off the harmful, offensive, and negligent contact by Defendant Testerman, Defendant Testerman then, with an extreme rage upon his face, took a step towards Plaintiff in a further harmful and aggressive manner appearing as if he intended to further strike Plaintiff.

1403. Plaintiff, believing that Defendant Testerman would again make harmful and offensive contact with him, used the flat of his right palm to push Defendant Testerman back from the attack position he stepped to in close proximity to Plaintiff.

1404. In doing so, Plaintiff stated loudly, "Get Back" to Defendant Testerman.

1405. Before Defendant Testerman could again lunge at Plaintiff again, the other individual security guard Defendants removed Defendant Testerman.

1406. Plaintiff, having just been assaulted and battered by Defendants Martinez and Testerman, went outside the City of Tulsa and spoke to security about the wrongful events which just transpired.

1407. Defendant Security Guard Martinez apologized for his actions in the elevator and the actions of Testerman.

1408. Plaintiff only seeks nominal damages of $1.00 from Defendant Martinez for all claims herein because he apologized.

1409. Tulsa Police Department Officer Josh Metcalf (Badge 2338) arrived on scene with Officer Olivia Slater (Badge 2774).

1410. Plaintiff spoke with Officer Josh Metcalf who asked if Plaintiff wanted to press charges against Defendant Testerman.

1411. Plaintiff declined to file charges against Defendant Testerman because he was not physically hurt by Defendant Testerman's contact.

1412. Plaintiff intended to instead enforce his civil rights instead through litigation.

1413. Plaintiff, working pro-bono on behalf of a client, filed suit against Defendant City of Tulsa for, among other things, violating the Oklahoma Open Meetings Act.

1414. Plaintiff's decision to file suit infuriated Defendant's Bynum Ewing, Hogan, and the other City of Tulsa Defendants.

1415. City of Tulsa Defendants then conspired to attack and discredit Plaintiff by filing false charges of battery against him using Defendant Testerman.

1416. Four (4) days after the incident at issue herein, and AFTER PLAINTIFF FILED SUIT AGAINST DEFENDANTS, the City of Tulsa Defendants conspired with Defendant Testerman to call the City of Tulsa Police Department on April 3, 2023 at 4:29 P.M. and file a battery claim against Plaintiff. *See* Testerman Report attached hereto as Exhibit "FFF."

1417. City of Tulsa Defendants conspired with one another to use City of Tulsa's own police force, the Tulsa Police Department, to investigate a crime which did not occur against an attorney suing them for violating transparency laws in the State of Oklahoma.

1418. In the April 3, 2023 Report, Testerman makes numerous false statements that constitute libel and/or slander and the libel/slander continues as Testerman continues to maintain the veracity of the false statements.

1419. Defendant Testerman, despite being a SECURITY GUARD, continually refers to himself in his report as "Officer Testerman."

1420. Defendant Testerman is not an "Officer" and does not have any sworn policing powers. Instead, Testerman has delusions of grandeur which Plaintiff insulted resulting in the physical attack by Testerman of Plaintiff.

1421. Testerman, again inaccurately, refers to his colleagues as "officers," when they too are security guards that possess no sworn policing powers.

1422. By naming himself an "officer," Defendant Testerman improperly bolsters his reputation in order to seduce the charges against Plaintiff as attacking an "officer" appears worse than stating that, after improperly placing his hands on Plaintiff, Plaintiff pushed Defendant Testerman away.

1423. Defendant Testerman fails to disclose the truth to deceive everyone.

1424. As a result of Defendant Testerman's false report, and the collusion of the City of Tulsa Defendants identified herein, Plaintiff was charged and arrested for battery.

1425. Upon information and belief, all Defendant City of Tulsa employees conspired with one another after Plaintiff filed his Open Meeting Lawsuit to bring the false charges against Plaintiff.

1426. As a result of the arrest, Plaintiff's reputation was forever tarnished, and the arrest resulted in additional injuries to Plaintiff for which these Defendants should each be held jointly and severally liable.

## B.  COMPLAINTS AGAINST CITY OF TULSA DEFENDANTS

### B.1 COUNT 1: DECLARATORY and INJUNCTIVE RELIEF- OPEN RECORDS ACT

1427. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1428. The Oklahoma Open Records Acts "purpose is furthered, not by restricting access by allowing public bodies to deny copies to the people of Oklahoma, but by requiring public bodies to allow copying." *Okla. Assn. of Broadcasters, Inc. v. City of Norman,* 2016 OK 119,127.

1429. Under the Oklahoma Open Records Act, "[c]onflicts between statutory provisions will be resolved in favor of construction which promotes, rather than limits, the Legislature's intent and an act's purpose." *Id.*

1430. Pursuant to the Act, "All records of public bodies and public officials shall be open to any person for inspection, copying, or mechanical reproduction during regular business hours . . . ." 51 O.S. § 24A.5

1431. In *Lawson v. Sequoya County 911 Trust Authority,* the Oklahoma Court of Civil Appeals held:

> The general statutory duty under the Open Records Act is established in 51O.S. §
> 24A.5, which provides, subject to certain exceptions, that "[a]ll records of public
> bodies and public officials shall be open to any person for inspection, copying, or
> mechanical reproduction during regular business hours ... ". *See Oklahoma Ass'n
> of Broadcasters, Inc. v. City of Norman, Norman Police Dep't,* 2016 OK 119, 1

15, 390 P.3d 689, 694 ("[t]he Legislature's emphatic message to government agencies is, unless otherwise specifically excluded, the public must have prompt and reasonable access to records.").

2022 OK CIV APP, ¶ 15.

1432. When considering the requirements of the Act, and how far an agency must go, they need not go far, but, **"Again, the only requirement is that the records be made available during regular business hours.** By holding his office open each weekday the sheriff complied with this requirement and thus complied with the statute." *Id.* (bold emphasis from Court).

1433. Nothing in the Act precludes any of the records requested by Plaintiff. *See Id.*

1434. Even if some portion of Plaintiffs' requests contained privileged material excluded from the Act, the Act, requires that, "[a]ny reasonably segregable portion of a record containing exempt material shall be provided after deletion of the exempt portions; ...." *Id.* at§ 24A.5(3).

1435. This indicates that the legislature considered there may be times when certain records were not immediately available and made provisions for such times.

1436. As for all other documents not falling under the exception the legislature created, they are required to be open for inspection during normal business hours.

1437. Defendant City of Tulsa should reasonably have recognized that most documents should be available for inspection and should have a procedure in place to segregate documents open for inspection from documents falling under an exception at the time they are received, filed, and/or maintained.

1438. Plaintiff made requests in conformity with the time, place, and manner required by the Act and the interpretation of the Act by Oklahoma Courts.

1439. The Oklahoma Open Records Act requires that public bodies, like Defendant City of Tulsa, maintain at least thirty (30) regular business hours a week when the public may appear and inspect and copy records of the public body. *See* 51 O.S. § 24A.6.

1440. If a public body "does not have regular business hours of at least thirty (30) hours a week, the public body shall post and maintain a written notice at its principal office and with the county clerk where the public body is located ...." 51 O.S. § 24A.6.

1441. The notice required under § 24.6 requires that the public body shall:

    i.    Designate the days of the week when records are available for inspection, copying or mechanical reproduction;

    ii.    Set forth the name, mailing address, and telephone number of the individual in charge of the records; and

    iii.    Describe in detail the procedures for obtaining access to the records at least two days of the week, excluding Sunday.

    *Id.*

1442. Defendant City of Tulsa's offices are open for greater than thirty (30) hours per week, and as such, § 24A.6 does not apply to them.

1443. However, this Court should find that the City of Tulsa, by practice, is in fact not open for at least thirty (30) hours per week to fulfill in person Open Records Act request, and if the Court finds as such, the Court must further conclude that the City of Tulsa violated the notice requirements of § 24A.6 since they were in practice not open at least thirty (30) hours per week.

1444. Defendants may argue that Plaintiff arrived at a time in which the City of Tulsa offices, or its designated person to respond to Open Record Act requests, were not available and/or open for public inspection and copying of records under its policies, despite it being regular business hours.

1445. The Defendants may also argue that they do not have to allow same-day inspection of open records.

1446. Even if Defendant City of Tulsa argues it was entitled to limit its available hours to access the records, which is not conceded, Defendant City of Tulsa was required to comply with 51 O.S. § 24A.6.

1447. Defendants failed to comply with 51 O.S. § 24A.6 when they limited access and availability of records of the public body pursuant to the Act.

1448. Defendant City of Tulsa maintained no notices in its public lobby regarding restrictions on times for inspecting and copying records pursuant to the Act.

1449. Defendant City of Tulsa filed no notices with the Country Clerk regarding restriction or availability of records from the City of Tulsa pursuant to the Act.

1450. City of Tulsa did not designate any specific days of the week when records would be available for inspection and copying.

1451. City of Tulsa did not offer Plaintiff a time to return in which the City of Tulsa would be able to assist in allowing inspection of public records.

1452. City of Tulsa did not set forth in name and with mailing address and telephone number, the name of the individual in charge of processing Open Record Requests on behalf of the City of Tulsa.

1453. Defendants did not provide any procedures for obtaining the records at least two (2) days of the week.

1454. The actions of the City of Tulsa Defendants were done in the course of their employment and with the express direction and consent of Defendant City of Tulsa.

1455. As such, Defendant City of Tulsa is jointly and severally liable for all violations of Oklahoma law perpetrated by Defendant Woodward under his authority.

1456. The actions and conduct of the City of Tulsa Defendants identified above constitute violations of the Open Records Act.

1457. Pursuant to the facts, Plaintiff is entitled to a declaratory judgment determining that the Defendants:

   a. Violated the Oklahoma Open Records Act by failing to provide access to inspect public records during regular business hours;

   b. Violated the Open Records Act by failing to provide the public access to records during regular business hours and for a sufficient number of hours each week;

   c. Violated the Open Records Act by denying Plaintiff copies public records during regular business hours of the City of Tulsa;

   d. Violated the Open Records Act by requiring that Plaintiff submit requests in writing;

   e. Violated the Open Records Act by delaying Plaintiffs access to records; and

   f. Violated the Open Records Act by requiring that Open Records Act by refusing to process immediately any reasonable request for an easily assessable public record.

1458. Plaintiff seeks entry of a permanent injunction compelling the City of Tulsa Defendants to refrain from conducting any activity which restricts the public's access to records maintained by the City of Tulsa in violation of the Act.

1459. Plaintiff seeks entry of a permanent injunction compelling the City of Tulsa Defendants to comply with the Oklahoma Records Act by submitting a plan to be supervised by this Court to properly train its agents and/or employees.

1460.  No adequate remedy at law exists for Plaintiffs to remedy the harm done by the named Defendants by their violation of the Open Records Act.

1461.  Substantial threat exists Plaintiff, and all citizens of Oklahoma, will suffer permanent and irreparable injury in the absence of the requested injunctive relief. Indeed, the public has already been previously subjected to said harm by the City of Tulsa.

1462.  The interests of the public are served by the issuance of injunctive relief, as the injunctions sought would prevent future actions taken by the City of Tulsa Defendants that violate the public's right to inspect and copy public records under the Act.

1463.  Plaintiff is entitled to a permanent injunction ordering City of Tulsa Defendants refrain from violating the Oklahoma Open Records Act.

### B.2 COUNT 2: Declaratory Judgment and Injunctive Relief- Open Meetings Act

1464.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1465.  Pursuant to the aforementioned facts and allegations, the Plaintiff is entitled to a declaratory judgment determining that the City of Tulsa Defendants:

   a.  Violated the Oklahoma Open Meeting Act by failing to the matters addressed above in open public meetings of the Tulsa City Council;

   b.  Violated the Open Meetings Act by engaging in serial meetings by Defendants Bynum and Ewing with the Tulsa City Councilors named herein.

   c.  Violated the Open Meetings Act by engaging in serial meetings, phone calls, and text messages with between City of Tulsa employees and members of the Tulsa City Council to discuss Plaintiff's complaints regarding their violations of the Open Records Act and Open Meetings Act.

d.   All votes taken by the Tulsa City Council in violation of the Open Meetings Act are null and void including the votes addressed herein related to Improve Our Tulsa.

e.   The Improve our Tulsa vote in 2024 violated the Open Meeting Act because the decision to send that measure to the voters was done so by using serial meetings between Defendants Bynum, Ewing, and the Tulsa City Council.

1466.  Plaintiff seeks entry of a permanent injunction compelling the City of Tulsa Defendants to refrain from conducting any activity which restricts constitutes a serial meeting in violation of the Oklahoma Open Meetings Act.

1467.  Plaintiff seeks entry of a permanent injunction compelling the City of Tulsa Defendants to comply with the Oklahoma Meeting Act by submitting a plan to be supervised by this Court to properly train its agents and/or employees related to compliance.

1468.  No adequate remedy at law exists for Plaintiffs to remedy the harm done by the named Defendants by their violation of the Open Meeting Act.

1469.  Substantial threat exists Plaintiff, and all citizens of Oklahoma, will suffer permanent and irreparable injury in the absence of the requested injunctive relief. Indeed, the public has already been previously subjected to said harm by the City of Tulsa.

1470.  The interests of the public are served by the issuance of injunctive relief, as the injunctions sought would prevent future actions taken by the City of Tulsa Defendants that violate the public's right to inspect and copy public records under the Act.

1471.  Plaintiff is entitled to a permanent injunction ordering City of Tulsa Defendants refrain from violating the Oklahoma Open Meeting Act.

1472.  Plaintiff is entitled to declaratory judgment invalidating the above referenced elections commenced in violation of the Open Meetings Act.

**B.3 COUNT 3: Declaratory Judgment and Injunctive Relief- The Tulsa Defendants ID POLICY Violate Plaintiff and other Citizen's Civil Rights**

1473.  The City of Tulsa Defendants required Plaintiff to produce an ID to access publicly accessible areas of the City of Tulsa.

1474.  The 4th Amendment to the United States Constitution prohibits the Tulsa Defendants from unreasonable search and seizure of Plaintiff's information without just cause.

1475.  Requiring Plaintiff and other persons to produce an identification to access publicly accessible areas of the City of Tulsa violate the civil rights of Plaintiff and others.

1476.  The actions of the City of Tulsa Defendants all stemmed from Plaintiff's objection to the ID requirement, and the City of Tulsa Defendants acted against Plaintiff as described herein as a result of his refusal to allow for the violation of his civil rights.

1477.  As a result of the compelled ID, Plaintiff suffers irreparable injury for which there is no adequate remedy at law.  Absent this Court's intervention, Plaintiff and others will continue to suffer irreparable injury.

1478.  City of Tulsa Defendants' use color of state law to enforce the unconstitutional laws and policies challenged by Plaintiff herein.

1479.  Due to Defendants' enforcement of the rules and regulations at issue herein, Plaintiff, and others similarly situated, are now and will continue to be denied their civil rights.

1480.  If not permanently enjoined by this Court, the City of Tulsa Defendants and their agents, employees, and representatives will continue to implement laws, rules and other similar policies and practices which will, as a matter of law, deprive Plaintiff and others of their constitutionally protected rights not to identify absent reasonable articulable suspicion of a crime.

1481.   The challenged rules and regulations have, are now causing, and will continue to cause Plaintiff to suffer irreparable injury, including but not limited to, deprivation of his freedom his civil rights.

1482.   Plaintiff has no plain, speedy, and adequate remedy at law for such injuries described herein necessitating and authorizing injunctive relief.

### B.4. COUNT 4: NEGLIGENCE, GROSS NEGLIGENCE, and NEGLIGENCE PER SE

1483.   All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1484.   The actions and/or inactions of City of Tulsa Defendants as fully laid out herein, constitute negligence, gross negligence, and negligence per se.

1485.   The City of Tulsa Defendants conspired together to cause the arrest of Plaintiff despite the fact that it was the City of Tulsa Defendants, as outlined herein, which caused harm to Plaintiff.

1486.   The City of Tulsa Defendants actions against Plaintiff, including the arrest, assault and battery of Plaintiff, were done as a result of Plaintiff filing a lawsuit against them and not for the stated reasons.

1487.   As a result of the City of Tulsa Defendants' negligence, gross negligence, and negligence per se, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1488.   The City of Tulsa Defendants are jointly and severally liable for the actions and/or inactions of the other City of Tulsa Defendants.

1489.   The actions and inactions of the City of Tulsa Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1490.   Wherefore, Plaintiff requests that this Court enter judgment against the TCSO Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.5.    COUNT 5: FALSE IMPROSONMENT**

1491.   All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1492.   The actions of all City of Tulsa Defendants worked in concert with the actions of the others to cause Plaintiff's false imprisonment.

1493.   At all times relevant to the facts in this matter, all individual City of Tulsa Defendants were acting within the scope and course of their employment and authority with their governmental employer.

1494.   All City of Tulsa Defendants are jointly and severally liable for the actions and/or inactions of the other City of Tulsa Defendants related to their activities at issue in this matter.

1495.   All City of Tulsa Defendants, jointly and severally, are thereby each liable to Plaintiff for the injuries he suffered.

1496.   As a result of the Defendants' false imprisonment, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1497.   The actions and inactions of the City of Tulsa Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1498.   Wherefore, Plaintiff requests this Court enter judgment against the City of Tulsa Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.6:   COUNT 6- Assault, Battery, False Imprisonment, and Malicious Prosecution**

1499. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1500. The actions of all City of Tulsa Defendants constitute assault and/or battery.

1501. The actions of all City of Tulsa Defendants constitute the false imprisonment of Plaintiff.

1502. The actions of all City of Tulsa Defendants constitute the malicious prosecution of Plaintiff.

1503. At all times relevant to the facts in this matter, the City of Tulsa Defendants were acting within the scope and course of their employment and authority with their governmental employer.

1504. City of Tulsa Defendants are jointly and severally liable for the actions of the other City of Tulsa Defendants related to the assault, battery, false imprisonment, and malicious prosecution of Plaintiff by City of Tulsa employees and agents.

1505. All City of Tulsa Defendants are jointly and severally all liable to Plaintiff for the injuries he suffered as a result of the assault, battery, false imprisonment, and malicious prosecution, including punitive damages, the costs of this action, and a reasonable attorney's fee.

1506. As a result of Plaintiff's assault, battery, false imprisonment and malicious prosecution by the City of Tulsa Defendants, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1507. The actions and inactions of the City of Tulsa Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1508. Wherefore, Plaintiff requests this Court enter judgment against City of Tulsa Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.7 COUNT 7: Intentional Infliction of Emotional Distress**

1509. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1510. The actions of all City of Tulsa Defendants were done intentionally and with the intention of causing Plaintiff to experience emotional distress.

1511. The actions of the City of Tulsa Defendants constitute intentional infliction of emotional distress on Plaintiff.

1512. All City of Tulsa Defendants are therefore liable to Plaintiff for their intentional infliction of emotional distress.

1513. At all times relevant to the facts in this matter, all individual City of Tulsa Defendants were acting within the scope of their employment and authority with their governmental employer.

1514. As a result of the intentional infliction of emotional distress of Plaintiff caused by the City of Tulsa Defendants, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1515. The actions and inactions of the City of Tulsa Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1516. Wherefore, Plaintiff requests this Court enter judgment against the City of Tulsa Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.8 COUNT 8– Civil Rights Violations (42 U.S.C. 1983)**

1517. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1518. All City of Tulsa Defendants, at all times relevant hereto, were acting under the color of state law.

1519. At all times relevant hereto, the City of Tulsa Defendants were acting pursuant to the custom,

policy, decisions, ordinances, regulations, widespread habit, usage, and/or practice of the other listed City of Tulsa Defendants in their actions pertaining to Plaintiff.

1520. At the time of the events at issue in this matter, Plaintiff had the clearly established constitutional right to be free from the violation of his constitutional rights including but not limited to the improper touching of Plaintiff, false imprisonment, malicious prosecution, unreasonable search and seizure, and brutalization during arrest.

1521. Any reasonable person in the roles of the City of Tulsa Defendants knew, or should have known, of Plaintiff's rights at the time of the incident at issue in this matter as they were clearly established at that time.

1522. The City of Tulsa Defendants violated Plaintiff's Fourth and Fourteenth Amendment rights.

1523. The City of Tulsa Defendants engaged in the conduct described herein willfully, maliciously, in bad faith, and in reckless disregard of Plaintiff's federally protected constitutional rights.

1524. The actions against Plaintiff were malicious, shocking, and objectively unreasonable in light of the circumstances.

1525. The criminal proceedings brought against Plaintiff will terminate in his favor with a not guilty jury verdict or dismissal.

1526. The acts and/or omissions of the City of Tulsa Defendants intentionally deprived Plaintiff of his constitutional and statutory rights and caused him to suffer damages.

1527. The City of Tulsa defendants are not entitled to qualified immunity for the conduct at issue in this matter.

1528. As a result of the violation of Plaintiff's constitutional rights by the City of Tulsa Defendants, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1529. The actions and inactions of the City of Tulsa Defendants in violation of Plaintiff's rights warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1530. Wherefore, Plaintiff requests this Court enter judgment against the City of Tulsa Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.9 COUNT 9- Negligent Hiring and Supervision of Individual Defendants**

1531. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1532. All City of Tulsa Defendants owned, controlled and/or managed the employed individual City of Tulsa Defendants.

1533. Oklahoma recognizes a tort for the negligent hiring and supervision of employees.

1534. At the time the City of Tulsa Defendants hired the individual City of Tulsa Defendants, the City of Tulsa Defendants knew and/or should have known that they posed a risk to the persons they came in contact with in their official capacities, but the City of Tulsa Defendants nonetheless proceeded to hire and retain the individual City of Tulsa Defendants, acting with conscious indifference to the rights, safety, and welfare of others, including Plaintiff.

1535. The aforementioned acts and/or omissions, singularly or in any combination thereof, rise to the level of negligent hiring, retention, and/or supervision of the individual City of Tulsa Defendants by Defendant City of Tulsa.

1536. City of Tulsa Defendants' acts and/or omissions, when viewed objectively, involved an extreme and/or unnecessary degree of risk considering the probability and/or magnitude of harm to others.

1537. Defendant City of Tulsa had actual and/or subjective awareness of the risk involved in hiring and retaining the individual City of Tulsa Defendants, but nevertheless proceeded with conscious indifference to the rights, safety and welfare of others when they hired and retained the individual Defendants.

1538. Therefore, Defendant City of Tulsa is liable for the negligent hiring, retention, and/or supervision of the individual City of Tulsa Defendants, and Plaintiff is entitled to recover Defendant City of Tulsa for all damages he sustained as a result of the acts and/or omissions of the City of Tulsa Defendants.

1539. As a result of the negligent hiring and supervision by all City of Tulsa Defendants, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1540. The negligent hiring and supervision practices by all City of Tulsa Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1541. Wherefore, Plaintiff requests this Court enter judgment against all City of Tulsa Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.10 COUNT 10: Defamation, Libel and Slander**

1542. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1543. City of Tulsa Defendants made false statements against Plaintiff to others, including but not limited to Defendant G.T. Bynum going on KRMG, regarding the Plaintiff.

1544. The City of Tulsa Defendants knew and/or should have known that their statements were

false at the time they made them, and that such false statements would harm Plaintiff.

1545.   The knowingly false statements of City of Tulsa Defendants directly led to Plaintiff's
        suspension by the Oklahoma Bar Association and forever wrongfully tarnished his reputation
        in the community.

1546.   The demation, libel and slander of Plaintiff in violation of Plaintiff's rights warrant the
        imposition of punitive damages, and Plaintiff requests punitive damages.

1547.   Wherefore, Plaintiff requests this Court enter judgment against the City of Tulsa Defendants
        in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.11 COUNT 11- Respondeat Superior**

1548.   All of the facts and allegations laid out in this Complaint, including the Exhibits attached
        hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1549.   At the time of the incident, all individual City of Tulsa Defendants were employees, agents,
        and/or servants of the non-individual Defendants, and the individual City of Tulsa
        Defendants were acting within the course and scope of their employment with the non-
        individual Defendants at the time of the incident at issue in this matter. As such, the non-
        individual City of Tulsa Defendants are jointly and severally responsible for the conduct of
        the individual City of Tulsa Defendants under the doctrine of *respondeat superior* due to the
        master-servant relationship which existed at the time of the incident at issue in this matter.

1550.   Wherefore, Plaintiff requests this Court enter judgment against the Defendants in an amount
        in excess of two million five hundred thousand dollars ($2,500,000.00).

1551.   The actions all City of Tulsa Defendants warrant the imposition of punitive damages in this
        matter.

## VI. FACTS AND CLAIMS AGAINST DEFENSANT MARIA TERESSA TERAN-GROSSNICKLAS

### A. Facts Against Defendants Danna Malone, Isaiah Brydie, and Brydie & Associates, PLLC

1552.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1553.  Defendant Danna Malone is an employee of Defendants Isaiah Brydie and Brydie & Associates, PLLC.

1554.  At all times relevant to the matters herein, Defendant Danna Malone acted in her individual capacity and as an agent and/or employee of Isaiah Brydie and Brydie & Associates, PLLC (collectively the "Malone Defendants")

1555.  The Malone Defendants acted in concert and conspiracy with one another at all times related to the fact addressed herein.

1556.  The Malone Defendants attempted to control the marijuana industry in the State of Oklahoma after passage of State Question 788 in 2018.

1557.  Plaintiff worked as an attorney representing marijuana businesses in the State of Oklahoma, and in doing so, began posting live to his Facebook account.

1558.  The Malone Defendants did not like Plaintiff's competition, and they began making false and defamatory statements about Plaintiff online.

1559.  The Malone Defendants filed Oklahoma State Questions 806 and 807 and worked to gather signatures to get those measures on a ballot in the State of Oklahoma.

1560.  Plaintiff spoke out against State Questions 806 and 807, and that caused the Malone Defendants to become further angry as it jeopardized their reputation in the cannabis industry.

1561. To silence Plaintiff, and in concert with one another, the Malone Defendants began making false claims against Plaintiff.

1562. The Malone Defendants conspired with one another to come up with a plan to file a fraudulent bar complaint against Plaintiff despite having no legitimate reason for doing so.

1563. The bar complaint and numerous statements made by the Malone Defendants accused Plaintiff of threatening physical harm to the Malone Defendants, even though such allegations were clearly lies.

1564. The Malone Defendants made repeated posts online, which were seen by numerous people, to defame Plaintiff and cause him harm.

1565. The Malone Defendants alleged that Danna Malone was forced to buy a gun to protect herself from the threats of Plaintiff, even though Malone's own Facebook posts clearly exhibited that the firearm in question was purchased BEFORE any statements were ever made by Plaintiff.

1566. Defendant Malone falsely accused Plaintiff of causing her business to be burglarized despite knowing for a fact that such was NOT the case.

1567. The false statements of the Malone Defendants resulted in Defendant OBA instituting action against Plaintiff to take his law license.

1568. As a result of the Malone Defendant's false statements and improper actions, Plaintiff was forced to defend himself against said claims, and despite his efforts, the false statements of the Malone Defendants resulted in Plaintiff's suspension without hearing.

1569. Defendant Malone and the Malone Defendant's continue to publicly post false statements about Plaintiff to cause him harm, and such actions caused Plaintiff harm and distress.

**B.  Claims Against Defendants Danna Malone, Isaiah Brydie, and Brydie & Associates, PLLC**

### B.1 COUNT 1- Defamation, Libel and Slander

1570. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1571. The Malone Defendants made false statements in her complaint against Plaintiff to Defendant OBA Defendants and publicly on their social media pages.

1572. Such statements were seen by 3rd parties and caused Plaintiff reputational harm.

1573. The Malone Defendants knew and/or should have known that her statements were false at the time she made them.

1574. The Malone Defendants made said false and defamatory statements in an attempt to defame Plaintiff, and their false statements did defame Plaintiff.

1575. Plaintiff incurred significant expenses in defending against the Malone Defendants' slanderous actions and fraudulent bar complaint.

1576. The false statements made by Defendant Malone and the Malone Defendants constitute defamation, libel and slander.

1577. The actions and inactions of the Malone Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1578. Wherefore, Plaintiff requests that this Court enter judgment against the Malone Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

### B.2 COUNT 2- Violation of Plaintiff's Civil Rights- 42 U.S.C. §§ 1983, 1988 (Against the Malone Defendants and Defendant OBA Defendants)

1579. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1580. The Malone and OBA Defendants actions deprived Plaintiff of his 1st Amendment rights.

1581. Defendant OBA's policy prohibiting Plaintiff from publicly discussing the Malone Defendant's grievances violate Plaintiff's civil rights.

1582. Defendant OBA Defendants threatened Plaintiff of loss of his law license if he publicly discussed the grievance filed against him by Defendant Malone.

1583. The policy and practice of Defendant OBA Defendant's prohibiting an attorney from speaking publicly about a grievance filed against them, when no such restriction exists for the person filing said grievance, violates the rights of attorneys in the State of Oklahoma.

1584. Those restrictions specifically infringed on Plaintiff's right to publicly discuss the Malone Grievance.

1585. The Malone Defendants actions in concert with Defendant OBA Defendants' actions resulted in a deprivation of Plaintiff's rights under the United States Constitution and 42 U.S.C. § 1983.

1586. Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00) as a result of Defendant Teran's violation of his civil rights.

1587. The Malone Defendants and OBA Defendants are jointly and severally liable for the actions and/or inactions of the other Defendants which violated Plaintiff's rights.

1588. The actions and inactions of the Malone and OBA Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1589. Wherefore, Plaintiff requests that this Court enter judgment against the Malone and OBA Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.3 COUNT 3- Declaratory Judgment and Injunctive Relief: Defendant OBA Defendant's Rule Prohibiting Plaintiff from Discussing Grievances Publicly Violated his Civil Rights (Against the Malone Defendants and Defendant OBA Defendants)**

1590.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1591.  Plaintiff is entitled to declaratory judgment that the Oklahoma Supreme Court's rule restricting an attorney from publicly discussing a grievance filed against them violates the rights guaranteed him pursuant to the 1st Amendment of the United States Constitution.

1592.  Plaintiff is entitled to injunctive relief prohibiting Defendant OBA Defendants from enforcing the above referenced restrictions against all persons, including Plaintiff.

1593.  Plaintiff is entitled to injunctive relief prohibiting Defendant OBA Defendants from punishing Plaintiff for publicly discussing any grievance filed against him.

1594.  Plaintiff is entitled to declaratory judgment that Defendant OBA violated Plaintiff's civil rights when OBA General Counsel Gina Hendryx threatened Plaintiff with punitive action if he publicly discussed the Malone or any other grievance against him.

**B.4. COUNT 4- Negligence, Gross Negligence, and Negligence Per Se**

1595.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1596.  The actions and/or inactions of the Malone Defendants in making statements about Plaintiff, as fully laid out herein, constitute negligence, gross negligence, and negligence per se.

1597. The Malone Defendants owed a duty to Plaintiff to ensure that the allegations against him be investigated to verify their veracity before making said statements, and the Malone Defendants breached that duty to Plaintiff.

1598. As a result of the Malone Defendants' negligence, gross negligence, and negligence per se, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1599. The actions of the Malone Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1600. Wherefore, Plaintiff requests that this Court enter judgment against the Malone Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

## B.5. COUNT 5: Abuse of Process

1601. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1602. The Malone Defendants use of Defendant OBA complaint process for an improper purpose constitutes abuse of process.

1603. The Malone Defendants improperly used the court's process improperly to cause denial of Plaintiff's rights.

1604. Plaintiff, due to the actions of the Malone Defendants, experienced great emotional pain and suffering and continues to suffer from such due to the pending claims against him levied by the Malone Defendant Teran with Defendant OBA Defendants.

1605. As a result of the Malone Defendants' abuse of process, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1606.  The actions and inactions of the Malone Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1607.  Wherefore, Plaintiff requests this Court enter judgment against the Malone Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**VII.    FACTS AND CLAIMS REGARDING DEFENDANTS TCSO, DEPUTY JOHN CARR, DEPUTY JASON TEETER, DEPUTY JOHN CARR, DEPUTY JOHN BOATMAN, DEPUTY JAMES COLLINS, OKLAHOMA DISTRICT ATTORNEY'S OFFICE FOR THE 14TH JUDICIAL DISTRICT, DISTRICT ATTORNEY STEVE KUNZWEILER, TULSA COUNTY COURT CLERK, and DON NEWBERRY (collectively the "Tulsa County Defendants")**

**A.    Factual Background: Plaintiff's Claims against the Tulsa County Defendants**

1608.  At all times mentioned, the Tulsa County Defendants were working officially as employees of a political subdivision of the State of Oklahoma operating in Tulsa County.

1609.   Defendants Tulsa County Sheriff, John Carr, Jason Teeter, John Boatman, and James Collins (collectively the "TCSO Defendants") are law enforcement in Tulsa County.

1610.  Steve Kunzweiler, in his official capacity, is the District Attorney for the 14th Judicial District of the State of Oklahoma located in Tulsa and Pawnee Counties.

1611.  The Tulsa County Defendants are properly sued directly under 42 U.S.C. § 1983 for their deliberately indifferent unconstitutional decisions, practices, policies, habits, customs, usages, training, derelict supervision, ratification, acquiescence, and intentional failures which directly contributed to and/or caused the complained of constitutional and statutory violations and injuries of Plaintiff.

1612.  Plaintiff is wrongfully charged with resisting arrest for an incident which allegedly occurred in Tulsa County on August 16, 2023.  *See* Resisting Docket attached hereto as Exhibit "GGG."

1613. The arrest at issue here stems from the charge of battery from the City of Tulsa matter addressed above, and as such, it arises from the same facts and circumstances from which that arose.

1614. On August 15, 2023, Plaintiff learned that a warrant issued for his arrest for allegations of assault and/or battery related to the incident at the City of Tulsa addressed above.

1615. Plaintiff, immediately upon learning of the warrant, traveled to the TCSO David L Moss Jail to turn himself in on August 15, 2023.

1616. Plaintiff went inside the lobby and identified himself and notified the front desk staff that a warrant existed for his arrest.  The staff at TCSO at the David L Moss facility turned Plaintiff away telling him to come back later and refused to let him surrender.

1617. The entire interaction at David L Moss, whereby Plaintiff was turned away despite the warrant, was captured on video.  *See* Turn in Video attached hereto as Exhibit "HHH."

1618. Knowing that an outstanding warrant existed for Plaintiff, TSCO forced Plaintiff to turn and leave.

1619. Plaintiff, after being turned away from the TCSO jail, decided to turn himself in the following day, August 16, 2023, at the Tulsa County Building.

1620. Plaintiff, an attorney, had a hearing that morning, and he knew that the TCSO worked the security for the County Building and maintained a large presence of deputies in the building.

1621. Plaintiff figured turning himself in there, since he was turned away at the TCSO jail, seemed the best course of action.

1622. Plaintiff, having never been arrested in his life up to that point, did not know if they could process him at the County Building, but figured at worse, they would take him to the TCSO

Jail, David L. Moss, to book in and bond out. The same jail TCSO turned Plaintiff away from the afternoon prior.

1623. Based on their own reports, TCSO knew Plaintiff called a press conference to for the morning of August 16, 2024 to announce he was running for Mayor and to turn himself in immediately thereafter for the warrant. *See* TCSO Reports attached hereto as Exhibit "III."

1624. Plaintiff adopts and incorporates the allegations false allegations made against Plaintiff by the TCSO Defendants in the TCSO Reports attached hereto as if fully laid out herein. *See Id.*

1625. Plaintiff, knowing his social media is well followed, announced his plans on Facebook Live. *See Id.*

1626. By their own admission, TCSO knew Plaintiff intended to voluntarily surrender again because the Facebook Posts by Plaintiff were reviewed by the TCSO. *See id.*

1627. On August 16, 2024, Plaintiff conducted his peaceful press conference in front of the County Building in front of a modest crowd and members of the press and proceeded to proceed to the entrance of the County Building to proceed inside and turn himself in. *See* TCSO Video attached hereto as Exhibit "JJJ."

1628. TCSO knew that Plaintiff intended to turn himself in, and Plaintiff had ZERO reason to resist an arrest he VOLUNTARILY showed up to facilitate.

1629. Plaintiff, wanting to present a neat and well-dressed appearance wore nice clothes, jewelry and a Rolex watch to the press conference and surrender.

1630. All of the events described herein were captured on multiple videos and reflect the truth of Plaintiffs allegations.

1631. Plaintiff proceeded to the door of the Tulsa County Courthouse when a TCSO officer informed Plaintiff that Plaintiff, and Plaintiff only he could proceed inside, and that everyone else would need to remain outside.

1632. Plaintiff stated verbally that he too would elect to stay outside to be arrested in sight of the public.

1633. For Plaintiff, given the history of his public attacks on the judiciary and the police system, in Plaintiff's mind, there would be far less chance of issues if his arrest was publicly witnessed.

1634. Plaintiff was clearly WRONG as the TCSO Defendants clearly were not impacted by the presence of cameras and physically abused Plaintiff for all to see.

1635. Without announcing Plaintiff was under arrest, without identifying himself as the person to arrest Plaintiff, and without simply asking Plaintiff to place his hands behind his back, TCSO Defendants immediately placed Plaintiff in a wrist and shoulder lock and twisted his arm behind his back causing Plaintiff immense pain and discomfort.

1636. One TCSO Defendant, in his own report, states that he did things with Plaintiff's warrant "in mind." However, as reflected in the video, ALL TCSO DEFENDANTS FAIL TO NOTIFY PLANTIFF HE IS UNDER ARREST, they never ask Plaintiff to submit to arrest. Instead, the TCSO Defendants immediately goes for an unnecessary and painful joint lock on Plaintiff. *See Id.*

1637. Plaintiff, despite being there to SURRENDER, received a painful joint lock without cause or necessity. *See Id.*

1638. NO USE OF FORCE WAS NECESSARY TO SECURE THE ARREST OF PLAINTIFF.

1639.   Plaintiff, reflexively turning away from the pain and because TCSO officers were twisting his arm behind his back, Plaintiff was forced to the ground by the TCSO Defendants.

1640.   Plaintiff ended up face down on the concrete.

1641.   Defendant TCSO Deputies piled on Plaintiff causing him additional great pain and discomfort.

1642.   TCSO Deputies hit Plaintiff in the head with the door to the Tulsa County Building.

1643.   One TCSO Officer grabbed Plaintiff's legs and began violently pushing them against Plaintiff's back causing extreme pain and causing Plaintiff's chest to depress in the ground.

1644.   Plaintiff began almost immediately experiencing shortness of breath and severe agonizing chest pain.

1645.   Plaintiff suffered prior heart attacks and experiences chest pain in high stress situations due to serious heart and artery related issues.

1646.   Plaintiff suffers from coronary artery disease.

1647.   Plaintiff suffers from small vessel disease.

1648.   Plaintiff suffers from a heart and blood flow condition called slow flow, which especially in highly stressful situations, restricts the amount of blood that flows to his heart.

1649.   Plaintiff believed he was experiencing a heart attack.

1650.   Plaintiff believed he would die.

1651.   As a child, Plaintiff was severely beaten and abused by a stepfather and others, and as a result, harmful contact by anyone causes Plaintiff intense emotional distress and fear of death.

1652.   Plaintiff, because of the action of the TCSO deputies, also suffered a severe panic attack resulting in a need for immediate medical attention.

1653. Defendant TCSO deputies, in a harmful, angry, aggressive, and highly negligent manner, and with the intention of causing Plaintiff harm, picked Plaintiff up without proper regard for his medical conditions and panic attack he was suffering and carried him inside the County Building causing additional severe shoulder pain for Plaintiff in the process.

1654. Plaintiff suffers from a completely separated right shoulder in which he experienced severe pain from the bone-on-bone contact caused by the TCSO picking Plaintiff up and carrying him more than thirty (30) feet unnecessarily.

1655. Plaintiff lay on the ground for what seemed like an eternity until medical personnel finally arrived.

1656. Upon information and belief, EMSA, the ambulance provider which responded, received calls from the spectators, NOT THE TCSO Deputies.

1657. Plaintiff remembers vividly being severely hurt outside, the pain from the cuffs cutting off circulation and causing cuts, and the other pain discussed herein.

1658. As a result of the events, Plaintiff was severely bruised from head to toe, and those injuries were photographically documented. *See* Pictures attached hereto as Exhibit "KKK."

1659. Plaintiff remembers vividly the feeling of the dirty cold floor of the County Building and the feeling like he was going to die as he felt like he would not ever see his wife and children again.

1660. The events, and the broadcast of what happened caused even greater pain, emotional distress, and harm to Plaintiff's reputation.

1661. The events forced Plaintiff despite having just announced his candidacy, to not run for Mayor as the fear of the horrific video being replayed is more than Plaintiff could bear to see repeatedly during a political campaign.

1662. Plaintiff felt like he was going to die, and frankly does not remember much else of the specifics of what happened.

1663. Plaintiff remembers EMSA medics giving him a shot of something, which helped him regain his breathing as he traveled to the hospital.

1664. Plaintiff, handcuffed to the gurney, was transported to St. John Hospital.

1665. At the St. John Hospital, two TCSO Sheriff's deputies conspired with a TCSO Major who called them to discuss if they could arrest Plaintiff for "passive resistance."

1666. Plaintiff overheard the call and asked the TCSO Defendant deputies about "passive resistance" as he had never heard of the concept, and he was told they sometimes charge people with resisting arrest for passively resisting.

1667. Passive Resistance, as a phrase, creates an oxymoron.  One cannot passively resist something.

1668. The TCSO Sheriff then told Plaintiff that he did not believe Plaintiff passively resisted, and that the Major agreed, so they would not be charging Plaintiff with resisting arrest upon arrival at the TCSO jail after the hospital.

1669. Plaintiff, shocked that they were even considering arresting him for their improper actions, made mental note of this conversation, and as it turns out, TCSO conjured up the false charges they sought most likely to limit their liability of litigation from Plaintiff.

1670. Defendant TCSO and Defendant Steve Kunzweiler, individually and in his official capacity, conspired to charge Plaintiff with resisting arrest and other crimes as retaliation for Plaintiff exposing corruption by government officials and Judges in Tulsa County, State of Oklahoma.

1671. All TCSO deputies which witnessed the deprivation of Plaintiff's civil rights and did not do anything to protect Plaintiff from actions of the TCSO Defendants constitutes a violation of Plaintiff's legal rights, federally and otherwise.

1672. Defendant District Attorney Kunzweiler hates Plaintiff ever since Plaintiff raised tens of thousands of dollars for a political opponent of Defendant Kunzweiler, Fred Jordan.

1673. Plaintiff also embarrassed Defendant Kunzweiler at speaking events in which Plaintiff and Kunzweiler participated related to medical marijuana.

1674. TCSO failed to properly train and supervise the Defendant Deputies herein.

**B.    CLAIMS FOR RELIEF AGAINST TCSO DEFENDANTS**

**B.1.    COUNT 1: Negligence, Gross Negligence, Negligence Per Se**

1675. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1676. The actions and/or inactions of Defendants, Tulsa County Sheriff's Department, Deputy John Carr, Deputy Jason Teeter, Deputy John Carr, Deputy John Boatman, Deputy James Collins, Oklahoma District Attorney's Office for District 14, Steve Kunzweiler, and Tulsa County, State of Oklahoma as fully laid out herein, constitute negligence, gross negligence, and negligence per se.

1677. As a result of the TCSO Defendants' negligence, gross negligence, and negligence per se, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1678. The actions and inactions of the TCSO Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1679.  Wherefore, Plaintiff requests that this Court enter judgment against the TCSO Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.2.  COUNT 2- False Imprisonment**

1680.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1681.  The actions of all TCSO Defendants constitute false imprisonment.

1682.  At all times relevant to the facts in this matter, all individual TCSO Defendants were acting within the scope and course of their employment and authority with their governmental employer.

1683.  All TCSO Defendants are jointly and severally liable for the actions and/or inactions of the other TCSO Defendants related to their activities at issue in this matter.

1684.  TCSO Defendants, jointly and severally, are thereby each liable to Plaintiff for the injuries he suffered.

1685.  As a result of the TCSO Defendants' false imprisonment, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1686.  The actions and inactions of the TCSO Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1687.  Wherefore, Plaintiff requests this Court enter judgment against the TCSO Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.3  COUNT 3- Assault and Battery (against the TCSO Defendants)**

1688. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1689. The actions of all Defendant Tulsa County Sheriff's Department, Deputy John Carr, Deputy Jason Teeter, Deputy John Carr, Deputy John Boatman, and Deputy James Collins constitute assault and/or battery.

1690. At all times relevant to the facts in this matter, the Tulsa County Sheriff's Department, Deputy John Carr, Deputy Jason Teeter, Deputy John Carr, Deputy John Boatman, and Deputy James Collins were acting within the scope and course of their employment and authority with their governmental employer.

1691. Defendants Tulsa County Sheriff's Department, Deputy John Carr, Deputy Jason Teeter, Deputy John Carr, Deputy John Boatman, and Deputy James Collins are jointly and severally liable for the actions of the other Defendants related to their activities at issue in this matter.

1692. All TCSO Defendants, Tulsa County Sheriff's Department, Deputy John Carr, Deputy Jason Teeter, Deputy John Carr, Deputy John Boatman, and Deputy James Collins, are jointly and severally all liable to Plaintiff for the injuries he suffered as a result of the assault and battery including punitive damages, the costs of this action, and a reasonable attorney's fee.

1693. As a result of Plaintiff's false imprisonment by the TCSO Defendants, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1694. The actions and inactions of the TCSO Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1695. Wherefore, Plaintiff requests this Court enter judgment against the TCSO Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

### B.4 COUNT 4- Intentional Infliction of Emotional Distress (Against the Tulsa County Defendants)

1696.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1697.  The actions of all TCSO Defendants were done intentionally and with the intention of causing Plaintiff to experience emotional distress.

1698.  The actions of TCSO Defendants constitute intentional infliction of emotional distress on Plaintiff.

1699.  All TCSO Defendants are therefore liable to Plaintiff for their intentional infliction of emotional distress.

1700.  At all times relevant to the facts in this matter, all individual TCSO Defendants were acting within the scope of their employment and authority with their governmental employer.

1701.  As a result of the intentional infliction of emotional distress of Plaintiff caused by the TCSO Defendants, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1702.  The actions and inactions of TCSO Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1703.  Wherefore, Plaintiff requests this Court enter judgment against TCSO Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

### B.5 COUNT 5- Civil Rights Violations (42 U.S.C. 1983) (Against all Tulsa County Defendants)

1704.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1705.  All TCSO Defendants, at all times relevant hereto, were acting under the color of state law.

1706.  At all times relevant hereto, TCSO Defendants were acting pursuant to the custom, policy,

decisions, ordinances, regulations, widespread habit, usage, and/or practice of the other listed TCSO Defendants in their actions pertaining to Plaintiff.

1707.    At the time of the events at issue in this matter, Plaintiff had the clearly established constitutional right to be free from the violation of his constitutional rights including but not limited to malicious prosecution, unreasonable search and seizure, and brutalization during arrest.

1708.    Any reasonable person in the roles of TCSO Defendants knew, or should have known, of Plaintiff's rights at the time of the incident at issue in this matter as they were clearly established at that time.

1709.    TCSO Defendants violated Plaintiff's 4th and 14th Amendment rights.

1710.    TCSO Defendants engaged in the conduct described herein willfully, maliciously, in bad faith, and in reckless disregard of Plaintiff's federally protected constitutional rights.

1711.    The violent arrest of Plaintiff was malicious, shocking, and objectively unreasonable in light of the circumstances.

1712.    The criminal proceedings brought against Plaintiff will terminate in his favor with a not guilty jury verdict or dismissal.

1713.    The acts and/or omissions of TCSO Defendants intentionally deprived Plaintiff of his constitutional and statutory rights and caused him to suffer damages.

1714.    TCSO defendants are not entitled to qualified immunity for the conduct at issue in this matter.

1715.    As a result of the violation of Plaintiff's constitutional rights by the TCSO Defendants, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1716.  The actions and inactions of the TCSO Defendants in violation of Plaintiff's rights warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1717.  Wherefore, Plaintiff requests this Court enter judgment against the TCSO Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00)

**B.6 COUNT 6- Violation of 42 U.S.C. 1983- Deliberately Indifferent Policies, Practices, Customs, Training, and Supervision in violation of the Fourth, Fourteenth, and First Amendments. (Against All Tulsa County Defendants).**

1718.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1719.  At the time of the events at issue in this matter, Plaintiff had clearly established rights regarding production of evidence, improper withholding of evidence, and fraud.

1720.  All TCSO Defendants knew and/or should have known of these rights at the time of the incident at issue in this matter as they were clearly established at that time.

1721.  The acts and/or omissions of these TCSO Defendants, as described herein, deprived Plaintiff of his constitutional and statutory rights and caused him to suffer damages.

1722.  Defendants are not entitled to qualified immunity for the conduct at issue in this matter.

1723.  Defendant the Office of District 14 District Attorney, at all times relevant herein, was the policymaker which employed Steve Kunzweiler, and in that capacity established policies, procedures, customs, and practices for the same.

1724.  Defendants, TCSO, at all times relevant herein, was the policymaker which employed the individual TCSO Defendants, and in that capacity established policies, procedures, customs, and practices for the same.

1725.  All TCSO Defendants are liable under 42 U.S.C. § 1983 for failing to supervise and train its employees, and for overlooking and covering up misconduct.

1726.  TCSO Defendants developed and maintained policies, procedures, customs, and/or practices exhibiting deliberate indifference to the constitutional rights of citizens, and these policies, procedures, customs, and/or practices were the actual and/or proximate cause of the violation of Plaintiff's constitutional and federal rights as set forth herein.

1727.  In light of the foregoing, Defendants' acts and omissions constitute a violation of Plaintiff's constitutionally and federally protected rights and constitute gross negligence and/or deliberate and conscious indifference to the rights, safety, and welfare of Plaintiff.

1728.  As a result of the violation of Plaintiff's constitutional rights by the TCSO Defendants related to their deliberately indifferent practices, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1729.  The actions and inactions of the TCSO Defendants in violation of Plaintiff's rights caused by the negligent practices of the TCSO Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1730.  Wherefore, Plaintiff requests this Court enter judgment against the TCSO Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.7   COUNT 7- Negligent Hiring and Supervision of Individual Defendants (against all corporate Tulsa County Defendants).**

1731.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1732.  All TCSO Defendants owned, controlled and/or managed the employed individual TCSO Defendants.

1733.  Oklahoma recognizes a tort for the negligent hiring and supervision of employees.

1734.  At the time the TCSO Defendants hired the individual TCSO Defendants, the TCSO Defendants knew and/or should have known that they posed a risk to the persons they came in contact within their official capacities, but the TCSO Defendants nonetheless proceeded to hire and retain the individual TSCO Defendants, acting with conscious indifference to the rights, safety, and welfare of others, including Plaintiff.

1735.  The acts and/or omissions, singularly or in any combination thereof, rise to the level of negligent hiring, retention, and/or supervision of the individual TCSO Defendants by the other governmental entity TCSO Defendants.

1736.  Defendants' acts and/or omissions, when viewed objectively, involved an extreme and/or unnecessary degree of risk considering the probability and/or magnitude of harm to others.

1737.  TCSO Defendants had actual and/or subjective awareness of the risk involved in hiring and retaining the individual Defendants, but nevertheless proceeded with conscious indifference to the rights, safety and welfare of others when they hired and retained the individual Defendants.

1738.  Therefore, the TCSO Defendants are liable for the negligent hiring, retention, and/or supervision of the individual Defendants, and Plaintiff is entitled to recover from TCSO Defendants all damages he sustained as a result of the acts and/or omissions of the TCSO Defendants.

1739.  As a result of the negligent hiring and supervision by all TCSO Defendants, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1740.  The negligent hiring and supervision practices by all TCSO Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1741.  Wherefore, Plaintiff requests this Court enter judgment against all TCSO Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.8 COUNT 8- DEFAMATION, LIBEL/SLANDER (against all Tulsa County Defendants).**

1742.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1743.  Deputy James Collins, in his August 16, 2023 report, makes knowingly false statements about Plaintiff. *See* TCSO Reports attached hereto as Exhibit "III."

1744.  The knowingly false statements of Defendant Deputy James Collins directly led to Plaintiff's criminal charges in this matter and forever wrongfully tarnished his reputation in the community.

1745.  Deputy James Collins, despite having access to recordings of the incident which clearly prove his statements false, acted with malice and accused Plaintiff of making racially insensitive comments.

1746.  Deputy James Collins accuses Plaintiff of saying the most heinous racist word Plaintiff can think of given Plaintiff's absolute love and respect for Civil Rights and the rights of all persons, regardless of color.

1747. Deputy James Collins accused Plaintiff of making racist comments knowing that Plaintiff officed on Black Wall Street, and that accusing him of such would cause great harm to his reputation.

1748. The videographic evidence PROVES that Plaintiff DID NOT make any such comments. See TCSO Video attached hereto as Exhibit "JJJ."

1749. Deputy James Collins false and salacious comments regarding Plaintiff, made in reckless disregard for the truth, caused Plaintiff substantial damage to his reputation.

1750. The charges were filed, in part, because of the salacious and false allegations of Deputy James Collins.

1751. Therefore, Defendant James Collins and all TCSO Defendants, are liable to Plaintiff for the defamation and libel/slander of Plaintiff.

1752. As a result of the defamation, libel, and slander of Plaintiff, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1753. The defamation, libel, and slander of Plaintiff by all TCSO Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1754. Wherefore, Plaintiff requests this Court enter judgment against all TCSO Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.9 COUNT 9- NINTH CLAIM FOR RELIEF- Respondeat Superior**

1755. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1756. At the time of the incident, all individual TCSO Defendants were employees, agents, and/or

servants of the non-individual Defendants, and the individual TCSO Defendants were acting within the course and scope of their employment with the non-individual Defendants at the time of the incident at issue in this matter. As such, the non-individual TCSO Defendants are jointly and severally responsible for the conduct of the individual Defendants under the doctrine of *respondeat superior* due to the master-servant relationship which existed at the time of the incident at issue in this matter.

1757.  The actions of all TCSO Defendants warrant the imposition of punitive damages in this matter.

## VIII.    FACTS AND CLAIMS REGARDING DEFENDANTS MICHAEL JELSING, CHRSITINE JELSING DURBIN, LEANN CRAIN, RICHARD CRAIN (collectively the "Jelsing Defendants"), and Defendant OBA Defendants

### A.    Factual Background: Plaintiff's Claims against the Tulsa County Defendants

1758.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1759.   Defendant Christine Jelsing Durbin and Plaintiff were married, and Plaintiff requested that Defendant move out.

1760.  Defendant Christine Jelsing Durbin moved to the State of North Dakota and Minnesota.

1761.  While living in either North Dakota and/or Minnesota, Defendant Christine Jelsing Durbin illegally gained access to Plaintiff's iMessages, emails, and text messages by hacking into Plaintiff's accounts remotely.

1762.  Defendant Christine Jelsing Durbin did not have Plaintiff's permission to access said accounts, and she did so in order to improperly obtain private facts regarding Plaintiff.

1763.  Defendant Christine Jelsing Durbin, during her hacking, downloaded iMessages, emails and text messages between Plaintiff and his attorney, Nathan Hendrickson.

1764. Defendant Christine Jelsing Durbin downloaded other personal messages of Plaintiff.

1765. Defendant Christine Jelsing Durbin then, without Plaintiff's consent and without legal justification or right, publicly disseminated those messages between Plaintiff and his legal counsel in the divorce case between Plaintiff and Defendant.

1766. Christine Jelsing Durbin provided those hacked messages to Michael Jelsing, who used them to file a false complaint against Plaintiff with Defendant OBA Defendants.

1767. Plaintiff advised Defendant OBA that the messages provided by Michael Jelsing constituted attorney/client communication and that the messages were improperly hacked by Defendant Christine Jelsing Durbin.

1768. Despite knowing that the documents were illegally obtained, OBA Defendants publicly published those messages thereby revealing private facts about Plaintiff which the general public had no right of knowing, namely his thoughts regarding Christine Jelsing Durbin and Michael Jelsing.

1769. While in North Dakota and Minnesota, Defendant Christine Jelsing Durbin had the other Jelsing Defendants repeatedly drive by Plaintiff's house in Broken Arrow, and Plaintiff repeatedly saw them driving by taking pictures of Plaintiff's house.

1770. Defendants Leann Crain and Richard Crain worked with the other Jelsing Defendants to spy on Plaintiff, and such actions constitute stalking and invasion of privacy.

1771. Defendants Leann Crain and Richard Crain regularly took pictures of the vehicles in Plaintiff's driveway and sent those pictures to the other Jelsing Defendants.

1772. Defendant Christine Jelsing Durbin then used those pictures to continually torment Plaintiff regarding visitors to his residence.

1773. Because of the actions of the Jelsing Defendants, Plaintiff felt trapped in his own home,

causing him to feel unsafe constantly.

1774.   Going further, the Jelsing Defendants conspired with one another, and Leann Crain illegally entered Plaintiff's home when he was not home.

1775.   While Defendant Leann Crain was illegally in Plaintiff's residence without his permission, Defendant Leann Crain stole property from Plaintiff's residence at the request of Defendant Christine Jelsing Durbin.

1776.   The property stolen by Defendant Lois Crain included, among other things, a Tiffany cross necklace he purchased for his daughter at Tiffany's in New York upon the birth of his daughter.

1777.   The Tiffany necklace was purchased by Plaintiff to give to his daughter upon her 16th birthday.

1778.   The Tiffany cross necklace cost more than ten thousand dollars ($10,000.00), and its sentimental value far exceed that price.

1779.   Defendant Lois Crain's theft of that necklace deprived Plaintiff of the ability to give it to his daughter.

1780.   Defendant Lois Crain, after stealing the necklace, gave it to Christine Jelsing Durbin.

1781.    Upon information and belief, after receiving the necklace from Defendant Lois Crain, Defendant Christine Jelsing lost or sold the necklace.

1782.   Defendant Christine Jelsing Durbin along with the other Jelsing Defendants, also broke into Plaintiff's garage and stole a boat, guns, and other equipment from Plaintiff.

1783.   Defendant Lois Crain's stalking behavior continued after the theft and included sending pictures of the car of Plaintiff's future wife to Defendant Christine Jelsing Durbin.

1784.   Defendant Christine Jelsing Durbin would then send those pictures to Plaintiff to make him

feel uncomfortable in his own home, and her actions resulted in such feelings.

1785. One day, as Plaintiff got out of the shower, he went into his bedroom naked and discovered Christine Jelsing Durbin there, naked. She attempted and did sexually assault Plaintiff trying to get him to have sex with her.

1786. Christine Jelsing Durbin grabbed and touched Plaintiff inappropriately.

1787. Plaintiff was horrified to find Christine Jelsing in his house as he had changed the locks after the prior thefts, and Plaintiff was unsure how she gained access to the house.

1788. Plaintiff threatened to call the Broken Arrow police to finally get Christine Jelsing Durbin to leave the property.

1789. During this same period, Defendant Michael Jelsing continually drove by Plaintiff's residence ensuring that Plaintiff saw him.

1790. Defendant Michael Jelsing threatened Plaintiff with great bodily harm at the Tulsa International Airport while Plaintiff held his infant daughter, he just picked up from the Jelsing Defendants.

1791. Christine Jelsing Durbin, while in Minnesota or North Dakota, called the Broken Arrow Police to Plaintiff's residence, claiming falsely that Plaintiff was in a disturbed emotional state. In fact, Plaintiff was asleep.

1792. Plaintiff awoke to officers beating on his front door, and he and another witness went to the front door to discovery 4 officers pointing firearms at Plaintiff.

1793. The actions of the Broken Arrow Police shocked and alarmed Plaintiff, and Plaintiff felt like he was about to be shot.

1794. Plaintiff learned that Christine Jelsing Durbin sent them there, and they were doing a supposed "welfare check."

1795.  After learning that Plaintiff was in fact asleep, and not in an emotional state, the police left.

1796.  As a result of the Jelsing Defendants' actions, Plaintiff was forced to sell his dream home and move to get away from the constant stalking.

1797.  After Plaintiff succeeded in obtaining orders requiring Defendant Christine Jelsing Durbin return with their minor child to Oklahoma, the Jelsing Defendants conspired with one another to file a false and libelous bar complaint against Plaintiff.

1798.  Defendant OBA Defendants, despite knowing the lack of credibility and truthfulness of the Michael Jelsing Complaint, used it anyway to improperly punish Plaintiff via an interim suspension without hearing.

**B.      CLAIMS FOR RELIEF AGAINST JELSING DEFENDANTS**

**B.1.    COUNT 1: Negligence, Gross Negligence, Negligence Per Se**

1799.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1800.  The actions and/or inactions of the Jelsing Defendants, as fully laid out herein, constitute negligence, gross negligence, and negligence per se.

1801.   As a result of the Jelsing Defendants' negligence, gross negligence, and negligence per se, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1802.  The actions and inactions of the Jelsing Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1803.  Wherefore, Plaintiff requests that this Court enter judgment against the Jelsing Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.2.    SECOND CLAIM FOR RELIEF: Violation of the Computer Fraud and Abuse Act**

1804. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1805. The Jelsing Defendants violated the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030(a)(2)(c), by intentionally accessing a protected computer without authorization and in doing so, obtaining Plaintiff's private information.

1806. As a direct result, Plaintiff suffered damages in excess of two million five hundred thousand dollars ($2,500,000.00) within a one-year period, as defined under 18 U.S.C. § 1030(e)(8).

1807. All Jelsing Defendants are jointly and severally liable for the actions and/or inactions of the other Jelsing Defendants related to their activities at issue in this matter.

1808. The Jelsing Defendants, jointly and severally, are thereby each liable to Plaintiff for the injuries he suffered.

1809. As a result of the Jelsing Defendants' violation of the Computer Fraud and Abuse Act, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1810. The actions and inactions of the Jelsing Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1811. Wherefore, Plaintiff requests this Court enter judgment against the Jelsing Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

### B.3    THIRD CLAIM FOR RELIEF- Violation of the Stored Communications Act

1812. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1813. The Jelsing Defendants violated the Stored Communications Act (SCA), 18 U.S.C. § 2701(a) by intentionally accessing and disseminating Plaintiff's stored electronic communications without authorization.

1814. As a direct result, Plaintiff suffered severe harm, including financial damages, emotional distress, and reputational injuries as a result of the Jelsing Defendants' actions, and Plaintiff's damages are in excess of two million five hundred thousand dollars ($2,500,000.00).

1815. All Jelsing Defendants are jointly and severally liable for the actions and/or inactions of the other Jelsing Defendants related to their activities at issue in this matter.

1816. The Jelsing Defendants, jointly and severally, are thereby each liable to Plaintiff for the injuries he suffered.

1817. As a result of the Jelsing Defendants' violation of the Stored Communications Act, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1818. The actions and inactions of the Jelsing Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1819. Wherefore, Plaintiff requests this Court enter judgment against the Jelsing Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.4 COUNT 4: Invasion of Privacy, Sexual Assault, Sexual Battery, Intentional Infliction of Emotional Distress**

1820. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1821. The actions of all Jelsing Defendants were done intentionally and with the intention of invading Plaintiff's right to privacy and seclusion thereby causing Plaintiff to experience severe emotional distress.

1822.  The actions of the Jelsing Defendants constitute an invasion of privacy, sexual assault, sexual battery, and intentional infliction of emotional distress on Plaintiff.

1823.  All Jelsing Defendants are therefore liable to Plaintiff for their invasion of Plaintiff's privacy, sexual assault, sexual battery, and the intentional infliction of emotional distress caused by their actions.

1824.  At all times relevant to the facts in this matter, all individual TCSO Defendants were acting within the scope of their employment and authority with their governmental employer.

1825.  As a result of the invasion of privacy and intentional infliction of emotional distress of Plaintiff caused by the Jelsing Defendants, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1826.  The actions and inactions of the Jelsing Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

1827.  Wherefore, Plaintiff requests this Court enter judgment against the Jelsing Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.8 COUNT 8: DEFAMATION, LIBEL and SLANDER**

1828.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1829.  The Jelsing Defendants made knowingly false statements about Plaintiff publicly, including in Defendant Michael Jelsing's complaint to Defendant OBA Defendants.

1830.  The knowingly false statements of the Jelsing Defendants, used improperly by Defendant OBA Defendants, constitute defamation, libel and slander of Plaintiff.

1831. As a result of the defamation, libel and slander of Plaintiff by the Jelsing Defendants and Defendant OBA Defendants, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1832. The defamation, libel and slander of Plaintiff by the Jelsing and OBA Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

1833. Wherefore, Plaintiff requests this Court enter judgment against the Jelsing Defendants and OBA Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

## IX.  FACTS AND CLAIMS AGAINST DEFENDANTS 14TH JUDICIAL DISTRICT, TULSA COUNTY COURT CLERK, DON NEWBERRY AND JUDGE TRACY PRIDDY (the "Priddy Defendants")

### A.  FACTUAL BACKGROUND CLAIMS AGAINST THE PRIDDY DEFENDANTS

1834. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1835. Minute Orders entered in the Oklahoma State Courts Network website ("OSCN.net) constitute official records under Oklahoma law.

1836. Such official records cannot be altered or destroyed under Oklahoma law pursuant to the Oklahoma Records Management Act, 67 O.S. § 209, the Oklahoma Open Records Act, 51 O.S. §24A. 1et seq., and Destroying Official Records, 21 O.S. §531.

1837. Plaintiff seeks declaratory and injunctive relief directing the Priddy Defendants to cease from engaging in the unlawful behavior described herein after this Court's ruling.

1838. The claims at issue herein directly relate to Defendant OBA Defendants claims against Plaintiff, and a ruling establishing that Plaintiff's claims against the Priddy Defendants were correct goes directly to the claims by Defendant OBA Defendants against Plaintiff.

1839. Plaintiff seeks review here because the Oklahoma Supreme Court refused to resolve the matter, and it is relevant to the issues herein.

1840. On April 06, 2023, Plaintiff entered the Tulsa County Building ") to attend a hearing on behalf of a client.

1841. Prior to the hearing, Plaintiff entered the offices of Judge Tracy L. Priddy ("Judge Priddy") to withdraw the motion which was the subject of the hearing. *Id*.

1842. Plaintiff expressed to Judge Priddy's clerk, Houa Xiong ("the Clerk") that Plaintiff withdrew the Emergency Application, and that Plaintiff did not intend to present the emergency application.

1843. Between the time filed, and the hearing, factors changed which eliminated the need for the sought emergency relief.

1844. Judge Priddy's Clerk acknowledged Petitioner's attorney's withdrawal of the motion, and informed counsel she would let Judge Priddy know.

1845. Plaintiff notified opposing counsel that he withdrew the Emergency Application on behalf of Plaintiff.

1846. Plaintiff did not immediately leave the County Building. Instead, Plaintiff went downstairs, came back to the same floor, and proceeded to Judge Drummond's clerk.

1847. While walking down the hall, Judge Priddy saw Plaintiff outside her courtroom, but made no comment. This was captured on video by courthouse security cameras.

1848. Defendant Priddy then held an improper ex parte hearing, or she held it before, we cannot say because it was done ex parte.

1849. This hearing was held despite Plaintiff withdrawing the Emergency Application.

1850. An Order ("Original Order") was subsequently entered into OSCN.net.

1851. The Original Order stated that Plaintiff "appeared and not appeared."

1852. It also indicated Defendant Priddy conducted an improper ex parte hearing.

1853. Plaintiff, after seeing that Minute Order, later returned to the County Building to inquire about the wording in the order, and subsequently left after an interaction with Defendant Priddy and law enforcement.

1854. Plaintiff attempted to view the Original Order on OSCN.net and discovered it had been destroyed and/or substantially altered by the Priddy Defendants.

1855. The Altered Order made no mention of the alteration and/or destruction of the Original Order, and the Original Order was completely removed from OSCN.net.

1856. Upon information and belief, the Priddy Defendants destroyed the Original Order entirely.

1857. Upon information and belief, the record was destroyed by either Defendant Priddy or her Clerk, at Priddy's direction.

1858. Upon information and belief, if the Clerk destroyed the record, Judge Priddy and Drummond are believed to have directed the Clerk to do so to give the impression Plaintiff was not present.

1859. Defendant Judge Priddy was aware that he was, indeed, present, as she saw him in the hallway.

1860. Defendant Priddy knew Plaintiff withdrew the Emergency Application, the only subject of the hearing in question.

1861. Houa Xiong, the Minute Clerk for Judge Priddy, works for Don Newberry in his official elected capacity as Court Clerk for Tulsa County.

1862. The actions of Xiong are attributable to Don Newberry as her employer, and any violations by Xiong, constitute a violation by all other Priddy Defendants.

1863. On May 25, 2023 at approximately 12:50 P.M., Plaintiff again entered the Courthouse in an attempt to retrieve the aforementioned minute orders via an Open Records Act request.

1864. Petitioner's attorney spoke with the "Supervisor" and "Head of Civil", Dianne Savage ("Savage").

1865. Savage showed Plaintiff an order from April 06, 2023, which appeared like the Original Order.

1866. However, upon further inspection, it revealed to be an attempted reproduction of the Original Order containing spelling and punctuation differences not present in the Original Order.

1867. After Plaintiff provided a copy of the deleted Original Order, the Priddy Defendants, to cover up their actions, attempted to reproduce the Original Order in order to cover up the felony their actions constitute pursuant to the Destroying Official Records. 21 O.S. § 531.

1868. The Priddy Defendants replaced the Original Order and attempted a reproduction/cover-up with an alternative ("Replacement to the Original").

1869. The April 06, 2023 record Savage showed Plaintiff differs from the Original Order record because the word "Appear" was actually "Appeared" in the Original Order.

1870. Additionally, the apostrophe on the word "Petitioners'" was after the " " in the version Savage showed while it was before the "s" in the Original Order.

1871. Additionally, the Original Order misspells the word "restraining" as "restarining" while the attempted reproduction correctly spells "restraining".

1872. The Replacement to the Original was entered on April 06, 2023, sometime after the first felony act of Destroying Official Records took place wherein the Original Order was destroyed, and a reproduction/cover-up was attempted.

1873. In showing Plaintiff her screen, Savage scrolled down to an April 1, 2023 record entry ("Correction Order").

1874. It is worth noting that this order was entered five (5) days after the April 11, 2023 improper ex parte hearing April 06, 2023, but only one day after Plaintiff requested the Original Order at the Civil Desk of the Tulsa County Clerk on April 10, 2023 wherein Plaintiff provided to Vicki Goodson ("Goodson"), 1st Deputy at the Tulsa County Clerk's Office, a copy of the Original Order.

1875. During this April 10, 2023 visit to request Records under the Open Record Act, Goodson stated that the Original Order, which she was provided a screen capture of, did not exist in the OSCN.net system and took a copy of the screen capture of the Original Order.

1876. The April 1, 2023 record purports to be a correction of "Minute for 04/06/2023".

1877. The Correction Order goes on to closely track the Replacement to the Original record which record was created April 06, 2023. However, this Correction Order did not accurately recount a correction of the Original Order, but instead purports to correct the Replacement to the Original which is also a falsification.

1878. In the Original Order, Defendant Priddy truthfully admits that Plaintiff appeared, but in the Replacement to the Original, Defendant Priddy claims only that Plaintiff did not appear.

1879. Upon information and belief, Defendant Judge Priddy spoke with Presiding Judge Doug Drummond to receive counsel on how to best cover up the felony act they committed.

1880. Upon information and belief, it is a regular practice of multiple judges in the 14th Judicial District to alter and/or destroy state records by feloniously deleting entered orders and replacing them with new ones.

1881. Upon information and belief, Judge Drummond, as Presiding Judge of the 14th Judicial District, told Judge Priddy to simply duplicate the Original Order into the system.

1882. Felonious destruction of official records cannot be undone by reproducing (poorly or in any manner) the destroyed records from a facsimile provided by Plaintiff sometime after committing the felony act in the first place.

1883. As of the present date, the Original Order still does not exist within OSCN.net, only a poorly duplicated version of it created after destruction of the original.

1884. Plaintiff requested a copy of the Original Order pursuant to the Oklahoma Open Records Act.

1885. The Civil desk supervisor, Savage, denied Petitioner's attorney the requested record because she stated that the original does not exist and that there is no way to recover previous versions of the altered Original Order or the deleted Minute Order.

1886. Pursuant to the Oklahoma Open Records Act, codified as 15 O.S. § 24A.1 et seq. in the State of Oklahoma, the issues in the present case are issues of statewide concern.

1887. Pursuant to the Oklahoma Records Management Act 67 O.S. §201 et seq., the issues in the present case are issues of statewide concern.

1888. Pursuant to Destroying Official Records, 21 O.S. §531, a felony act, the issues in the present case are issues of statewide concern.

1889. Plaintiff is entitled to judgment finding that the destruction and alteration of the Minute Order was in contravention of the Oklahoma Records Management Act, 67 O.S. § 209, as destruction or alteration of a State Record in the possession of a Public Body, the court.

1890. Plaintiff is entitled to a judgment finding that the destruction and alteration of the Minute Order was in contravention of the Oklahoma Open Records Act by failing to provide access to inspect, copy, or reproduce public Records during the regular business hours of the Public Body. 15 O.S. § 24A. 1et seq.

1891. Plaintiff is entitled to judgment finding that the destruction and alteration of the Minute Order was in contravention of 21 O.S. §531 by Destroying Official Records, a felony act.

1892. The Oklahoma Open Records Act exists to vest in the citizens of Oklahoma "[t]he inherent right to know and be fully informed about their government." 51 O.S. §24A.2.

1893. The person wishing to withhold public records from Oklahoma citizens "shall at all times bear the burden of establishing such records are protected by... a confidential privilege." 51 O.S. § 24A.2.

1894. The purpose of the Act is to "ensure and facilitate the public's right of access to and review of government records so they may efficiently and intelligently exercise their inherent political power." 51 O.S. §24A.2.

1895. A Record under the Act is:

all documents including, but not limited to, any book, paper, photograph, microfilm, data files created by or used with computer software, computer tape, disk, record, sound recording, film recording, video record or other material regardless of physical form or characteristic, created by, received by, under the authority of, or coming into the custody, control or possession of public officials, public bodies or their representatives in connection

with the transaction of public business, the expenditure of public funds or the administering

of public property.

51 O.S. 24A.3(1)

1896. A Public Body under the Act includes, but is not limited to:

any office, department, board, bureau, commission, agency, trusteeship, authority, council, committee, trust or any entity created by a trust, county, city, village, town, township, district, school district, fair board, court, executive office, advisory group, task force, study group or any subdivision thereof, supported in whole or in part by public funds or entrusted with the expenditure of public funds or administering or operating public property, and al committees, or subcommittees thereof.

1897. Petitioner is entitled to a relief ordering the Priddy Defendants to permanently cease the

destruction and alteration of Court Records.

1898. Plaintiff is entitled to his costs and attorneys' fees. 51 O.S. 24A.3(2)

1899. A public body does not include, except as laid out in 15 O.S. 24A.4, "[j]udges, justices, the

Council on Judicial Complaints, the Legislature or legislators."

1900. However, a Public Body does include any "court. supported in whole or in part by public

funds . . . ." *Id.* Thus, a court, in general, and its component parts, such as a court clerk, are

a public body.

1901. Additionally, the Original Order described herein, is a "data [file] created by or used with

computer software" and it "[came] into the custody, control or possession of..." a Public Body

(i.e., the court). 51 O.S. §24A.3(1). Thus, the Original Order in question is a Record under

the meaning of the Act. No exception exists under the Act which gives any court the right to

deny the public access.

1902. Pursuant to the Oklahoma Open Records Act, "All records of public bodies and public

officials shall be open to any person for inspection, copying, or mechanical reproduction

during regular business hours; . . . . " 51 O.S. § 24A.5.

1903. The Oklahoma Open Records Act's "purpose is furthered, not by restricting access by allowing public bodies to deny copies to the people of Oklahoma, but by requiring public bodies to allow copying." *Okla. Assn. of Broadcasters, Inc. v. City of Norman*, 2016 OK 119, 427.

1904. Under the Oklahoma Open Records Act, "[c]onflicts between statutory provisions will be resolved in favor of construction which promotes, rather than limits, the Legislature's intent and an act's purpose." *Id.*

1905. In *Lawson v. Sequoya County 911 Trust Authority*, the Oklahoma Court of Civil Appeals held: the general statutory duty under the Open Records Act is established in 51 O.S. § 24A.5, which provides, subject to certain exceptions, that "[a]ll records of public bodies and public officials shall be open to any person for inspection, copying, or mechanical reproduction during regular business hours...". *See Oklahoma Assn' of Broadcasters, Inc. v. City of Norman, Norman Police Dep't,* 2016 OK 119, 1 15, 390 P.3d 689, 694 ("[t]he Legislature's emphatic message to government agencies is, unless otherwise specifically excluded, the public must have prompt and reasonable access to records."). 2022 CIV APP, 9 15.

1906. Nothing in the Act precludes copying, inspection, or reproduction of any of the records requested by Plaintiff.

1907. The Priddy Defendants failed to comply with 51 O.S. § 24A.6 when they denied access to the records of a public body pursuant to the Act. The fact that such denial entirely centered around the Priddy Defendants' destruction of the Record further complicates matters for the Priddy Defendants.

1908. The Priddy Defendant's actions violated the Oklahoma Record Management Act.

1909.   The Oklahoma Records Management Act 67 O.S. § 201 et seq. lays out the statutory guidelines for retention and preservation of State Records.

1910.   A State Record includes "[a] record of the Supreme Court, the Court of Criminal Appeals or any other court of record, whether of statewide or local jurisdiction." 67 O.S. § 203(b)(3).

1911.   Under the Records Management Act, "[a]ll records made or received by or under the authority of or coming into the custody, control or possession of public officials of this state in the course of their public duties shall not be mutilated, destroyed, transferred, removed, altered, or otherwise damaged or disposed of, in whole or in part, except as provided by law." (Emphasis Added) 67 O.S. §209.

1912.   Defendant Priddy's clerk, who works for Defendant Newberry, is a public official as an employee of the court (a public body), and as such is part of a public body as previously defined under 51 O.S. 24A.3(2).

1913.   Defendant Priddy and her clerk caused to be created a Record (i.e., a "data [file] created by or used with computer software" which "[came] into the custody, control or possession of . . ." a Public Body, the court and court clerk).

1914.   Said Records "[s]hall not be mutilated, destroyed, transferred, removed, altered, or otherwise damaged or disposed of, in whole or in part, except as provided by law." (Emphasis Added) 67 O.S. §209.

1915.   Defendant Priddy, and/or her clerk, at the direction of the Priddy Defendants, destroyed and/or altered the Original Order in violation of 67 O.S. § 209 on April 06, 2023, sometime after 1:00 P.M.

1916. Due to the illegal destruction and/or alteration of the public Record in contravention of 67 O.S. § 209, upon request, the court failed to provide the Record for "[inspection, copying, or mechanical reproduction during regular business hours" as required by 51 O.S. 24A.5.

1917. The Priddy Defendants actions violated law regarding destroying official records.

1918. The Priddy Defendants acted in concert to commit a felony under 21 O.S. § 531 which states, "[a]ny sheriff, coroner, clerk of court, constable or other ministerial officer, and every deputy or subordinate of any ministerial officer who mutilates, destroys, conceals, erases, obliterates or falsifies any record or paper appertaining to his office shall be guilty of a felony.

1919. Undoubtedly, the Defendant Court Clerk, at the direction of Defendant Priddy and Judge Drummond, "destroy[ed], conceal[ed], eras[ed]. or falsifi[ed] [a] record." before attempting to put the toothpaste back in the tube after their felony acts.

1920. Notably, until provided the Original Order, Defendant Priddy felt she was under no obligation to avoid the destruction of records or try to duplicate to Original Order to coverup her misdeed.

1921. This is not the first time Petitioner's counsel caught a judge sitting in the 14th Judicial District doing this same thing, so it appears a normal course of action for multiple judges of the 14ht Judicial District.

1922. Judge Priddy tried to call back her prior bad acts but predictably failed. Once one commits a felony act, it cannot be undone by replacing a document destroyed in contravention of the laws of the State of Oklahoma. This would be like robbing a store at gunpoint and then later returning the money in hopes one could undo their robbery. Oklahoma laws, and frankly no laws, work that way.

**B.    CLAIMS AGAINST THE PRIDDY DEFENDANTS**

**B.1 COUNT 1- Declaratory and Injunctive Relief**

1923.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1924.  Pursuant to the aforementioned facts and allegations, Plaintiff is entitled to a declaratory judgment determining that the Priddy Defendants:

(a) Violated the Oklahoma Open Records Act by failing to provide access to inspect, copy, or reproduce public Records during the regular business hours of the Public Body, 15 O.S. § 24A.1 et seq.; and

(b) Violated the Oklahoma Records Management Act by destroying and/or altering a State Record in the possession of a Public Body, the court. 67 O.S. § 209; and (c) Violated 12 O.S. §531 by Destroying Official Records, a felony act.

1925.  The Priddy Defendants refused to perform their functions with competence and/or diligence.

1926.  In concert, they created a partially true State Record before destroying and/or altering the record and replacing it with an untrue record before deciding to use the undersigned's facsimile to attempt to duplicate the destroyed record.

1927.  Plaintiff, by luck of taking a screen capture of the original order, ensured the Priddy Defendants failed in this coverup, and the Priddy Defendants exposed themselves further by leaving spelling and punctuation differences between the Original Order and the attempted duplication (the coverup order).

1928.  Not only did the Priddy Defendants violate 21 O.S. § 531, but they also violated 67 O.S. § 209 and created a situation wherein 15 O.S. § 24A. 1et seq. was violated because the Open Record destroyed was not available for inspection or copying upon request.

1929.   The Priddy Defendants, acting in concert, violated, or caused to be violated, three (3) distinct

Oklahoma Statutes in an attempt to derail Petitioner and Petitioner's counsel's efforts in that

case.

1930.   This Court should declare that 1. Minute Orders entered in the Oklahoma State Courts

Network website ("OSCN.net") constitute official records under Oklahoma law, 2. the

Priddy Defendants' destruction and alteration of the Minute Order occurred in contravention

of the Oklahoma Open Records Act, 51 O.S. § 24A.1 et seq., the Oklahoma Records

Management Act, 67 O.S. §209, and Destroying Official Records, a felony act, 12 OS. §531,

3. Defendant OBA's prosecution of its complaint against Plaintiff related to the issues

addressed herein is improper as not only was Plaintiff correct, but his conduct is protected

by the 1st Amendment to the United States Constitution.

1931.   Plaintiff further requests orders prohibiting the Priddy Defendants from engaging in the

unlawful behavior described herein after this Court's ruling.

1932.   Plaintiff further requests orders prohibiting OBA Defendants from taking punitive action

against Plaintiff for the actions described herein.

**X.    FACTS AND CLAIMS AGAINST DEFENDANTS:  STATE OF OKLAHOMA,
OKLAHOMA MEDICAL MARIJUANA AUTHORITY, THE OKLAHOMA
BUREAU OF NARCOTICS AND DANGEROUS DRUGS, (hereinafter the
"OMMA and OBNDD Defendants"), OKLAHOMA MANAGEMENT
ENTERPRISE SERVICES, METRC, LLC, JACK MATTINGLY SR. and
METRC, LLC.**

**A.    FACTS AGAINST THE OMMA AND OBNDD DEFENDANTS**

1933.   All of the facts and allegations laid out in this Complaint, including the Exhibits attached

hereto, are adopted and incorporated herein by reference as if laid out herein in their

entirety.

1934.   Plaintiff is entitled to a Writ of Prohibition commanding that the Oklahoma Medical

Marijuana Authority not enforce the provisions of SB913(2023) due to its violation of Oklahoma law and the Constitution of the State of Oklahoma.

1935. 75 O.S. § 319 provides the opportunity for judicial review of the OMMA's implementation of 75O.S.§319 contained in OAC 442:10-5-3.3.

1936. Pursuant to § 319, Plaintiff must show that enforcement of the surety bond and residency requirements "would result in present, continuous and irreparable impairment of the constitutional rights of the [Plaintiff]. As laid out herein, Plaintiff easily bounds over that small hurdle.

1937. Additionally, provisions of both the Oklahoma Constitution and the United States Constitution justify Plaintiff's request for relief, as detailed below.

1938. Plaintiff can establish his entitlement to the requested relief under the statutes and pursuant to the respective constitutional provision.

1939. OMMA and OBNDD regularly enforce the requirement that all Oklahoma medical marijuana businesses be owned by someone with at least two (2) years residency in Oklahoma prior to application.

1940. To go even further with unconstitutional residency requirements, the Oklahoma Legislature added additional requirements targeted at people who moved to the State of Oklahoma from other states.

1941. On April 20, 2023, SB913 took effect. SB913 amends 63 O.S. § 427.14.

1942. SB913, among other things, targets commercial medical marijuana growers by requiring them to either 1. post a fifty-thousand-dollar ($50,000) surety bond, or 2. prove they owned the licensed premises for more than five (5) years in order for the OMMA to grant or renew licenses.

1943. SB913 further requires commercial grower license applicants to provide sufficient documentation establishing either 1. Oklahoma residency for two (2) years immediately preceding the application submission date, or 2. five (5) years of continuous Oklahoma residency during the twenty-five (25) years immediately preceding the application submission date.

1944. The OMMA and OBNDD adopted new emergency regulations to codify SB913.

1945. OMMA codified the residency requirement as OAC 442:10-5-3.1 and the surety bond requirement is codified as OAC 442:10-5-3.3. *See* Appendix at No. 2: Surety Bond and No. 3: Residency.

1946. Pursuant to Article V, Sec. 59 of the Oklahoma Constitution, the issues in the present case are issues of statewide concern.

1947. Pursuant to the Equal Protection Clause of the 14th Amendment, the issues in the present case are issues of statewide and national concern.

1948. Pursuant to the dormant Commerce Clause, the issues in the present case are issues of statewide cand national concern.

1949. The Court may and should exercise original jurisdiction over the claims alleged herein and may properly exercise personal jurisdiction over the parties.

1950. Plaintiff is entitled to judgment finding that the SB913 surety bond requirement, codified as OAC 442:10-5-3.3 is unconstitutional.

1951. Plaintiff is entitled to judgment finding that the SB913 residency requirement, first created by State Question 788 and codified as OAC 442:10-5-3.1, is unconstitutional.

1952. Plaintiff is entitled to a writ ordering Defendants permanently cease the enforcement of the SB913 surety bond and residency requirements, codified as OAC 442:10-5-3.3 and OAC

442:10-5-3.1 respectively.

1953. OMMA and OBNDD constitute a public body under Oklahoma law. *See* 25 O.S. § 304(1) (defining Public Body to include, "all boards, bureaus, commissions, agencies, trusteeships, authorities, councils**,** committees, public trusts or any entity created by a public trust").

1954. As a "Public Body," each of the OMMA and OBNDD Defendants and their members must comply with the Oklahoma Open Meeting Act. *See* 25 Okla. Stat. §§ 304 *et seq.*

1955. Oklahoma codified the Open Meetings Act, as 25 O.S. §§ 301 *et seq.*

1956. The stated purpose of the Open Meeting Act is to facilitate and encourage an informed citizenry's understanding of government. *25 OS. § 302.*

1957. Under the statutory provisions contained in 25 O.S. §§ 301 *et seq.,* any public body, as defined in § 304(A) as "all boards, bureaus, commissions, agencies, trusteeships, authorities, councils, committees, public trusts or any entity created by a public trust . . . ", is required to provide to the public specific times and places, which are convenient to the public, such that citizens may attend said meetings and be informed of the activities of their government.

1958. To be "informed" under Section 301, the Act requires that citizens be aware of matters discussed during public meetings. By communicating about matters of public concern secretively, Defendants violated the Open Meeting Act.

1959. By its language, the Open Meeting Act requires public bodies, like the OMMA and OBNDD, to conduct meetings in the fresh air that only the sunshine of transparency brings to the process of governance.

1960. The OBNDD prohibited Plaintiff and other members of the public from attending public hearings related to its adoption of regulations, and in doing so, they locked citizens out of the building.

1961. The OMMA prohibited Plaintiff and other members of the public from attending and freely recording its public meetings related to its adoption of regulations, and in doing so, the violated the rights of Plaintiff and others.

1962. The language in 25 O.S. § 303 requires that meetings of public bodies be both convenient to the public and **open** to the public. (emphasis added).

1963. To be "open" to the public, the public must be able to see and hear all the discourse of all members of the public body. *See* 25 O.S. §301 et seq.

1964. Pursuant to the Act, a meeting is not open if the public cannot see the members of the public body during the public meeting. *See Id.*

1965. To further discourage and punish Plaintiff and others for publicly criticizing them, Defendant OMMA prohibited Plaintiff and others from using public restrooms in the building occupied and controlled by Defendant OMMA.

1966. The OMMA's failure to provide access to the public to the public restrooms constitute a violation of the American's with Disability Act.

1967. The OMMA's actions violate the Civil Rights Act of 1964.

1968. Pursuant to the Open Meetings Act, a meeting is not open if the public cannot hear the members of the public body while they discuss agenda items during the public meeting.

1969. The Oklahoma Open Meetings Act, 25 O.S. § 303 specifically requires: All meetings of such public bodies ... shall be preceded by advance public notice specifying the time and place of each such meeting to be convened as well as the subject matter or matters to be considered at such meeting, as hereinafter provided.

1970. Under the Open Meeting Act, "Meeting" means "[t]he conduct of business of a public body . . . ." 25 O.S. § 304(2).

1971. The OMMA and OBNDD Defendants constitute a public body under the Open Meetings Act.

1972. Defendants attempted to conduct a meeting under the Act for purposes of conducting business of the public body.

1973. A violation of the Open Meetings Act, "does not require a showing of bad faith, malice, or wantonness, but, rather, encompasses conscious, purposeful violations of law or blatant or deliberate disregard of law by those who know, or should know requirements of the Act...."

   *Wilson* v. *City of Tecumseh,* 2008 OK CIV APP 84, ¶13.

1974. The Open Meeting Act provides criminal sanctions for violation of its provisions by stating as follows:

   A.  Any person or persons willfully violating any of the provisions of this Act shall be guilty of a misdemeanor and upon conviction shall be punished by a fine not exceeding Five Hundred Dollars ($500.00) or by imprisonment in the county jail for a period not exceeding one (1) year or by both such fine and imprisonment.

   25 O.S. § 314(A).

1975. Aside from the criminal sanctions addressed above, the Open Meeting Act also authorizes any person to bring a civil suit seeking declaratory or injunctive relief, or both. *See* 25 Okla. Stat.§ 314 (B)(l).

**B.    CLAIMS AGAINST DEFENDANTS OMMA, ADRIA BERRY, OBNDD, OKLAHOMA STATE FIRE MARSHALL (collectively the OMMA AND OBNDD DEFENDANTS"), METRC, LLC, JACK MATTINGLY, MJBIZ CON, LLC, LAS VEGAS CONVENTION CENTER and JOHN DOES 1 and 2.**

**B.1    COUNT 1- Plaintiff is Entitled to injunctive Relief Pursuant to Title 75, Section 319 (against the OMMA and OBNDD Defendants).**

1976. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

1977. Title 75, Section 319 expressly grants this Court power to stay enforcement "upon such terms as it deems proper and shall do so whenever required by subsection (2) of this section."

Subsection 2 provides:

> In every proceeding in any court for the review of an order of an agency, upon the filing of an application, supported by verified statements of material fact establishing that the enforcement of the order pending final decision would result in present, continuous and irreparable impairment of the constitutional rights of the applicant, a stay of the enforcement of such order and of the accrual of penalties thereunder shall be entered upon the condition that: injury to adverse parties or to the public, as the case may be, can be obviated through the furnishing of security adequate to compensate for any loss which may be suffered as a result of the stay in the event the order is affirmed, in whole or in part;
>
> a supersedeas bond, in the amount and with sureties prescribed and approved by the reviewing court, in its sound judicial discretion, as adequate to meet requirement . . . .

1978. Plaintiff meets Section 319 requirements authorizing this Court enter an order staying enforcement of the surety bond and residency requirements.

1979. The fact Plaintiff is subject to the residency and surety bond requirement constitutes "present, continuous, and irreparable impairment of the constitutional rights of [Petitioners]".

1980. Defendant OMMA once again regulated via its website before adopting regulations.

1981. OMMA stated on its website that, "OMMA will reject applications initially submitted to the Authority after April 20, 2023, by current licensees and new business applicants that do not have records on file with OMMA as required by SB 913 (2023) and OAC 442:10-5-3.3." *See* Appendix at No. 1: OMMA Injury.

1982. Given this clear intent by OMMA to enforce and penalize people that cannot comply with the illegal bond requirement contained in SB 913, this Court should issue an order staying enforcement.

1983. The Oklahoma Legislature, Governor, and OMMA's intentional deprivation of the rights of Plaintiff and others, triggers the Commerce Clause.

1984. The Commerce Clause directly limits the power of the States to discriminate against interstate commerce. *New Energy Co. of Indiana v. Limbach,* 486 U.S. 269,273, 108 S.Ct. 1803, 1807 (1988).

1985. When a state statute clearly discriminates against interstate commerce, it will be struck down unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism. *New Energy Co., supra; Maine v. Taylor,* 477 U.S. 131, 106 S.Ct. 2440 (1986).

1986. In this case, commercial growers or those desiring to grow, are arbitrarily and capriciously subjected to an improper residency and surety bond requirements, and the OBNDD and OMMA will deny or revoke their licenses if they do not comply. *See* Appendix at No. 4: OMMA Injury.

1987. Defendants OMMA and OBNDD regularly deny applicants licenses because they do not meet the Oklahoma residency requirement.

1988. The residency requirement and bond requirement unduly restrict Oklahomans from making a living and is not substantiated by any "valid factor" on the part of Oklahoma.

1989. Case law provides that one may challenge regulations of their own State under the Commerce Clause. *Oregon Waste Sys. v. Dept. of Env. Quality,* 511 U.S. 93, 114 S.Ct. 1345, 1349 (1994) (in-state landfill operators entitled to challenge their own state's regulations burdening interstate commerce and their ability to provide commercial services to nonresident customers); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136 (1992).

1990. In terms of the residency requirement, all commercial license applicants are currently required by both OMMA and OBNDD to provide sufficient documentation establishing either: 1. Oklahoma residency for at least two (2) years immediately preceding the application submission date, or 2. five (5) years of continuous Oklahoma residency during the twenty-five (25) years immediately preceding the application submission date. *See* Appendix at No. 1: SB913 at p. 8-9.

1991. Further, Section (l)(E)(l 1) states, "[a]pplicants that were issued a medical marijuana business license prior to August 30, 2019, are hereby exempt from the two-year or five-year Oklahoma residence requirement mentioned above." *See* Appendix at No. 1: SB913 at p. 9. This requirement clearly targets out-of-state economic actors traveling to the state with the desire to conduct business within the state.

1992. The present case is like *Tennessee Wine and Spirits Retailers Ass'n. v. Thomas,* 139 S.Ct. 2449, 204 L.Ed. 801 (2019).

1993. In that case, the State of Tennessee enacted a rule requiring those applying for liquor store operation licenses to reside in the state for at least two (2) years.

1994. The Court noted, "[ u]nder our dormant Commerce Clause cases, if a state law discriminates against out-of-state goods or nonresident economic actors, the law can be sustained only on a showing that it is narrowly tailored to '"advanc[e] a legitimate local purpose'". *Id.* at 2461 (citing *Dep't of Revenue of Ky. v. Davis,* 533 U.S. 328, 338, 128 S.Ct. 1801 (2008).

1995. In its reasoning, the Court noted, "[t]he provision at issue here expressly discriminates against nonresidents and has at best a highly attenuated relationship to public health or safety." *Tennessee Wine and Spirits,* 139 S.Ct. 2449 at 2474.

1996. If the Supreme Court of the United States found a two-year residency requirement to be

unconstitutional, surely a residency requirement with a 5-year property ownership requirement on top of it is even more so violative of the United States and Oklahoma Constitutions.

1997. No legitimate local purpose exists other than to create burdens on ownership in the hopes of illegally forcing people out of business.

1998. Here, a narrowly tailored legitimate local purpose does not exist.

1999. The Respondents in the *Tennessee Wine and Spirits* argued the constitutionality of the residency requirement based on a concern for public health and safety. The Court found this argument unpersuasive to deny nonresident economic actors the right to conduct business in the State of Tennessee for an arbitrary period of time.

2000. The true purpose of the requirement is clear in this case.

2001. In essence, the State of Oklahoma, OBNDD and OMMA are interfering with interstate commerce by prohibiting every out-of-state applicant from successfully obtaining a license.

2002. The language of SB913(l)(E)(l 1) supports this statement, as every applicant who obtained a commercial license prior to August 30, 2019, is arbitrarily exempt from the requirement.

2003. The OMMA and OBNDD requirements expressly discriminate against nonresidents and those owning property less than five (5) years in a manner that clearly violates the dormant Commerce Clause.

2004. For these reasons, Plaintiff is entitled to declaratory judgment that the surety bond requirement and the residency requirements are unconstitutional.

2005. For these reasons, Plaintiff is entitled to injunctive relief ordering the OMMA and OBNDD Defendants NOT TO ENFORCE the unconstitutional statutes, regulations, and procedures

used by the Defendants.

**B.2    COUNT 2- The Surety Bond Requirement Violates the Special Law Prohibition of the Oklahoma Constitution (against the OMMA and OBNDD Defendants)**

2006.   All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2007.   When a law is considered a "special law" in violation of the Oklahoma Constitution, the Court must take steps to strike down the offending law. Here, the surety bond requirement most certainly constitutes a special law.

2008.   OMMA's surety bond requirement serves to target commercial growers in a way that it does not target any other type of medical marijuana business, or any other farmer in Oklahoma growing crops or livestock.

2009.   As stated previously, SB913 targets commercial medical marijuana growers by requiring them to either 1) post a fifty-thousand-dollar ($50,000) surety bond, or 2) prove that they owned the licensed premises for more than five (5) years in order for the OMMA to grant or renew licenses. *See* Appendix at No. 1: SB913 at p. 14.

2010.   This rule arbitrarily sets commercial growers apart from other businesses.

2011.   Additionally, commercial growers are further divided as, depending on their property ownership status, they are not uniformly subject to the bond requirement.

2012.   Article V, Sec. 59 of the Oklahoma Constitution states, "Laws of a general nature shall have a uniform operation throughout the State, and where a general law can be made applicable, no special law shall be enacted." If a law is challenged as a special law, the reasonableness of the classification and the uniformity of its operation are considered in determining its constitutionality. *Black v Ball Janitorial Serv., Inc.,* 730 P.2d 510,514 (Okla. 1986) (*citing Haas v. Holloman,* 327 P.2d 655, 658-9 (Okla. 1958).

2013.  Here, the reasonableness of the classification for surety bonds is non-existent.

2014.  There are no public policy justifications stated in the text of the bill, related to public health and safety, or otherwise.

2015.  The purpose of the surety bond requirement is solely to ensure that the State of Oklahoma, through the OMMA, collects all the money it desires.

2016.  Additionally, there is no uniformity of the requirement's operation. Commercial growers are the only entities subject to the bond requirement; the other recognized forms of medical marijuana licensees include processors, dispensaries, transporters, and testing laboratories are excluded.

2017.  None of the other recognized forms of licensees are subject to this surety bond requirement.

2018.  As such, the surety bond requirement constitutes a special law in violation of the Oklahoma Constitution.

2019.  For these reasons, Plaintiff is entitled to declaratory judgment that the surety bond requirement and the residency requirements are special laws prohibited by the Oklahoma Constitution.

2020.  For these reasons, Plaintiff is entitled to injunctive relief ordering the OMMA and OBNDD Defendants NOT TO ENFORCE the special laws addressed above.

**B.3.    COUNT 3- The Surety Bond Requirement Violates the Equal Protection Clause of the 14th Amendment to the United States Constitution (against the OMMA and OBNDD Defendants)**

2021.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2022.  The surety bond requirement further violates the Equal Protection Clause of the United States Constitution.

2023. Under the law, the presumption of statutory validity disappears if a fundamental right or suspect class is involved, or "if the classification rests on grounds wholly irrelevant to the achievement of the state's objective." *Fair School Finance Council of Oklahoma, Inc. v. State,* 1987 OK 114134, 746 P.2d 1135.

2024. The purpose of the Equal Protection Clause is to determine the validity of classifications created by state laws. *Parham v. Hughes,* 441 U.S. 347, 351, 99 S.Ct. 1742, 1745 (1979).

2025. Due Process requires that all governmental actions have a fair and reasonable impact on the life, liberty, or property of the person affected. *City of Edmond v. Wakefield,* 537 P.2d 1211, 1213 (Okla. 1975).

2026. In the present case, the surety bond requirement makes an unreasonable distinction between commercial growers and all other forms of medical marijuana. licensees.

2027. It also makes the distinction, as noted above, even in the grower group between those owning their land for five (5) years, those owning their land for less than five (5) years, and then a third group that are tenants of another classification.

2028. Under the rational basis test, there is no legitimate rational basis for requiring commercial growers to post $50,000 surety bonds to operate if they have not owned their property for at least five (5) years.

2029. The length of ownership is utterly an arbitrary trigger point of the requirement.

2030. The language of SB913, states that an "[t]he bond shall be conditional that the obligor will comply with the provisions of this act including, but not limited to, building codes, administrative rules, and other relevant laws, and all rules and regulations made pursuant to this act and will pay all amounts of money that may be due to the state during the time such bond is in effect."

2031.  The bill's own language speaks to the supposed "legitimate, rational basis" of this law: the State's desire to make more money. If the State was truly concerned that medical marijuana licensees were not adhering to its regulations, it would not solely target commercial growers or out of state residents.

2032.  There is simply no justification under the rational basis test that saves this bill. *Gladstone v. Bartlesville Indep. Sch. Dist. No. 30,* 2003 OK 30, 66 P.3d 442 (upholding governmental tort immunity under rational basis test by finding the legitimate objective is to protect the public fisc [sic] by limiting recoverability for public wrongs, and the challenged exemption was rationally related to the objective).

2033.  The Equal Protection Clause stands to protect business owners from discriminatory, arbitrary, and capricious treatment. *State ex rel. Wood v. Gold/Blue 1988 Chevrolet,* 924 P.2d 792 (Okl.App.1996) ("It is well settled that a law that is 'invidiously discriminatory' and offensive to equal protection 'when it lays an unequal hand on those in the same class and same quality and not on another.'") (*Citing Kirk v. Bd of Cty. Comm'rs of Muskogee Co.,* 595 P.2d 1334, 1337 (Okla. 1979)).

2034.  SB913 arbitrarily creates different classes of medical marijuana businesses, not only between commercial growers and other types of medical marijuana businesses, but also within the class of commercial growers.

2035.  As detailed above, every other class of medical marijuana licensee is exempt from this surety bond requirement making it clearly invidiously discriminatory.

2036.  Plaintiff is entitled to declaratory judgment declaring that the surety bond requirement and the residency requirements are unconstitutional.

2037.  Plaintiff is entitled to injunctive relief ordering the OMMA and OBNDD Defendants NOT

to enforce the bond and residency requirements.

**B.4.    COUNT 4- Declaratory Judgment Holding the Agreement between Defendants State of Oklahoma, OMMA, OMES, and METRC, LLC violate Oklahoma law and are therefore Unenforceable.**

2038.    All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2039.    If the agreement between Metrc, LLC ("Metrc") and the Oklahoma Medical Marijuana Authority ("OMMA") requires businesses use only the proprietary tags of Metrc, the agreement mandates that Metrc provide those tags at no additional cost to the State of Oklahoma and no cost to medical marijuana patients.

2040.    Plaintiff holds a medical marijuana card in the State of Oklahoma, and as a patient, purchases medical marijuana products subject to the regulations and contracts at issue herein.

2041.    The costs of the Metrc tags, which the Defendants improperly require licensed businesses purchase, are passed along to consumers like Plaintiff.

2042.    Those passed on costs increase the costs of the products.

2043.    Oklahoma requires that even products which fall under federal hemp laws and regulations must contain a Metrc tag if grown by an Oklahoma medical marijuana business.

2044.    On September 18, 2020, the State of Oklahoma by and through the Office of Management and Enterprise Services ("OMES"), entered into an Agreement with Metrc in response to the Request for Proposal ("RFP") identified below for the purpose of providing a supplier-hosted cannabis inventory tracking system solution, also called 'seed-to-sale', to assist OMMA in monitoring the cannabis supply chain lifecycle statewide.

2045.    OMES/OMMA issued the Request for Proposal Solicitation No. 3400001663-REBID (hereinafter "RFP").

2046.   The RFP contains "Exhibit A" which identifies the specific deliverables required under the RFP. *See Id* at p. 5-6.

2047.   Section A.7 of Exhibit A to the RFP provides that the "Seed to Sale solution must fulfill each of the mandatory requirements set forth in this section." *See Id.*

2048.   Among those requirements, the RFP communicates the following MANDATORY requirements:

A.7.2 Track and trace all cannabis inventory in the state from seed to final sale to a patient or to its disposal (supply chain lifecycle) ...

A.7.5 Assign a unique global unique (sic) identifier at an enterprise level for every plant, product, or other tracked item. The upload process/processes must include assignment of global unique identifier if those items do not already have a unique Seed-to-Sale System Identifier....

A.7.6 The global unique identifier must remain tied to the tracked product throughout the supply chain lifecycle regardless of the system used by the licensed entity or the method used to update the record in the Seed to Sale Solution.

2049.   Additionally, the tag must remain tied to the tracked product. *Id.* at §A.7.6.

2050.   As such, if the Metrc tags are a deliverable under the RFP, the tags must be included and affixed during the existence of the product. Further, providing service to the underlying businesses clearly constitutes a deliverable under the language above.

2051.   Metrc must provide service both to the State of Oklahoma and business licensees for the service to function and must do so for the bid price.

2052.   The RFP issued by the State of Oklahoma provides additional language problematic to OMMA and Metrc's arguments that businesses must pay for the tags and monthly service fees in

addition to licensing fees to the OMMA. The Bidder Instructions note: **"THE STATE HAS
NO RESPONSIBILITY TO INDEPENDENTLY REVIEW AN ENTIRE BID FOR
EXCEPTIONS AND ANY EXCEPTION EMPODIED IN ANOTHER SECTION OF
THE BID OR IN A FORMAT OTHER THAN THE PROVIDED TABLE WILL
NOT BE CONSIDERED."** See Appendix at No. 4: Bidder Instructions at p. 8.

2053.   All of the facts and allegations laid out in this Complaint, including the Exhibits attached
hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2054.   The Bidder Instructions provide in Section Four that, "[a]ny requested **exceptions** or
**revisions** to terms associated with the Solicitation **shall be inserted** in this section using the
table provided at the end of these Bidder Instructions. *Id. at p.* 7 (emphasis added).

2055.   In Section Four: Requested Exceptions to Terms, Metrc, LLC stated, "Metrc LLC **does not have
any exceptions or revisions** to the terms associated with this Solicitation." *See* Appendix No.
5: Metrc Bid at p. 12 (bold emphasis added).

2056.   On April 14, 2020, Metrc, LLC submitted its Bid Response. The Final and Best Offer Sheet of
the Contract calls for OMMA to pay Metrc $5,000 in the first year of the contract.  In years 2-
10, OMMA is to pay Metrc $42,500 per year.  *See Id.* at p. 82.

2057.   In its Bid, Metrc lists its proprietary tags at the rate of $0.45 for each individual RFID plant tag
and $0.25 for each individual RFID package tag. *Id.* at p. 85.

2058.   Nothing in the RFP authorizes OMES/OMMA to contract for services rendered to business
licensees only.

2059.   Moreover, the RFP nor Bid are issued by, or executed by, any Oklahoma licensed medical
marijuana entities as they are not a party to the RFP or Metrc Bid.

2060.   Section J of the RFP allows a bidder responding to the RFP to propose value-added products

and services not included as a deliverable in the issued RFP, but it requires that bidders follow a simple procedure.

2061.  Section J provides, "[i]f a Bid includes an offer of value-added products and/or services, such offer shall be inserted in this section and include associated pricing and any other information relevant to such value-added offer.

2062.  However, the State is not obligated to purchase value-added products or services." *See* Appendix No. 3: RFP at p. 121.

2063.  Use of the word "State" reiterates that the relationship exists between the State of Oklahoma and the bidder, Metrc.

2064.  In Section J of the Metrc Bid, which mirrors Section J of the RFP, Metrc identifies the following value-added products and/or services: "Handheld Readers" and "Additional Development Work" as an "Offer of Value-Added Products and/or Services." *See* Appendix No. 5: Metrc Bid at p. 86-7.

2065.  Metrc DOES NOT list Metrc proprietary tags or its monthly service to businesses as a "Value-Added" product and/or service.

2066.  Attachment B to the RFP provides that, "[s]upplier may not add products or services to its offering under the Contract without the State's prior written approval. Such request may require a competitive bid of the additional products or services. If the need arises for goods or services outside the scope of the Contract, Supplier shall contact the State." *See* Appendix at No. 3: RFP at p. 12.

2067.  The RFP and resulting Metrc Bid specifically adopts and incorporates the Oklahoma Central Purchasing Act.

2068.  In the Final and Best Offer Sheet, Metrc stated an estimated average cost per Oklahoma

Licensee of $705.00 dollars per year for the plant and product tags.

2069. Section 9 of the RFP provides that, "Price proposed will be a **firm fixed price to accomplish completion of the deliverable."** *Id.* at p. 117. (emphasis added).

2070. While Metrc clearly states its pricing model is not a fixed price model, that does not matter as the term conflicts with the RFP requiring a fixed price bid.

2071. Metrc provided its bid knowing the State required a fixed price, but now Metrc, and strangely OMMA/OMES, want monthly service and tag fees paid to Metrc on top of the fixed price contained in the contract.

2072. The RFP states, "[t]he one-time costs associated with each deliverable for Metrc's implementation of our track-and-trace solution are included in the following table. "

2073. The Table lists six (6) deliverables, none of which are Metrc plant or package tags. *See* Appendix No. 3: RFP at p. 117.

2074. Under Annual Cost in the Metrc Bid, Metrc RFID tags are either not a part of the contract with Metrc, or they are included in the offering and deliverables to the State of Oklahoma pursuant to the bid.

2075. The Metrc Bid provides the relevant section of the RFP and Metrc's response to that section. Metrc provides:

> **I.Sec.9.ii:** The price proposed in response to this section must be a single, all-inclusive cost to include all applicable software licensing, software maintenance, hosting, help desk support, training, and reporting required by the solicitation specifications ... The all-inclusive annual cost to the OMMA for an Oklahoma-specific version of our track-and-trace system is $16,250 per quarter ($65,000 annually).

2076. Under the Overview section of the Statement of Work, Metrc states that it shall, "provide the OMMA with a track-and-trace system for Oklahoma's medical cannabis program within six months of the finalized contract." *See* Appendix No. 5: Metrc Bid at p. 38.

2077. As part of the Statement of Work, Metrc specifically agreed to provide "[a]n online portal for licensees to purchase physical RFID tags to act as the sole unique identifier for plants and products." *Id.*

2078. The State of Missouri considered issues nearly identical to those at issue here when Metrc tried the same tricks, and that case provides definitive guidance. *See* Appendix at No. 6: *Metrc, LLC v. Steelman,* 617 S.W.3d 472 (Mo. Ct. App. 2021).

2079. The Missouri Court rightfully rejected Metrc's argument that its tag and licensee service fees were required in the contract but not included in the pricing.

2080. The Court found:

> We conclude, after reading the contract as a whole, that Metrc's provision of proprietary RFID tags to the State and to industry participants was a necessary component of Metrc's seed-to-sale tracking solution, and that the amount Metrc expected to be paid for the RFID tags was required to be included within the firm, fixed price ...

2081. As a result, it was not legally erroneous for the trial court to conclude that the contract was unambiguous, and that its plain language prohibits Metrc from charging the State or industry participants for proprietary RFID tags beyond the firm, fixed price for its seed-to-sale tracking ... *Id.* at 484.

2082. Here, the Metrc tags and licensee service constitute a deliverable, and this Court should issue an Order finding such and directing OMMA/OMES to enforce its contract with Metrc and/or cease requiring use of the Metrc service by licensees.

2083. Plaintiff is entitled to declaratory judgment declaring that the contract entered into by the OMMA Defendants, OMES, and METRC, LLC violate Oklahoma law and are therefore invalid.

2084. Plaintiff is entitled to injunctive relief ordering the OMMA and OBNDD Defendants and OMES NOT to enforce the contract with Metrc, LLL.

**B.5.    COUNT 5- Metrc Tags, as required by the OMMA and OBNDD Defendants and the**

**Seven Percent (7%) excise tax imposed by Defendant State of Oklahoma constitute an unlawful tax and/or fee.**

2085.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2086.  Metrc is a for profit company; not a governmental entity and/or quasi-governmental entity.

2087.  Pursuant to 63 O.S. § 426(A), (SQ 788 Tax), the tax on retail medical marijuana sales will be established at seven percent (7%) of the gross amount received by the seller.

2088.  According to the original version of 63 O.S. § 426(B), "Tax proceeds will be applied primarily to finance the regulatory office." *See* 63 O.S. § 426 (Section 7, State Question 788, Initiative Petition 412, adopted at election held June 26, 2018).

2089.  The RFP/Metrc Bid, as applied by OMMA, violates Article JO, Section 5, Article 10, Section14, and Article JO, Section 19 of the Oklahoma Constitution.

2090.  If this Court interprets the Metrc Bid as a fixed price contract including tag fees and monthly licensee user fees inclusive of the bid price, the RFP/Bid may not run afoul of the Oklahoma Constitution and statutes.

2091.  However, any other conclusion leads to the conclusion Defendants OBNDD and OMMA's requirement that Oklahoma medical marijuana licensed businesses purchase the services and tags from Metrc violates Oklahoma law.

2092.  The Oklahoma Supreme Court, in considering when license fees become taxes, clearly noted the prevailing standard, and adopted the position that,

> The imposition of license fees as a condition to issuing a license when plainly intended as police regulations will be upheld if the revenue derived therefrom is not disproportionate to the cost of issuing the license and the regulation of the business licensed. Anything in excess of an amount which will defray such necessary expenses cannot be imposed under the police power alone, because it then becomes a revenue measure . . . In determining whether a fee required for a license is excessive or not, the expense or amount of regulatory provisions and the nature of

the subject of regulation should be considered, and, if the amount is wholly out of proportion to the expense involved, it will be declared a tax.

*City of Shawnee v. Reid Bros. Plumbing Co.,* 1949 OK 82, 19.

2093.  Here, Oklahoma law provides a seven percent (7%) excise tax to cover oversight. The RFP and Metrc Bid, as applied by OMMA presently, directs additional money paid by Oklahoma businesses to a private company, Metrc, LLC.

2094.  Page 84 of the Metrc Bid provides that, in order to reduce the burden on our client agencies as they implement cannabis policy and manage the challenges of comprehensively regulating a new industry, we invest the initial capital needed to get our seed-to-sale system functional.

2095.  Metrc further states, "Metrc recoups this initial investment and supports future system improvements by charging each cannabis business license a reporting fee of $40 per month alongside the cost of RFID tracking tags: $0.45 for each plant tag and $0.25 for each package tag." *Id.* at p. 85.

2096.  By its own terms, the Metrc Contract acts as a way for the OMMA to fund its activities because Metrc fronts the initial costs and recoups the costs and profits on the back end. Instead of the excess tax revenue going to the State of Oklahoma, it goes to Metrc.

2097.  The Oklahoma Constitution provides, "the power of taxation shall never be surrendered, suspended, or contracted away." Okla. Const. Art. 10, §5(A). The way OMMA mandates businesses pay Metrc monthly fees and buy Metrc tags, surrenders the power to tax to Metrc. Metrc sets the prices.

2098.  That delegation of power to a private company runs afoul of Okla. Const. Art. 10, §5(A), and as such, the Metrc Bid, as enforced, must be declared unconstitutional.

2099.  The Oklahoma constitution further provides that, "[t]axes shall be uniform upon the same

class of subjects." Okla. Const. Art. 10, §5(B).

2100.  Metrc clears up any confusion about whether they violate this provision when they note, "[t]he industry fees are very affordable and, by design, are proportionate with a licensee's size." *See* Appendix at No. 5: Metrc Bid at 85.

2101.  Something proportionate to license size cannot simultaneously be "uniform" as required.

2102.  The Oklahoma Supreme Court held, "these provisions express an unmistakable constitutional policy disfavoring special exemptions from taxation and favoring uniformity of taxation, such that all citizens help shoulder the financial burden of supporting our state government." *Oklahoma Automobile Dealers Association v. State ex rel. Oklahoma Tax Commission,* 401 P.3d 1152, 2017 OK 64.

2103.  Even if we granted an argument that the class is justifiably limited to only medical marijuana business licensees, each member of that class receives different treatment.

2104.  Even in a limited class, the $0.45 Metrc tags are for plant tags only, and those are only created by licensed growers.

2105.  Growers pay a disproportionate tax of $0.45 for tags, when all other members of the same class pay either no tax, or a lesser tax.

2106.  The package tags of $0.25 from Metrc apply to processed goods and packaged flower.

2107.  Dispensaries, laboratories, research facilities, and waste facilities generally only deal with already tagged products, so they may purchase no tags. As such, the Metrc tags, as applied in every situation, are not uniform.

2108.  The Oklahoma Constitution further limits the power to tax and mandates that, "taxes shall be levied and collected by general laws, and for public purposes only." Art. 10, Sec. 14.

2109.  The Oklahoma Legislature passed no law, let alone a general law, authorizing these

compelled payments to Metrc.

2110.  Additionally, even if it did, such would be invalid because, since the money goes to a private company, Metrc, the command would clearly not constitute a "public purpose only."

*Id.*

2111.  OMMA, despite not possessing a single grant of power from the Legislature to tax or impose fees, adopted rule, 442:10-5-1.1 requiring that:

> Upon acceptance of the license issued by the Authority the licensee shall "Bear the financial responsibility for all compliance and inventory tracking obligations and responsibilities set forth in Oklahoma statutes and these Rules. The Authority will not contribute to, fund, or subsidize any commercial licensee's compliance or tracking expenses. Nothing herein shall be construed to require the Authority to contribute to, subsidize, or fund in any way a commercial licensee's compliance or tracking expenses.

2112.  This directive from Defendants OBNDD and OMMA constitutes a tax.

2113.  The Oklahoma Constitution requires that, "All bills for raising revenue shall originate in the House of Representatives." Art. 5, Sec. 33(A).

2114.  Additionally, "No revenue bill shall be passed during the five last days of session." Finally, to become effective, a new tax bill that originated in the Oklahoma House of Representatives and passed at least five (5) days before end of Session must also either be referred to the people pursuant to Sec. 33(0) or must pass both the Oklahoma House and Oklahoma Senate with¾ majorities in each chamber.

2115.  Additionally, a tax bill can only become effective ninety days "after it has been approved by the Legislature and acted on by the Governor." *Id.*

2116.  None of those powers were granted to OMMA/OMES, and as such, their passing along costs to licensees cannot stand.

2117.  In 2017, the Oklahoma Legislature faced a budget crisis.

2118. In order to, among other things, bring the budget in balance, the Legislature passed the Smoking Cessation and Prevention Act of 2017. *Naifeh v. State ex rel. Okla. Tax Comm'n.,* 2017 OK 63, 111-7 (hereinafter referred to as the "Smoking Act").

2119. The Smoking Act imposed a "$1.50 per-pack assessment as a 'smoking cessation fee' rather than a tax ...." *Id.* at 17.

2120. The purported purpose of the Smoking Act was reducing the incidence of smoking by increasing its cost. *Id.*

2121. In *Naifeh,* the Oklahoma Supreme Court reiterated an important policy at play in this matter, and that is, "[o]ur Constitution grants to the Legislature the power to legislate on any 'rightful subject.'

2122. Thus, '[e]xcept where it encounters a specific constitutional [provision] prohibiti[ng]' it from taking a particular action, 'the Legislature has the right and the responsibility to declare the fiscal policy of Oklahoma." *Id.* at 111.

2123. In discussing State Question 640, the *Naifeh* Court noted it was opposed by many then serving in the Legislature, but the amendment was widely regarded as a decision by the people of Oklahoma to greatly limit the Legislature's ability to enact new taxes.

2124. The people of Oklahoma approved the measure at special election, modifying Section 33 so that it now also contains the nation's most stringent legislative super-majority requirement, mandating that revenue bills either be approved by the people or by three-fourths of the Legislature. *Id.* at 113.

2125. The analysis in *Naifeh* establishes that, as applied and enforced by OMMA, the requirement to purchase and use Metrc tags and services is tantamount to a revenue bill and tax.

2126. In *Naifeh,* the Court noted that revenue bills are those "bills for raising revenue" and includes not only those whose "principal object is the raising of revenue" and whether it 'lev[ies] taxes

in the strict sense of the word.'" *Id.* at 121.

2127. In examining a revenue bill, "a measure's purpose must be measured by its actual operation and effect, rather than by any legislator's statements as to what motivated his or her vote for the measure."

2128. Oklahoma decisions require that we look to "'what the legislation actually accomplishes ... and no[t] what a legislature states it is accomplishing."

2129. Here we are looking at a contract, not legislation, but the same logic applies.

2130. The Legislature did not authorize the OMMA/OMES to enter into a contract passing costs on to end users.

2131. By passing along the costs to the end users, the OMMA and OMES taxed Oklahoma licensees, and Metrc reaps the profits.

2132. Additionally, the Citizens of the State of Oklahoma did not approve the seven (7) percent excise taxes now imposed by the State of Oklahoma.

2133. Additionally, regarding any argument that the tag fees and monthly fees are merely regulatory and not a tax, the *Naifeh* case destroys that argument as well.

2134. The Court found: And because the revenue to be collected is so substantial ... those revenues make up a significant part of the measure's actual effect.

2135. The State argues that the revenues will be put to the "regulatory" use of offsetting the financial burdens that smoking imposes on the State.

2136. This argument fails both as a matter of law and fact. First, all government spending is "regulatory" in some sense, in that the machinery of state government is all the creation of one regulatory scheme or another.

2137. Thus, to describe spending designed to pay for the operation of state government as

"regulatory" is merely to describe state government taxing and spending ...

2138. Thus, while SB 845 contains certain provisions that can be characterized as regulatory, those provisions either impose no new obligations, merely amplify existing regulatory language, or codify already-in-effect state policies. *Id.* at1133-34.

2139. OMMA contracted with a company called NCS to analyze all the data it receives from Metrc.

2140. At present OMMA/OMES and Metrc pass along to businesses a $40.00 per month fee paid by each business equating to $451,600.00 per month, or $5,419,200.00 per year, paid to Metrc by OMMA licensees.

2141. Metrc also charges $0.45 per plant tag and $0.25 per package tag.

2142. Using the same NCS data provided by OMMA, there are presently 6,404,921 live plants in Oklahoma. *See* Appendix No. 2.1: NCS Plants Data.

2143. That equates to $2,882,214.45 paid to Metrc just on plants alive at the time of this filing. Tags, by Metrc's rule, cannot be reused.

2144. As the Court did in *Naifeh,* this Court too should conclude that,

> Surely the people did not intend that the Legislature could blatantly tax them without complying with Article V, Section 33, by merely wordsmithing their bills to describe some "regulatory" purpose for the tax. Thus, we reiterate that whether a measure is "intended to raise revenue" must be the overarching consideration in determining whether a measure is a "revenue bill." If so, the Legislature must either muster enough votes to satisfy Article V, Section 33, or submit the measure to the people for their approval.

> *Naifeh v. State ex rel. Okla. Tax Comm'n.,* 2017 OK 63,142.

2145. If OMES/OMMA/METRC can do what they have in this matter, they possess more power than the Oklahoma Legislature and Governor combined.

2146. That would mean Defendants OMES, OBNDD and OMMA, themselves, can create policy, impose taxes, and compel their collection, all without following any of the limitations placed on the Legislature.

2147. Plaintiff is entitled to declaratory judgment declaring that taxes and fees outlined above are unconstitutional and violate Oklahoma law.

2148. Plaintiff is entitled to declaratory judgment declaring that the taxes and fees outlined above violate the United States Constitution as such represents taxation without representation as the public does not have any voice with the OMMA and OBNDD Defendants and/or Defendants OMES or Metrc, LLC.

2149. Plaintiff is entitled to declaratory judgment declaring that the taxes and fees collected by Defendants, as outlined above, are ill gotten gains, and should be returned to those who were wrongfully compelled to purchase products, pay fees, or pay taxes, including all Oklahoma medical marijuana businesses and Oklahoma medical marijuana patients.

2150. Plaintiff is entitled to injunctive relief ordering the OMMA and OBNDD Defendants and Defendant OMES and Metrc, LLC NOT to enforce and/or collect the fees and taxes outlined above.

2151. Plaintiff is entitled to injunctive relief ordering the OMMA and OBNDD Defendants and Defendant OMES and Metrc, LLC NOT to enforce and/or collect the fees and taxes outlined above.

2152. Plaintiff is entitled to injunctive relief compelling Defendants return to the people all ill-gotten games collected pursuant to the illegal schemes outlined herein.

**B.6    COUNT 6- Declaratory Judgment: The OMMA Requirement to Use Metrc Tags Violates the Oklahoma Central Purchasing Act.**

2153. In addition to the above, Defendants OMES, OBNDD and OMMA's requirements that businesses purchase only from Metrc violate the Oklahoma Central Purchasing Act.

2154. The Oklahoma Central Purchasing Act governs all state purchasing unless specifically excluded. 74 O.S. §§ 85.1 *et seq.*

2155. Nothing justifies the exclusion of the Metrc Bid from the Oklahoma Central Purchasing Act.

2156. The Purchasing Act creates the Office of Management and Enterprise Services (hereinafter "OMES") headed by the State Purchasing Director who is hired by the Director of OMES. 74 O.S. § 85.3(A).

2157. Title 74, Section 85.5 enumerates a broad and lengthy list of powers and duties assigned to the State Purchasing Director.

2158. Despite the generously broad grant of authority, notably missing from the Purchasing Act is any grant of authority to the State Purchasing Director to execute a contract on behalf of the State of Oklahoma which in turn requires private businesses in the State of Oklahoma to purchase exclusively from that State vendor.

2159. Nothing in § 85.5 grants the Purchasing Director authority to command any private citizen to perform any act.

2160. The OMMA requirements also violate the Oklahoma Central Purchasing Act because they require businesses to pay up-front for the Metrc service and proprietary tags and shipping costs before Metrc will send them.

2161. Section 85.44B of Title 74 clearly prohibits such advance payments providing, "[p]ayment for products or services pursuant to a contract executed by a state agency, whether or not such state agency is subject to the Oklahoma Central Purchasing Act shall be made only after products or services have been accepted as satisfactory."

2162. The Metrc Bid violates Section 85.44B(A) because it requires the tags be paid for in advance by the end user.

2163. Based on the foregoing, OMES/OMMA were legally precluded from executing a contract requiring up-front payment, regardless of whether it was on their behalf, or as they might allege, on the behalf of the third-party business entities.

2164. As such, this Court may properly issue emergency relief ordering OMMA to stop enforcing the Metrc Bid against Oklahoma businesses.

2165. Plaintiff is entitled to declaratory judgment declaring that the taxes and fees collected by Defendants, as outlined above, violate the Oklahoma Central Purchasing Act.

2166. Plaintiff is entitled to injunctive relief ordering Defendants NOT to enforce and/or collect the fees and taxes outlined above.

2167. Plaintiff is entitled to injunctive relief ordering Defendants to disgorge themselves of all monies collected in violation of the Oklahoma Central Purchasing Act.

**B.7    COUNT 7- Tortious Interference with Contractual relations (against Defendants Jack Mattingly, Metrc, LLC, MJBIZ CON, LLC, Las Vegas Convention Center, and John Does 1 &2) (collectively the Metrc Defendants).**

2168. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2169. Defendant Jack Mattingly, working on behalf of Metrc, LLC filed a complaint with Defendant OBA against Plaintiff.

2170. The complaint filed by Defendant Mattingly contains numerous false statements about Plaintiff, and Mattingly made said statements with the intention of defaming Plaintiff.

2171. The actions of Defendant Mattingly did cause Plaintiff damage including reputational harm and resulted in his interim suspension by the Oklahoma Bar Association.

2172. Defendant Mattingly worked for Defendant Metrc, LLC at the time of the false statements, and said statements and complaint were made against Plaintiff to silence him from brining the above referenced claims against Metrc, LLC.

2173. Plaintiff purchased a booth at the 2023 MJ Biz Con in Las Vegas intending to put up a booth to promote his business and bring awareness to the issues addressed herein related to Defendant Metrc, LLC.

2174. Defendants Mattingly and Metrc, LLC, upon learning that Plaintiff reserved and paid for a booth, contacted Defendant MJ Biz Con, LLC to interfere with Plaintiff's contract with Defendants Imagiccom Communications, LLC and INSP, LLC d/b/a MJ Bix Con (hereinafter "MJ Biz Con").

2175. Defendants Mattingly and Metrc succeeded in interfering with his contract with MJ Biz Con, LLC, and in doing so, Plaintiff was prohibited from attending MJ Biz Con, LLC, and his booth was cancelled.

2176. Plaintiff suffered substantial economic losses because of the actions of the Defendants, including costs of the booth, booth materials, plane tickets, hotel rooms, employee costs, and opportunity costs.

2177. Additionally, their actions cost Plaintiff to lose a consulting client paying Plaintiff more than $10,000.00 per month when Plaintiff was barred from entering MJ Biz Con, LLC.

2178. Two security guards, representing themselves as police despite not being, ordered Plaintiff out of the public portions of the Las Vegas Convention center despite having no legal authority to do so.

2179. The Defendant John Does 1 & 2 were acting on behalf of Defendants Mattingly, Metrc, LLC, MJ Biz Con, LLC, and the Las Vegas Convention Center.

2180. The Defendant Security Guards stalked and followed Plaintiff and interfered with his right to occupy public sidewalks of the premises to protest Defendants MJ Biz Con, LLC and Metrc, LLC.

2181. After two (2) days of being denied his right to occupy a public sidewalk, Plaintiff called the Las Vegas Police Department, who responded and informed the Metrc Defendants that the sidewalk was public, and as such, they improperly ordered Plaintiff removed from it for engaging in protected 1st Amendment Activities.

2182. Each of the Metrc Defendants are jointly and severally liable for the actions of the other Metrc Defendants related to the actions addressed in this section.

2183. As a result of the tortious interference by the Metrc Defendants with Plaintiff's contracts, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2184. The actions and inactions of the Metrc Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

2185. Wherefore, Plaintiff requests this Court enter judgment against the Metrc Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.8   COUNT 8- Declaratory Judgment, Injunctive Relief, and Monetary Damages arising out of passage and enactment of Oklahoma SB 15x (2023) (against Defendants State of Oklahoma and Oklahoma Bureau of Narcotics and Dangerous Drugs).**

2186. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2187. Petitioner is a resident of the State of Oklahoma and holds a patient license issued by the Oklahoma Medical Marijuana Authority.

2188. The Oklahoma Bureau of Narcotics and Dangerous Drugs Control License ("OBNDD") is a law enforcement agency in the State of Oklahoma, and as part of that, it issues licenses to Oklahoma businesses and individuals related to controlled drugs in the State of Oklahoma.

2189. All OBNDD licenses expire October 31st of each year requiring licensees to renew every year.

2190. SB15x became law without the Governor's signature on June 2, 2023.

2191. SB15x increases the OBNDD annual licensing fee from $500.00 per annum to $2,500.00 per annum.

2192. SB15x adds no other directives, enforcement authority, oversight responsibility, or other enforcement endeavors which OBNDD must undertake justifying a $2,000.00 annual license fee increase to cover those newly assigned regulatory operations.

2193. The fee increase applies to thousands of Oklahoma licensed businesses.

2194. The OBNDD "license fee" increase results in OBNDD receiving $28,225,000.00 from licensees instead of the $5,645,00 they would have received before the passage of SB15x.

2195. An annualized increase in funding for the OBNDD of $22,571,00.00 constitutes a tax under Oklahoma law.

2196. The fees authorized by SB15x violate Art. V, § 33 of the Oklahoma Constitution.

2197. For over a century, this Court has held that if a bill's overarching purpose is to fill state coffers with money, and it levies a tax for a public purpose, it is a "bill for raising revenue" subject to Art. V, § 33.

2198. After the people of Oklahoma strengthened Art. V, § 33 even further by passing State Question 640 in 1992, a revenue-raising bill cannot become law unless it (1) originates in the House; (2) is passed before the last five days of the legislative session; and (3) is approved either by a 3/4 supermajority of legislators or a majority of voters in a referendum.

2199. For decades, those restrictions barred tax increases lacking the requisite legislative or popular support.

2200. SB15x constitutes a tax. It is a quintessential "bill for raising revenue" that must clear Art. V, § 33 hurdles.

2201. SB15x looks and acts like a licensing fee, but it requires business owners to pay an additional $2,000 per year in registration fees on top of the prior amount of $500 per annum.

2202. This Court should reject the dangerous fiction that a tax is not a "bill to raise revenue" if the
Legislature labels the tax a "fee."

2203. For decades, the Oklahoma Supreme Court carefully distinguished between taxes (which
primarily aim to raise revenue) and fees (which only raise revenue incidentally, by charging
regulated parties' money in exchange for state benefits).

2204. If SB15x stands, any tax increase can evade constitutional prerequisites for tax hikes if
legislators employ verbal hocus-pocus to enact it as a "fee."

2205. Allowing SB15x to remain also incentivizes the precise ills Art. V, § 33 was designed to
prevent: putting off difficult budget issues to the session's final days and ramming through
poorly conceived, patchwork revenue bills.

2206. This Court should declare unlawful unconstitutional bills and award other appropriate relief.
*E.g., Fent P. Contingency Rev. Bd.,* 2007 OK 27, 163 P.3d 512.

2207. This Court should likewise declare SB15x unconstitutional and prohibit its enforcement.

2208. This Court should enjoin enforcement of SB15x.

2209. The public has a clear interest in not being subjected to an unconstitutional law.

2210. Further, there is a pressing need for an early decision declaring SB15x void.

2211. As the Oklahoma Supreme Court explained, a law is a revenue-raising bill under Art. V, §
33 as long as its "principal object is the raising of revenue," and it "lev[ies] taxes in the strict
sense of the word." *Id* (quoting *Calvey v. Daxon,* 2000 OK 17, 14,997 P.2d 164, 170).

2212. SB15x fits this description perfectly as its only object was to raise revenue.

2213. SB 1 5x imposes a new $2,500 "registration fee" to manufacturers of "any controlled
dangerous substances" without explaining the justification for the increase from the original
$500 annual fee.

2214. The Oklahoma Senate issued this $2,500 "fee" to manufacturers, while Practitioners, mid-level Practitioners, Home Care Agencies, Hospices, and Home Care Services pay only $140 "registration fees," and Medical Facility Owners and distributors pay only a $300 "fee."

2215. Notably, these are annual, nonrefundable "registration fees."

2216. In short, SB15x is wrongfully gouging Oklahoma businesses of revenue and masking it with a Bill and calling it a "registration fee."

2217. The costs of these fees are passed on to Oklahoma citizens, including Plaintiff.

2218. SB15x strongly resembles HB 2437 (2010), a bill exacting "access payments," which was designed to raise $78 million in revenue by taking money from health carriers.

2219. Despite HB 2437's nomenclature, the Oklahoma Supreme Court had no difficulty exercising original jurisdiction, summarily declaring that bill an improper revenue-raising bill invalid under Art. V, § 33, and enjoining its enforcement." *Naifeh v. State ex rel. Oklahoma Tax Commission*, 2017 OK 63, 400 P.3d 759.

2220. Further confirming that SB15x's primary aim is raising revenue, its $2,000 increase bears no resemblance to "true fees, under which revenue may incidentally arise." *Leveridge v. Okla. Tax Comm'n,* 1956 OK 77, 8, 294 P.2d 809, 811. As explained:

> 1.    Fees produce incidental revenues because they involve the payment of money in exchange for a governmental service or benefit, usually as part of a broader regulatory program. Similarly, fees exacted as part of a comprehensive regulatory scheme only raise revenue incidentally because the money exacted from regulated parties lets them continue operating their businesses in exchange for dedicating money to a specific regulatory aim. Thus, the primary purpose of a tax or license fee exacted from transportation companies using Oklahoma public highways was not to raise revenues. *Ex Parte Sales,* 1924 OK 668, 233 P. 186, 187; *see Ex parte Tindall,* 1924 OK 669, 229 P. 125, 126. Rather, the payment was part of a comprehensive scheme to prevent transportation companies from "appropriat[ing] the public highways to their own free use," and reflected the Legislature's judgment that private companies should pay a fee in exchange for the benefit of using public property. *Sales,* 1924 OK 668, 233 P. at 187. And the revenues went directly to "the maintenance of the public highways," which had been deteriorating due to transportation companies' monopolization of the roads.

*Naifeh v. State ex rel. Oklahoma Tax Commission,* 2017 OK 63, 400 P.3d 759, *Tindall,* 1924 OK 669,229 P. at 130.

2221.  By contrast, SB15x is exactly the kind of misbranded "fee" that this Court previously considered a tax. *Way v. Grand Lake Ass'n, Inc.,* 1981 OK 70, 11 36,635 P.2d 1010, 1016; *Naifeh v. State ex rel. Oklahoma Tax Commission,* 2017 OK 63,400 P.3d 759.

2222.  SB15x compels business owners to pay the OBNDD $2,000.00 more per year.

2223.  SB15x thus assesses a new burden on an entire class of taxpayers: all medical marijuana business owners pay more.

2224.  SB15x provides public revenue the same as a tax: but instead of its fees going to the Treasury, they go directly to the OBNDD.

2225.  The stakes of this case for the public cannot be overstated.

2226.  Absent this Court's intervention, the State's view of Art. V, § 33 could nullify every procedural protection against taxation that Oklahomans enshrined in the Constitution and reinforced through the ballot in approving State Question 640.

2227.  The Oklahoma Supreme Court stressed that "[t]he right of the initiative is precious, and it is one which this Court is zealous to preserve to the fullest measure of the spirit and the letter of the law." *In re Initiative Petition No. 382,* 2006 OK 45, 3, 142 P.3d 400,403.

2228.  If SB15x survives, the Oklahoma Legislature could defy Art. V, § 33's strict procedural hurdles simply by rebranding the bill as a policy-driven "fee."

2229.  If a Medical Marijuana business tax can become a "registration fee," "nothing stops an alcohol tax from becoming an "inebriation cessation fee" to stop drunk driving, or an excise tax on restaurant meals from masquerading as an "opulence cessation fee" to cover the rising state health-care costs of obesity-related diseases.

2230.  In short, under the State's view, State Question 640 did not transform Art. V, § 33 into the nation's

strictest constitutional limitations on new taxes. All that amendment would do is penalize any legislators unwilling to engage in semantic tomfoolery." *Naifeh v. State ex rel. Oklahoma Tax Commission,* 2017 OK 63,400 P.3d 759.

2231. The Oklahoma Supreme Court described Art. V, § 33 as a provision with teeth when it envisioned that State Question 640 would "impose severe limitations upon the Legislature's ability to raise new revenue" and would "impact significantly the governmental framework of the state and perhaps, not without difficulty and frustration given limited resources." *Id.   (In re Initiative Petition No. 348,* 1991 OK 1101, 820, P.2d 772, 774, 781).

2232. The Oklahoma Supreme Court had no trouble looking behind labels to invalidate an "access payment" as an unconstitutional tax under Art. V, § 33, and this Court should have no such trouble here. *Id. See also, Holland,* 2010 OK 60,240 P.3d 665.

2233. Based on the foregoing, this Court should issue emergency relief ordering the State of Oklahoma to stop enforcing unconstitutional laws and collecting improper taxes.

2234. Plaintiff is entitled to declaratory judgment declaring that the taxes and fees collected by Defendants, as outlined above, violate the Oklahoma Constitution.

2235. Plaintiff is entitled to injunctive relief ordering Defendants NOT to enforce and/or collect the fees and taxes outlined above.

2236. Plaintiff is entitled to injunctive relief ordering Defendants to disgorge themselves of all monies collected in violation of Oklahoma law.

2237. As a result of the improper taxation identified herein, Plaintiff and Oklahoma residents suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2238. Wherefore, Plaintiff requests this Court enter judgment against the Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00) and ordering the State of Oklahoma to return to the citizens of the State of Oklahoma all improperly collected taxes.

**B.9 COUNT 9- Violation of the Americans with Disability Act and Plaintiff's Civil Rights- 42 U.S.C. §§ 1983, 1988 (against Defendant OMMA and the Metrc Defendants).**

2239. Defendant OMMA violated the Americans with Disability Act and Plaintiff's civil rights by its actions identified herein.

2240. The Metrc Defendants, specifically Defendants Las Vegas Convention Center and John Does 1 & 2 enforce the laws, policies, practices and customs related to the public's access of the Law Vegas Convention Center, and they do so under color of state law to the detriment of Plaintiff and those similarly situated.

2241. As a result of Metrc Defendants' violation of Plaintiff's rights under the United States Constitution and 42 U.S.C. § 1983, caused by his improper removal of Plaintiff from the Las Vegas Convention Center, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2242. The Metrc Defendants are jointly and severally liable for the actions and/or inactions of the other Metrc Defendants which resulted in the violation of Plaintiff's constitutional rights.

2243. The actions and inactions of the OMMA and other Metrc Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

2244. Wherefore, Plaintiff requests that this Court enter judgment against all Metrc Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.10 COUNT 10- Violation of the 1st Amendment (against the Metrc Defendants)**

2245. Metrc Defendants' current rules and procedures related to access to the Las Vegas Convention Center violate Plaintiff and others 1st Amendment Rights.

2246. The Metrc Defendants laws, policies, procedures and customs are insufficient to ensure individuals are not improperly deprived of their right to bear arms.

2247. The unconstitutional policies and practices of the Metrc Defendants related to the deprivation of Plaintiff's rights were done under color of state law.

2248. The Metrc Defendants' violation of Plaintiff's rights under the 1st Amendment of the United States Constitution and 42 U.S.C. § 1983, caused Plaintiff to suffer economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2249. The Metrc Defendants are jointly and severally liable for the actions and/or inactions of the other Defendants which violated Plaintiff's right to bear arms.

2250. The actions and inactions of the Metrc Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

2251. Wherefore, Plaintiff requests that this Court enter judgment against the Metrc Defendants, jointly and severally, in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.11 COUNT 11- Negligence, Gross Negligence, and Negligence Per Se (against the Metrc Defendants).**

2252. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2253. The actions and/or inactions of the Metrc Defendants as fully laid out herein, constitute negligence, gross negligence, and negligence per se.

2254. The Metrc Defendants conspired together, as outlined herein, to deprive Plaintiff of his rights and caused him substantial damages.

2255. The Metrc Defendants actions against Plaintiff were done because of Plaintiff exposing the wrongdoing of Defendant Metrc, LLC and Defendant MJ Biz Con, LLC.

2256. As a result of the Metrc Defendants' negligence, gross negligence, and negligence per se, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2257. The Metrc Defendants are jointly and severally liable for the actions and/or inactions of the other Metrc Defendants.

2258. The actions and inactions of the Metrc Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

2259. Wherefore, Plaintiff requests that this Court enter judgment against the Metrc Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.12.  COUNT 12- Abuse of Process (against Metrc Defendants)**

2260. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2261. Defendants Jack Mattingly improperly used the attorney complaint system in Oklahoma by making false statements against Plaintiff for the purpose of impacting Plaintiff's ability to work as an attorney and bring cases on behalf of clients against his client, Defendant Metrc, LLC.

2262. Defendant Mattingly used the laws of the State of Oklahoma and the processes of the courts of the state of Oklahoma for an improper purpose and in abuse of the Court's processes.

2263. All Metrc Defendants are jointly and severally liable of the actions of Defendant Mattingly, and such actions by Mattingley were done at the direction and with the consent of the other Metrc Defendants.

2264. The Metrc Defendants worked in concert with the actions of the others to cause Plaintiff damages.

2265. Plaintiff, due to the actions of the Defendants, experienced great emotional pain and suffering and continues to suffer from such due to the pending contempt charges against him.

2266. At all times relevant to the facts in this matter, all of the individual Metrc Defendants were acting within the scope and course of their employment to try and prevent Plaintiff from exposing their wrongdoing.

2267. As a result of the Metrc Defendants' abuse of process, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2268. The actions and inactions of the Metrc Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

2269. Wherefore, Plaintiff requests this Court enter judgment against the Metrc Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.13 COUNT 13- Negligent Hiring and Supervision of Individual Defendants (against OMMA, OBNDD and Metrc Defendants).**

2270. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2271. Defendants OMMA and OBNDD are responsible for the actions and/or inactions of their employees identified herein.

2272. Defendant Metrc, LLC, controlled and/or managed the employed individual Defendant Jack Mattingly.

2273. Defendant Las Vegas Convention Center controlled and/or managed the employed

individuals John Does 1 & 2.

2274. The Metrc Defendants conspired with one another to deprive Plaintiff of his rights.

2275. Oklahoma recognizes a tort for the negligent hiring and supervision of employees.

2276. The acts and/or omissions, singularly or in any combination thereof, rise to the level of negligent hiring, retention, and/or supervision of the individual Metrc Defendants by the Metrc Defendants.

2277. The OMMA, OBNDD, and Metrc Defendants acts and/or omissions, when viewed objectively, involved an extreme and/or unnecessary degree of risk considering the probability and/or magnitude of harm to others.

2278. The OMMA, OBNDD, and Metrc Defendants had actual and/or subjective awareness of the risk involved in hiring and retaining the individual Metrc Defendants, but nevertheless proceeded with conscious indifference to the rights, safety and welfare of others when they hired and retained them.

2279. Therefore, the OMMA, OBNDD, and Metrc Defendants are liable for the negligent hiring, retention, and/or supervision of the individual Defendants, and Plaintiff is entitled to recover against OMMA, OBNDD, and Metrc Defendants for all damages he sustained as a result of the acts and/or omissions of the individual Defendants.

2280. As a result of the negligent hiring and supervision, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2281. The negligent hiring and supervision practices by the Metrc Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

2282. Wherefore, Plaintiff requests this Court enter judgment against all Metrc Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.14 Count 14- Respondent Superior (Against the Metrc Defendants)**

2283. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2284. At the time of the incident, the individual Metrc Defendants were employees, agents, and/or servants of the corporate Metrc Defendants, and the individual Metrc Defendants were acting within the course and scope of their employment at the time of the incidents at issue in this matter.

2285. As such, the corporate Metrc Defendants are jointly and severally responsible for the conduct of the individual Metrc Defendants under the doctrine of *respondeat superior* due to the master-servant relationship which existed at the time of the incident at issue in this matter.

2286. The actions the Metrc Defendants warrant the imposition of punitive damages in this matter.

2287. Wherefore, Plaintiff requests this Court enter judgment against the Metrc Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.15 Count 15- Damages, Declaratory Judgment, and Injunctive Relief against Defendants Mattingly and Metrc, LLC for their violation of Oklahoma Antitrust Laws**

2288. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2289. The actions of Defendants Jack Mattingly and Metrc, LLC constitute a contract, combination or conspiracy in restraint of trade in violation of 79 Okla. Stat. § 203.

2290. Plaintiff requests that this Court enter judgment declaring that the actions of Defendants Metrc, LLC and Jack Mattingly constitute monopolistic practices and enjoining Defendants from engaging in similar behavior in the future.

2291. As a result of the improper restraint of trade by the Defendants, Plaintiff and similarly situated persons and businesses suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2292. The restraint of trade intentionally caused by the Metrc Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

2293. Wherefore, Plaintiff requests this Court enter judgment against Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.16 Count 16- Damages, Declaratory Judgment, and Injunctive Relief against Defendants Mattingly and Metrc, LLC for their violation of the Oklahoma Consumer Protection Act.**

2294. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2295. Defendants Jack Mattingly and Metrc, LLC engaged in unfair and deceptive trade practices by mandating the purchase of overpriced proprietary RFID tags, violating 15 Okla. Stat § 752.

2296. Plaintiff requests this Court enter judgment declaring that the actions of Defendants Metrc, LLC and Jack Mattingly constitute unfair and deceptive trade practices and enjoining Defendants from engaging in similar behavior in the future.

2297. As a result of the improper restraint of trade by the Defendants, Plaintiff and similarly situated persons and businesses suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2298. The unfair and deceptive trade practices by the Metrc Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

2299. Wherefore, Plaintiff requests this Court enter judgment against the Metrc Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.17    Count 17- Damages, Declaratory Judgment, and Injunctive Relief against Defendants Mattingly and Metrc, LLC for their violation of the Sherman Antitrust Act.**

2300. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2301. The actions of Defendants Mattingly and Metrc, LLC constitute an unlawful restraint of trade and an attempt to monopolize the market for cannabis RFID tags in the medical marijuana and hemp industries violating 12 U.S.C §§ 1 and 2.

2302. Plaintiff requests that this Court enter judgment declaring that the actions of Defendants Metrc, LLC and Jack Mattingly constitute monopolistic practice violate the Sherman Antitrust Act and enjoining Defendants from engaging in similar behavior in the future.

2303. As a result of the violation of the Sherman Antitrust Act by the Defendants, Plaintiff and similarly situated persons and businesses suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2304. Violation of the Sherman Antitrust Act by the Metrc Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

2305. Wherefore, Plaintiff requests this Court enter judgment against the Metrc Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.18 Count 18- Damages, Declaratory Judgment, and Injunctive Relief against Defendants Mattingly and Metrc, LLC for their violation of the Clayton Act.**

2306. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2307. The actions of Defendants Mattingly and Metrc, LLC constitute exclusive dealing arrangements which substantially lessen competition and tend to create a monopoly in the RFID tag market for medical marijuana and hemp in the United States in violation of 12 U.S.C. § 14.

2308. Plaintiff requests this Court enter judgment declaring that the actions of Defendants Metrc, LLC and Jack Mattingly constitute monopolistic practices violating the Clayton Act and enjoining Defendants from engaging in similar behavior in the future.

2309. As a result of the violation of the Clayton Act by the Defendants, Plaintiff and similarly situated persons and businesses suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2310. Violation of the Clayton Act by Metrc Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

2311. Wherefore, Plaintiff requests this Court enter judgment against Metrc Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.19 Count 19- Unjust Enrichment against Defendants Mattingly and Metrc, LLC.**

2312. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2313. The actions of Defendants Jack Mattingly and Metrc, LLC constitute an unjust enrichment for Defendant Metrc, LLC.

2314. Equity and good conscience require restitution to Plaintiff and similarly situated persons.

2315. Plaintiff requests that this Court enter judgment declaring that the actions of Defendants Metrc, LLC and Jack Mattingly constituted unjust enrichment and enjoining Defendants from engaging in similar behavior in the future.

2316. As a result of the unjust enrichment of Defendant Metrc, LLC, Plaintiff and similarly situated persons and businesses suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2317. The actions of the Metrc Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

2318. Wherefore, Plaintiff requests this Court enter judgment against Defendants Mattingly and Metrc, LLC in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

### XI. FACTS AND CLAIMS REGARDING DEFENDANTS OMMA, OKLAHOMA FIRE MARSHALL, OKLAHOMA HIGHWAY PATROL, OKLAHOMA CITY, OKLAHOMA CITY POLICE DEPARTMENT, and DANIEL HIGGINBOTTOM (collectively the "OKC Defendants")

**A.  Factual Background: Plaintiff's Claims against OKC Defendants**

2319. At all times mentioned, Daniel Higginbottom was working officially as an employee of Oklahoma City and the Oklahoma City Police Department.

2320. The Oklahoma State Fire Marshall noticed the public of its intent to conduct a public meeting regarding regulations it intended to adopt related to medical marijuana businesses.

2321. The Oklahoma State Fire Marshall is subject to the Oklahoma Open Meetings Act as outlined above.

2322. Plaintiff traveled to Oklahoma City to attend the public meeting.

2323.  The meeting was held in conjunction with Defendant OMMA and at the building where
OMMA resides.

2324.  Even though there are thousands of medical marijuana businesses, the State Fire Marshall
and OMMA scheduled the public meeting in a room that held less than fifty (50) people.

2325.  The OMMA and State Fire Marshall intentionally picked the meeting room to restrict the
number of citizens which could attend the public meeting.

2326.  Additionally, the State Fire Marshall filled the room with its employees to further limit the
public's ability to attend the public hearing.

2327.  The OMMA and Oklahoma Highway Patrol locked members of the public out of the building
and prohibited the public from attending the public hearing.

2328.  Plaintiff and approximately one hundred (100) members of the public were locked out in the
March cold outside the building during the public meeting.

2329.  The OKC Defendants took no reasonable steps to broadcast the public meeting or provide
spill over coverage of the meeting so the public could attend.

2330.  The Fire Marshall Meeting resulted in the adoption of administrative regulations of the
Oklahoma State Fire Marshall without allowing for the required public comment of those
attending to make comments.

2331.  Plaintiff was locked out of the building and requested that someone call the Oklahoma City
Police Department so that he and others could report the State Fire Marshall's violation of
the Oklahoma Open Meetings Act, a misdemeanor under Oklahoma law.

2332.  Defendant Daniel Higginbottom arrived on scene as an Oklahoma City Police Officer.

2333.  Defendant Higgenbottom entered the OMMA building and spoke with representatives of the
State Fire Marshall, OMMA, and Oklahoma Highway Patrol.

2334. Defendant Higgenbottom colluded with the OMMA, State Fire Marshall, and Oklahoma Highway Patrol to unlawfully order the crowd to leave public areas of a sidewalk.

2335. Plaintiff tried to file a report with Defendant Higgenbottom, and he refused.

2336. Plaintiff was recording the interaction, and he was there in his capacity as a member of the press working for Guerrilla Publishing, LLC.

2337. Plaintiff, while filming, followed Defendant Higgenbottom to his patrol vehicle via a public sidewalk.

2338. The actions at issue were all captured on bodycam and that bodycam footage is attached hereto as Exhibit "MMM"

2339. The actions at issue were also captured by Plaintiff, and that footage is attached hereto as Exhibit "NNN."

2340. While filming Defendant Higgenbottom during his performance of his job duties as a police officer, Defendant Higgenbottom, without probable cause, unlawfully detained Plaintiff.

2341. Defendant Higgenbottom placed his hands on Plaintiff and put Plaintiff in handcuffs, causing him physical injuries.

2342. Defendant Higgenbottom stated that he detained Plaintiff to check him for warrants.

2343. Defendant Higgenbottom had no probable cause to believe that Plaintiff had any outstanding warrants, and Plaintiff had no outstanding warrants.

2344. Defendant Higgenbottom placed Plaintiff in the back seat of his patrol vehicle while handcuffed.

2345. Defendant Higgenbottom held Plaintiff unlawfully while he ran an unlawful warrant check.

2346. Defendant Higgenbottom interfered with Plaintiff's video recording taken as a member of the press.

2347.  Defendant Higgenbottom deprived Plaintiff of his liberty without cause, and in doing so, caused Plaintiff great emotional distress.

2348.  The OKC Defendants are properly sued directly under 42 U.S.C. § 1983 for their deliberately indifferent unconstitutional decisions, practices, policies, habits, customs, usages, training, derelict supervision, ratification, acquiescence, and intentional failures which directly contributed to and/or caused the complained of constitutional and statutory violations and injuries of Plaintiff.

2349.  As a result of the events, Plaintiff wrists were bruised from the handcuffs, and those injuries were photographically documented.

2350.  Bodycam video shows Defendant Higgenbottom colluded with the other OKC Defendants to deprive Plaintiff of his civil rights and liberty.

2351.  Plaintiff filed a complaint against Defendant with the Oklahoma City Police Department, and the department failed to take any action against Defendant Higgenbottom reflecting a lack of acceptance of responsibility by the OKC Defendants.

2352.  The OKC Defendants failed to properly train and supervise their employees, and that failure resulted in the damages outlined herein.

**B.    CLAIMS FOR RELIEF AGAINST OKC DEFENDANTS**

**B.1.   COUNT 1: Negligence, Gross Negligence, Negligence Per Se**

2353.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2354.  The actions and/or inactions of the OKC Defendants, as fully laid out herein, constitute negligence, gross negligence, and negligence per se.

2355. As a result of the OKC Defendants' negligence, gross negligence, and negligence per se, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2356. The actions and inactions of the OKC Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

2357. Wherefore, Plaintiff requests that this Court enter judgment against the OKC Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.2. COUNT 2- False Imprisonment**

2358. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2359. The OKC Defendants are jointly and severally liable for the actions of the other OKC Defendants.

2360. The actions of all OKC Defendants constitute false imprisonment.

2361. At all times relevant to the facts in this matter, all individual OKC Defendants were acting within the scope and course of their employment and authority with their governmental employer.

2362. The OKC Defendants, jointly and severally, are thereby each liable to Plaintiff for the injuries he suffered.

2363. As a result of the OKC Defendants' false imprisonment, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2364. The actions and inactions of the OKC Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

2365.  Wherefore, Plaintiff requests this Court enter judgment against the OKC Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

### B.3  COUNT 3- Assault and Battery

2366.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2367.  The actions of Defendant Higgenbottom constitute assault and/or battery.

2368.  At all times relevant to the facts in this matter, Defendant Higgenbottom was acting within the scope and course of his employment and authority with their governmental employer.

2369.  All OKC Defendants, are jointly and severally all liable to Plaintiff for the injuries he suffered as a result of the assault and battery including punitive damages, the costs of this action, and a reasonable attorney's fee.

2370.  As a result of Plaintiff's false imprisonment by the OKC Defendants, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2371.  The actions and inactions of the OKC Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

2372.  Wherefore, Plaintiff requests this Court enter judgment against the OKC Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

### B.4 COUNT 4- Intentional Infliction of Emotional Distress

2373.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2374.  The actions of all OKC Defendants were done intentionally and with the intention of causing Plaintiff to experience emotional distress.

2375. The actions of the OKC Defendants constitute intentional infliction of emotional distress on Plaintiff.

2376. All OKC Defendants are therefore liable to Plaintiff for their intentional infliction of emotional distress.

2377. As a result of the intentional infliction of emotional distress of Plaintiff caused by the OKC Defendants, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2378. The actions and inactions of the OKC Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

2379. Wherefore, Plaintiff requests this Court enter judgment against the OKC Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.5 COUNT 5- Civil Rights Violations (42 U.S.C. 1983).**

2380. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2381. All OKC Defendants, at all times relevant hereto, were acting under the color of state law.

2382. At all times relevant hereto, OKC Defendants were acting pursuant to the custom, policy, decisions, ordinances, regulations, widespread habit, usage, and/or practice of the other listed OKC Defendants in their actions pertaining to Plaintiff.

2383. At the time of the events at issue in this matter, Plaintiff had the clearly established constitutional right to be free from the violation of his constitutional rights including but not limited to, freedom of speech, freedom of press, freedom from unreasonable search and seizure, freedom from false imprisonment, and freedom from brutalization during a false arrest.

2384.  Any reasonable person in the roles of the OKC Defendants knew, or should have known, of Plaintiff's rights at the time of the incident at issue in this matter as they were clearly established at that time.

2385.  The OKC Defendants violated Plaintiff's First, Fourth and Fourteenth Amendment rights.

2386.  The OKC Defendants engaged in the conduct described herein willfully, maliciously, in bad faith, and in reckless disregard of Plaintiff's federally protected constitutional rights.

2387.  The unlawful detention of Plaintiff was malicious, shocking, and objectively unreasonable in light of the circumstances.

2388.  The acts and/or omissions of the OKC Defendants intentionally deprived Plaintiff of his constitutional and statutory rights and caused him to suffer damages.

2389.  The OKC Defendants are not entitled to qualified immunity for the conduct at issue in this matter.

2390.  As a result of the violation of Plaintiff's constitutional rights by the OKC Defendants, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2391.  The actions and inactions of the OKC Defendants in violation of Plaintiff's rights warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

2392.  Wherefore, Plaintiff requests this Court enter judgment against the OKC Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00)

**B.6 COUNT 6- Violation of 42 U.S.C. 1983- Deliberately Indifferent Policies, Practices, Customs, Training, and Supervision in violation of the Fourth, Fourteenth, and First Amendments.**

2393.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2394. At the time of the events at issue in this matter, Plaintiff had clearly established rights regarding his right to record from publicly accessible areas of a public sidewalk on the grounds of the Oklahoma Capitol complex.

2395. All OKC Defendants knew and/or should have known of these rights at the time of the incident at issue in this matter as they were clearly established at that time.

2396. The acts and/or omissions of these OKC Defendants, as described herein, deprived Plaintiff of his constitutional and statutory rights and caused him to suffer damages.

2397. Defendants are not entitled to qualified immunity for the conduct at issue in this matter.

2398. Defendant Oklahoma City and Oklahoma City Police Department, at all times relevant herein, were the policymakers which employed Defendant Higgenbottom, and in that capacity established policies, procedures, customs, and practices for the same.

2399. All OKC Defendants are liable under 42 U.S.C. § 1983 for failing to supervise and train their employees, and for overlooking and covering up misconduct.

2400. The OKC Defendants developed and maintained policies, procedures, customs, and/or practices exhibiting deliberate indifference to the constitutional rights of citizens, and these policies, procedures, customs, and/or practices were the actual and/or proximate cause of the violation of Plaintiff's constitutional and federal rights as set forth herein.

2401. In light of the foregoing, OKC Defendants' acts and omissions constitute a violation of Plaintiff's constitutionally and federally protected rights and constitute gross negligence and/or deliberate and conscious indifference to the rights, safety, and welfare of Plaintiff.

2402. As a result of the violation of Plaintiff's constitutional rights by the TCSO Defendants related to their deliberately indifferent practices, Plaintiff suffered economic and non-economic

damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2403. The actions and inactions of the OKC Defendants in violation of Plaintiff's rights caused by the negligent practices of the OKC Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

2404. Wherefore, Plaintiff requests this Court enter judgment against the OKC Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.7  COUNT 7- Negligent Hiring and Supervision of Individual Defendants**

2405. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2406. All OKC Defendants owned, controlled and/or managed the employed individual OKC Defendants.

2407. Oklahoma recognizes a tort for the negligent hiring and supervision of employees.

2408. At the time the OKC Defendants hired the individual OKC Defendants, the OKC Defendants knew and/or should have known that they posed a risk to the persons they came in contact within their official capacities, but the OKC Defendants nonetheless proceeded to hire and retain the individual OKC Defendants, acting with conscious indifference to the rights, safety, and welfare of others, including Plaintiff.

2409. The aforementioned acts and/or omissions, singularly or in any combination thereof, rise to the level of negligent hiring, retention, and/or supervision of the individual OKC Defendants by the other governmental entity OKC Defendants.

2410. The OKC Defendants' acts and/or omissions, when viewed objectively, involved an extreme

and/or unnecessary degree of risk considering the probability and/or magnitude of harm to others.

2411. The OKC Defendants had actual and/or subjective awareness of the risk involved in hiring and retaining the individual Defendants, but nevertheless proceeded with conscious indifference to the rights, safety and welfare of others when they hired and retained the individual OKC Defendants.

2412. Therefore, the OKC Defendants are liable for the negligent hiring, retention, and/or supervision of the individual OKC Defendants, and Plaintiff is entitled to recover from OKC Defendants all damages he sustained as a result of the acts and/or omissions of the individual OKC Defendants.

2413. As a result of the negligent hiring and supervision by all OKC Defendants, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2414. The negligent hiring and supervision practices by all OKC Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

2415. Wherefore, Plaintiff requests this Court enter judgment against all OKC Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

**B.8 COUNT 8- Violation of Oklahoma Open Meeting Act**

2416. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2417. Defendant Oklahoma State Fire Marshall violated the Oklahoma Open Meeting Act by locking members of the public out of a public meeting with public comments.

2418.  Defendant Oklahoma State Fire Marshall violated the Oklahoma Open Meetings Act by adopting regulations without a public hearing and public comment.

2419.  Plaintiff is entitled to declaratory judgment that Defendant Oklahoma Fire Marshall violated the Oklahoma Open Meetings Act.

2420.  Plaintiff is entitled to declaratory judgment that all regulations adopted by Defendant Oklahoma Fire Marshall in violation of the Oklahoma Open Meetings Act are invalid.

2421.  Plaintiff is entitled to injunctive relief ordering Defendants to NOT enforce the improperly adopted regulations in violation of the Oklahoma Open Meetings Act.

**B.9 COUNT 9- Respondeat Superior**

2422.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2423.  At the time of the incident, all individual OKC Defendants were employees, agents, and/or servants of the non-individual OKC Defendants, and the individual OKC Defendants were acting within the course and scope of their employment with the non-individual OKC Defendants at the time of the incident at issue in this matter. As such, the non-individual OKC Defendants are jointly and severally responsible for the conduct of the individual Defendants under the doctrine of *respondeat superior* due to the master-servant relationship which existed at the time of the incident at issue in this matter.

2424.  The actions of all OKC Defendants warrant the imposition of punitive damages in this matter in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2425.  Wherefore, Plaintiff requests this Court enter judgment against all OKC Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

XII. **FACTS AND CLAIMS AGAINST DEFENDANTS VOJISLAV HRISTOV AND OBA DEFENDANTS**

A. **Facts about Defendant Vojislav Hristov and Defendant OBA Defendants**

2426. Defendant Vojislav Hristov used Jones Brown Law Firm, Logan Jones, and Eric Brown to submit fraudulent documents to the OMMA and OBNDD to obtain a marijuana grower license.

2427. Defendant Hristov obtained those licenses fraudulently, and without telling his employees, he hired and employed individuals to work at the grow.

2428. The OBNDD discovered Hristov's fraud, and raided one of his marijuana grows.

2429. At the time of the raid, Hristov's lead grower and his girlfriend were at the grow property.

2430. The individuals were arrested by the OBNDD for, among other things, unlawful cultivation and possession of marijuana.

2431. Defendant Hristov, through Jake Hollingshead, contacted Plaintiff about representing the grower and his girlfriend who were arrested.

2432. At the time, Hristov was not charged with any crime, and he and Plaintiff did not know if he would be charged.

2433. Hristov paid $7,500.00 toward the representation of the grower and his girlfriend.

2434. Defendant Hristov WAS NEVER A CLIENT of Plaintiff, and Plaintiff made clear at the meeting that he could not represent Hristov in the event he was charged in the future due to potential conflict of interest.

2435. Plaintiff informed Hristov that he would not share any information about the case with Hristov without the consent of his clients.

2436. Plaintiff immediately undertook the representation of the arrested individuals, and those individuals were extremely pleased with Plaintiff's representation.

2437. Eventually, OBNDD charged Hristov, and Hristov contacted Plaintiff about representing him.

2438. Plaintiff again explained to Hristov he could not represent him due to conflict of interest, and Plaintiff helped Hristov find another attorney.

2439. Defendant Hristov became upset Plaintiff would not represent him and demanded return of the $7,500.00 he paid toward the representation of the other defendants.

2440. Plaintiff refused to return the monies as he earned the money during his representation of the clients he was hired to represent.

2441. Hristov threatened to file a bar complaint against Plaintiff, knowing full well that he was not and never was a client, to coerce Plaintiff to give him back the $7,500.00.

2442. Apparently, Hristov was in a financial situation, and demanded the money not because it was owed, but because he had no other source of income at the time.

2443. Plaintiff again refused.

2444. Hristov flied a bar complaint with Defendant OBA making false allegations which he knew and/or should have known were untrue at the time they were made.

2445. Even though Plaintiff provided the contact information for Jake Hollingshead, who arranged Plaintiff's hiring and was present at all meetings, Defendant OBA failed to contact him, and instead, improperly took Hristov's statements as true.

2446. As a result of Hristov's false statements, Defendant OBA Defendants suspended Plaintiff's license, causing Plaintiff to lose his career and law firm.

**B.      Claims Against Defendants Vojislav Hristov and Defendant OBA Defendants**

**B.1.   COUNT 1: Negligence, Gross Negligence, Defamation, Libel and Slander**

2447. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2448. Defendant Hristov made false statements against Plaintiff to others.

2449. Defendant OBA Defendants knew and/or should have known that the statements were false, but despite such knowledge, he chose to treat them as true to settle his vendetta against Plaintiff for properly refusing to return money he paid toward the representation of others.

2450. Hristov and Defendant OBA Defendants knew and/or should have known their statements about Plaintiff were false at the time they made them, and that such false statements would harm Plaintiff.

2451. The statements of Hristov, improperly adopted by Defendant OBA, constitute negligence, gross negligence, and negligence per se.

2452. The knowingly false and negligent statements directly led to harm of Plaintiff and forever wrongfully tarnished his reputation in the community.

2453. As a result of the actions of Hristov and OBA Defendants, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2454. The acts by Hristov and Defendant OBA Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

2455. Wherefore, Plaintiff requests this Court enter judgment against all Hristov and Defendant OBA Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

XIII.   **FACTS AND CLAIMS AGAINST DEFENDANTS ANTHONY SMITH, JOHN FRASURE, and CHAD BIBLER**

A.   **Facts about Defendants Anthony Smith, John Frasure, and Chad Bibler**

2456.   Since Defendant OBA initiated its action against Plaintiff, Defendants Anthony Smith, John Frasure, and Chad Bibler began making inflammatory and false statements about Plaintiff knowing that the statements about Plaintiff were false.

2457.   Defendants Smith and Frasure borrowed high-end cinema camera equipment from Plaintiff.

2458.   Plaintiff loaned Defendants Smith and Frasure camera equipment, lenses, microphones, camera stands and accessories valued in excess of $10,000.00.

2459.   Defendants Smith and Frasure refuse to return Plaintiff's equipment, and their failure resulted in Plaintiff being unable to complete work causing him economic damages.

2460.   Defendants Smith, Frasure, and Bibler (the "Smith Defendants"), after Plaintiff demanded the return of his equipment, began making false public statements about Plaintiff on social media stating Plaintiff donated the equipment to Frasure.

2461.   Plaintiff possesses text messages and other evidence showing those statements to be absolute lies, and such lies made publicly caused Plaintiff reputational damages.

2462.   The Smith Defendant's failure to return Plaintiff's equipment caused Plaintiff to suffer a loss of income and business opportunities.

2463.   Defendant Bibler and Smith further publicly posted accusing Plaintiff of being an undercover informant for the OBNDD and federal government.

2464.   The false statements of Bibler and Smith were done knowing that Plaintiff NEVER worked for any governmental entity in his life.

2465.   The false statements of Bibler and Smith caused Plaintiff economic and non-economic damages and reputational harm.

2466. Plaintiff demanded that the Smith Defendants cease and desist from making false public statements about Plaintiff, but they refused and continue to public such false statements.

**B.    Claims Against Smith Defendants**

**B.1.   COUNT 1: Conversion, Trespass to Chattel, Larceny, Grand Larceny, Negligence, Gross Negligence, Defamation, Libel and Slander**

2467. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2468. The Smith Defendants made false statements against Plaintiff to others.

2469. The Smith Defendants knew and/or should have known that the statements were false, but despite such knowledge, they chose to treat them as true to settle their personal vendetta against Plaintiff.

2470. The Smith Defendants knew and/or should have known that their statements about Plaintiff were false at the time they made them, and that such false statements would harm Plaintiff.

2471. The statements of the Smith Defendants constitute negligence, gross negligence, and negligence per se.

2472. The statements of the Smith Defendants constitute defamation, libel, and slander.

2473. The actions of the Smith Defendants in depriving Plaintiff of his property constitutes conversion, trespass to chattel, larceny, and grand larceny.

2474. The actions and inactions of the Smith Defendants directly led to harm of Plaintiff and forever wrongfully tarnished his reputation in the community.

2475. As a result of the actions of the Smith Defendants, Plaintiff suffered economic and non-

economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2476.   The acts the Smith Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages in excess of two million five hundred thousand dollars ($2,500,000.00).

2477.   Wherefore, Plaintiff requests this Court enter judgment against all Smith Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

### XIV.   FACTS AND CLAIMS AGAINST DEFENDANTS CARRI LAWRENCE, WALLACE LAWRENCE, HIVE STAFFING, LLC d/b/a CHRONIC DOCS, and HONEY COMB HOLDING INVESTMENTS, LLC (the "Lawrence Defendants")

### A.   Facts about Lawrence Defendants

2478.   Since Defendant OBA initiated its action against Plaintiff, the Lawrence Defendants saw an opportunity to take advantage of Plaintiff because he was not in a position to defend himself.

2479.   The Lawrence Defendants borrowed high end mixed martial arts equipment from Plaintiff on behalf of the other Lawrence Defendants, including a mixed martial arts cage used for conducting public mixed martial arts events.

2480.   Plaintiff loaned the Lawrence Defendants the equipment with the promise that they would compensate Plaintiff with fifty percent (50%) of their revenue.

2481.   Plaintiff loaned the equipment, valued in excess $25,000.00, and promised to return the equipment upon demand by Plaintiff for return of the equipment.

2482.   Plaintiff requested the Lawrence Defendants compensate him as promised, and they refused to do so.

2483.   Plaintiff requested the Lawrence Defendants return his equipment so he could use them for events, which they refused.

2484. Plaintiff, due to the failure of the Lawrence Defendants to return the equipment, caused Plaintiff to lose income and revenue from fight promotions he intended and could not conduct without the equipment.

2485. The Lawrence Defendants, after refusing to return the equipment, became upset when Plaintiff published that they were holding his equipment hostage.

2486. The Lawrence Defendants then began making false and defamatory statements about Plaintiff publicly regarding the false OBA claims against Plaintiff, causing Plaintiff to suffer damages.

2487. The Lawrence Defendants knew and/or should have known that their statements were false at the time they made them.

2488. The Lawrence Defendants interfered with Plaintiff's business relationships on Black Wall Street using false information.

2489. The Lawrence Defendants continue to refuse to return Plaintiff's equipment, and their failure resulted in Plaintiff being unable to complete work causing him economic damages.

2490. Plaintiff possesses text messages and other evidence showing those statements to be absolute lies, and such lies made publicly caused Plaintiff reputational damages.

2491. The Lawrence Defendant's failure to return Plaintiff's equipment caused Plaintiff to suffer a loss of income and loss of business opportunities.

2492. Plaintiff demanded that the Lawrence Defendants cease and desist from making false public statements about Plaintiff, but they refused and continue to public such false statements.

**B.     Claims Against Lawrence Defendants**

**B.1.   COUNT 1: Conversion, Trespass to Chattel, Tortious Interference with Contractual Relations, Larceny, Grand Larceny, Negligence, Gross Negligence, Defamation, Libel and Slander**

2493. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2494. The Lawrence Defendants made false statements about Plaintiff to others.

2495. The Lawrence Defendants knew and/or should have known that the statements were false, but despite such knowledge, they chose to treat them as true to settle their personal vendetta against Plaintiff.

2496. The Lawrence Defendants knew and/or should have known that their statements about Plaintiff were false at the time they made them, and that such false statements would harm Plaintiff.

2497. The statements of the Lawrence Defendants constitute negligence, gross negligence, and negligence per se.

2498. The statements of the Lawrence Defendants constitute defamation, libel, and slander.

2499. The actions of the Lawrence Defendants in depriving Plaintiff of his property constitutes conversion, trespass to chattel, larceny, and grand larceny.

2500. The actions and inactions of the Lawrence Defendants directly led to harm of Plaintiff and forever wrongfully tarnished his reputation in the community.

2501. The actions of the Lawrence Defendants constitution tortious interference with Plaintiff's contractual relationships.

2502. As a result of the actions of the Lawrence Defendants, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars

($2,500,000.00).

2503.   The acts of the Lawrence Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2504.   Wherefore, Plaintiff requests this Court enter judgment against all Lawrence Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

## XV. FACTS AND CLAIMS AGAINST DEFENDANTS HEATHER KIRK COLLINS AND CHAD COLLINS

### B. Facts about the Collins Defendants

2505.   Since Defendant OBA initiated its action against Plaintiff, the Collins Defendants saw an opportunity to take advantage of Plaintiff.

2506.   The Collins Defendants stole tens of thousands of dollars from Plaintiff over the course of six (6) months as Plaintiff focused on winding up his legal practice resulting from his improper suspension by Defendant OBA.

2507.   When Plaintiff learned of the theft of money from Plaintiff, he terminated his relationship with Plaintiff.

2508.   After Plaintiff terminated his relationship with the Collins Defendants, they engaged in a pattern of false and libelous conduct to try and steal business from Plaintiff, and their actions resulted in Plaintiff losing business.

2509.   The Collins Defendants additional used inside information of Plaintiff to steal consulting clients of Plaintiff causing him economic harm and lost business opportunities.

2510.   Plaintiff possesses text messages and other evidence showing those statements addressed above to be absolute lies, and such lies made publicly caused Plaintiff reputational damages.

2511. Plaintiff demanded the Collins Defendants cease and desist from making false public statements about Plaintiff, but they refused and continue to public such false statements.

**B.    Claims Against the Collins Defendants**

**B.1.   COUNT 1: Conversion, Larceny, Grand Larceny, Tortious Interference with Business Relations, Negligence, Gross Negligence, Defamation, Libel and Slander**

2512. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2513. The Collins Defendants made false statements about Plaintiff to others.

2514. The Collins Defendants knew and/or should have known that the statements were false, but despite such knowledge, they chose to treat them as true to settle their personal vendetta against Plaintiff.

2515. The Collins Defendants knew and/or should have known their statements about Plaintiff were false at the time they made them, and that such false statements would harm Plaintiff.

2516. The statements of the Collins Defendants constitute negligence, gross negligence, and negligence per se.

2517. The actions of the Collins Defendants constitute tortious interference with business relationships of Plaintiff.

2518. The statements of the Collins Defendants constitute defamation, libel, and slander.

2519. The actions of the Collins Defendants in depriving Plaintiff of his property constitutes conversion, trespass to chattel, larceny, and grand larceny.

2520. The actions and inactions of the Collins Defendants directly led to harm of Plaintiff and

forever wrongfully tarnished his reputation in the community.

2521. As a result of the actions of the Collins Defendants, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2522. The acts the Collins Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2523. Wherefore, Plaintiff requests this Court enter judgment against all Collins Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

### XVI. FACTS AND CLAIMS AGAINST DEFENDANTS OKLAHOMA COUNTY DISTRICT ATTORNEY'S OFFICE, and VICKI BEHENNA (the "Behenna Defendants").

**A.    Facts about the Behenna Defendants**

2524. The facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2525. Plaintiff, while working in his capacity as a journalist, traveled to the Oklahoma county Courthouse.

2526. Plaintiff reviewed twenty (20) criminal case files with the Oklahoma County Court Clerk, and in doing so, noticed that the Behenna Defendants were not redacting personal information about criminal defendants by publishing their name, date of birth, address, height, weight, and social security numbers.

2527. Plaintiff discussed the matter with the Oklahoma County Court Clerk, and they suggested that Plaintiff bring the matter to the attention of the Behenna Defendants.

2528. Plaintiff traveled to the PUBLIC offices of the Behenna Defendants.

2529. While in the lobby of the building, Plaintiff encountered an employee of the Behenna Defendants, who directed him upstairs to the offices of Defendant Oklahoma County District Attorney.

2530. Plaintiff traveled with other reporters upstairs in a readily accessible elevator.

2531. Plaintiff arrived at the doors of the Defendant Oklahoma County District Attorney, and Plaintiff rang the bell.

2532. Employees of the Behenna Defendant granted Plaintiff by buzzing him and those with him into the offices of the District Attorney.

2533. Upon going inside, Plaintiff tried to make an appointment with the Behenna Defendants, and he informed the employees of the reason for the visit related to the public information in the criminal files.

2534. Plaintiff departed thereafter.

2535. After his visit, the Behenna Defendants filed a bar complaint against Plaintiff for him engaging in constitutionally protected activities.

2536. The statements by the Behenna Defendants were false at the time they were made, and the Behenna Defendants knew and/or should have known that their statements were false.

2537. The Behenna Defendants actions were in retaliation for Plaintiff exercising his right to freedom of speech and press.

2538. As a result of their false and salacious claims, Defendant OBA Defendants suspended Plaintiff, causing him great emotional distress and economic damages.

## B.    Claims Against the Behenna Defendants

## B.1.    COUNT 1: Negligence, Gross Negligence, Defamation, Libel and Slander, Violation of Plaintiff's Civil Rights

2539.    All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2540.    The Behenna Defendants made false statements about Plaintiff to others, including Defendant OBA.

2541.    The Behenna Defendants knew and/or should have known that the statements were false, but despite such knowledge, they chose to treat them as true to settle their personal vendetta against Plaintiff.

2542.    The Behenna Defendants knew and/or should have known that their statements about Plaintiff were false at the time they made them, and that such false statements would harm Plaintiff.

2543.    The statements of the Behenna Defendants constitute negligence, gross negligence, and negligence per se.

2544.    The statements of the Behenna Defendants constitute defamation, libel, and slander.

2545.    The actions of the Behenna Defendants were an attempt to punish Plaintiff for exercising his 1st Amendment rights, and such actions violate Plaintiff's rights pursuant to the United States Constitution and 42 U.S.C. § 1983.

2546.    The actions and inactions of the Behenna Defendants directly led to harm of Plaintiff and forever wrongfully tarnished his reputation in the community.

2547. As a result of the actions of the Behenna Defendants, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2548. The acts the Behenna Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages.

2549. Wherefore, Plaintiff requests this Court enter judgment against the Behenna Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

### XVII. FACTS AND CLAIMS AGAINST DEFENDANTS TAYLOR BURKE, BARBER & BARTZ, and KURT GLASSCO and (the "Burk Defendants").

#### A. Facts about the Burke Defendants

2550. The facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2551. Plaintiff, while working in his capacity as an attorney, represented clients against Taylor Burke.

2552. Plaintiff also appeared in front of Defendant Kurt Glassco.

2553. Defendant Kurt Glassco solicited bribes from Plaintiff, which Plaintiff refused to deliver.

2554. During Plaintiff's representation of a client, he sought the recusal of Glassco for improper conduct related to the matter and for improper treatment of female attorneys.

2555. Defendant Taylor Burke is a friend of Defendant Glassco, and upon information and belief, bribes Glassco for favorable treatment.

2556. Defendant Glassco became upset with Plaintiff, but he recused from the case because he knew that Plaintiff could establish his improper conduct.

2557.  Defendant Glassco, in open court, encouraged Defendant Burke to avenge him by filing a bar complaint against Plaintiff.

2558.  Plaintiff represented another individual in a case with Defendant Burke representing the other party.

2559.  After beating Defendant Burke in that matter, Defendant Burke, on his own behalf and on behalf of Defendant Glassco, filed a bar complaint against Plaintiff containing false statements to harm Plaintiff.

2560.  The Burke Defendants actions caused Plaintiff damages, and Defendant OBA, treating all Burke allegations as true despite knowing them to be untrue, suspended Plaintiff.

2561.  At the time of the false allegations, Defendant Burke acted as an agent and/or employee of Barber & Bartz, a professional corporation.

2562.  The Burke Defendants acted in conspiracy with one another to obtain improper punishment of Plaintiff via a bar complaint containing false allegations.

2563.  The statements by Burke Defendants were false at the time they were made, and the Burke Defendants knew and/or should have known that their statements were false.

2564.  As a result of their false and salacious claims, OBA Defendants suspended Plaintiff, causing him great emotional distress and economic damages.

**B.    Claims Against the Burke Defendants and OBA Defendants**

**B.1.    COUNT 1: Negligence, Gross Negligence, Defamation, Libel, Slander, Violation of Plaintiff's Civil Rights**

2565.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2566.  The Burke Defendants made false statements about Plaintiff to others, including Defendant OBA.

2567. The Burke Defendants knew and/or should have known that the statements were false, but despite such knowledge, they chose to treat them as true to settle their personal vendetta against Plaintiff.

2568. The Burke Defendants knew and/or should have known that their statements about Plaintiff were false at the time they made them, and that such false statements would harm Plaintiff.

2569. The statements of the Burke Defendants constitute negligence, gross negligence, and negligence per se.

2570. The statements of the Burke Defendants constitute defamation, libel, and slander.

2571. The actions of the Burke Defendants were an attempt to punish Plaintiff for exercising his 1st Amendment rights, and such actions violate Plaintiff's rights pursuant to the United States Constitution and 42 U.S.C. § 1983.

2572. The actions and inactions of the Burke and OBA Defendants directly led to harm of Plaintiff and forever wrongfully tarnished his reputation in the community.

2573. As a result of the actions of the Burke and OBA Defendants, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2574. The acts the Burke and OBA Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2575. Wherefore, Plaintiff requests this Court enter judgment against the Burke Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

## XVIII. FACTS AND CLAIMS AGAINST DEFENDANT DOUG PEWITT, INDIVIDUALLY AND AS DISTRICT ATTORNEY FOR DELAWARE AND COUNTY AND DEFENDANT OBA DEFENDANTS

### A. Facts about the Pewitt Defendants.

2576. The facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2577. The Pewitt Defendant's bar complaint against Plaintiff, containing false statements, was filed to harm Plaintiff.

2578. The Pewitt Defendants actions caused Plaintiff damages, and Defendant OBA, treating all of the Pewitt allegations as true despite knowing them to be false, suspended Plaintiff's license to practice law.

2579. At the time of the false allegations, Defendant Stinson acted individually and acted as an agent and/or employee of the Ottawa and Delaware County District Attorney's Office.

2580. The Pewitt Defendants acted in conspiracy with one another to obtain improper punishment of Plaintiff via a bar complaint containing false allegations.

2581. The statements by the Pewitt Defendants were false at the time they were made, and they knew and/or should have known that their statements were false.

2582. As a result of Pewitt's false and salacious claims, OBA Defendants suspended Plaintiff, causing him great emotional distress and economic damages.

### B. Claims Against the Pewitt Defendants and OBA Defendants

### B.1. COUNT 1- Negligence, Gross Negligence, Defamation, Libel, Slander, Violation of Plaintiff's Civil Rights

2583.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2584.  The Pewitt Defendants made false statements about Plaintiff to others, including Defendant OBA.

2585.  The Pewitt Defendants knew and/or should have known that the statements were false, but despite such knowledge, they chose to treat them as true to settle their personal vendetta against Plaintiff.

2586.  The Pewit Defendants knew and/or should have known that their statements about Plaintiff were false at the time they made them, and that such false statements would harm Plaintiff.

2587.  The statements of the Pewitt Defendants constitute negligence, gross negligence, and negligence per se.

2588.  The statements of the Pewitt Defendants constitute defamation, libel, and slander.

2589.  The actions of the Pewitt Defendants were an attempt to punish Plaintiff for exercising his 1st Amendment rights, and such actions violate Plaintiff's rights pursuant to the United States Constitution and 42 U.S.C. § 1983.

2590.  The actions and inactions of the Pewitt and OBA Defendants directly led to harm of Plaintiff and forever wrongfully tarnished his reputation in the community.

2591.  As a result of the actions of the Pewitt and OBA Defendants, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2592. The acts the Pewitt and OBA Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2593. Wherefore, Plaintiff requests this Court enter judgment against the Pewitt Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

## XIX.    FACTS AND CLAIMS AGAINST DEFENDANTS SHEILA D. STINSON and 7th JUDICIAL DISTRICT OF THE STATE OF OKLAHOMA. (the "Stinson Defendants").

### A.    Facts about the Stinson Defendants.

2594. The facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2595. The Stinson Defendant's bar complaint against Plaintiff, containing false statements, was filed to harm Plaintiff.

2596. The Stinson Defendants actions caused Plaintiff damages, and Defendant OBA, treating all of the Stinson allegations as true, suspended Plaintiff's license to practice law.

2597. The Stinson Defendant's statements about Plaintiff were false at the time they were made, and the Stinson Defendants made them knowing they were false and would cause Plaintiff damages.

2598. At the time of the false allegations, Defendant Stinson acted individually and acted as an agent and/or employee of the 7th Judicial District.

2599. The Stinson Defendants acted in conspiracy with one another to obtain improper punishment of Plaintiff via a bar complaint containing false allegations.

2600. The statements by the Stinson Defendants were false at the time they were made, and they knew and/or should have known that their statements were false.

2601.  As a result of their false and salacious claims, Defendant OBA Defendants suspended Plaintiff, causing him great emotional distress and economic damages.

**B.     Claims Against the Stinson Defendants and OBA Defendants**

**B.1.    COUNT 1: Negligence, Gross Negligence, Defamation, Libel, Slander, Violation of Plaintiff's Civil Rights**

2602.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2603.  The Stinson Defendants made false statements about Plaintiff to others, including Defendant OBA.

2604.  The Stinson Defendants knew and/or should have known that the statements were false, but despite such knowledge, they chose to treat them as true to settle their personal vendetta against Plaintiff.

2605.  The Stinson Defendants knew and/or should have known that their statements about Plaintiff were false at the time they made them, and that such false statements would harm Plaintiff.

2606.  The statements of the Stinson Defendants constitute negligence, gross negligence, and negligence per se.

2607.  The statements of the Stinson Defendants constitute defamation, libel, and slander.

2608.  The actions of the Stinson Defendants were an attempt to punish Plaintiff for exercising his 1st Amendment rights, and such actions violate Plaintiff's rights pursuant to the United States Constitution and 42 U.S.C. § 1983.

2609.  The actions and inactions of the Stinson and OBA Defendants directly led to harm of Plaintiff

and forever wrongfully tarnished his reputation in the community.

2610.  As a result of the actions of the Stinson and OBA Defendants, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2611.  The acts the Stinson and OBA Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2612.  Wherefore, Plaintiff requests this Court enter judgment against the Stinson Defendants in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

## XX.    FACTS AND CLAIMS AGAINST DEFENDANTS ANTHONY BRIXEY, JOSEPH LANTZ, and TJB RESTRICTED HOLDINGS, LLC (the "Brixey Defendants")

### A.    Facts about the Brixey Defendants.

2613.  The facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2614.  The Brixey Defendants bar complaint against Plaintiff, containing false statements, was filed in an effort to harm Plaintiff.

2615.  The Brixey Defendants actions caused Plaintiff damages, and Defendant OBA, treating all of the Brixey allegations as true, suspended Plaintiff's license to practice law.

2616.  The Brixey Defendant's statements about Plaintiff were false at the time they were made, and the Brixey Defendants made them knowing they were false and would cause Plaintiff damages.

2617.  The Brixey Defendants acted in conspiracy with one another to obtain improper punishment of Plaintiff via a bar complaint containing false allegations.

2618.  The statements by the Brixey Defendants were false at the time they were made, and they
       knew and/or should have known that their statements were false.

2619.  The statements by the Brixey Defendants were made from their anger that Plaintiff refused
       to continue representing them for free.

2620.  As a result of the Brixey Defendants false and salacious claims, Defendant OBA Defendants
       suspended Plaintiff, causing him great emotional distress and economic damages.

**B.      Claims Against the Brixey Defendants and OBA Defendants**

**B.1.   COUNT 1: Negligence, Gross Negligence, Defamation, Libel, and Slander**

2621.  All of the facts and allegations laid out in this Complaint, including the Exhibits attached
       hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2622.  The Brixey Defendants made false statements about Plaintiff to others, including Defendant
       OBA.

2623.  The Brixey Defendants knew and/or should have known that the statements were false, but
       despite such knowledge, they chose to treat them as true to settle their personal vendetta
       against Plaintiff.

2624.  After Defendant TJB was discovered to be acting in violation of Oklahoma law, they lost
       their business.

2625.  Plaintiff felt bad for Joseph Lantz, one of the owners of Defendant TJB, and Plaintiff gave
       Defendant Brixey a job working for Plaintiff.

2626.  The Brixey Defendants were additionally upset because Plaintiff terminated the employment
       of Defendant Joseph Lantz when Plaintiff learned that Lantz was improperly collecting a
       paycheck for work despite not performing the work.

2627. The actions of Defendant Lantz constitute unjust enrichment, and he should be ordered to
return all ill-gotten gains obtained wrongfully from Plaintiff.

2628. The Brixey Defendants knew and/or should have known that their statements about Plaintiff
were false at the time they made them, and that such false statements would harm Plaintiff.

2629. The Brixey Defendants each conspired and acted in concert with one another to cause
Plaintiff damages.

2630. The statements of the Brixey Defendants constitute negligence, gross negligence, and
negligence per se.

2631. The statements of the Brixey Defendants constitute defamation, libel, and slander.

2632. The actions and inactions of the Brixey Defendants and OBA Defendants directly led to harm
of Plaintiff and forever wrongfully tarnished his reputation in the community.

2633. As a result of the actions of the Brixey and OBA Defendants, Plaintiff suffered economic
and non-economic damages in an amount in excess of two million five hundred thousand
dollars ($2,500,000.00).

2634. The acts of the Brixey Defendants warrant the imposition of punitive damages, and Plaintiff
requests punitive damages.

2635. Wherefore, Plaintiff requests this Court enter judgment against the Brixey Defendants in an
amount in excess of two million five hundred thousand dollars ($2,500,000.00).

## XXI. <u>FACTS AND CLAIMS AGAINST OKLAHOMA ATTORNEY MUTUAL INSURANCE COMPANY ("OAMIC)</u>

### B. **Facts about Defendant OAMIC.**

2636. The facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2637. Plaintiff purchased insurance from OAMIC in 2009, and he continued that policy until recently.

2638. Plaintiff informed OAMIC of the claims against him at issue herein, and OAMIC failed to take proper action to protect and defend Plaintiff, despite the existing insurance contract between Plaintiff and OAMIC.

2639. The actions of OAMIC constitute breach of their insurance contract with Plaintiff.

2640. The actions of OAMIC constitute bad faith.

2641. The failure of OAMIC to honor its insurance contract with Plaintiff, and thereby they caused Plaintiff substantial economic and non-economic harm.

### B. **Claims Against OAMIC**

### B.1. **COUNT 1: Bad Faith, Breach of Contract, Negligence, Gross Negligence, and Negligence Per Se.**

2642. All of the facts and allegations laid out in this Complaint, including the Exhibits attached hereto, are adopted and incorporated herein by reference as if laid out herein in their entirety.

2643. The actions and/or inactions of OAMIC constitute bad faith, breach of contract, negligence, gross negligence and negligence per se.

2644. As a result of the actions and inactions of OAMIC, Plaintiff suffered economic and non-economic damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2645. The acts of the Brixey Defendants warrant the imposition of punitive damages, and Plaintiff requests punitive damages in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

2646. Wherefore, Plaintiff requests this Court enter judgment against OAMIC in an amount in excess of two million five hundred thousand dollars ($2,500,000.00).

WHEREFORE, Plaintiffs pray for judgment against each Defendant awarding Plaintiff the following:

1. Damages in excess of two million five hundred thousand dollars (2,500,000.00) against all Defendants.

2. Punitive damages against all Defendants in an amount to be determined by the jury but no less than two million five hundred thousand dollars (2,500,000.00);

3. Injunctive Relief as requested above;

4. Declaratory Judgment as requested above;

5. Reasonable interest and costs; and

6. Such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Ronald E. Durbin, II, Pro Se
8703 S Winston Ave
Tulsa, OK 74137

918-346-1755
[ron@guerrillaarmy.com](mailto:ron@guerrillaarmy.com)